# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF KANSAS

**IN RE SPRINT CORPORATION**
**ERISA LITIGATION**

**Case No. 03-2202-JWL**

**This Order Relates to All Cases**

---

## MEMORANDUM AND ORDER

This is a putative class action involving claims of alleged breach of fiduciary duties under the Employee Retirement Income Security Act of 1974, 29 U.S.C. §§ 1000-1461 ("ERISA"). Plaintiffs assert claims as participants in and on behalf of three different retirement savings plans against defendants Sprint Corporation, committees that participated in administering the plans and individual members of those committees, the individual members of Sprint's board of directors, and the third-party trustee for the plans, Fidelity Management Trust Company. The matter is presently before the court on Plaintiffs' Motion for Final Approval of Class Action Settlement (doc. #229) and Plaintiffs' Motion for an Award of Attorneys' Fees and Reimbursement of Expenses and for an Award to the Plaintiffs (doc. #233). For the reasons explained below, the court will finally approve the parties' settlement and award plaintiffs' attorneys' fees and expenses in the amount of $3.9 million out of which $5,000 is to be paid to each of the four named plaintiffs.

## NATURE AND PROCEDURAL HISTORY OF THE CASE

In these consolidated ERISA cases, named plaintiffs Fran Lindholm, Anton P. Spanier, LaVonne M. Easter, and Jeffery M. Snethen allege that defendants breached their fiduciary duties by allowing three of Sprint's defined contribution 401(k) retirement plans to remain so highly invested in Sprint stock during a time period when Sprint stock was an imprudent investment and by failing to disclose material information to plan participants. The defendants include Sprint corporation and various Sprint employees, officers, and directors who were allegedly involved with administering the plans, as well as the third-party trustee for the plans.

Plaintiffs' complaint largely survived defendants' motions to dismiss. *See generally In re Sprint Corp. ERISA Litig.*, Case No. 03-2202-JWL, 2004 WL 2182186, at *1-*7 (D. Kan. Sept. 24, 2004); *In re Sprint Corp. ERISA Litig.*, 388 F. Supp. 2d 1207 (D. Kan. 2004). Plaintiffs then filed a motion for class certification (doc. #83). Before that motion was at issue, the parties announced they had reached an agreement to settle this case. On motion, the court issued an order preliminarily certifying a class for settlement purposes, preliminary approving the proposed settlement, approving the form and dissemination of class notice, and setting the fairness hearing (doc. #223). The court held the initial fairness hearing on May 15, 2006.

On May 17, 2006, the court issued an Order for Supplemental Briefing & Hearing (doc. #244) because the court had significant concerns about some of the issues that had developed at the fairness hearing about which the court did not believe the parties had

2

adequately developed the record—namely, although the court had been aware prior to the fairness hearing that the proposed settlement conferred different types of relief on different categories of plaintiffs, the court had not been aware that those differences created such an arguably significant disparity in the value of the benefits that the proposed settlement would confer on the different categories of employees. The court also noted that the record did not support the requested $15,000 award to each of the named plaintiffs. The court allowed the proponents of the settlement and any objectors who wished to be heard to submit supplemental briefing on those issues and the court set this case for a supplemental hearing on May 26, 2006.

On May 23, 2006, the parties brought to the court's attention the fact that notice of the initial fairness hearing was not mailed to a significant number of absentee class members. After reviewing additional briefing submitted by the parties, the court issued an order (doc. #257) approving the form and dissemination of a supplemental class notice and setting a second fairness hearing for July 26, 2006. The parties and objectors filed additional papers relating to the settlement. The court held the second fairness hearing on July 26, 2006.

The court has evaluated the terms of the proposed settlement, all of the papers submitted by the settlement proponents, the objections asserted by settlement objectors, and the arguments and evidence presented at both the initial fairness hearing and the second fairness hearing. After thorough consideration of the record, the court is now prepared to rule.

## FINAL APPROVAL OF THE PROPOSED SETTLEMENT

The court may approve a settlement on finding that the settlement is "fair, reasonable, and adequate." Fed. R. Civ. P. 23(e)(1)(C). The court's main concern in evaluating the settlement is to ensure that the rights of passive class members are not jeopardized by the proposed settlement. 7B Charles Alan Wright et al., Federal Practice & Procedure §1797.1, at 79 (3d ed. 2005); *see also Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 623 (1997) (noting that the Rule 23(e) inquiry "protects unnamed class members from unjust or unfair settlements affecting their rights when the representatives become fainthearted before the action is adjudicated or are able to secure satisfaction of their individual claims by a compromise"). Moreover, it is generally accepted that where settlement precedes class certification (e.g., approval for settlement and certification are sought simultaneously, as is the case here) district courts must be "even more scrupulous than usual" when examining the fairness of the proposed settlement. *In re Warfarin Sodium Antitrust Litig.*, 391 F.3d 516, 534 (3d Cir. 2004); *accord Hanlon v. Chrysler Corp.*, 150 F.3d 1011, 1026 (9th Cir. 1998); *see also* Manual for Complex Litigation, Fourth § 21.612, at 313 (2004) ("Class actions certified solely for settlement, particularly early in the case, sometimes make meaningful judicial review more difficult and more important. Courts have held that approval of settlement class actions under Rule 23(e) requires closer judicial scrutiny than approval of settlements reached only after class certification has been litigated through the adversary process.").

4

The Tenth Circuit has set forth four non-exclusive factors which this court must consider in evaluating whether the proposed settlement is fair, reasonable, and adequate: (1) whether the proposed settlement was fairly and honestly negotiated; (2) whether serious questions of law and fact exist, placing the ultimate outcome of the litigation in doubt; (3) whether the value of an immediate recovery outweighs the mere possibility of future relief after protracted and expensive litigation; and (4) the judgment of the parties that the settlement is fair and reasonable. *Rutter & Wilbanks Corp. v. Shell Oil Co.*, 314 F.3d 1180, 1188 (10th Cir. 2002). Another factor in this case to which the parties, the court, and the objectors have devoted considerable attention is the extent to which the proposed settlement treats particular segments of the class differently from others not only in terms of the type of relief, but more specifically in terms of the arguably significant disparity in the value of that relief. *See* Manual for Complex Litigation, Fourth § 21.62, at 317 (noting that courts have examined the extent to which "particular segments of the class are treated significantly differently from others"). The proponents of the settlement are responsible for providing sufficient evidence to support a conclusion that the settlement is fair. *Gottlieb v. Wiles*, 11 F.3d 1004, 1015 (10th Cir. 1993).

## I.    The Structure of the Settlement

In the parties' Class Action Settlement Agreement dated February 2, 2006, they agreed to a structured settlement of this litigation. Key to an understanding the structure of the settlement is an understanding of the changes Sprint's corporate structure has undergone since the time when the parties first began serious settlement negotiations. In 2005, the

merger between Sprint and Nextel gained the necessary regulatory and shareholder approvals and became final, culminating in the creation of Sprint Nextel Corporation. As the two companies combined, this provided an opportunity for Sprint to evaluate and restructure its retirement savings plans which are the basis for this lawsuit. At the time of the merger, it was planned that Sprint's Local Telecommunications Division would be spun off from Sprint Nextel into a new, separate company once the necessary approvals were obtained. Ultimately, this resulted in the spin-off of Embarq Corporation in May of 2006. With that spin-off a significant number of the class member plaintiffs became Embarq employees. As a consequence of the spin-off, bargaining unit employees are no longer employed by Sprint; rather, they are employed (if at all) by Embarq. With this background in mind, then, the court will discuss the key components of the settlement agreement.

●   <u>Cash Settlement Fund</u> – Sprint has paid $4,000,000 to a cash settlement fund which is to be paid to the plans and distributed among former plan participant class members according to a plan of allocation. These former plan participants consist of Embarq employees (including those who are subject to collective bargaining agreements with Embarq) as well as former Sprint employees who are no longer with Sprint Nextel or Embarq.

●   <u>Increased Vesting</u> – Effective January 1, 2006, Sprint increased on a pro rata basis the vested amount of matching contributions in the accounts of former employees who were less than 100% vested at the time of separation from Sprint and who remain participants in the three retirement plans at issue in this lawsuit, in a uniform percentage amount which

in the aggregate totals $1.6 million. This aspect of the settlement, then, only pertains to former Sprint employees who remain participants in the plans and who are less than 100% vested.

●    <u>Increased Match</u> – Effective January 1, 2006, and continuing until at least January 1, 2007, Sprint increased its matching contributions to its employees' 401(k) accounts to at least 100% of the first 4% of eligible compensation. The parties had originally estimated the value of the increased match to be $17.9 million, but they later determined this estimated value was incorrect because it was based on the projected amount of the increased match for all legacy Sprint employees,[1] not just those who fall within the class definition. The parties have now estimated this aspect of the settlement to be worth approximately $8.95 million. Only current Sprint employees, not Embarq employees or any other former Sprint employees, benefit from the Increased Match as set forth in the settlement agreement.

●    <u>Plan Amendments</u> – Effective January 1, 2006, and continuing until at least January 1, 2007, Sprint enacted the following plan amendments to its employees' retirement savings plan:

1.)    increased limits on participants' pretax contributions to 80% of eligible compensation;

2.)    immediate vesting of future matching contributions;

---

[1] The term "legacy Sprint employee" is a term of art at Sprint Nextel which refers to employees who were employed by a Sprint subsidiary company and, after the merger, remain employed by a Sprint Nextel subsidiary company except for those companies that became Embarq subsidiaries.

3.)    ability to diversify future matching contributions; and

4.)    unlocking matching contributions previously made by Sprint.

As with the Increased Match, the Plan Amendments only apply to current Sprint employee class members. But, in the settlement agreement, Sprint agrees to use its "best efforts" to implement similar amendments for the retirement savings plans for Embarq employees (which includes those who are subject to collective bargaining agreements with Embarq).

● Participant Communications Improvements – Effective January 1, 2006, Sprint enhanced its online resources and communications to its plan participants and made available seminars and meetings with financial advisors. For former employees, these enhancements include two one-hour financial planning meetings with Ameriprise financial advisors, which Sprint has estimated to have a retail value of approximately $350-$400 to each former employee.

● Settlement Expense Fund – Sprint will pay up to $3.9 million to cover the attorneys' fees of class counsel, litigation costs and expenses (including the costs of class notice, independent fiduciary review of the settlement, and settlement administration), and any awards to the named plaintiffs.

The class members, then, will receive different aspects of the settlement depending on whether they are current or former Sprint employees and, if they are former employees, whether they remain participants in the plans and whether they are 100% vested. All former employees will share in the $4 million Cash Settlement Fund and will receive two one-hour financial planning meetings. Those who are still participants in the plans and who are not

8

100% vested will receive the Increased Vesting. Current Sprint employees, on the other hand, will receive the Increased Match, the Plan Amendments, and the Participant Communications Improvements. Sprint has agreed to use its best efforts to implement similar plan amendments for Embarq employees. All of these aspects of the settlement are net of attorneys' fees and related expenses.

As the parties had originally presented the various terms of the settlement agreement to the court, it appeared there was an arguably significant disparity between the different categories of class members inasmuch as the current Sprint employees seemed to be receiving at least three times (on an average, per-employee basis) the value former employees were receiving. Thus, the court was concerned that Sprint might have been giving favored treatment to its own employees at the expense of its former employees, a significant number of which had just then become former Sprint Nextel employees by virtue of the Embarq spin-off. The arguably significant disparity in the value of relief did not seem to be attributable to any differences in the strength or value of the class members' claims.[2] Since the court voiced these concerns, the parties have focused their attention on the different types of relief being granted to the different categories of plaintiffs. This has been helpful to the court in

---

[2] The court wishes to clarify that it has never stated that the recovery for the different categories of class members must be equal. Furthermore, the court never stated that it would not grant settlement approval notwithstanding these discrepancies. The court was simply of the opinion that the parties had not adequately developed this important issue in their original submissions to the court or at the initial fairness hearing, and the court believed that the disparity was potentially significant enough that it warranted a greater level of attention from the parties in order to allow the court to scrutinize the settlement more meaningfully.

attempting to evaluate whether the settlement is fair, reasonable, and adequate. The court is not attempting to determine whether the settlement has equal value to each of the class plaintiffs. The court understands that the value class members will receive depends upon a number of factors such as their level of investment in the plans as well as their ability and willingness to capitalize on the different types of relief being offered under the terms of the settlement. But, the court believes that in determining whether the settlement is fair, reasonable, and adequate it is important to understand the settlement not only in terms of its application to the class as a whole, but also in terms of its anticipated impact on different class members.

Approximately 21,690 of the class member plaintiffs are current Sprint Nextel employees. They will receive increased matching contributions valued at $8.95 million, or approximately $413 per employee. It should be noted, however, that Randall Parker, the Sprint/Embarq benefits representative who testified at the second fairness hearing, testified that although the settlement agreement called for an increased match of 100% of the first 4% of eligible compensation, Sprint Nextel ultimately chose to implement a retirement plan with an increased match of 100% of the first **5%** of eligible compensation—a plan with more beneficial terms than the one required by the settlement agreement. In fact, he testified that this choice was also driven by competitive considerations. Thus, although this aspect of the settlement certainly has meaningful value, that value is attenuated somewhat by the fact that this result was not solely attributable to the settlement agreement. Additionally, these class members will receive the benefit of the Plan Amendments such as the contribution ceiling

increase, immediate vesting, diversification of future company matching contributions, and unlocking of unvested units.  They also will receive the Participant Communication Improvements.  The parties have not attempted to place a value on the Plan Amendments or the Participant Communication Improvements for purposes of obtaining final approval of the settlement, but suffice it to say that the court is satisfied that these aspects of the settlement certainly have some value to the current Sprint Nextel employee class members.  It is important to note that in order for these employees to obtain the full value of the settlement they must continue to work for Sprint Nextel and contribute adequately to their 401(k) plans. On average, then, notwithstanding the somewhat attenuated value of the increased match, it appears that the value of relief for this category of plaintiffs likely is in excess of $413 per plaintiff.

Approximately 63,275 class member plaintiffs are former plan participants.  Of these, approximately 16,409 are current Embarq employees (including Embarq employees who are subject to collective bargaining agreements) and 46,866 are former Sprint and/or Embarq employees.  These class members will receive their share of the $4 million Cash Settlement Fund pursuant to the allocation plan, or approximately $63 per plaintiff.  Unlike the various plan amendments which apply to the current Sprint Nextel employee class plaintiffs, this component of the settlement is not contingent upon these class members' future behavior. Additionally, these former plan participants are entitled to financial planning services with an estimated retail value of $350.  Of course, the extent to which they will use these services is uncertain.  Undoubtedly, some will and some will not.  But, nonetheless, this relief is

11

available to them and creates some value for them. Thus, the value of relief for this category of plaintiffs is approximately $63-$413 per plaintiff. Also, Sprint has also agreed to use its best efforts to implement similar Plan Amendments for the current Embarq employees. Based on the Embarq representative's testimony at the second fairness hearing in this case, the court is satisfied that as a practical matter this aspect of the settlement already has and will continue to have real value for the Embarq employees, albeit perhaps some more than others depending on the outcome of union negotiations. Thus, this aspect of the settlement has the potential to add yet additional value to the Embarq employees' portion of the settlement.

Approximately 3,844 class member plaintiffs are former employees who still are plan participants and were less than 100% vested at the time of their separation from employment. These class members will receive their pro rata shares of the $1.6 million in Increased Vesting, or approximately $416 per plaintiff. Like the $4 million cash settlement for the other category of former employees, this aspect of the settlement is not contingent upon these class members' future behavior. This category of class members also will receive financial planning services with an estimated retail value of $350. Again, this creates some value for this category of class plaintiffs. In sum, these class members will receive a settlement value in the range of $416-$766 per plaintiff. Although this category of class members stands to receive the greatest monetary benefit, because they are no longer Sprint Nextel or Embarq employees there is no potential for them to reap the benefits of the other nonmonetary

12

components of the settlement in terms of more favorable restructuring of the Sprint Nextel and/or Embarq plans.

Having analyzed the settlement structure and the estimated impact of the settlement on the various categories of the class member plaintiffs, then, the court will now analyze the four factors the court must evaluate in determining whether the settlement is fair, reasonable, and adequate.

## II.    Analysis of the Four Factors

### A.    The Proposed Settlement Was Fairly and Honestly Negotiated

The court is satisfied that the settlement in this case was fairly and honestly negotiated. Plaintiffs' counsel conducted an extensive investigation of the allegations in the complaint and the losses suffered by the plans. They obtained and reviewed tens of thousands of pages of documents including plan documents and materials, communications with plan participants, internal Sprint documents, SEC filings, press releases, public statements, news articles, and other publications and documents. Defendants vigorously challenged the adequacy of the allegations in plaintiffs' consolidated complaint by filing two rounds of motions to dismiss. At the time serious settlement discussions began, plaintiffs had filed a motion for class certification and that motion was almost at issue. The parties had begun to engage in discovery.

Although the parties began serious settlement discussions relatively early in the case, the timing of the settlement negotiations was the fortuitous consequence of being able to capitalize on the timing of the Sprint/Nextel merger and the opportunity to restructure

13

Sprint's retirement plans during the imminent blending of the two sets of workforces. Sprint was unwilling to pay much cash to settle this case given its perception of the case's weaknesses. By utilizing the opportunity to restructure Sprint's retirement plans to benefit the existing plan participants, the parties were able to allocate the available cash to former plan participants. In doing so, they attempted to structure the settlement so as to maximize the settlement benefits for class as a whole and for each of category of class member plaintiffs. These negotiations were further complicated by the then-anticipated spin-off of Sprint's Local Telecommunications Division because the parties needed to be able to attempt to predict the consequences of that spin-off on the settlement.

In sum, counsel litigated this case during its early phases aggressively and in a manner that demonstrated legal expertise in this area of the law. Then, once the opportunity for settlement came about, plaintiffs' counsel pushed for creative settlement possibilities that worked to maximize the settlement value for the class as a whole as well as for the various categories of class members. The settlement is a result of litigation-related considerations and uncertainties as well as an opportunity for improvements in Sprint's employee benefit plans. The court is satisfied that this factor weighs in favor of settlement approval.

B.    *Serious Questions of Law and Fact Place the Ultimate Outcome in Doubt*

For the detailed reasons set forth on the record by the parties at the first fairness hearing on May 15, 2006, the court wholeheartedly agrees with the parties' assessment of this case. In short, numerous serious questions of law and fact placed the ultimate outcome of this case in real doubt. Having ruled upon defendants' motions to dismiss for failure to

state a claim upon which relief can be granted, the court is familiar with the law in similar cases and, to put it mildly, it would have been interesting to see if and how plaintiffs could have survived the summary judgment phase. Although plaintiffs survived defendants' motion to dismiss, they did so only under the very narrow standard of review which the court must apply to Rule 12(b)(6) motions. Additionally, even if plaintiffs could have survived defendants' motions for summary judgment, additional serious questions of law and fact also would have placed in doubt the value of the recovery plaintiffs might have been able to obtain. Although the value of the settlement might not seem like much for a case with such a potentially monumental scale at its inception, the court believes plaintiffs are faring well under the terms of the settlement compared to what the outcome of this case probably would have been in the absence of the settlement given the developing state of the law and the facts on issues that likely would have predominated this case in determining both liability and damages. The court cannot overstate the significance of this factor in the court's ultimate determination that the settlement is fair, reasonable, and adequate. This factor weighs heavily in favor of approving the settlement.

### C.    Value of Immediate Recovery

The third factor the court must consider is "whether the value of an immediate recovery outweighs the possibility of future relief after protracted and expensive litigation." *Gottlieb v. Wiles*, 11 F.3d 1004, 1014 (10th Cir. 1993). The value of the settlement must be weighed against "the possibility of some greater relief at a later time, taking into consideration the additional risks and costs that go hand in hand with protracted litigation."

*Id.* at 1015. Here, if plaintiffs were to proceed with this litigation through a trial on the merits, there is a substantial risk that they would not have been able to establish liability and that the amount of damages ultimately awarded may have been less than the amounts guaranteed by the settlement. Meanwhile, the size of the recovery would have been reduced by additional costs incurred by plaintiffs' counsel in taking this case through trial and likely appeals. Given the meager prospects of establishing any significant amount of damages, the mere possibility of obtaining more meaningful relief in the future is bleak. Thus, the value of an immediate recovery outweighs the possibility of future relief after protracted and expensive litigation. This factor, too, weighs heavily in favor of settlement approval. Indeed, it is the combination of the second and third factors – that serious questions of law and fact place the ultimate outcome of this litigation in doubt combined with the fact that the possibility of obtaining better relief after protracted and expensive litigation is unlikely – that weigh the most heavily in the court's determination that the settlement is fair, reasonable, and adequate to the class members.

> D.    *The Parties' Judgment that the Settlement is Fair and Reasonable*

With respect to the fourth factor, the court is satisfied that the attorneys on both sides of this case genuinely believe the settlement is fair and reasonable. They believe it provides significant benefits to the class members, particularly when measured against the significant risks to any recovery if the action were to proceed to summary judgment and/or trial. Plaintiffs counsel explains that ERISA cases involving allegedly imprudent offering of employer stock in 401(k) plans are a fairly new type of class action as to which there has

been little, if any, governing case law by the Supreme Court or by the Tenth Circuit. Defendants' counsel explains that many of the class members' claims were subject to a variety of defenses that would have barred their ERISA claims entirely. Collectively, then, counsel believe that the settlement confers significant benefits on the class of plaintiffs compared to what they probably would have received in the absence of settlement. This factor also weighs in favor of settlement approval.

## III.    Objections by Class Members

### A.    Objections of Donald V. Jones

Donald V. Jones filed objections to the settlement (doc. #224) in which he raises two objections. First, he contends that all members of the class should be informed of what their benefit would be before the settlement is approved, not after. Second, on a related note, Mr. Jones argues that there should be a single list on which the benefit each class member is to receive under the settlement should be listed. The court overrules both of these objections. Notice provided to the class is adequate where it sets forth the formula for distributing the settlement fund among the class members. *Nat'l Treasury Employees Union v. United States*, 54 Fed. Cl. 791, 806 (2002); *In re Lease Oil Antitrust Litig.*, 186 F.R.D. 403, 429-30 (S.D. Tex. 1999) ("Notice is adequate where the class member is notified of the formula of allocation."); 3 Newberg on Class Actions § 8.32, at 265 (4th ed. 2002) ("It is unnecessary for the settlement distribution formula to specify precisely the amount that each individual class member may expect to recover."); *cf.* Manual for Complex Litigation, Fourth § 21.312, at 295 (2004) (stating the settlement notice should "explain the procedures for allocating and

17

distributing settlement funds"). In fact, it is not at all unusual for class members not to know the amounts they will be receiving until after final approval. *Nat'l Treasury Employees Union*, 54 Fed. Cl. at 806. Here, the process of determining the amount of each class member's recovery will require a complex calculation: first, the plan administrator must calculate each participant's and former participant's net loss, then exclude those with a net gain, calculate each participant's and former participant's preliminary fractional share, use that to calculate the preliminary dollar recovery, exclude those with a de minimis preliminary dollar recovery of less than $25, then recalculate as many times as necessary so as to arrive at a final fractional share and final dollar recovery for each participant and former participant who is entitled to receive more than a de minimis amount until the sum of the final dollar recoveries equals the cash settlement fund. In evaluating a plan of allocation, the court must ensure that the distribution of funds is fair and reasonable. *In re Global Crossing Sec. & ERISA Litig.*, 225 F.R.D. 436, 462 (S.D.N.Y. 2004). When formulated by competent and experienced class counsel, as is the case here, an allocation plan need only have a reasonable, rational basis. *Id.* A reasonable plan may consider the relative strength and values of different categories of claims. *Id.* In this case, the court is satisfied that the plan of allocation is fair and reasonable because it appears to be rationally based on the participants' proportionate losses in the 401(k) plans. Such a "[p]ro-rata distribution of settlement funds based on investment loss is clearly a reasonable approach." *Id.*

  B.  *Objections of William Don Cline*

18

William Don Cline filed objections to the settlement (doc. #225) in which he raises two concerns. First, he wants to know if the settlement can be distributed to his Individual Retirement Account on a tax-free basis. The parties have assured the court that the settlement proceeds will be distributed through the plans on a pre-tax basis and, consequently, they can be rolled over on a tax-free basis into an IRA.

Second, Mr. Cline objects to the settlement on the grounds that he believes that combining the Sprint FON and Sprint PCS stock on a two-PCS-for-one basis was unfair. The claims in this case, however, do not relate to the FON and PCS stock combination and therefore Mr. Cline's objection is beyond the scope of this case. According to plaintiffs, numerous other lawsuits already are pending in connection with the allocations between the wireline operations and the wireless operations before the recombination of the tracking stocks and breach of fiduciary duties in the recombination. Because this objection does not present any grounds indicating that the settlement is unfair, unreasonable, and/or inadequate as it relates to the allegations asserted in this case, then, this objection is overruled.

C.    *Objections of Bonnie Faye Johns*

Bonnie Faye Johns filed objections to the settlement (doc. #226) in which she objects to the allocation formula for distributing the cash settlement fund. The thrust of her objection is that the allocation formula is unreasonable because plan participants will not recover all or the vast majority of their total losses. But the court is satisfied that the plan of allocation is fair and reasonable and that the overall recovery is adequate. Ms. Johns' objection erroneously presumes that the alleged misconduct that is the subject of this lawsuit was

responsible for the full drop in the value of plan assets during the relevant time period; that

settlement recovery should be 100% of the drop while ignoring the risks of plaintiffs being

unable to establish liability, causation, and damages; and the possibility that the class might

recover nothing at all in the absence of the settlement. As previously explained, serious

questions of law and fact exist which place the ultimate outcome of this lawsuit in doubt.

Ms. Johns' objection unrealistically fails to discount the value of this case in light of the

uncertainties that would be presented by ongoing litigation. Contrary to Ms. Johns'

objection, the court does not believe that the amount of the settlement is inadequate at all.

As such, her objection is overruled.

   D.    *Objections of Edward C. McCulloch, Robert Herrera, James W. Jarbo, and
          Janis L. Fisher*[3]

   Objectors Edward C. McCulloch, Robert Herrera, James W. Jarbo, and Janis L. Fisher

were active objectors in this case. These class members are members of the local unions of

the International Brotherhood of Electrical Workers, AFL-CIO (IBEW). They filed written

objections through counsel Francis J. Morton, who also appeared at the first and second

fairness hearings on their behalf. It is the court's understanding that the IBEW objectors

formerly were employed by Sprint and are now employed by Embarq under collective

bargaining agreements. Messrs. McCulloch and Herrera were participants in the Centel

---

[3] The court notes that it has reservations about the extent to which the IBEW objectors themselves (as opposed to the unions generally) have standing to assert some of the objections they have asserted. Mr. Morton has not discussed the actual terms of the collective bargaining agreements which apply to these four objectors' employment with Embarq.

Retirement Savings Plan for Bargaining Unit Employees (CRS Plan BUE). Mr. Jarbo and Ms. Fisher were participants in the Sprint Retirement Savings Plan for Bargaining Unit Employees (SRS Plan BUE). As former Sprint employees who are now employed by Embarq, under the settlement they fall within the category of employees who will receive a portion of the Cash Settlement Fund according to the plan of allocation, two meetings with a financial advisor, and Sprint agrees to use its best efforts to implement similar amendments with respect to their retirement plans. This group of objectors raised a myriad of objections to the settlement.

In the objections they first filed with the court (doc. #227), they objected to the settlement on the following grounds: they are not receiving the Increased Match; Sprint Nextel's obligation to use its best efforts to implement similar plan amendments is illusory and Embarq should make an outright offer the plan amendments to them; Sprint Nextel can change or withdraw the Plan Amendments on January 1, 2007; the settlement does not clearly indicate that bargaining unit employees will receive part of the Cash Settlement Fund; they are not being offered the Participant Communication Improvements; and the class notice is confusing because it caused bargaining unit employees to believe they would receive the Increased Match. Following the court's order allowing supplemental briefing concerning the arguably significant disparity in the value of the settlement to the different categories of class members, these objectors filed a supplemental brief (doc. #250). In that brief, they point out that the two one-hour meetings with a financial advisor is of no value to bargaining unit employees because free financial planning services already are available to them through the

21

local unions. They continue to argue that the "best efforts" clause is illusory. Given these considerations, these objectors argue that the settlement is designed to disproportionately favor the group of employees Sprint is keeping. Prior to the second fairness hearing, these objectors filed another set of objections (doc. #263). In those objections, they contend that the proposed settlement is unfair, unreasonable, and inadequate for the reasons previously stated, and also for largely the same reasons stated in their prior objections. Summarized, they believe all class members should receive substantially equal shares of the settlement value, based on the damage period of 1998 to the present, and should not favor the class members Sprint chose to retain as employees. They point out that the aspect of the settlement which pertains to current Sprint Nextel employees benefits all Sprint Nextel employees, not just the plaintiff class members. Again, they point out that financial advisor services are of no tangible value to bargaining unit employees and, therefore, Sprint should simply give $300 to those union members who elect to receive the money in lieu of financial adviser services. And, they point out that Sprint Nextel already is not living up to the "best efforts" clause because Embarq representatives have refused to meet with members of the objector unions to attempt to implement similar plan amendments.

The overall thrust of the vast majority of these objections is that the IBEW objectors believe they are getting shortchanged under the terms of the settlement, particularly compared to current Sprint Nextel employees. After careful consideration of this argument, the court disagrees with the IBEW objectors' view that the settlement is skewed against them. The IBEW objectors, like all Embarq employees, are receiving their fair share of the

Cash Settlement Fund which current Sprint Nextel employees are not receiving. Although Embarq employees are not receiving the $8.95 million Increased Match which current Sprint Nextel employees are receiving, that Increased Match is the most dubious aspect of the "settlement." The settlement agreement itself only required an increased match of 100% of the first 4% of eligible compensation. Sprint Nextel ended up restructuring the plan to provide for an increased match of 100% of the first **5%** of eligible compensation, and Mr. Parker testified that was the result of competitive considerations. All current Sprint Nextel employees, not just those who are plaintiff class members, are receiving the benefit of the increased match. Thus, it appears that the Increased Match aspect of the settlement was motivated as much by (and perhaps even more so by) other forces as it was by the settlement. The court is not persuaded that this aspect of the settlement itself confers such a significant benefit on the current Sprint Nextel employees as the IBEW objectors seem to believe that it does. Rather, it appears to the court that Sprint Nextel employees would have received a favorable restructuring of their retirement plan even in the absence of the settlement. And, significantly, because the parties chose to allocate this aspect of the settlement to the current Sprint Nextel employees, this freed up the Cash Settlement Fund so that it could be devoted entirely to former employees such as the IBEW objectors.

In addition to the court being unpersuaded that the Increased Match necessarily confers significant benefits on current Sprint Nextel employees insofar as it is labeled a provision of the settlement agreement itself, the court further notes that Embarq employees potentially stand to gain more than the current Sprint Nextel employees because they will

receive their portion of the Cash Settlement Fund (a benefit not conferred on current Sprint Nextel employees) plus they stand to benefit from amendments to their retirement plans similar to the Plan Amendments, as well. Although the parties have not attempted to place a value on the Plan Amendments, they obviously confer some value, perhaps even significant value, on those plaintiffs who will benefit from them. Notwithstanding the IBEW objectors' arguments to the contrary, the settlement **does** require Sprint Nextel to use its best efforts to implement similar plan amendments for Embarq employees. Simply because that has not yet occurred does not obviate the legal obligation that will arise upon final approval of the settlement by the court. The court rejects the IBEW objectors' argument that this provision of the settlement is illusory. This objection seems to be geared primarily toward forcing Embarq to place an offer on the table. But the settlement agreement does not require Embarq to extend such an unconditional offer; it only requires Sprint Nextel to use its "best efforts" to implement similar plan amendments. Regardless of the outcome that ultimately may come to fruition as a result of this provision, the court believes that the proposed settlement is sufficiently fair and reasonable as a whole and to the Embarq employees—union as well as non-union—that the court would approve the settlement even in the absence of the "best efforts" clause. This "best efforts" clause exists largely because of the logistics of the Embarq spin-off and the fact that the Embarq union employees are subject to a series of thirty-four separately negotiated collective bargaining agreements which are subject to renewal approximately every three years with approximately one-third of the agreements coming up for renegotiation each year. Many of these agreements already have in place

similar provisions to the Plan Amendments. Thus, the court finds the IBEW objectors' arguments in this regard to be without merit.

The court also finds the IBEW objectors' arguments concerning the duration of the Plan Amendments to be without merit. Under the plain language of the proposed settlement those Plan Amendments apply only to Sprint Nextel employees, not to Embarq employees. To the extent Embarq employees ultimately may receive the benefit of similar plan amendments by virtue of the "best efforts" clause, the court simply notes that the settlement agreement is subject to the duty of good faith and fair dealing which is implied in every contract. Moreover, the collective bargaining agreements are generally for three-year terms, and therefore it seems unlikely that any of the IBEW objectors would stand to benefit from similar plan amendments for less than three years.

Turning to the IBEW objectors' objection that the financial planning services are of no value to them because they already receive financial planning services through the local unions, the court also does not find that this consideration renders the settlement unfair, unreasonable, and/or inadequate. While these financial planning services may be of diminished value to these union members, the court simply cannot find that they are of NO value whatsoever to the IBEW objectors. The decision whether to take advantage of these sessions rests with each individual class member. The court also rejects the IBEW objectors' suggestion that Sprint should give them $300 instead of the financial planning services. "The court may not modify the terms of a proposed settlement. Rather, a court must approve or

disapprove of the settlement as a whole." 5 Moore's Federal Practice § 23.168, at 23-522 (3d ed. 2006).

The IBEW objectors' objections to the form of the initial class notice are overruled as moot because the court approved a supplemental notice which was intended to address, among other things, the IBEW objectors' original concerns regarding arguable ambiguities in the original class notice. The only lingering notice issue, then, is the objection Mr. Morton raised at the second fairness hearing that the supplemental notice deprives class members of fair notice because it states the Increased Match for current Sprint Nextel employees is valued at $17.9 million when, in fact, the parties later placed a more accurate value on the Increased Match of approximately $8.95 million. Although counsel for the IBEW objectors seems to advance this argument as a reason the court should withhold final approval of the settlement, the court believes that the more appropriate inquiry is whether a corrective notice should be issued. One of the policies of Rule 23's notice provision is to protect class members from misleading communications from the parties or their counsel. *Erhardt v. Prudential Group*, 629 F.2d 843, 846 (2d Cir. 1980). Thus, it would be within the court's discretion to order a corrective notice to be issued to correct this arguably misleading statement. But, after careful consideration of this issue, the court determines that a corrective notice is unnecessary here because the supplemental notice was not materially misleading. The supplemental notice explains the Increased Match as follows:

> The Increased Match involves an increased matching contribution from Sprint for the benefit of Sprint employees who participate in the Sprint Retirement Savings Plan or the equivalent plan which resulted from the merger

26

of Sprint and Nextel Communications, Inc. Under the Settlement, Sprint has agreed that . . . it will increase its matching contributions allocated to the accounts of Sprint employees who participate in the Sprint Retirement Savings Plan (but not the [SRS Plan BUE] or the [CRS Plan BUE]) to at least 100% of the first 4% of eligible compensation. Co-Lead Counsel and the Company believe that the guaranteed value of the Increased Match to the Settlement Class (referred to as the "Guaranteed Increased Match" in the remainder of this Supplemental Notice) is approximately $17.9 million.

To be sure, at the time this supplemental notice was issued counsel and Sprint did, in fact, believe that the Increased Match had a value of approximately $17.9 million; it was not until later that they realized this number was incorrect. Thus, the $17.9 million number was an inadvertent misstatement at the time, albeit it was arguably misleading. Ultimately, however, the court does not believe that the $17.9 million number was materially misleading because the notice did not state the number of plaintiffs who would share in this Increased Match and, consequently, the court doubts that class members reading the notice would have ascribed much significance to the $17.9 million number because the notice did not provide the rest of the information they would have needed to translate that number into an estimated value for each recipient of the notice. The court believes that a class member plaintiff reading the notice probably would have focused more on the fact that the notice states Sprint is increasing its matching contribution to 100% of the first 4% of eligible compensation. This information provides each class member with the information he or she needs in order to be able to determine the value of the settlement to him or her. Thus, notwithstanding this discrepancy in the class notice, the court believes issuance of a corrective notice is unnecessary here.

For all of these reasons, then, all of the IBEW objectors' objections to the settlement are overruled. The court does note that it has given careful considerations to these objections because they have served the important function of focusing the court's attention on the arguable discrepancies between what various categories of class members are receiving. After close scrutiny of those discrepancies, the court nonetheless determines that the settlement is fair, reasonable, and adequate

E.   *Objections of Bob Richard, Ralph Nesler, Stan Ruhnke, Rodger Ruhl, Frank Appodaca, and Melvin Simon*

Objectors Bob Richard, Ralph Nesler, Stan Ruhnke, Rodger Ruhl, Frank Appodaca, and Melvin Simon also were active objectors in this case. These class members are members of the local unions of the Communications Workers of America, AFL-CIO (CWA). They filed written objections through counsel, and counsel appeared at the second fairness hearing on their behalf. The overall thrust of their objections is similar to the nature of the objections raised by the IBEW objectors. For the same reasons that those objections were overruled with respect to the IBEW objectors, then, those same objections are overruled with respect to the CWA objectors.

Additionally, the CWA objectors contend that the failure to include any members of the CWA in the settlement negotiations resulted in the proposed settlement inadequately compensating this portion of the class while providing substantially greater compensation to another portion of the class and reflected inherent unfairness in the negotiation process. The court disagrees. As explained previously, the court believes that Embarq employees

28

have fared adequately under the terms of the settlement. The law does not require involvement of absentee class members' attorneys in the settlement negotiation process. Moreover, the CWA objectors' interests were adequately represented by the named class members—in particular, by plaintiff Anton P. Spanier, who was a participant in the CRS Plan BUE. Accordingly, this objection is overruled.

    *F.*    *Objections of Cheryl Thomas-Lightner*

Cheryl Thomas-Lightner filed written objections to the settlement (doc. #262) in which she raises four different objections to the settlement. First, she contends that the different values of awards for the different classes of people are unfair and that all participants should share proportionately in the cash settlement fund. As explained above, the court has already determined that the plan of allocation is fair and reasonable.

Second, Ms. Thomas-Lightner contends that the de minimis amount is unfair. Again, as discussed previously, the plan of allocation excludes from participation in the Cash Settlement Fund those plan participants and former participants who would receive less than $25. The court believes this de minimis floor is fair and reasonable in order to preserve the Cash Settlement Fund from excessive and unnecessary expenses in the overall interests of the class as a whole. *Cf. In re Global Crossing Sec. & ERISA Litig.*, 225 F.R.D. 436, 463 (S.D.N.Y. 2004) (finding $10 de minimis threshold in the allocation plan was reasonable).

Third, Ms. Thomas-Lightner contends that the amount of cash included in the settlement is unfair. She asks to have the $300 for financial planning meetings deposited directly into her account. As explained previously, however, the court may not modify the

terms of the settlement, but instead must approve or disapprove of the settlement as a whole. Ms. Thomas-Lightner has the prerogative to decide whether to utilize the financial planning meetings. Whether she chooses to do so does not change the court's determination that the settlement as a whole is fair, reasonable, and adequate.

Fourth, she complains about the Sprint stock options purchased as a part of Sprint's Management Incentive Plan. Like Mr. Cline's objection concerning the Sprint FON and PCS stock combination, this objection is based on considerations that are outside of the scope of this lawsuit. Consequently, this consideration is irrelevant to the settlement and release of the claims at issue in this lawsuit, which are confined to Sprint's 401(k) retirement savings plans. For all of these reasons, then, Ms. Thomas-Lightner's objections are overruled.

## IV.    Conclusion

In sum, the court concludes that the disparity in the value of relief among the different categories of class members is not as significant as the court had first understood it to be after the initial fairness hearing. Additionally, the court is satisfied that the disparities that exist were created in an attempt to maximize the settlement value for the class as a whole by allocating cash resources to former plan participants while capitalizing on the ability to restructure the retirement plans for current Sprint Nextel employees. Ultimately, the recovery for each of the categories of class member plaintiffs will depend upon a number of considerations such as their relative losses in the plans, their continued participation in the Sprint Nextel plans, and union negotiations. The court is satisfied that the settlement was fairly and honestly negotiated in a genuine effort to maximize recovery for the class as a

whole given the minimal amount of cash that Sprint was willing to contribute to settle this case. Moreover, Sprint's unwillingness to contribute more money to settle this case is fully justified given the serious questions of law and fact that exist placing the ultimate outcome of this litigation in doubt, particularly when combined with the fact that it is highly unlikely plaintiffs would have been able to obtain more favorable relief after protracted and expensive litigation. The court fully credits the parties' judgment, as well as the independent fiduciary's opinion, that the settlement is fair and reasonable. For all of these reasons, the court finds that the settlement is fair, reasonable, and adequate. Accordingly, the settlement is approved.

## ATTORNEY FEES AND REIMBURSEMENT OF EXPENSES AND AN AWARD TO THE NAMED PLAINTIFFS

Plaintiffs' attorneys ask the court to award $3.9 million in fees and expenses and $15,000 to each of the four named plaintiffs.[4] Section 8.4 of the settlement agreement requires Sprint to pay plaintiffs' attorneys' fees, costs and expenses, any court approved award to the named plaintiffs, and the costs of providing notice to class members and administering the settlement, up to a total maximum amount of $3.9 million. Sprint states

---

[4] It is not clear from this motion whether plaintiffs are requesting $3.9 million **plus** $15,000 to each of the four named plaintiffs or $3.9 million **out of which** $15,000 is to be paid to each of the four named plaintiffs. To be sure, the settlement agreement provides that any court approved award to the named plaintiffs is to come from the $3.9 million Settlement Expense Fund. Thus, the court construes the request for an award to the named plaintiffs to conform to the terms of the settlement, meaning that award must come out of the $3.9 million Settlement Expense Fund being requested by plaintiffs' counsel.

that it does not oppose this motion (doc. #240). The class was given notice of these anticipated requests, but no objectors raised any objections to these projected awards.

When there is a common fund created by a settlement, the court must apply one of two methods of determining reasonable attorneys' fee awards: the percentage of the fund method, or the lodestar method developed in the statutory fee shifting cases. *Rosenbaum v. MacAllister*, 64 F.3d 1439, 1445 (10th Cir. 1995). Under either methodology, the fee awarded must be reasonable. *Gottlieb v. Barry*, 43 F.3d 474, 482 (10th Cir. 1994). The preferred method in common fund cases is the percentage of the fund analysis. *Rosenbaum*, 64 F.3d at 1445. Regardless of which method is used, the court must consider the following twelve factors: (1) the time and labor required, (2) the novelty and difficulty of the questions presented by the case, (3) the skill requisite to perform the legal service properly, (4) the preclusion of other employment by the attorneys due to acceptance of the case, (5) the customary fee, (6) whether the fee is fixed or contingent, (7) any time limitations imposed by the client or the circumstances, (8) the amount involved and the results obtained, (9) the experience, reputation, and ability of the attorneys, (10) the "undesirability" of the case, (11) the nature and length of the professional relationship with the client, and (12) awards in similar cases. *Id.* & n.3. In this case, the court finds that after considering these twelve factors the requested fee is justified under both the percentage-of-the-fund and the lodestar methods.

As to the time and labor required (factor 1), counsel have submitted declarations stating they spent thousands of hours on this lawsuit during a time period spanning more than

three years. They conducted investigations of Sprint's 401(k) retirement plans before filing this lawsuit. They filed their initial pleadings in mid 2003; the cases were consolidated; they began preliminary discovery; they filed their initial consolidated pleading; they intervened during the settlement approval process in a previously filed securities fraud class action in order to prevent the ERISA claims in this case from being released; they devoted significant attention to responding to defendants' motions to dismiss; they commenced full blown discovery; and they filed a motion for class certification. They began to engage in settlement negotiations in February of 2005, these negotiations took many months, and the settlement agreement finally was signed in early 2006. The settlement approval process before this court has taken several months. It has involved two class notices, three rounds of briefing, and two fairness hearings. The countless hours plaintiffs' counsel devoted to this lawsuit clearly precluded them from spending that time on other cases (factor 4).

As the court alluded to previously in its discussion of whether the settlement was fair, reasonable, and adequate, this case presented novel and difficult issues (factor 2). The applicable law is complex, unsettled, and in a rapid state of development. This case was "undesirable" (factor 10) from the start in the sense that the issues presented were inherently risky. Consequently, a high level of skill in this area of the law was necessary to perform the legal services in this case properly (factor 3). Plaintiffs' counsel possessed the requisite level of experience, reputation, and ability in the field of ERISA class actions and other complex litigation (factor 9). The high quality of plaintiffs' counsel's work culminated in the successful resolution of this complex case. This was demonstrated by their successful and

commendable prosecution of this case through the motion to dismiss stage and the ultimate settlement of this case under favorable terms.

Factors 6, 7, and 11 do not apply here. There was no prearranged fee in this case. Plaintiffs' counsel states there were no real time limitations imposed by the client or the circumstances. And, plaintiffs' counsel states that the factor relating to the nature and length of the professional relationship with the client does not apply here.

The court turns, then, to the remaining three factors—the customary fee for similar work (factor 5), the amount involved and the results obtained (factor 8), and awards in similar cases (factor 12). The court is satisfied that the total value of the settlement in this case likely is well in excess of $25 million. This includes the $4 million Cash Settlement Fund, the $1.6 million in Increased Vesting, and the $8.95 Increased Match. Additionally, these amounts are net of the $3.9 million Settlement Expense Fund which will cover attorneys' fees and expenses, including the cost of both class notices and the cost of retaining an independent fiduciary to review the fairness of the settlement. Although the parties have not devoted significant attention to attempting to place a value on the Plan Amendments and the Participant Communications Improvements, those aspects of the settlement are worth significant value to the class members which the court estimates to be in the range of millions of dollars. For example, the two one-hour meetings with a financial advisor, a $350 value, are being made available to more than 67,000 class members. If only one-third of these class members elect to take advantage of those meetings, that confers an additional benefit of nearly $8 million. Also, although it might be difficult to place a value on the "unlocking"

of matching contributions, the court is persuaded that this component of the settlement probably has a value well in excess of $10 million. Plaintiffs have submitted a financial report that places a value on this "unlocking" component of the settlement of more than $28 million and plaintiffs have directed the court's attention to other authority suggesting that this component of the settlement probably has a value in the tens of millions of dollars. *See In re Ikon Office Solutions, Inc. Sec. Litig.*, 209 F.R.D. 94, 99 (E.D. Pa. 2002) (relying on an expert report which valued a similar unlocking component of a settlement at more than $50 million; noting that "[r]ecent scholarly articles . . . strongly support the theory that employee retirement savings are quantifiably more valuable when diversified than when they are concentrated in an employer's stock"). Plaintiffs submitted a declaration from Edwin J. Mills in which he opines that the plaintiffs' recovery in this case might have been less than $12 million based on the loss in the value of plan assets which could have been linked to the alleged misconduct in this case. Thus, the results obtained by virtue of the settlement are extraordinary compared to the anticipated difficulties of establishing significant amounts of damages even if plaintiffs could have overcome the numerous obstacles for establishing liability.

Based on a conservative value of the settlement of $25 million, then, plaintiffs' requested fees and expenses of $3.9 million represent less than 16% of the benefit conferred on the plaintiff class members. The court has no difficulty concluding that this is an imminently reasonable percentage under the percentage-of-the-fund method based on the customary fee for similar work and awards in similar cases. *See, e.g., Gottlieb v. Barry*, 43

F.3d 474, 487-88 (10th Cir. 1994) (finding 22.5% of common fund was "well within the range of permissible reasonable fee awards" and citing case law for the proposition that 25% of the common fund is the benchmark); *see also In re Xcel Energy, Inc., Sec., Derivative & ERISA Litig.*, 364 F. Supp. 2d 980, 1000 (D. Minn. 2005) (approving attorneys fees of 25% plus expenses); *In re WorldCom, Inc. ERISA Litig.*, Case No. 02-4816, 2004 WL 2338151, at *11 (S.D.N.Y. Oct. 18, 2004) (approving set-aside of 20% of the cash component of the settlement fund for attorneys' fees).

The court also finds that the requested fees and expenses of $3.9 million are reasonable based on the lodestar method. Plaintiffs' counsel's collective lodestar is now $3,046,545, plaintiffs' counsel's expenses to date are $176,467, and the claims administrator's costs for printing and mailing the class notice were $81,631. Thus, plaintiffs' total expenses thus far are $258,098. Backing this expense out of the $3.9 million, then, this leaves approximately $3.6 million in attorneys' fees, which results in a lodestar multiplier of only 1.18, a multiplier which the court finds to be imminently reasonable based on the risks associated with counsel taking on this case.

As to plaintiffs' request for an award of $15,000 to each of the named plaintiffs, however, the court simply cannot find that such an award is reasonable. Named plaintiff LaVonne Easter estimated that she spent 40 hours on this litigation; Jeffery Snethen estimated that he spent 84 hours on this litigation; Fran Lindholm estimated that he spent 83 hours on this litigation; and Anton P. Spanier estimated that he spent 110 hours on this litigation. The court certainly recognizes that the time these individuals devoted to this

lawsuit inured to the common benefit of the class and, to that end, the court believes they are entitled to some type of incentive award above and beyond what the typical class member is receiving. They have performed an important service to the class and the burden of this commitment deserves to be recognized through an award. But, although the aggregate value of the settlement is significant, no class member stands to gain more than $1,000 on an average, per-plaintiff basis. The named plaintiffs devoted approximately 80 hours, on average, to this lawsuit. The court believes that an award of $5,000 adequately compensates each of them for their time. *See, e.g.*, *In re WorldCom, Inc. ERISA Litig.*, Case No. 02-4816, 2004 WL 2338151, at *11 (approving an award of $5,000 to each of the three named plaintiffs).

**IT IS THEREFORE ORDERED BY THE COURT** that Plaintiffs' Motion for Final Approval of Class Action Settlement (doc. #229) is granted and Plaintiffs' Motion for an Award of Attorneys' Fees and Reimbursement of Expenses and for an Award to the Plaintiffs (doc. #233) are granted in part and denied in part. The court hereby finally approves the parties' settlement and awards plaintiffs' attorneys' fees and expenses in the amount of $3.9 million out of which $5,000 is to be paid to each of the four named plaintiffs.

**IT IS SO ORDERED** this 3rd day of August, 2006.

s/ John W. Lungstrum

_____

37

John W. Lungstrum
United States District Judge