**EXHIBIT D**

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ILLINOIS

KATHI COOPER, BETH HARRINGTON, )
and MATTHEW HILLESHEIM, )
Individually and on Behalf of All Those )
Similarly Situated, )
)
        Plaintiffs, )
)
vs. )  CIVIL NO. 99-829-GPM
)
THE IBM PERSONAL PENSION PLAN )
and IBM CORPORATION, )
)
        Defendants. )

## MEMORANDUM AND ORDER

**MURPHY, Chief District Judge:**

      This matter is before the Court on Class Counsel's Motion for Award of Attorneys' Fees, Costs and Incentive Awards ("Fee Request") (Doc. 352). Based upon the entire record in this case, including the objections and other comments filed by the Class Members and the arguments presented at the hearing held on August 8, 2005, the Court finds and orders as follows:

      This litigation started November 1, 1999, and will continue for at least another year as the parties continue to litigate two of the central issues before the United States Court of Appeals and potentially the United States Supreme Court. IBM's 1995 implementation of a pension equity formula and its 1999 implementation of a cash balance formula raise six difficult and novel issues. It was clear when this case was filed that it would be hard fought and was likely to be ultimately resolved by the Court of Appeals for the Seventh Circuit or perhaps the United States Supreme Court. In fact, early in the case the Court observed at an oral argument that "I understand . . .

whatever I do here will be reviewed *de novo* in the Court of Appeals. And of the cases I have handled here, I believe that this case has the best chance of ending up in the United States Supreme Court. . . ." Transcript of Oral Arg. at 4:23-5:8 (Dec. 17, 2002).

On September 17, 2001, this Court certified the case as a class action pursuant to Rule 23(b)(2) of the Federal Rules of Civil Procedure on behalf of three Subclasses. Subclass 1 consists of Class Members who accrued benefits under the Pension Credit Formula adopted by the Plan effective January 1, 1995, but did not accrue any benefits under the Cash Balance Formula adopted by the Plan effective July 1, 1999. Subclass 2 is comprised of Class Members who accrued a benefit under the Cash Balance Formula adopted by the Plan effective July 1, 1999. There are more than 250,000 members of Subclasses 1 and 2. Subclass 3 consists of approximately 15,000 individuals who were participants in the Plan as of July 1, 1999, but did not complete five years of service such that they did not vest in their Plan benefit. The Subclass 3 claims were settled under the terms of a Settlement Agreement approved by the Court on January 10, 2005 (*see* Docs. 287, 288). IBM subsequently filed an interlocutory appeal challenging the certification of the case as a class action. This appeal was denied by the United States Court of Appeals for the Seventh Circuit. *See Cooper v. IBM*, No. 01-8034 (7th Cir. Nov. 19, 2001).

This Court is familiar with the complex and novel issues involved in this case, as well as the work of Class Counsel in prosecuting the claims for more than five years of this hard-fought litigation. This prosecution has included extensive discovery, expert witness depositions, and voluminous briefing on all of the factual and legal issues, as well as numerous court hearings.

On May 18, 2005, the parties entered into a Settlement Agreement ("Settlement"). Following a hearing on August 8, 2005, the Court approved that Settlement as fair and reasonable

and in the best interests of the Class following the required notice to Class Members.

The Settlement requires IBM to amend the Plan to provide additional pension benefits to eligible members of the Class which, when added to the amount of attorneys' fees awarded by the Court to Class Counsel, will total in value $314,293,000 as of November 1, 2006. While the Settlement provides that Defendants will appeal the Court's decision regarding liability on the Cash Balance Claim and the Always Cash Balance Claim, the Settlement resolves the issues regarding the remedies that should be awarded with respect to these claims in the event this Court's rulings are upheld on appeal. IBM agrees that if the Court's liability ruling in favor of the Class on the Always Cash Balance Claim is upheld on appeal, the Plan will be amended to provide additional pension benefits. The additional value of those benefits, including the attorneys' fees awarded by the Court to Class Counsel in connection with that claim, will be $620,000,000 (in addition to the guaranteed amount of $314,293,000). IBM also agrees that if the Court's liability ruling in favor of the Class on the Cash Balance Claim is upheld on appeal, the Plan will be amended to provide additional pension benefits which, along with the attorneys' fees awarded by the Court to Class Counsel in connection with that claim, will total $1,714,293,000.

Notably, the Settlement provides that any benefit provided to a participant as a result of the Settlement Agreement is an independent Plan obligation separate, apart from, and in addition to any other benefit accrued by a participant before the Settlement Date under the Cash Balance Formula, the Pension Credit Formula, or any formula under any other employee pension benefit plan sponsored by IBM. In addition, any pension benefit a participant would otherwise accrue under any Plan formula, or any other employee pension benefit plan sponsored by IBM based on service after the Settlement Date, will not be reduced or offset by and will not wear away any participant's

Settlement Benefit. Finally, IBM waives any defense or right to assert any precedent or policy that might preclude or prohibit the entry of retroactive relief.

Class Counsel seeks fees on a decreasing percentage as follows: (1) an amount equal to 29% of the amount of any Settlement Benefits recovered up to $250 million; (2) an amount equal to 25% of the amount of any Settlement Benefits recovered in excess of $250 million up to the amount of $750 million; (3) an amount equal to 21% of the amount of any Settlement Benefits recovered in excess of $750 million up to the amount of $1,250 million; and (4) an amount equal to 17% of any Settlement Benefits recovered in excess of $1,250 million. If the Class prevails on all claims, the blended fee produced by the above percentages is 22.25%. Class Counsel also requests incentive awards of $40,000 for Ms. Cooper and $20,000 for Ms. Harrington to be paid out of the attorneys' fees and costs award. Class Counsel is not requesting any additional recovery to reimburse them for the expenses they already have incurred or will incur in the future but have agreed to reimburse themselves for those costs out of whatever fees are awarded by this Court.

In considering Class Counsel's Fee Request, this Court is guided by the numerous decisions of the Seventh Circuit requiring the Court to do its "best to award counsel the market price for legal services, in light of the risk of nonpayment and the normal rate of compensation in the market at the time." *In re Synthroid Marketing Litig.*, 264 F.3d 712, 718 (7th Cir. 2001) ("*Synthroid I*"); *see also Florin v. Nationsbank of Ga., N.A.*, 34 F.3d 560, 565 (7th Cir. 1994) (directing district court to determine fair attorneys' fees in class action by considering the probability of success at the outset of the litigation); *In re Continental Ill. Sec. Litig.*, 962 F.2d 566, 572 (7th Cir. 1992) ("The object in awarding a reasonable attorney's fee . . . is to give the lawyer what he would have gotten in the way of a fee in an arm's length negotiation, had one been feasible."). Where, as here, it is "impossible

to know *ex post* exactly what terms would have resulted from arm's-length bargaining *ex ante*, courts must do their best to recreate the market by considering factors such as actual fee contracts that were privately negotiated for similar litigation, information from other cases, and data from class-counsel auctions." *Taubenfeld v. Aon Corp.*, No. 04-3140, 2005 WL 1560331, at *1 (7th Cir. July 5, 2005).

Based on the evidence before the Court regarding the market for class counsel in cases of this type and a long line of ERISA decisions, it is appropriate to award Class Counsel a percentage of recovery fee in this case. *Florin*, 34 F.3d at 563; Mark Berlind, Attorney's Fees under ERISA: When is an Award Appropriate?, 71 Cornell L. Rev. 1037, 1060-61 (1986) ("Applying the common benefit doctrine reflects the statute's purpose. . . . Nothing in ERISA indicates that Congress intended to preempt the common benefit doctrine."). As the Ninth Circuit stated in *Staton v. Boeing Company*, 327 F.3d 938, 967 (9th Cir. 2003), "We conclude, as have the two other circuits that have addressed the issue, that there is no preclusion on recovery of common fund fees where a fee-shifting statute applies." *Citing Brytus v. Spang & Co.*, 203 F.3d 238, 246-247 (3rd Cir. 2000); *Cook v. Niedert*, 142 F.3d 1004 (7th Cir. 1998). This reasoning is appropriate here, where an award of attorneys' fees under ERISA's fee-shifting statute is not automatic and depends upon a variety of factors. *See, e.g., Quinn v. Blue Cross & Blue Shield Ass'n*, 161 F.3d 472, 478 (7th Cir. 1998).

The Seventh Circuit has indicated that "the decision whether to use a percentage method or a lodestar method remains in the discretion of the district court." *Florin*, 34 F.3d at 566. In exercising that discretion, the Seventh Circuit has noted that in common fund/benefit cases, "the measure of what is reasonable [as an attorney fee] is what an attorney would receive from a paying client in a similar case." *Montgomery v. Aetna Plywood, Inc.*, 231 F.3d 399, 408 (7th Cir. 2000); *see*

*also In re Continental Illinois Securities Litig.*, 985 F.2d 867 (7th Cir. 1992). Thus, "[t]he approach favored in the Seventh Circuit is to compute attorney's fees as a percentage of the benefit conferred on the class," particularly where that percentage of the benefit approach replicates the market. *Williams v. General Elec. Capital Auto Lease*, No. 94-C-7410, 1995 WL 765266, *9 (N.D. Ill. Dec. 26, 1995); *see also Long v. Trans World Airlines, Inc.*, 1993 WL 121824, *1 (N.D. Ill. Apr. 19, 1993). Here, a percentage of the benefit approach clearly best replicates the market.

The uncontested evidence in this case is that Plaintiffs could not afford to retain counsel on any basis other than a contingent fee. Cooper Dec. at ¶ 3. Class representative Kathi Cooper attests that she would not have hired Class Counsel on an hourly basis. *Id.* There is no reason to believe that any other Class Member would have been willing to pay hourly fees in the hope that the case would be successful and the fees paid ultimately recovered from IBM. Class Counsel, nationally recognized experts in ERISA pension benefit cases, attest that they have not and would not accept a similar case on any basis other than a contingency fee basis. Sprong Aff. at ¶ 6. The record before the Court establishes that no other capable counsel was willing to take the case on any basis. Cooper Dec. at ¶ 5; Carr Dec. at ¶¶ 8-14; Lewis Dec. at ¶¶ 11-14. Thus, the undisputed evidence is that the market for legal services for this litigation is a contingency fee. In fact, even the vast bulk of the objectors do not disagree that a percentage of the recovery approach is appropriate in this case, they merely dispute the appropriate percentage.

In determining what an appropriate percentage should be in the unique circumstances of this case, the Court has considered a number of factors. Class Counsel submitted affidavits and briefs setting forth a large number of other large ERISA class actions in which counsel have been awarded fees similar to or greater than the percentages requested here. In addition, this Court is personally

familiar with fees in a significant number of relatively similar cases that have been awarded in this District, and the Fee Request in this case is below the amount in many of those cases in spite of the fact that this case involved similar—or in all likelihood far more—risk.

While not dispositive, attorneys' fees from analogous class action settlements are indicative of what the market is for such representation and, therefore, what an appropriate fee should be here. As this Court noted in awarding Class Counsel 29% of the recovery in connection with the settlement of the claims on behalf of the Subclass 3 members, "we have a pretty substantial body of case law now built up on these complex cases and it seems as if 30 percent is just about the bench mark." Transcript of Final Approval Hearing, Subclass 3, at 4:9-11 (Jan. 1, 2005). Similarly, the Court notes that the Affidavit of Jeffrey Lewis, a nationally recognized expert in prosecuting complex ERISA litigation, indicates that his firm has regularly been awarded fees in the neighborhood of 25% of the recovery. Lewis Dec. at ¶ 17. Importantly, as Mr. Lewis's affidavit makes clear, those awards occurred in cases with substantially less risk than here. As Mr. Lewis attests, due to the extreme risk in this case, his firm declined to bring it or any other case raising these issues until after this Court's July 31, 2003 Order. Lewis Dec. at ¶ 14. The Court has reviewed the Declaration of Stephen Susman, a prominent trial counsel with vast experience in complex litigation, who attests that if he had been asked to undertake this case for an individual client or group of clients on a nonclass basis, he would have done so only if they had agreed to pay his expenses and also his standard 33 1/3 contingent fee. Susman Dec. at ¶ 6.

The Seventh Circuit's recent decision in *Taubenfeld v. Aon* indicates that it is also appropriate to consider the "quality of legal services rendered and the contingent nature of the case." *Taubenfeld*, No. 04-3140, 2005 WL 1560331, at *3. The quality of the legal work of all counsel in

this case has been exemplary. The quality of Class Counsel's legal work both in and out of the courtroom is ably demonstrated by the benefits conferred on the Class as a result of the Settlement. Even if the Class were to lose both of the issues on appeal, the Settlement would be one of the largest pension settlements in the nation's history. And in the event that the Class prevails on either or both of the issues on appeal, the Settlement is likely to be the largest pension settlement in history.

It is clear that the Settlement represents a solid achievement in terms of the benefits it provides Class Members compared to what they could have achieved by further litigation. For example, as noted by Defendants in their moving papers seeking approval of the Settlement, Class Counsel not only achieved record-breaking additional benefits for the Class but also achieved a "valuable guarantee that plaintiffs could not have obtained in litigation—an assurance from defendants that they will not offset or 'wear away' the supplemental benefits provided by the Settlement against pension benefits earned for future service to IBM." (*See* Doc. 353 – Defendants' Memorandum in Support of Joint Motion for Approval of Settlement – at 6.) While it is an extremely valuable benefit to the Class Members, it is not, as a mathematical matter, reflected in the value of the recovery, but it warrants consideration.

The degree of risk of nonpayment in this case was high at the outset. It is undisputed that at the time Class Counsel initiated this action no other qualified counsel in the country would do so. When this case was commenced in 1999, only two courts had considered legal challenges to cash balance plans, and both decisions were summary judgment orders rejecting the plaintiffs' claims. *See Esden v. Retirement Plan of the First National Bank of Boston*, 182 F.R.D. 432 (D. Vt. 1999); *Lyons v. Georgia-Pacific Corp. Salaried Employees Ret. Plan*, 66 F.Supp.2d 1328 (N.D. Ga. 1999).

Shortly after this case was filed, another district court rejected a claim that cash balance plans violate ERISA § 411(b)(1)(H). *See Eaton v. Onan Corp.*, 117 F.Supp.2d 812 (S.D. Ind. 2000). To date, Class Counsel are the only attorneys in the country who have prevailed on the claim that a pension equity formula or a cash balance plan formula violates ERISA § 411(b)(1)(H).

The Court is also aware from the voluminous briefing in this case that there was not only a high degree of risk in the litigation context, but there was also considerable additional risk that either regulatory or legislative action might eliminate any potential for success in the courtroom. In short, there can be no question that the risk of nonpayment in this case was extraordinarily high, much higher than in the other large pension cases of which this Court is aware. In addition to facing an uphill legal and political battle, it was equally clear that anyone representing Plaintiffs would be required to overcome a well-financed adversary and prominent defense counsel with abundant financial and legal resources at their disposal.

In determining an appropriate percentage of the recovery to award, this Court is mindful of the directive in *Synthroid I* that,

> the district court must estimate the terms of the contract that private plaintiffs would have negotiated with their lawyers, had bargaining occurred at the outset of the case (that is, when the risk of loss still existed). The best time to determine this rate is the beginning of the case, not the end (when hindsight alters the perception of the suit's riskiness, and sunk costs make it impossible for the lawyers to walk away if the fee is too low). This is what happens in actual markets. Individual clients and their lawyers *never* wait until after recovery is secured to contract for fees.

*Synthroid I*, 264 F.3d at 718 (emphasis in original).

All of the evidence before the Court indicates that in the event the IBM employees had been required as a group to negotiate the terms of a fee contract with Class Counsel at the outset of the

case, the fee percentage contained in the resulting contract would have been equal to—and more likely higher than—the Fee Request before this Court.

This Court has also considered data from so-called class-counsel auctions. The Court notes that in *In re: Synthroid Marketing Litig.*, 325 F.3d 974 (7th Cir. 2003) ("*Synthroid II*"), the Seventh Circuit indicated that the sophisticated third-party payors (the insurance companies) in that case negotiated a flat 22% rate even after the risk of the litigation had passed and a recovery was assured. 325 F.3d at 976, 978 (explaining the 22% rate was agreed to "after a good deal of the risk had been dissipated" and that the TPPs still "had to offer 22% to sign up lawyers on a contingent fee."). To apply the rationale of that case to the circumstances of this case, the Court must take into consideration the notable differences between the auctions conducted in the securities field where literally dozens of skilled and experienced law firms battle each other to represent the class and typically base their cases on long established legal precedents and the situation present here.

As nationally known pension lawyer Jeffrey Lewis attests, there are only a handful of lawyers in the country who have the expertise and background to practice in this area (compared to the thousands of attorneys who practice securities litigation), and none of them was willing to undertake the risk of pursuing cases challenging cash balance plans in 1999 or for years thereafter. Lewis Dec. at ¶¶ 12-14. The evidentiary record also demonstrates that several of the best and most prominent employment firms in the country specifically refused to take the case on behalf of the IBM employees on any terms. Carr Dec. at ¶¶ 8-13. Similarly, Mr. Susman attests that "if the Court had held an auction at the beginning of this case for qualified counsel to undertake this litigation, no qualified firm would have proposed a fee structure below what Class Counsel is requesting in this case." Susman Dec. at ¶ 8; *see also* Carr Dec. at ¶ 14.

Based on all the evidence and testimony, the Court concludes that if an "auction" had in fact taken place, Class Counsel would have been the only bidder and, in light of the risk then involved, would have extracted a far higher fee that they are now requesting. Thus, the undisputed evidence before this Court indicates that under the standards enunciated in *Synthroid I* and *Synthroid II*, Class Counsel's Fee Request (inclusive of costs) is at or below what application of an "auction" scenario would have determined.

Class Counsel will be required to continue to litigate the two central issues in this case for an indefinite period of time. Not only will that involve additional time and expense, but it also involves additional risk. This is a unique factor in this case and merely emphasizes the reasonable nature of the Fee Request, as any counsel negotiating a fee contract at the outset of the litigation would certainly have taken the potential for appellate litigation into consideration in setting a fee in light of the very novel issues involved in this case.

In analyzing the appropriate fee to be awarded to Class Counsel, the Court has also given careful consideration to the objections that have been filed with the Court regarding the Fee Request. The most notable aspect of those objections is how few were filed. Although more than 272,000 potential Class Members were notified by first class mailing, only 45 objected to the Fee Request in any fashion. This is particularly remarkable in light of the sophistication of the Class Members and the high degree of interest in this litigation by the Class Members as evidenced by the fact that the website IBM established to provide additional information regarding the Settlement to Class Members received more than 38,000 visits. A significant number of the objections to the Fee Request (33 out of the total of 45) are individuals who have filed letters indicating that they agree with a longer statement of objection filed by Mr. Leas. Apparently Mr. Leas's statement was widely

circulated on the internet in an effort to solicit additional objections agreeing with his point of view.

Putting aside the mischaracterizations and inaccuracies regarding both the Class claims and the Settlement in Mr. Leas's objection, his objection ignores any consideration of the controlling Seventh Circuit authority. Instead, it relies almost totally on information Mr. Leas selectively culls from a law review article reporting on a statistical study of class action fee awards. Putting aside the limitations of that study and the potential for distortion when one tries to apply it to arrive at an appropriate fee in this case under the proper Seventh Circuit standards, when one closely examines the article for cases in the category applicable here (the over $190 million decile), the mean fee percentage was 16.4%, the median was 17.6%, and the standard deviation was 9.6%. Applying those percentages here, a fee award of 26% on a $929 million recovery would be presumptively reasonable, and an award of up to 35.6% potentially could be reasonable, depending on the complexity of the case and the risks involved. The study supports the reasonableness of the Fee Request, considering the risk and complexity of this case.

It is plain to see that Class Counsel greatly benefit from a contingent fee scheme. But this case could have ended differently in which event Counsel would have toiled for years having fronted the costs of the litigation for no reward whatsoever. In that event no one would argue that a contingent fee agreement along the lines approved here was unreasonable.

The Fee Request is unreasonable only if the result was likely from the outset, which is not the case. The motion for attorneys' fees, costs, and incentive awards (Doc. 352) is **GRANTED**. The Plan shall pay Class Counsel fees as an administrative cost of the Plan in accordance with the Settlement Agreement and calculated on a decreasing percentage as follows: (1) an amount equal to 29% of the amount of any Settlement Benefits recovered up to $250 million; (2) an amount equal

to 25% of the amount of any Settlement Benefits recovered in excess of $250 million up to the amount of $750 million; (3) an amount equal to 21% of the amount of any Settlement Benefits recovered in excess of $750 million up to the amount of $1,250 million; and (4) an amount equal to 17% requested of any Settlement Benefits recovered in excess of $1,250 million. Class Counsel shall pay incentive awards of $40,000 to Ms. Cooper and $20,000 to Ms. Harrington out of the attorneys' fees paid by the Plan and shall also reimburse themselves for any expenses they already have incurred or will incur in the future out the attorneys' fees awarded by this Court.

Finally, for the reasons set forth on the record at the August 8, 2005 hearing, the final motion for settlement approval (Doc. 351) is **GRANTED**, and the Clerk is **DIRECTED** to enter judgment accordingly.

**IT IS SO ORDERED.**

DATED: 08/16/05

> s/ G. Patrick Murphy
> G. PATRICK MURPHY
> Chief United States District Judge