# EXHIBIT L

## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK





| | |
|---|---|
| JAMES BOLLA, individually and on behalf of all others similarly situated, | Civil Action No: 10461 |
| Plaintiff, | |
| v. | |
| CITIGROUP INC., CITIBANK N.A., CHARLES PRINCE, THE PLANS ADMINISTRATIVE COMMITTEE OF CITIGROUP INC., THE 401(k) INVESTMENT COMMITTEE, and JOHN DOES 1 - 20, | |
| Defendants. | |

## COMPLAINT FOR VIOLATIONS OF THE
## EMPLOYEE RETIREMENT INCOME SECURITY ACT

Plaintiff, individually and on behalf of all others similarly situated, by his attorneys, alleges the following based upon the investigation of his counsel, except as to allegations specifically pertaining to Plaintiff which are based on personal knowledge. The investigation of counsel is predicated upon, among other things, a review of public filings by Citigroup Inc. ("Citigroup" or the "Company") with the United States Department of Labor and the Securities and Exchange Commission, press releases issued by the Company, media reports about the Company, and publicly available trading data relating to the price of Citigroup's securities.

### I.    NATURE OF THE ACTION

1.    Plaintiff brings this suit as a civil enforcement action under the Employee Retirement Income Security Act ("ERISA") §§ 502(a)(2), (3), 29 U.S.C. §§ 1132(a)(2), (3), for

Doc. 159023

relief on behalf of the Citigroup 401(k) Plan, and the Citibuilder 401(k) Plan for Puerto Rico (the "Plans"), 401(k) plans operated and established by Citigroup as a benefit for its employees to permit tax-advantaged savings for retirement and other long-term goals. Citigroup is the Plans' "sponsor," within the meaning of ERISA § 3(16)(B), 29 U.S.C. § 1002(16)(B).

2.     Plaintiff brings this action pursuant to Rules 23(a), (b)(1), (b)(2), and (b)(3) of the Federal Rules of Civil Procedure on behalf of himself and a class of all participants and beneficiaries of the Plans, and on behalf of the Plans themselves, during the period January 1, 2007 through the present (the "Class Period"). Defendants are entities and persons acting in a fiduciary capacity or who assumed a fiduciary role in relation to the Plans.

3.     Plaintiff's claims arise from the failure of the Defendants to act solely in the interest of the participants and beneficiaries of the Plans, and to exercise the required skill, care, prudence, and diligence, in administering the Plans and the Plans' assets.

4.     Plaintiff alleges that Defendants allowed the imprudent investment of the Plans' assets in Citigroup common stock throughout the Class Period despite the fact that they clearly knew or should have known that such investment was unduly risky and imprudent due to the Company's serious mismanagement and improper business practices including, among other practices: (a) participating in the formation and management of off-balance-sheet structured investment vehicles ("Conduits" or "SIVs") without disclosing Citigroup's contingent liabilities or risks related thereto; (b) causing said Conduits and/or SIVs to issue billions of dollars worth of commercial paper and short term loans based on false and misleading statements; (c) marketing and extending subprime loans made on a "low documentation" basis, without adequate consideration of the borrower's ability to pay and with unreasonably high risk of borrower

default; (d) failing to adequately disclose Citigroup's subprime loan loss exposure to investors, including the Plans' participants; (e) operating without the requisite internal controls to determine appropriate loan loss provisions; (f) understating loan loss provisions that did not properly reflect the risk facing Citigroup; all of which caused Citigroup's financial statements to be misleading and which artificially inflated the value of shares of Citigroup stock. In short, during the Class Period, the Company was seriously mismanaged and faced dire financial crisis due to such mismanagement, which rendered Company stock an imprudent investment.

5.      As Citigroup's dire financial conditions became known to the market, its stock fell from $54.26, on June 19, 2007, to $34, at the close of the market on November 16, 2007 – a 37.3% decline in share price and a loss of approximately $100 billion in market value in less than 6 months.

6.      Plaintiff and the other participants and beneficiaries of the Plans owned Citigroup stock through the Plans and have suffered substantial losses. As of December 31, 2006, the Citigroup 401(k) Plan held $4.13 billion of Citigroup Stock, which amounted to 32% of the plan's total assets. Based on publicly available information, it appears that Defendants' breaches of fiduciary duties have caused the Plans to lose well over $1.3 billion dollars in retirement savings during the Class Period.

7.      Plaintiff's claims arise from the failure of the Defendants to exercise the "care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims" in administering the Plans and the Plans' assets during the Class Period.

8.     In particular, Plaintiff alleges that Defendants breached their fiduciary duties to the participants of the Plans because they knew or should have known that the Company's securities were no longer a prudent investment, yet they failed to take steps to eliminate or reduce the amount of Company stock in the Plans, and failed to give Plaintiff and the Class complete and accurate information about Citigroup's loan loss exposure so they could make informed investment choices under the Plans.

9.     As a result of the Defendants' breaches alleged herein, the Plans suffered substantial losses.

10.    Because Plaintiff's claims apply to the participants and beneficiaries as a whole and because ERISA authorizes participants such as Plaintiff to sue for breaches of fiduciary duty on behalf of the Plans, Plaintiff brings this action as a class action of behalf of all participants and beneficiaries of the Plans.

## II.    JURISDICTION AND VENUE

11.    This Court has subject matter jurisdiction over this action pursuant to § 28 U.S.C. 1331 and  ERISA § 502(e)(1), 29 U.S.C. § 1132(e)(1).

12.    This Court has personal jurisdiction over Defendants under ERISA §502(e)(2), 29 U.S.C. § 1132(e)(2) because one or more of the Defendants may be found in this district. The Court also has personal jurisdiction over Defendants because the Company's principal executive offices are located in New York, New York.  Defendants systematically and continuously have done and continue to do business in this State, and the case arises out of Defendants' acts within this State.

13.    Venue is proper under ERISA § 502(e)(2), 29 U.S.C. § 1132(e)(2), because

Defendants administer the Plans in this district, some or all of the actionable conduct for which relief is sought occurred in this district, and one or more of the Defendants may be found in this district.

## III.    THE PARTIES

### Plaintiff

14.    Plaintiff James Bolla ("Plaintiff") is a resident of the state of Florida. He is a participant or beneficiary of the Citigroup 401(k) Plan within the meaning of ERISA §§ 3(7) and 502(a), 29 U.S.C. §§ 1102(7) and 1132(a), and was a participant or beneficiary of the plan throughout the Class Period. He continues to hold shares of Company stock in his retirement account in the Citigroup 401(k) Plan and did so throughout the Class Period.

### Defendants

#### A.    Citigroup

15.    Defendant Citigroup is a business entity organized under the laws of the state of Delaware with its executive offices located at 70 Pine Street, New York, New York.

16.    Citigroup is a diversified global financial services holding company whose businesses provide a broad range of financial services to consumer and corporate customers. Citigroup has more than 200 million customer accounts and does business in more than 100 countries.

17.    Citigroup is the sponsor of the Plans within the meaning of ERISA, and itself exercised important fiduciary duties and responsibilities. Citigroup exercised ultimate decision-making authority for the administration and management of the Plans and Plans' assets. Thus, Citigroup is a fiduciary of the Plans within the meaning of ERISA §3(21)(A), 29 U.S.C. §

1002(21), in that it exercises discretionary authority or discretionary control respecting management of the Plans, exercises authority or control respecting management or disposition of the Plans' assets, and/or exercises discretionary authority or discretionary responsibility in the administration of the Plans.

18.     Citibank N.A. is the Sponsor of the Citigroup 401(k) Plan. Plan assets are held in a trust fund established under the Citigroup 401(k) Plan and are invested in one or more of the funds available for investment. Citibank N.A. is a fiduciary of the Plans within the meaning of ERISA §3(21)(A), 29 U.S.C. § 1002(21), in that it exercises discretionary authority or discretionary control respecting management of the Plans, exercises authority or control respecting management or disposition of the Plans' assets, and/or exercises discretionary authority or discretionary responsibility in the administration of the Plans.

**B.     Director Defendants**

19.     Upon information and belief, the Citigroup Board of Directors ("Citigroup Board" or the "Board") has ultimate oversight over the Plans, and is a fiduciary of the Plans within the meaning of ERISA §3(21)(A), 29 U.S.C. § 1002(21), in that it exercises discretionary authority or discretionary control respecting management of the Plans, exercises authority or control respecting management or disposition of the Plans' assets, and/or exercises discretionary authority or discretionary responsibility in the administration of the Plans.

20.     Defendant Charles Prince ("Prince") was at all times relevant hereto Chairman of the Board and Chief Executive Officer of Citigroup, until being forced to resign on November 4, 2007. Most of Prince's compensation package is tied to his performance at the Company. For example, during the year ended December 31, 2006, Prince received a bonus of $13.2 million

and stock awards amounting to $10.6 million, in addition to his base salary of $1 million. Upon information and belief, Defendant Prince has ultimate oversight over the Plans, and is a fiduciary of the Plans within the meaning of ERISA §3(21)(A), 29 U.S.C. § 1002(21), in that it exercises discretionary authority or discretionary control respecting management of the Plans, exercises authority or control respecting management or disposition of the Plans' assets, and/or exercises discretionary authority or discretionary responsibility in the administration of the Plans.

21.     Plaintiff does not at this time name all persons who served as members of the Board during the Class Period. Instead, Plaintiff only names the top executive officer of Citigroup because as such, he had intimate knowledge of the Company's business operations and practices and, therefore, knew or should have known the Company's stock was an imprudent investment during the Class Period.

### C.     The Plans Administrative Committee of Citigroup Inc.

22.     The Plans Administrative Committee of Citigroup Inc. ("Administrative Committee") is the Plan' Administrator and, upon information and belief, was responsible for administering and managing the Plans on a day-to-day basis, and advising Citigroup and the Citigroup Board regarding the Plans and Plans' assets. Therefore, the Administrative Committee members are fiduciaries of the Plans within the meaning of ERISA in that they exercised discretionary authority with respect to: (i) management and administration of the Plans; and/or (ii) management and disposition of the Plans' assets.

### D.     The 401(k) Plan Investment Committee

23.     Upon information and belief, the 401(k) Plan Investment Committee was responsible for choosing the Plans' investments and monitoring the performance of those funds.

Therefore, the 401(k) Plan Investment Committee members are fiduciaries of the Plans within the meaning of ERISA in that they exercised discretionary authority with respect to: (i) management and administration of the Plans; and/or (ii) management and disposition of the Plans' assets.

24.     Defendants John Does 1-20 are reserved for additional fiduciaries of the Plans. At the present time, certain fiduciaries are unknown to Plaintiff. Once their identities are discovered, Plaintiff will amend his Complaint to join them under their true names.

## IV.    THE PLANS

25.     By information and belief, the Plans are defined contribution plans covering eligible employees of the Company. They are "employee pension benefit plan[s]" within the meaning of ERISA §3(2)(A), 29 U.S.C. § 1002(2)(A). Further, they are "eligible individual account plan[s]" within the meaning of ERISA  §407(d)(3), 29 U.S.C. §1107(d)(3), and also are a "qualified cash or deferred arrangement[s]" within the meaning of I.R.C. §401(k), 26 U.S.C. §401(k). The Plans are not a party to this action. Pursuant to ERISA, however, the relief requested in this action is for the benefit of the Plans.

26.     The amounts of employee and Company contributions were limited by pertinent provisions of the Internal Revenue Code. Participants directed employee and Company contributions to various investment options in the Plans. Most of these options were diversified mutual funds. However, the options also included the Citigroup Common Stock Fund.

27.     According to the Citigroup 401(k) Plan's Form 11-K Annual Report of the Citigroup 401(k) Plan, as of December 31, 2006, approximately $4.13 billion of the plan's

$12.92 billion of assets were invested in Citigroup common stock through the Citigroup Common Stock Fund.

## V.    DEFENDANTS' FIDUCIARY STATUS

28.    **Named Fiduciaries**. ERISA requires every plan to provide for one or more named fiduciaries of the Plans pursuant to ERISA § 402(a)(1), 29 U.S.C. § 1002(21)(A). The person named as "administrator" in the plan instrument is automatically a named fiduciary, and in the absence of such a definition, the sponsor is the administrator. ERISA § 3(16)(A), 29 U.S.C. § 1002(16)(A).

29.    **De Facto Fiduciaries**. ERISA treats as fiduciaries not only persons explicitly named as fiduciaries under § 402(a)(1), but also any other persons who act in fact as fiduciaries, i.e., perform fiduciary functions (including a juridical person such as Citigroup). ERISA § 3(21)(A)(i), 29 U.S.C. § 1002(21)(A)(i), makes a person a fiduciary "to the extent . . . he exercises any discretionary authority or discretionary control respecting management of such plan or exercises any authority or control respecting management or disposition of its assets . . . or . . . has any discretionary authority or discretionary responsibility in the administration of such plan." During the Class Period, all of the Defendants performed fiduciary functions under this standard, and thereby also acted as fiduciaries under ERISA, by, among other things, appointing Plan administrators, overseeing the Plan administrators, and making statements to participants with respect to the Company, its financial results and business prospects.

## VI.    DEFENDANTS' FIDUCIARY DUTIES UNDER ERISA

30.    ERISA is a comprehensive statute covering virtually all aspects of employee benefit plans, including retirement savings plans, such as the Plan. The goal of ERISA is to

protect the interests of Plan participants and their beneficiaries:

> It is hereby declared to be the policy of this chapter to protect interstate commerce and the interests of participants in employee benefit plans and their beneficiaries, by requiring the disclosure and reporting to participants and beneficiaries of financial and other information with respect thereto, by establishing standards of conduct, responsibility, and obligation for fiduciaries of employee benefit plans, and by providing for appropriate remedies, sanctions, and ready access to the Federal courts.

ERISA § 2(b), 29 U.S.C. § 1001(b).

31.     Under ERISA, those responsible for employee benefit plan management stand in a fiduciary relationship to plan participants. Pursuant to ERISA, a "fiduciary" is defined broadly to include all persons or entities that are able to exercise discretionary authority over the management of a plan or the payment of benefits. 29 U.S.C. § 1002(21)(A). ERISA requires strict fidelity and loyalty in the execution of the plan's management.

32.     ERISA imposes on Defendants, who are responsible for the Plan, the requirement to "discharge his [or her] duties with respect to a plan solely in the interest of the participants and their beneficiaries and . . . with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims." ERISA § 404(a)(1)(B), 29 U.S.C. § 1104(a)(1)(B).

33.     ERISA also imposes on Defendants responsible for the Plans a duty of loyalty, requiring these Defendants to "discharge [their] duties with respect to a plan solely in the interest of the participants and their beneficiaries and . . . for the exclusive purpose of ... providing benefits to the participants and their beneficiaries." ERISA § 404 (a)(1),(A),(i), 29 U.S.C. § 1104(a)(1),(A),(i).

34.    Other duties imposed upon Defendants who are fiduciaries under ERISA by virtue of their exercise of authority or control respecting the management of the Plans or disposition of Plan assets, include but are not limited to:

a.    The duty to investigate and evaluate the merits of decisions affecting the use and disposition of Plan assets;

b.    The duty to evaluate all investment decisions with "an eye single" to the interests of Plan participants and beneficiaries;

c.    The duty to avoid placing themselves in a position where their acts as officers, directors, or employees of the Company will prevent their functioning with the complete loyalty to participants demanded of them as trustees of a pension plan, and, if they find themselves in such a position, to seek independent, unconflicted advice;

d.    The duty, under appropriate circumstances, to monitor or influence the management of the companies in which the Plans own stock including, where appropriate, the obligation to bring a derivative action if the fiduciaries were or should have been aware that the officers and directors of the entities whose stock was held by the Plans had breached fiduciary duties owed their shareholders;

e.    To the extent that a party is responsible for appointing and removing fiduciaries, the duty to monitor those persons who have been named;

f.    The duty to disclose and inform of any material adverse information about the Company which duty entails, among other things: (1) a duty not to

make materially false and misleading statements or misinform Plan participants; (2) an affirmative duty to inform Plan participants about material adverse factors which were affecting the Company any time the fiduciary knew or should have known, pursuant to his duty to investigate, that failing to make such a disclosure might be harmful; (3) a duty to convey complete and accurate information material to the circumstances of plan participants and their beneficiaries; and (4) a duty to insure that investments were not purchased at a price above what the Defendants, but not the participants and beneficiaries, knew or should have known to be in excess of fair market value as defined in the relevant Treasury regulations and in most instances at a price which renders it improbable that the investments will bring a fair return commensurate with the prevailing rates; and

g.    When a plan is composed of various investment funds, the duty to inform and disclose also includes the duty to impart to plan participants material information which the fiduciary knows or should know is sufficient to the average plan participant of the comparative risks associated with investing in any particular investment.

35.    ERISA permits the fiduciary function to be shared among various individuals and entities. Given ERISA's functional conception of a fiduciary, absent formal discovery it is impossible to know which fiduciaries exercised which fiduciary functions. Based on the

information available to Plaintiff, the Defendants' fiduciary responsibilities were at least partially

allocated among Citigroup, the Administrative Committee, and the Investment Committee.

## VII.    FACTS BEARING ON FIDUCIARY DUTY

**A.    Citigroup Stock Was an Imprudent Investment for the Plans during the Class Period Because of the Company's Serious Mismanagement, Precipitous Decline in the Price of its Stock, and Dire Financial Condition.**

**1.    Background**

### a.    The Expansion of the Subprime Lending Industry

36.    The mortgage lending business has changed dramatically since the 1970s with the

development of national markets for mortgages, technological changes, and the advent of

securitization. In fact, the mortgage market has been the fastest growing securitization debt

market, larger than the market for U.S. Treasury bonds and notes. Between 2004 and 2005, the

subprime mortgage lending industry grew from $120 billion to $625 billion. Ruth Simon and

James R. Hagerty, *More Borrowers With Risky Loans Are Falling Behind- Subprime Mortgages

Surged As Housing Market Soared; Now, Delinquencies Mount*, Wall St. J., Dec. 5, 2006.

37.    One of the products of this new mortgage market is phenomenal growth in

subprime lending. The term "subprime" generally refers to "borrowers who do not qualify for

prime interest rates because they exhibit one or more of the following characteristics: weakened

credit histories typically characterized by payment delinquencies, previous charge-offs,

judgments, or bankruptcies; low credit scores; high debt-burden ratios; or high loan-to-value

ratios." Sandra F. Braunstein, Dir., Div. of Consumer and Cmty. Affairs, Fed. Reserve Bd.,

*Testimony Before the Subcommittee on Financial Institutions and Consumer Credit, Committee*

*on Financial Services,* U.S. House of Representatives: Subprime Mortgages. Mar. 27, 2007, *available at* http://www.federalreserve.gov/boarddocs/testimony/2007/20070327/default.htm.

38.     At the end of 2006, subprime borrowers represented approximately 13-14% of the 43 million first-lien mortgage loans outstanding in the United States. Subprime lending has grown rapidly in recent years. In 1994, fewer than 5% of mortgage originations were subprime, but by 2005 about 20% of new mortgage loans were subprime.

39.     Many industry experts and regulators, including the Federal Deposit Insurance Corporation (the "FDIC"), have attributed the rapid growth in the subprime lending market to a confluence of factors that occurred in 2004 and 2005, including rising home prices, declining affordability, historically low interest rates, intense lender competition, innovations in the structuring and marketing of mortgages, and an abundance of capital from lenders and mortgage securities investors. *See* Sandra L. Thompson, Dir., Div. Of Supervision and Consumer Prot., *Testimony Before the Committee on Mortgage Market Turmoil: Causes and Consequences,* Mar. 22, 2007, *available at* http://www.fdic.gov/news/news/speeches/chairman/spmar22071.html.

40.     In 2004, as interest rates began to climb, the pool of potential prime borrowers looking to refinance began to dry up and lenders began extending loans to subprime borrowers with troubled credit histories in an effort to maintain or grow market share in a declining origination environment. Thus, between 2003 and 2005, the prevalence of subprime loans among all mortgage originations more than doubled.

41.     In order to take advantage of this new market, lenders began weakening their underwriting standards, including:

(a)     reducing the minimum credit score borrowers need to qualify for certain loans;

(b)    allowing borrowers to finance a greater percentage of a home's value or to carry a higher debt load;

(c)    introducing new products designed to lower borrowers' monthly payments for an initial period; and

(d)    allowing borrowers to take out loans with little, if any, documentation of income and assets.

See Ruth Simon, *Mortgage Lenders Loosen Standards-Despite Growing Concerns, Banks Keep Relaxing Credit-Score, Income and Debt-Load Rules,* Wall St. J., July 26, 2005, at D1.

42.    In addition to lowering underwriting standards, lenders began offering novel loan products to entice borrowers which put them at greater risk of defaulting:

(a)    **No-documentation and low-documentation loans:**  Known in the industry as "liar loans," the practice of requiring little or no documentation from borrowers constituted as much as 40% of subprime mortgages issued in 2006, up from 25% in 2001. *See* Gretchen Morgenson, *Crisis Looms in Mortgages,* N.Y. Times, Mar. 11, 2007.  Moreover, industry research reported in April 2006 revealed that 90% of borrowers had overstated their incomes by 5% or more and in 60% of the cases, borrowers had inflated their incomes by more than half. *Id.*

(b)    **Piggy-back loans:** These combine a mortgage with a home-equity loan or line of credit, allowing borrowers to finance more than 80% of the home's value without paying for private mortgage insurance.  As of 2006, about half of all subprime loans included "piggyback" loans, and on average all borrowers financed 82% of the underlying value of their property, markedly up from 48% in 2000. *See Id.;*

James R. Hagerty & Ruth Simon, *Home Lenders Pare Risky Loans- More*
*Defaults Prompt Cut in 'Piggyback' Mortgages; Housing Market May Suffer*,
Wall St. J., Feb. 14, 2007, at A3.

(c)     **Interest-only mortgages:** These allow borrowers to pay interest and no principal
in the loan's early years, which keep payments low for a time, but require that the
deferred payment of principal be made in the future through increased monthly or
balloon payments.

(d)     **Option adjustable-mortgages:** The most prevalent of which are hybrid
adjustable rate mortgages ("ARMs"), the loans are marketed with promotional or
"teaser" rates during the loans's introductory period that later balloon to much
higher rates once the introductory period has ended.  ARMs currently account for
between one-half and one-third of subprime mortgages.  *See* Testimony of Roger
T. Cole, Director, Division of Banking Supervision and Regulation, The Federal
Reserve Board, *Mortgage Markets,* Before the Committee on Banking, Housing
and Urban Affairs, U.S. Senate, Mar. 22, 2007, *available at*
http://www.federalreserve.gov/boarddocs/testimony/2007/20070322/default.htm.

        **b.      The Demise of the Subprime Lending Industry.**

43.     In late 2004 and early 2005, industry watchdogs began expressing growing fears
that relaxed lending practices were increasing risks for borrowers and lenders in overheated
housing markets. *See* Simon, *Mortgage Lenders, supra.*  As lenders were making it easier for
borrowers to qualify for loans by such practices as described above, they were also greatly

increasing the likelihood that borrowers would be unable to make payments, and that defaults would rise.

44.     Of particular concern was the prevalence of adjustable-rate loans, which in combination with the lowered lending standards, were more likely to result in borrowers' early payment defaults.

45.     In May 2005, bank regulators issued their first-ever guideline for credit-risk management for home-equity lending and, in December 2005, new guidelines for mortgage lenders were issued as well.  *Id.;* Testimony of Sandra L. Thompson, *supra.*  The proposed "Interagency Guidance on Nontraditional Mortgage Product Risks" sent a clear message to the marketplace that bank regulators were concerned about the lessened underwriting standards and general lax risk management practices of subprime lenders.

46.     However, most subprime lenders failed to heed these and other warnings.  Despite rising interest rates and general housing market cooling in 2005, lenders continued to offer borrowers credit under weakened lending standards.  Many lenders kept introductory "teaser" rates low even after short-term interest rates began rising in June 2005.  It was not until mid to late 2006 when lenders began to tighten up their terms.

47.     Thus, in mid-2005, delinquency rates for subprime loans (60-days or more past due) rose for the first time in 2002.  By the fourth quarter of 2005, delinquencies and foreclosures began to rise even more severely – as of October 2005, the delinquency rate was twice that recorded on new subprime loans a year earlier.  *See* Simon & Hagerty, *More Borrowers, supra.*

48.    According to the FDIC, total subprime delinquencies rose from 10.33% in the fourth quarter of 2004 to 13.33% in the fourth quarter of 2006 and foreclosures rose from 1.47% to 2.0% over the same period.  Testimony of Sandra L. Thompson, *supra*.

49.    Subprime loans with ARMS accounted for the largest rise in delinquency rates, an increase from 9.83% to 14.44% between the fourth quarter of 2004 and the fourth quarter of 2006; whereas foreclosures rose from 1.5% to 2.7% during the same period.  *Id.*

50.    In 2006 alone, roughly 80,000 subprime borrowers fell into delinquency.  *See* Simon & Hagerty, *More Borrowers, supra.*

51.    At the end of 2006, subprime loans were going into foreclosure at a faster pace than loans made in previous years, and in many cases the loans were "so bad right off the bat" and "so far beyond the borrower's ability to pay that giving the borrower more time to pay or restructuring the loan wouldn't help."  *Id.*

52.    By at least January 2007, Citigroup became aware of an extraordinary increase in the default of its subprime loans and the heavy losses which the Company would inevitably recognize.  Despite these troubles, Citigroup failed to disclose its subprime loan loss exposure.  Instead, the Company slowly revealed its losses and loss exposure during the Class Period to blunt the impact and mask the depth and breath of the crisis.

### c.    Citigroup Fails to Adequately Disclose Contingent Liabilities With Respect to Off Balance Sheet Entities

53.    Conduits and SIVs are entities that banks use to issue commercial paper, which are usually highly rated, short-term notes that offer investors a safe-haven investment with a yield slightly above certificates of deposit or government debt.

54.    SIVs use the proceeds from the issuance of commercial paper to purchase longer-term investments such as corporate receivables, auto loans, credit-card debt or mortgages. Banks profit from the SIVs by pocketing the spread between the rate by which they borrow money and the rate by which they lend money.

55.    The vehicles are often established in a tax haven and are run solely for investment purposes as opposed to typical corporate activities.

56.    Because most conduits or SIVs are off the-balance-sheet entities, it is difficult for investors to size up the financial risks they pose. Off-balance-sheet liabilities played a major role in the 2001 collapse of Enron Corp., and the makers of accounting rules have generally sought to get affiliated entities back on the balance sheets of the companies creating them.

57.    According to reports, Citigroup operates conduits and SIVs with assets totaling at least $160 billion. *See* David Reilly, *Post-Enron rule changes kept banks' risks in dark --- Investors still found it hard to figure out what was going on*, Wall St. J., Oct. 17, 2007.

58.    In order to raise proceeds for its SIVs, Citigroup touted to money market fund managers and other investors that the conduits were safe investments which use the proceeds from the issuance of commercial paper and short term notes to invest strictly in high quality debt securities. *See Capital Markets: Team Of The Month - Citigroup SIV Enters Uncharted Space - Citigroup Alternative Investments Last Month Launched A Pioneering Structured Investment Vehicle. It Boosts Leverage To The Subordinated Noteholder Without Really Increasing The R; structured investment vehicles*, The Banker, Oct. 1, 2004; *Citigroup creates bespoke SIV for mystery ABS investor; Structured investment vehicle; asset backed securities; Citigroup Inc.*, Euromoney Institutional Investor, Nov. 10, 2006.

59.     However, as described below, in fact, Citigroup's conduits invested in subprime loans and, as a result, many investors are no longer willing to purchase commercial paper from its SIVs. Because the conduits still owe money to commercial-paper holders, and they can't raise money by selling new commercial paper, they are being forced to sell its assets at fire-sale prices to pay off its debts. As a result, Citigroup's conduits are on the brink of collapse, subjecting the Company to billions of dollars in liability as a result of investor lawsuits for causing the conduits to issue debt based on materially false and misleading statements. Moreover, Citigroup may have to move its conduits onto its balance sheet, and recognize billions of dollars in potential liability that the Company had not fairly disclosed to investors in Citigroup common stock, including Plan participants. *See* Peter Eavis, *Behind the Citigroup rescue*, Fortune, Oct. 15, 2007.

**2.      Citigroup Was Aware of the Extraordinary High Default Rates of Its Subprime Assets and Failed to Provide Complete and Accurate Information to Participants Regarding the Company's Loan Loss Exposure**

60.     On January 19, 2007, Citigroup announced its financial results for the year ended December 31, 2006, and for the fourth quarter ended December 31, 2006. The Company reported net income for the 2006 fourth quarter of $5.13 billion, record quarterly revenues of $23.8 billion, record full year 2006 revenues of $89.6 Billion, and record full year 2006 income from continuing operations of $21.2 Billion.

61.     In a press release issued by the Company, announcing its results, Defendant Prince stated "Our results were highlighted by double-digit revenue growth in our corporate and investment banking, wealth management and alternative investment businesses. In U.S. consumer, we continued to see positive trends from our strategic actions."

62.     During a January 19, 2007 conference call with investors discussing the

Company's fourth quarter 2006 results, a UBS analyst questioned why loan loss reserves had not

changed when there had been a pick up in Citigroup's consumer loans. Citigroup's Chief

Financial Officer ("CFO") at the time, Sallie Krawcheck, stated that:

> "...we believe that we have adequate reserves, we believe we have
> the right level of reserve for what we are seeing in terms of the
> growth in the portfolio, what we see in terms of the embedded loss in
> the portfolio. And as the environment changes the complexion, the
> portfolio changes, etc., we review that. We have I guess to go along
> with the guys that have the pocket protectors or the Ph.D. guys who
> look at the reserves and we feel very good, very good about the level
> of them."

63.     On January 23, 2007, the Company announced that Citigroup's CFO, Krawcheck,

was reassigned to head the Company's brokerage and private banking business -- a lower profile

job with narrower responsibilities. The change put Krawcheck back in charge of the brokerage

business she ran two years ago. It also put her in charge of a division of Citigroup that accounted

for only 8 percent of the Company's net income.

64.     On February 9, 2007, Citigroup's shares fell 1.2% to $54.31 after Britain's HSBC

Holdings, Europe's largest bank, warned that bad debts from its U.S. mortgage lending business

would hurt results.

65.     On February 23, 2007, Citigroup filed its Form 10-K for the year ended December

31, 2006, with the SEC. The Company reported that it earned $21.2 billion from continuing

operations on revenues of $89.6 billion; income was up 7% from 2005, while diluted EPS from

continuing operations increased 11%, with the increment in the growth rate reflecting the benefit

from our share repurchase program; and net income, which includes discontinued operations,

was $21.5 billion, down 12% from the prior year, reflecting the absence of significant gains on

sales of businesses recorded in 2005.

66.    Commenting on its outlook for 2007, the Company stated in part:

> We enter 2007 with good business momentum, as we expect to see our investment initiatives generate increasing revenues, and are well-positioned to gain from our balanced approach to growth and competitive advantages.

> We expect to continue to achieve growth in loans, deposits and other customer activity resulting from our increased distribution points, expanded product offerings, and the impact from recent targeted acquisitions.

> In 2006, our international businesses contributed 43% of our income from continuing operations. We expect to continue to re-weight our revenue mix towards International Consumer, CIB and Global Wealth Management.

> Disciplined capital allocation will remain fundamental to our strategic process and we will have a sharp focus on expense management.

> Although there may be volatility in our results in any given year, over the long term our revenues are targeted to grow organically at a mid- to high-single-digit rate, with strong expense and credit management driving earnings and earnings per share growth at a faster level. We will seek to augment this growth rate over time through targeted acquisitions.

> Credit is broadly stable as 2007 begins; however, we are budgeting for a moderate deterioration of credit in 2007. In addition, the tax benefits we realized in 2006 will not be repeated in 2007, and we anticipate the effective tax rate to return to a more normalized rate of 30% to 31%, not the 27.3% recorded in 2006.

67.    In commenting on its U.S. Consumer Lending dividions, Citigroup stated in its

Form 10-K that "Provisions for loan losses and for benefits and claims increased primarily on

higher credit losses in the Real Estate Lending and Auto businesses, partially offset by higher

22

loan loss reserve releases of $63 million in the Real Estate business. Credit losses increased due to volume growth and seasoning in Real Estate, as well as volume growth in Autos."

68.    Citigroup did not disclose any problems with its subprime loan portfolio in its Form 10-K. In fact, the Company led investors to believe that its subprime loss exposure was minimal by stating that from 2004 to 2005 "Non-prime [subprime] mortgage originations declined 20%, reflecting the Company's decision to avoid offering teaser rate and interest-only mortgages to lower FICO score customers."

69.    On February 25, 2007, Citigroup announced that it replaced Sallie Krawcheck with Gary Crittenden. Gary Crittenden came to Citigroup from American Express Company, where he was the company's chief financial chief for the last six years.

70.    On April 11, 2007, Citigroup announced that it would eliminate about 17,000 jobs as part of a companywide restructuring to reduce costs and improve profit. According to news reports, Citigroup executives, including Defendant Prince, had been under pressure from investors and analysts to get a handle on the bank's burgeoning expenses, which grew 15 percent during 2006, twice the pace of revenue growth, and caused the Company's shares to lag behind those of other big money center banks. Although the Company knew that it would suffer massive losses as a result of its subprime exposure by at least January 2007, Defendant Prince was under intense pressure to delay this disclosure until he obtained control over Citigroup's expenses.

71.    On April 16, 2007, Citigroup reported net income for the 2007 first quarter of $5.01 billion, or $1.01 per share. In a press release announcing the results, Citigroup stated "U.S.

consumer revenue growth continued to trend positively, up 6%." Defendant Prince was quoted

as stating:

> We achieved these results while completing our structural expense
> review, which will help us become a leaner, more efficient
> organization and lower our rate of expense growth.  As we look
> ahead, our priorities are clear: we will invest to grow and integrate
> our businesses, take actions to improve efficiency and lower costs,
> and continue to build momentum across our franchises.

72.    Citigroup held a conference call with investors on April 16, 2007, to discuss the

Company's financial results for the first quarter of 2007.  When questioned by an analyst as to

whether $9 billion worth of loans held by Citigroup were no documentation or low

documentation subprime loans, Citigroup's CFO would not answer the question and implied that

said loans were profitable:

> - GLENN SCHORR, ANALYST, UBS: Thanks, it is UBS. On slide
> 6, the U.S consumer mortgage trend, in the footnote, you noted that
> it excludes $5 billion of first mortgages and almost $4 billion of
> second mortgages where you didn't have FICO and LTV data. Just
> curious on what type of loans that might be, why you don't have the
> data and how your gut is that that might change the results that you
> showed on the slide?
>
> GARY CRITTENDEN: We actually just finished preparing this data
> over the course of the last week or so and we don't have a
> comprehensive view that includes all of the -- the full scope of the
> portfolio. The underlying delinquency performance of the things that
> were excluded from the table have very good delinquency
> performance associated with them. So there was no -- if you look at
> the underlying performance of those mortgages that were excluded
> from the table with those that are included, there was just no
> underlying difference in the delinquency performance between the
> two.
>
> GLENN SCHORR: Got you. I would guess it is probably stuff that
> falls into that all [pay] no [doc]/low doc type of --.

> GARY CRITTENDEN: You know, we don't use that nomenclature
> here and don't think about the business in that way.
>
> GLENN SCHORR: Okay. But you don't have FICO and LTV scores
> on the loans? Okay. I'm good. I don't need a follow-up. Thanks.
>
> GARY CRITTENDEN: Great. Thanks.

73.     In the April 16, 2007, conference call, Citigroup's CEO, Defendant Prince, told

analysts that he was pleased the bank had achieved "positive operating leverage" in the first

quarter, with revenue up 12% more than the 10% rise in expenses, in an attempt to please

investors who had been pressing for expense control. "It feels good to me to see that progress,"

Prince said. "We are delivering on our plan."

74.     Excluding an $871 million after-tax charge relating to the Company's

restructuring plan, the Company's profit was $1.18 per share for the first quarter of 2007, which

beat analyst estimates of $1.10.  Citigroup stock reached a high of $53.59 on the news, a 3.9%

increase from is closing price of $51.60 on April 13, 2007.

75.     Citigroup's comments about its operations led investors to believe that

Citigroup's subprime loan loss exposure was minimal.  Paul Nolte, director of investments at

Hinsdale Associates, a money management firm was quoted as stating "One of the question

marks coming into earnings season has been the mortgage issue, and Citigroup making positive

comments about its business has lent some strength to the overall market." Rob Kelley and

Grace Wong, *Stocks soar on earnings, deals*, CNNMoney.com, April 16, 2007.

76.     On May 4, 2007, Citigroup filed its Form 10-Q for the first quarter ended March

31, 2007, in which the Company reported income from continuing operations of $5.01 billion in

the first quarter of 2007. The Company also reported in part:

Customer volume growth was strong, with average loans up 14%, average deposits up 19%, average interest-earning assets up 25%, and client assets under fee-based management up 12% from year-ago levels. U.S. debt, equity and equity-related underwriting increased 21% from year-ago levels. Branch activity included the opening of 99 branches during the quarter (48 internationally and 51 in the U.S.). U.S. Cards accounts were up 14% and purchase sales were up 6%.

***

Net interest revenue increased 8% from last year as higher deposit and loan balances were offset by pressure on net interest margins. Net interest margin in the first quarter of 2007 was 2.46%, down 39 basis points from the first quarter of 2006...

Operating expenses increased 17% from the first quarter of 2006. Excluding the restructuring charge in 2007 and the 2006 initial adoption of SFAS 123(R), expenses were up 12% from the prior year. The relationship between revenue growth and expense growth, excluding the aforementioned impact of restructuring and SFAS 123(R), improved during the quarter. As our Structural Expense Review takes shape, we expect the pace of year-over-year expense growth (excluding acquisitions) to continue to moderate through 2007.

***

Credit costs increased $1.3 billion from a year ago, primarily driven by an increase in net credit losses of $509 million and a net charge of $597 million to build loan loss reserves. The $597 million net build compares to a net reserve release of $154 million in the prior-year period. The build was primarily due to increased reserves to reflect: a change in estimate of loan losses inherent in the initial tenor portion of the Consumer Loan Portfolio; portfolio growth, and increased delinquencies in second mortgages, in the U.S. Consumer Lending mortgage portfolio; and portfolio growth in Markets & Banking, which includes higher commitments to leveraged transactions and an increase in average loan tenor. The Global Consumer loss rate was 1.69%, a 23 basis-point increase from the first quarter of 2006.

77.     On June 12, 2007, the media reported that a large hedge fund controlled by The

Bear Stearns Companies, Inc. ("Bear Stearns") has fallen 23% from the start of the year through

late April. "The fund, called the High-Grade Structured Credit Strategies Enhanced Leverage

Fund, [was] widely exposed to subprime mortgages, or home loans to borrowers with weak

credit histories." Kate Kelly and Serena Ng, *Bear Stearns Fund Hurt by Subprime Loans*, Wall

St. J., June 12, 2007.

78.    Before the market opened, on June 20, 2007, the media reported that two Bear

Stearns hedge funds that held more than $20 billion of investments, mostly in complex securities

made up of bonds backed by subprime mortgages were close to being shut down as a rescue plan

fell apart in a drama that could have wide-ranging consequences for Wall Street and investors.

Kate Kelly, Serena Ng and David Reilly, *Two Big Funds At Bear Stearns Face Shutdown --- As*

*Rescue Plan Falters Amid Subprime Woes, Merrill Asserts Claims*, Wall St. J., June 20, 2007.

On this news, investors correctly speculated that Citigroup may have similar problems, and the

Company's common stock tumbled from its close of $54.26 on June 19, 2007 to close at $51.15

on June 25, 2007 – a 5.7% decline in less than a week.

79.    Before the close of the market on July 20, 2007, Citigroup reported net income for

the 2007 second quarter of $6.23 billion, or $1.24 per share, both up 18%. In a press release

announcing the results Defendant Price stated:

> We continued to generate revenue and volume growth in our U.S.
> consumer franchise, while making excellent progress in re-weighting
> Citi towards our other businesses, especially our international
> franchises, where revenues and net income increased over 30%. Our
> capital markets-driven businesses performed extremely well and
> international consumer revenues and volumes grew at a double-digit
> pace.

80.    On a July 20, 2007 conference call with investors discussing its second quarter

2007 results, Citigroup was forced to reveal that it had been actively managing down its

subprime exposure "some time" and had reduced its exposure "over the last six months." During the second quarter of 2007, Citigroup's profits from consumer banking fell 15 percent, to $2.7 billion, as credit costs increased by $934 million. Citigroup increased its loan loss reserves by $465 million citing higher delinquencies in citing second mortgages in consumer lending. Citigroup also announced that it expects to see continued deterioration in consumer-credit quality through the year's second half, and Citigroup probably will make "meaningful additions" to its loss reserves.

81.    After Citigroup reported that it will probably suffer meaningful losses in the second half of 2007, its stock steeply declined over the next week from a close of $51.19 on July 19, 2007 to a close of $46.97 on July 27, 2007 – an 8.2% decline, wiping out approximately $20.8 billion in market share.

82.    On August 3, 2007, Citigroup filed is Form 10-Q for the second quarter ended June 30, 2007. Citigroup reported in part:

> Income from continuing operations rose 18% to $6.226 billion and was the highest ever recorded by the Company. Diluted EPS from continuing operations was also up 18%.
>
> ***
>
> Customer volume growth was strong, with average loans up 16%, average deposits up 20%, and average interest-earning assets up 32%. International Cards purchase sales were up 31%, while U.S. Cards sales were up 6%. In Global Wealth Management, client assets under fee-based management were up 40% from year-ago levels, and client assets in Alternative Investments grew 55%. Branch activity included the opening or acquisition of 160 new branches during the quarter (136 internationally and 24 in the U.S.).
>
> ***

Operating expenses increased 16% from the second quarter of 2006 driven by increased business volumes and acquisitions (which contributed 4%). Expense growth was partially offset by savings from our Structural Expense Initiatives and the release of $300 million of litigation reserves reflecting our continued progress in favorably resolving WorldCom/Research Litigation matters. The relationship between revenue growth and expense growth continued to improve during the quarter with positive operating leverage of 4%.

\*\*\*

Credit costs increased $934 million or 59%, primarily driven by an increase in net credit losses of $259 million and a net charge of $465 million to increase loan loss reserves. The $465 million net charge compares to a net reserve release of $210 million in the prior-year period. The build in U.S. Consumer was primarily due to increased reserves to reflect: higher delinquencies in second mortgages in U.S. ConsumerLending, a change in estimate of loan losses inherent in the U.S. Cards portfolio, and portfolio growth. The increase in International Consumer primarily reflected portfolio growth, an increase in past due accounts and portfolio seasoning in Mexico cards, higher net credit losses in Japan consumer finance, and the impact of recent acquisitions. The Global Consumer loss rate was 1.56%, an 8 basis-point increase from the second quarter of 2006. Corporate cash-basis loans declined 25% from year-ago levels to $599 million.

83.    On October 1, 2007, as previously warned, Citigroup announced that dislocations in the mortgage-backed securities and credit markets, and deterioration in the consumer credit environment are expected to have an adverse impact on third quarter financial results. Citi estimated that it would report a decline in net income in the range of 60% from the prior-year quarter, subject to finalizing third quarter results. The Company's stated losses included a $1.4 billion write-off in Citigroup's $57 billion portfolio of highly leveraged loans, a loss of about $1.3 billion on the value of securities backed by subprime loans, and a loss of $600 million in fixed-income credit trading. Citigroup also announced that consumer credit costs rose $2.6

billion, mostly due to a boost in loan-loss reserves. Citigroup's shares actually rallied after the October 1, 2007 profit warning, as investors were cheered by Defendant Prince's comments that markets were recovering and Citigroup expected a "return to a normal earnings environment in the fourth quarter."

84.    On October 15, 2007, Citigroup reported its poor financial results for the third quarter of 2007 and announced write-offs that were half a billion dollars more than the Company had forecast only two weeks earlier. Citigroup's third-quarter results included a $1.35 billion pretax write-down in the value of leveraged loans, $1.56 billion of pretax losses tied to loans and subprime mortgages that were to be repackaged and sold to investors, $636 million in pretax fixed-income trading losses and $2.98 billion in increased consumer credit costs.

85.    On October 13, 2007, the media reported that a number of banks, including Citigroup, had discussions with the United States Treasury Department regarding the creation of to create a super fund to create liquidity for SIVs and conduits that were facing liquidity problems. According to reports, many investors had stopped buying commercial paper sold by these structures because they were concerned that the vehicles were exposed to subprime loans. As a result, the vehicles could not raise proceeds to pay off their debts. Also, the vehicles could not immediately sell their assets without suffering a loss.

86.    The purpose of the proposed super fund wass to purchase troubled SIVs' assets and eventually resell them in an effort to prevent discount fire sales. "Some bankers objected to the plan, calling it an escape hatch for Citigroup, which has more SIVs than any other bank." Carrick Mollenkamp, Deborah Solomon and Robin Sidel, Rescue Readied By Banks Is Bet To Spur Market, Wall St. J., Oct. 15, 2007. According to a Reuters article, dated October 21, 2007,

and entitled *Banks launch reform drive in wake of credit crisis*, "[s]ome bankers have criticised the U.S. fund rescue plan as inappropriate because it risked dragging out problems instead of tackling them head-on." The Reuters article stated that Deutsche Bank AG's chief executive officer, Josef Ackermann, rejected the idea and advised financial actors burdened with illiquid assets to write down their value now while the financial sector was strong and not to drag any uncertainty that has made banks become fearful to lend to one another.

87.    On October 16, 2007, Henry M. Paulson, Jr., U.S. Treasury secretary, said that the conduct of some mortgage market participants had been "shameful" and called for consideration of a nationwide licensing and monitoring system for mortgage brokers. *Secretary Paulson Speaks on Current Housing and Mortgage Market Developments*, US Fed News, Oct. 16, 2007. Mr. Paulson also warned caution over banks' exposure to off-balance sheet vehicles, such as Citigroup's conduit vehicles. Mr. Paulson stated that "[o]ur bank regulators must evaluate regulatory capital requirements applicable to bank exposures to off-balance sheet vehicles," and that the U.S. Treasury would "review the accounting rules" for these special purpose entities. *Id.*

88.    In connection with the SIV reports, the media reported that Citigroup "has nearly $160 billion in SIVs and conduits, but its shareholders wouldn't get a clear view of this from reading the bank's balance sheet." David Reilly, *Post-Enron rule changes kept banks' risks in dark --- Investors still found it hard to figure out what was going on*, Wall St. J., Oct. 17, 2007.

89.    It was also reported by the media that "Citigroup is the largest player in the SIV market with seven funds holding about $80 billion in assets" and that SIV "investors are skeptical" about the SIVs and that "[i]nvestors complained that the SIVs were not as reliable as they had been billed." Carrick Mollenkamp, Deborah Solomon, Robin Sidel and Valerie

Bauerlein, *SIVs Fueled Debt Boom, But Now Banks Scramble To Prop Up the Funds*, Wall St. J.,

Oct. 18, 2007.

90.     After the Company disclosed $500 million in additional losses and media reports

surfaced about Citigroup's potential multi-billion dollar exposure to off balance sheet SIVs and

conduits, Citigroup's common stock price fell from a close of $47.87 on Friday, October 12,

2007, to a close of $46.24 on October 15, 2007 – a 3.4% decline. The Company's stock price

continued to tumble over the next few days to $42.61 on October 19, 2007 -- a 10.9% decline --

wiping out approximately $25 billion in market value over a 5 day period.

91.     Citigroup's shares fell another 6.8% on November 1, 2007 after Credit Suisse and

CIBC World Markets downgraded the Company's stock on concern that Citigroup might have to

cut its dividend to boost its capital, amid reports that Citigroup would be required to disclose

billions more in losses. Citigroup shares fell $2.85 to $38.51, their lowest level since May 2003

and their biggest one-day drop since September 2002.

92.     On November 2, 2007, after the market closed, the media reported that

Citigroup's Board would hold an emergency meeting over the weekend, where Defendant Prince

would resign.

93.     On November 3, 2007, the media reported that "[t]he SEC [was] reviewing how

Citigroup accounted for certain off-balance-sheet transactions that are at the heart of a

banking-industry rescue plan, according to people familiar with the matter." Robin Sidel,

Monica Langley and Gregory Zuckerman, *Citigroup CEO Plans to Resign As Losses Grow ---*

*Bank's Board to Meet With Prince on Sunday; SEC Queries Accounting*, Wall St. J., Nov. 3.

2007. The article also reported that "[t]he SEC is also taking a broad look at how brokerage

firms valued assets tied to high-risk mortgages and whether they were timely in their disclosure of losses to investors." *Id.*

94.    On November 4, 2007, Citigroup announced that its CEO, Defendant Prince resigned. The Company also announced "significant declines" in the fair value of approximately $55 billion in U.S. sub-prime related direct exposures in its Securities and Banking (S&B) business. The Company estimated that the reduction in revenues attributable to these declines ranged from approximately $8 billion to $11 billion. That would far surpass the roughly $2.2 billion in mortgage-related writedowns and trading losses that Citigroup reported in its third-quarter earnings last month.

95.    After the market opened on November 5, 2007, Citigroup's stock fell to $35.60.

96.    On November 5, 2007, Citigroup filed its Form 10-Q for the quarter ended September 30, 2007, with the SEC. Citigroup disclosed in its Form 10-Q that it provided a $10 billion credit line to its SIVs of which $7.6 billion of credit had been drawn upon as of October 31, 2007.

97.    On November 19, 2007, Goldman Sachs Group analysts recommended that investors sell their stock in Citigroup Inc., saying the giant bank faces more write-downs of mortgage-related exposures and may have to cut its dividend to shore up its eroded capital ratios. Goldman estimated Citigroup will have to book $15 billion in write-downs over the next two quarters.

98.    In all, as Citigroup slowly revealed its dire financial conditions, its stock fell from $54.26, on June 19, 2007, to $34, at the close of the market on November 16, 2007. This amounts to a 37.3% decline in share price and a loss of approximately $100 billion in market

value in less than six months. Citigroup stock continues to fall, reaching a low of $32 on November 19, 2007.

### VIII.    DEFENDANTS BREACHED THEIR FIDUCIARY DUTIES

### A.    Defendants' Knowledge of Citigroup's Stock Risk and Subsequent Communication with Plan Participants and Beneficiaries

99.    Because of Defendants' positions with the Company, they had access to adverse undisclosed information about its business, operations, products, operational trends, financial statements, markets, and present and future business prospects via access to internal corporate documents (including the Company's operating plan, budgets and forecasts, and reports of actual operations compared thereto), conversations and connections with other corporate officers and employees, attendance at management and Board of Directors' meetings and committees thereof, and via reports and other information provided them in connection therewith.

100.    Because of the access to this information, the Defendants knew or should have known that Citigroup's common stock was an imprudent investment during the Class Period.

101.    Upon information and belief, the Defendants regularly communicated with employees, including Plan participants and beneficiaries, about Citigroup's financial performance, future financial and business prospects, and the attractiveness of Citigroup stock.

102.    Despite the Defendants' knowledge of Citigroup's risky business practices during the Class Period, the Company fostered a positive attitude toward Citigroup as a Plan investment. Management touted strong Company performance and stock benefits. Employees continually heard positive news about Citigroup's growth, were led to believe that Citigroup stock was a good investment, and that the Plans were prudently managed.

103.    Moreover, Citigroup publicly repeatedly highlighted favorable operating results, artificially favorable revenue growth trends, and other positive financial indicators, which were later found to be false and misleading.

104.    As fiduciaries, the Defendants had a duty to provide participants with complete and accurate information regarding the Plans' investment options, including the Citigroup Common Stock Fund. Despite these duties, however, the Defendants failed to provide Plan participants with complete and accurate information regarding Citigroup stock, such that the participants could appreciate the true risks presented by investments in the stock and could make informed decisions regarding investments in the Citigroup Common Stock Fund.

105.    Employees never received any information from the Company or any other Plan fiduciary that indicated that the Company's stock was not a prudent investment for their funds remaining in the Plans.

106.    Citigroup employees and Plan participants were led to believe that Citigroup stock was a prudent investment and that the Plans were managed properly.  These misleading communications regarding the performance of Citigroup stock and its true value caused Plaintiff and the Class to invest in the Citigroup Common Stock Fund and to maintain that investment to their detriment.

107.    Moreover, the Defendants knew or should have known certain basic facts about the characteristics and behavior of Plan participants, well-recognized in the 401(k) literature and the trade press, concerning investments in company stock, including that:

    a.    Out of loyalty, employees tend to invest in company stock;

    b.    Employees tend not to change their investment option allocations in the

plan once made; and

c.   Lower income employees tend to invest more heavily in company stock than more affluent workers, though they are at greater risk;

108.   Even though the Defendants knew or should have known these facts, and even though they knew of the high concentration of Plan participant funds invested in the Citigroup Common Stock Fund, they did nothing to address these risks and circumstances.

109.   Defendants' concealment of material non-public information, as well as their improper influence on Plan participants, caused Plaintiff and the Class to invest in Citigroup stock and retain their investment in the stock. The investment decisions of the Plaintiff and the Class were dependent on the misrepresentations and omissions of the Defendants.

**B.   Conflicts of Interest**

110.   Prince had a strong incentive for the participants of the Plan to invest heavily in Citigroup stock because his compensation was closely tied to the performance of Citigroup's stock price.

111.   In addition, the Administrative and Investment Committee members were dominated and/or controlled by Citigroup and Defendant Prince. Their salaries and bonuses were dependent upon obedience to Citigroup and Defendant Prince.

112.   These conflicts of interest forced the Defendants to choose between serving their own interests or serving the interests of the Plan participants and beneficiaries. Although ERISA requires that the Defendants serve the participants and beneficiaries with loyalty and prudence, the Defendants failed to do so.

### C.    Causation

113.    The Plans suffered well over $1 billion in losses because a substantial amount of the Plans' assets were imprudently allowed to be put at great risk by the Defendants, through investment by the Plans in Citigroup common stock during the Class Period, and in breach of Defendants' fiduciary duties.

114.    Had the Defendants properly discharged their fiduciary duties, including the provision of full and accurate disclosure of material facts concerning investment in Citigroup common stock and divesting the Plans of Company stock offered by the Plans when such investment alternative became imprudent, the Plans would have avoided all of the losses that it suffered through its investment in Company common stock.

### D.    Remedies for Defendants' Breach of Fiduciary Duties

115.    The Defendants breached their fiduciary duties in that they knew or should have known the facts as alleged above, and therefore knew or should have known that the Plans' assets should not have been so heavily invested in Company stock. As a consequence of the Defendants' breaches, the Plans suffered significant losses.

116.    ERISA § 502(a)(2), 29 U.S.C. § 1132(a)(2), authorizes a plan participant to bring a civil action for appropriate relief under ERISA § 409, 29 U.S.C. § 1109. Section 409 requires "any person who is a fiduciary . . . who breaches any of the . . . duties imposed upon fiduciaries . . . to make good to such plan any losses to the plan . . . ." Section 409 also authorizes "such other equitable or remedial relief as the court may deem appropriate . . . ."

117.    With respect to calculation of the losses to a plan, breaches of fiduciary duty result in a presumption that, but for the breaches of fiduciary duty, the participants and beneficiaries in

the plan would not have made or maintained their investments in the challenged investment and, where alternative investments were available, that the investments made or maintained in the challenged investment would have instead been made in the most profitable alternative investment available. In this way, the remedy restores the values of the plan's assets to what they would have been had the plan been properly administered.

118.    Plaintiff and the Class are therefore entitled to relief from the Defendants in the form of: (1) a monetary payment to the Plans to make good to the Plans the losses to the Plans resulting from the breaches of fiduciary duties alleged above, in an amount to be proven at trial based on the principles described above, as provided by ERISA § 409(a), 29 U.S.C. § 1109(a); (2) injunctive and other appropriate equitable relief to remedy the breaches alleged above, as provided by ERISA §§ 409(a) and 502(a)(2-3), 29 U.S.C. §§ 1109(a) and 1132(a)(2-3); (3) reasonable attorney fees and expenses, as provided by ERISA § 502(g), 29 U.S.C. § 1132(g), the common fund doctrine, and other applicable law; (4) taxable costs and (5) interests on these amounts, as provided by law; and (6) such other legal or equitable relief as may be just and proper.

119.    Each Defendant is personally liable and jointly liable for the acts of the other Defendants as a co-fiduciary.

## IX.    CLASS ACTION ALLEGATIONS

120.    Plaintiff brings this action as a class action pursuant to Rules 23(a), (b)(1), (b)(2), and (b)(3) of the Federal Rules of Civil Procedure on behalf of himself and a class consisting of all participants or beneficiaries of the Plans and their beneficiaries, excluding the Defendants, for whose accounts the fiduciaries of the Plans made or maintained investments in Citigroup stock

through the Plans during the Class Period, from January 1, 2007 through the present. Excluded from the Class are Defendants, members of the Defendants' immediate families, any officer, director or partner of any Defendant or any entity in which a Defendant has a controlling interest and the heirs, successors or assigns of any of the foregoing.

121.    This action is properly maintainable as a class action because:

A.    The members of the Class are so numerous that joinder of all members is impracticable. While the exact number of Class members are unknown by Plaintiff at this time and can only be ascertained through appropriate discovery, Plaintiff believes there are, at a minimum, thousands of members of the Class. According to the Citigroup 401(k) Plan's Form 5500 Annual Report for the year ended December 31, 2005, the plan had 157,504 participants with account balances at the end of the year.

B.    Plaintiff's claims are typical of those of the Class because Plaintiff and members of the Class suffered similar harm and damages as a result of Defendants' systematic unlawful and wrongful conduct described herein. Absent a class action, members of the Class may not receive restitution or other appropriate relief, will continue to suffer losses, and these violations of law will proceed without remedy.

C.    Plaintiff is a representative party who will fairly and adequately protect the interests of the other members of the Class and has retained counsel competent and experienced in complex class action and ERISA litigation. Plaintiff has no interests antagonistic to, or in conflict with, the Class it seeks to represent.

D.    A class action is superior to other available methods for the fair and

efficient adjudication of the claims asserted herein. Prosecution of separate actions by members of the Class would create a risk of inconsistent adjudications with respect to individual members of the Class which would establish incompatible standards of conduct for Defendants. As the damages suffered by the individual Class members may be relatively small, the expense and burden of individual litigation make it virtually impossible for the Class members individually to redress the wrongs done to them. The likelihood of individual Class members prosecuting separate claims is remote. Furthermore, Defendants' conduct affected and affects all Class members in a similar manner making declaratory and injunctive relief to the Class as a whole appropriate.

122.    The questions of law and fact common to the members of the Class predominate over any questions affecting individual members of the Class. The questions of law and fact which are common to Plaintiff and the Class include, among others:

a.    Whether ERISA applies to the claims at issue;

b.    Whether Defendants owe and owed fiduciary duties to the members of the Class;

c.    The nature of the fiduciary duties Defendants owe or owed to members of the Class;

d.    Whether Defendants breached their fiduciary duties; and

e.    The extent of losses sustained by members of the Class and/or the Plan and the appropriate measure of relief.

123.    Plaintiff anticipates no difficulties in the management of this action as a class action.

## X.    ERISA § 404(C) DEFENSE INAPPLICABLE

124.    ERISA § 404(c) is an affirmative defense that provides a limited exception to fiduciary liability for losses that result from participants' exercise of control over investment decisions. In order for § 404(c) to apply, participants must in fact exercise "independent control" over investment decisions, and the fiduciaries must otherwise satisfy the procedural and substantive requirements of ERISA § 404(c), 29 U.S.C. § 1104(c), and the regulations promulgated under it.

125.    ERISA § 404(c) does not apply here for several reasons. First, ERISA § 404(c) does not and cannot provide any defense to the Plans' fiduciaries' imprudent decision to select and continue offering Citigroup stock in the Plan, as that decision was not made or controlled by the participants. See Final Reg. Regarding Participant Directed Individual Account Plans (ERISA Section 404(c) Plans) ("Final 404(c) Reg."), 57 Fed. Reg. 46906-01, 1992 WL 277875, at *46924 n.27 (Oct. 13, 1992) (codified at 29 C.F.R. pt. 2550).

126.    Second, even as to participant directed investment in Citigroup stock, ERISA § 404(c) does not apply because Defendants failed to ensure effective participant control by providing complete and accurate material information to participants regarding Citigroup stock. See 29 C.F.R. § 2550.404c-1(b)(2)(i)(B) (the participant must be provided with "sufficient information to make informed decisions"). As a consequence, participants in the Plans did not have informed control over the portion of the Plans' assets that were invested in Citigroup stock as a result of their investment directions, and the Defendants remained entirely responsible for losses that result from such investment.

Doc. 159023

127.    Because ERISA § 404(c) does not apply here, the Defendants' liability to the

Plans, the Plaintiff, and the Class for losses caused by the Plans' investment in Citigroup stock is

established upon proof that such investments were or became imprudent and resulted in losses in

the value of the assets in the Plans during the Class Period.

**COUNT I**
**For Breach of Fiduciary Duty or Knowing Participation Therein**
**(Against All Defendants)**

128.    Plaintiff incorporates the foregoing paragraphs herein by reference.

129.    The Plan is governed by the provisions of ERISA, 29 U.S.C. § 1001, *et seq.*, and

Plaintiff and the Class are participants and/or beneficiaries in the Plan. Each of the Defendants is

a fiduciary or co-fiduciary with respect to the Plans pursuant to the provisions of ERISA. As

co-fiduciaries, each of the Defendants is liable for the other's conduct.

130.    Defendants violated their fiduciary duties of loyalty and prudence by: (1) failing to

adequately investigate and monitor the merits of the investments in Company stock; (2) failing to

take steps to eliminate or reduce the amount of Company stock in the Plans; and (3) failing to

give plaintiffs and the Class accurate information about Citigroup regarding its business practices

so they could make informed investment choices under the Plans.

131.    At all times relevant to the allegations raised herein, each of the Defendants was a

co-fiduciary of the others. Each Defendant knowingly participated in the fiduciary breaches

described herein, enabled its co-fiduciaries to commit such fiduciary breaches by its own failure

to comply with the provisions of ERISA, and/or had knowledge of the breaches of its

co-fiduciaries and failed to take reasonable efforts to remedy such breaches.

132.    As a result of Defendants' breach of fiduciary duties, Plaintiff and the Class, as well as the Plans, suffered damages, the exact amount of which will be determined at trial. Defendants are personally liable to Plaintiff and the Class for these losses.

## COUNT II
### For Violations of ERISA Disclosure Requirements
### (Against All Defendants)

133.    Plaintiff incorporates the foregoing paragraphs herein by reference.

134.    Defendants failed to advise Plaintiff and the Class that their investment in Citigroup stock was at substantial risk as a result of the Company's business practices and its exposure to massive penalties and/or fines. Defendants also failed to provide Plaintiff and the Class with accurate, truthful, or complete information about the Company's operations and illegal generation of revenue.

135.    Unbeknownst to Plaintiff and the Class, but known to Defendants, Citigroup's undisclosed risk of impaired financial condition was not revealed during the relevant time period. Because of the disparity in knowledge between Defendants, Plaintiff, and the Class, Plaintiff and the Class relied on Defendants to provide them with accurate and complete information about Citigroup, which was material to the suitability of Company stock as a prudent investment option.

136.    By failing to convey complete and accurate information to Plaintiff and the Class, Defendants violated their affirmative duty to disclose sufficient information to apprise Plaintiff and the Class of the risks associated with investment in Company stock when Defendants knew or should have known that the failure to disclose such material information would result in damages to Plaintiff and the Class.

137.    As a result of Defendants' failure to disclose and inform, Plaintiff and the Class

suffered damages, the exact amount of which will be determined at trial. Defendants are

personally liable to Plaintiff and the Class for these losses.

### COUNT III
### For Failure to Monitor Fiduciaries
### (Against Citigroup and Defendant Prince)

138.    Plaintiff incorporates the foregoing paragraphs herein by reference.

139.    At all relevant times, as alleged above, the Defendants were fiduciaries within the

meaning of ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A). Thus, they were bound by the duties of

loyalty, exclusive purpose, and prudence.

140.    Upon information and belief, at all relevant times, the scope of the fiduciary duties

of Citigroup and Defendant Prince included the responsibility to appoint, and, thus, monitor the

performance of the Administrative Committee.

141.    Under ERISA, a monitoring fiduciary must ensure that the monitored fiduciaries

are performing their fiduciary obligations, including those with respect to the investment and

holding of plan assets, and must take prompt and effective action to protect the plan and

participants when they are not.

142.    The monitoring duty further requires that appointing fiduciaries have procedures

in place so that on an ongoing basis they may review and evaluate whether investment fiduciaries

are doing an adequate job (for example, by requiring periodic reports on their work and the

plan's performance, and by ensuring that they have a prudent process for obtaining information

and resources they need). In the absence of a sensible process for monitoring their appointees,

the appointing fiduciaries would have no basis for prudently concluding that their appointees

were faithfully and effectively performing their obligations to plan participants or for deciding whether to retain or remove them.

143.    Furthermore, a monitoring fiduciary must provide the monitored fiduciaries with complete and accurate information in their possession that they know or reasonably should know that the monitored fiduciaries must have in order to prudently manage the plan and the plan assets, or that may have an extreme impact on the plan and the fiduciaries' investment decisions regarding the plan.

144.    Citigroup and Defendant Prince breached their fiduciary monitoring duties by, among other things: (a) failing altogether to monitor their appointees, to evaluate their performance, or to have any system in place for doing so, and standing idly by as the Plans suffered enormous losses as a result of the appointees imprudent action; (b) failing to ensure that the monitored fiduciaries appreciated the true extent of Citigroup's highly risky and inappropriate business and inflated revenue from illegal activities, and the likely impact of such practices on the value of the Plan's investment in Citigroup stock; (c) to the extent any appointee lacked such information, failing to provide complete and accurate information to all of their appointees such that they could make sufficiently informed decisions with respect to the Plans' assets; and (d) failing to remove appointees named herein whose performance was inadequate in that they continued to make and maintain huge investments in Citigroup stock during the Class Period for participants' retirement savings in the Plans, and who breached their fiduciary duties under ERISA.

145.    As a result of Citigroup and Defendant Prince failure to monitor fiduciaries,

Plaintiff and the Class suffered damages, the exact amount of which will be determined at trial.

Defendant Prince is personally liable to Plaintiff and the Class for these losses.

## COUNT IV
### For Breach of Duty to Avoid Conflicts of Interest
### (Against All Defendants)

146.    Plaintiffs incorporate the allegations contained in the previous paragraphs of this

Complaint as if fully set forth herein.

147.    At all relevant times, as alleged above, all Defendants were fiduciaries within the

meaning of ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A).

148.    ERISA § 404(a)(1)(A), 29 U.S.C. § 1104(a)(1)(A), imposes on a plan fiduciary a

duty of loyalty, that is, a duty to discharge his/her duties with respect to a plan solely in the

interest of the participants and beneficiaries and for the exclusive purpose of providing benefits

to participants and its beneficiaries.

149.    Defendants breached their duty to avoid conflicts of interest and to promptly

resolve them by, inter alia: failing to engage independent fiduciaries who could make

independent judgments concerning the Plans' investment in the Citigroup Common Stock Fund;

failing to notify appropriate federal agencies, including the United States Department of Labor,

of the facts and transactions which made Citigroup Stock an unsuitable investment for the Plans;

failing to take such other steps as were necessary to ensure that participants' interests were

loyally and prudently served; with respect to each of these above failures, doing so in order to

prevent drawing attention to the Company's inappropriate practices; and by otherwise placing the

interests of the Company, their co-defendants, and themselves above the interests of the participants with respect to the Plans' investment in Company Stock.

150.    As a direct and proximate result of the breaches of fiduciary duties alleged herein, the Plans, and indirectly Plaintiffs and the Plans' other participants and beneficiaries, lost a significant portion of their retirement investments.

151.    Pursuant to ERISA § 502(a)(2), 29 U.S.C. § 1132(a)(2) and ERISA § 409, 29 U.S.C. § 1109(a), Defendants in this Count are liable to restore the losses to the Plans caused by their breaches of fiduciary duties alleged in this Count.

## COUNT V
### Co-Fiduciary Liability
### (Against Citigroup and Prince)

152.    Plaintiffs incorporate by this reference the allegations above.

153.    This Count alleges co-fiduciary liability against the following Defendants: Citigroup and Prince (collectively, the "Co- Fiduciary Defendants").

154.    As alleged above, during the Class Period the Co-Fiduciary Defendants were named fiduciaries pursuant to ERISA § 402(a)(1), 29 U.S.C. § 1102(a)(1), or de facto fiduciaries within the meaning of ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A), or both. Thus, they were bound by the duties of loyalty, exclusive purpose, and prudence.

155.    As alleged above, ERISA § 405(a), 29 U.S.C. § 1105, imposes liability on a fiduciary, in addition to any liability which he may have under any other provision, for a breach of fiduciary responsibility of another fiduciary with respect to the same plan if knows of a breach and fails to remedy it, knowingly participates in a breach, or enables a breach. The Co-Fiduciary Defendants breached all three provisions.

156.    Knowledge of a Breach and Failure to Remedy: ERISA § 405(a)(3), 29 U.S.C. § 1105, imposes co-fiduciary liability on a fiduciary for a fiduciary breach by another fiduciary if, he has knowledge of a breach by such other fiduciary, unless he makes reasonable efforts under the circumstances to remedy the breach. Citigroup and Defendant Prince knew of the breaches by other fiduciaries and made no efforts, much less reasonable ones, to remedy those breaches. In particular, they did not communicate their knowledge of the Company's illegal activity to the other fiduciaries.

157.    Citigroup, through its officers and employees, engaged in highly risky and inappropriate business practices, withheld material information from the market, provided the market with misleading disclosures, and profited from such practices, and, thus, knowledge of such practices is imputed to Citigroup as a matter of law.

158.    Defendant Prince, by virtue of his position at Citigroup, participated in and/or knew about the Company's highly risky and inappropriate business and as well as their consequences, including the artificial inflation of the value of Citigroup stock.

159.    Because Citigroup and Defendant Prince knew of the Company's inappropriate business practices, they also knew: a) that the members of Administrative and Investment Committees were breaching their duties by continuing to invest in Company stock; and b) that the members of the Administrative and Investment Committees were breaching their duties by providing incomplete and inaccurate information to participants. Yet, they failed to undertake any effort to remedy these breaches. Instead, they compounded them by downplaying the significance of Citigroup's loan loss exposures, and obfuscating the risks posed to the Company, and, thus, to the Plans.

160.    **Knowing Participation in a Breach**: ERISA § 405(a)(1), 29 U.S.C. § 1105(1), imposes liability on a fiduciary for a breach of fiduciary responsibility of another fiduciary with respect to the same plan if he participates knowingly in, or knowingly undertakes to conceal, an act or omission of such other fiduciary, knowing such act or omission is a breach. Citigroup, as a de facto fiduciary as alleged above, participated in all aspects of the fiduciary breaches of the other Defendants. Likewise, Defendant Prince knowingly participated in the breaches of the members of the Administrative and Investment Committees because, as alleged above, they had actual knowledge of the Company's misconduct, ignoring their oversight responsibilities (as Directors), and permitted the members of the Administrative and Investment Committees to breach their duties.

161.    **Enabling a Breach**: ERISA § 405(a)(2), 29 U.S.C. § 1105(2), imposes liability on a fiduciary if by failing to comply with ERISA § 404(a)(1), 29 U.S.C. §1104(a)(1), in the administration of his specific responsibilities which give rise to his status as a fiduciary, he has enabled another fiduciary to commit a breach.

162.    Citigroup and Defendant Prince's failure to monitor the members of the Administrative and Investment Committees enabled those committees to breach their duties.

163.    As a direct and proximate result of the breaches of fiduciary duties alleged herein, the Plans, and indirectly Plaintiffs and the Plans' other participants and beneficiaries, lost well over a billion dollars of retirement savings.

164.    Pursuant to ERISA §§ 409 and 502(a)(2) and (a)(3), 29 U.S.C. §§ 1109(a) and 1132(a)(2) and (a)(3), the Co-Fiduciary Defendants are liable to restore the losses to the Plans

caused by their breaches of fiduciary duties alleged in this Count and to provide other equitable relief as appropriate.

## COUNT VI
### Knowing Participation in a Breach of Fiduciary Duty
### (Against All Defendants)

165.    Plaintiffs incorporate the allegations contained in the previous paragraphs of this Complaint as if fully set forth herein.

166.    To the extent that Citigroup is found not to have been fiduciary or to have acted in a fiduciary capacity with respect to the conduct alleged to have violated ERISA, Citigroup knowingly participated in the breaches of those Defendants who were fiduciaries and acted in a fiduciary capacity and as such is liable for equitable relief as a result of participating in such breaches.

167.    Citigroup benefitted from the breaches by discharging its obligations to make contributions to the Plans in amounts specified by the Plans, contributing Citigroup stock to the Plans while the value of the stock was inflated as the result of Citigroup's highly risky and improper business practices, and providing the market with materially misleading statements and omissions.  Accordingly, Citigroup may be required to disgorge this benefit or a constructive trust should be imposed on treasury shares of Citigroup stock which would have been contributed to the Plans, but for Citigroup's participation in the foregoing breaches of fiduciary duty.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for judgment as follows:

a.    Determining that this is a proper class action to be certified under Rule 23 and appointing Plaintiff class representative on behalf of the Class;

b.    Declaring that Defendants have violated the duties, responsibilities, and obligations imposed upon them as fiduciaries and co-fiduciaries and that they violated the ERISA disclosure and monitoring requirements as described above;

c.    Awarding extraordinary, equitable, and/or injunctive relief as permitted by law, equity, and the federal statutory provisions sued hereunder, pursuant to Fed. R. Civ. P. 64 and 65;

d.    Awarding the Plans and/or Plaintiff and members of the Class, restitution, disgorgement and/or other remedial relief;

e.    Allowing a trial by jury to the extent permitted by law;

f.    Awarding the Plans and/or Plaintiff and members of the Class pre-judgment and post judgment interest, as well as their reasonable attorneys' fees, expert witness fees, and other costs; and

g.    Awarding such other relief as this Court may deem just and proper.

Dated: New York, New York

November 19, 2007

Respectfully submitted,

By: _____

Marian P. Rosner (MR-0410)
Robert Finkel (RF-2373)
Andrew Lencyk (AL-4329)
WOLF POPPER LLP
845 Third Avenue
New York, New York 10022
Tel. (212) 759.4600
*Attorneys for Plaintiff*