Exhibit I

NOT FOR PUBLICATION

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

GERALD H. PETERSON, <u>et al.,</u>                        :
                                                          :
    Plaintiffs,                        :
                                                          :            :
        vs.                    :     Civil Action No.: 99-4982 (JLL)
                                                          :
AMERICAN TELEPHONE &                                      :
TELEGRAPH CO.,                                            :
                                                          :     OPINION & ORDER
    Defendant.                         :
_____ :

APPEARANCES:

BRIAN J. MCMAHON, ESQ.
Gibbons, Del Deo, Dolan, Griffinger & Vecchione
One Riverfront Plaza
Newark, NJ 07102-5497

JOEL C. FEFFER, ESQ.
MATTHEW M. HOUSTON, ESQ.
Wechsler Harwood LLP
488 Madison Avenue
New York, NY 10022
(Attorneys for Plaintiffs)

CHRISTOPHER H. MILLS, ESQ.
KATHLEEN MCLEOD CAMINITI, ESQ.
DAVID H. GANZ, ESQ.
Collier, Jacob & Mills, P.C.
580 Howard Avenue
Somerset, NJ 08873
(Attorneys for Defendant)

JOSE L. LINARES, U.S.D.J.

      This matter comes before the Court as a putative class action on behalf of former employees of AT&T who retired after April 28, 1997 and before January 1, 1998 under the Special Update to AT&T's Management Pension Plan (the "Plan"). Plaintiffs allege that AT&T breached its fiduciary duties under § 404 (29 U.S.C. § 1104) of the Employee Retirement Income Security Act of 1974 ("ERISA") by encouraging them to retire under terms less advantageous than what could have been obtained shortly thereafter. Defendant presently seeks a motion for summary judgment pursuant to Fed.R.Civ.P. 56, and in a separate motion Plaintiffs seek certification of the class. The motion is resolved without oral argument. Fed.R.Civ.P. 78. As discussed herein, to the extent that Defendant has complied with its requirements under ERISA, Defendant's motion for summary judgment is GRANTED on all claims, except for Plaintiffs' claim that Defendant made statements that retirees would be eligible for future changes to the Plan. On that issue, summary judgment is DENIED with respect to Plaintiffs Lando and Wuzniak and GRANTED with respect to all other named Plaintiffs. Plaintiffs' motion for class certification is DENIED.

### Background

The present dispute arises out of changes made to Defendant AT&T's Management

Pension Plan through the enactment of its Voluntary Retirement Incentive Program ("VRIP").[1]

The VRIP, which will be subsequently discussed in greater detail, provided substantial financial

benefits to departing management employees who were on AT&T's payroll as of January 1,

1998, and employees who retired prior to that date were ineligible for these increased benefits. It

is those employees that retired "prematurely" so as to preclude them from VRIP benefits who

have filed this action.

The AT&T Management Pension Plan is an ERISA-covered defined-benefit pension plan

in which AT&T, and not the employees, makes all contributions. At all relevant times, AT&T

Executive Vice President of Human Resources Harold Burlingame was responsible for making

recommendations to senior executives on changes to the Plan. Burlingame was a member of

AT&T's senior management team, referred to at AT&T as the Operations Group ("OG"). Other

_____

[1]The facts in this case are almost entirely undisputed, as the disagreement between the parties centrally stems from the proper legal characterization of those facts. The Court will note particular factual disputes in its discussion when relevant.

It is important to note that Plaintiffs believe the scope of this dispute goes back to 1996 when the former CEO of AT&T announced large employee reductions, and that the pension plan changes presently under scrutiny are connected to discussions made at that time. Because Plaintiffs provide no credible evidence of any sort of decision or long-term "master plan" to reduce the work force, the Court rejects such allegations and limits the discussion of background facts accordingly. The evidence clearly shows that VRIP was designed and implemented entirely at Armstrong's directive and cannot be construed as part of the design of his predecessor. Before the advent of VRIP, there were no plans by AT&T to use pension plan enhancements to reduce the workforce, but only the policy that AT&T would continue to use its existing severance pay plan, the Force Management Program to provide benefits to those who were downsized.

than Burlingame, the OG was composed of the CEO, the CFO, and the principal operating heads

of the various business units.  Once the OG approved a change to the pension plan, it would

make recommendations to the Compensation and Employee Benefits Committee, which could

then make recommendations to the Board of Directors.  The full Board had the final and

exclusive authority to amend the Plan.

Prior to 1997, the Plan calculated a participant's pension benefit by using a "modified

career average" formula, in which a participant's pension was based on his annual compensation

during a specified multi-year period (known as the "pay-base averaging period"), his length of

service, and a specified percentage multiplier.  On April 16, 1997, AT&T's Board of Directors

amended the Plan to adopt a "Cash Balance" formula ("Cash Balance"), effective January 1,

1998.[2]   Under Cash Balance, participants would receive hypothetical cash balance accounts that

would be supplemented annually with "interest" and "pay" credits.  In order to transition to Cash

Balance, AT&T simultaneously implemented a program known as "Special Update."  Special

Update was a one-time only fixed increase in the benefits provided under the Plan.[3]   Special

---

[2]AT&T has always reserved the right "to modify, suspend, change or terminate the Plan at
any time."   Plaintiffs were advised of this right both in writing and during seminar presentations.
(Def. Statement of Material Facts, ¶ 5-6).

[3]The Special Update modified the "compensation base averaging period" (the period
upon which benefits were calculated) to be based on the amount earned during the period 1994-
1996 rather than 1987-1992.  It also added a special "enhancement factor" to a participant's years
of service, and removed age and service requirements for the immediate receipt of a pension so
that participants could start receiving their pension at any age.  Finally, it fixed benefit accruals
so that time worked by Plan participants after December 31, 1996 would not be factored in to the
formula for calculating benefits.  Defendant claims that Special Update amounted to
approximately a 25% increase in the pension amounts of long-service participants over the prior
Plan formula. (Def. Mot. S.J., 4).  According to Plaintiffs, Special Update increased the
traditional pension benefit by 9-11%. (Pl.'s Opp. Mot. S.J., 8).

Update was designed to provide security to those participants who neared retirement before their

benefits under the Cash Balance account could adequately accrue.

On April 28, 1997, Burlingame distributed a letter and fact sheet to eligible AT&T

employees informing them of the impending Special Update/Cash Balance modifications to the

AT&T Management Pension Plan.  The fact sheet stated in pertinent part:

> In general, if you are within 7 years of retirement eligibility under the
> current plan, your special update will most likely provide a greater
> benefit than the cash balance feature.  If you're more than 7 years from
> retirement eligibility under the current plan though, the cash balance
> feature will most likely produce a better benefit than the special
> update.

Dep. Ex. D-7.

The letter encouraged employee participation in company-sponsored seminars to learn

more about the pension changes.  During these seminars, Plaintiffs allege, in various

permutations, that Defendant orally misrepresented that the Special Update would provide the

greatest benefits to retirees over the next four to seven years and that anyone retiring pursuant to

this plan would be given the opportunity to participate in future changes to the Plan.  Over the

next several months, AT&T issued various detailed communications to participants regarding

Special Update and Cash Balance in both paper and electronic form.

C. Michael Armstrong became the new CEO of AT&T on November 1, 1997.  Soon after

taking the helm, Armstrong set out to substantially reduce the company's expenses.  During

November 1997, Armstrong began to outline a series of "bold strokes" he wanted implemented at

AT&T which included various cost-cutting measures.  (Def. Statement of Material Facts, ¶ 48).

Pursuant to this outline, Burlingame then consulted the staff of an AT&T subsidiary, Actuarial

Sciences Associates, Inc. ("ASA") to "think conceptually" about the options that AT&T could use to reduce its workforce. (Id. at ¶ 50). ASA responded on December 1, 1997 with various "tools" available, yet none of these approaches resembled what ultimately became the Voluntary Retirement Incentive Program. At some point in the middle of December, Armstrong asked Burlingame to develop a plan to substantially reduce AT&T's workforce. By the end of December, the AT&T Director of Benefit Planning met with ASA staff in a "brain storming" session to explore various options that could be used in an early retirement incentive program. Around this period, ASA actuaries also performed cost analyses on several designs involving pension enhancements. As of the end of 1997, senior-level executives had not yet discussed changing the Plan in order to reduce the number of AT&T employees.

On January 7, 1998, for the first time, the Operations Group was presented with different options for reducing the size of the workforce, which included measures to temporarily increase pension benefits with the goal of persuading employees to retire. As no consensus was reached at the meeting on how to proceed, the OG instructed Burlingame to further develop and refine the different alternatives discussed. (Id. at 63-65). On January 10-11, 1998, members of AT&T's Human Resources, Benefits and Legal departments met with representatives of ASA, during which they examined the feasibility of three downsizing options: 1) using the Plan to create incentives for management employees to leave AT&T (the precursor of the VRIP); 2) implementing an involuntary force reduction; and 3) a combined voluntary/involuntary program. These sessions produced a document that evaluated each option. (Id. at ¶ 66-68). At a meeting held on January 14, 1998, the three design options were presented to the entire Operations Group. No final decision was reached as to which of the three options, if any, would be

approved and recommended to the Board.  (Id. at ¶ 70-72).  On January 16, 1998, the OG

discussed downsizing again and placed the issue on the Board's next agenda.  On January 19,

1998, the OG met to discuss force reduction and agreed to recommend the VRIP concept to the

Compensation and Employee Benefits Committee at its upcoming meeting.  The VRIP plan was

presented to the Committee on January 20, 1998, and the Committee agreed to recommend

resolutions to the Board of Directors that would authorize the development of VRIP and direct

Burlingame to study additional details of the Plan.  The following day, the Board adopted the

Committee's recommendation authorizing the development of VRIP.  On January 26, 1998,

AT&T announced the concept of VRIP to its employees.  (Id. at ¶ 73-78).  Over the next several

months, numerous oral and written communications were made between AT&T senior

management and executives regarding further development of the VRIP design.  On March 18,

1998, the Board approved the final design of VRIP and formally adopted the program.  (Id. at ¶

80).

        The VRIP program as ultimately formulated offered, for a limited period, significant

financial benefits to certain full-time or part-time managers who were participants in the Plan at

any time from January 1, 1998 to January 21, 1998 and who met other eligibility criteria.

Participants who accepted the offer and voluntarily terminated their employment received a one-

time "incentive" added to their pension benefits, regardless of whether it was calculated under

the Special Update or Cash Balance formulas.  VRIP did not constitute a permanent Plan change

for employees who did not accept the package.

        Plaintiffs first filed their putative class action complaint on October 22, 1999, and

amended it on January 28, 2000, seeking to represent a class of management employees who

elected retirement benefits from April 28, 1997 to December 31, 1997 under the Special Update

program.  Because the named Plaintiffs terminated their employment with AT&T prior to

January 1, 1998, they were not eligible for the Voluntary Retirement Incentive Program.  The

amended complaint alleges that AT&T breached its fiduciary duties under § 404 (29 U.S.C. §

1104) of the Employee Retirement Income Security Act of 1974 ("ERISA") by encouraging them

to retire under less favorable conditions than what could have been obtained soon after under the

VRIP.  Plaintiffs filed their motion for class certification on September 23, 2002, and Defendant

filed its summary judgment motion on December 16, 2002.


### Summary Judgment Standard

Rule 56(c) of the Federal Rules of Civil Procedure provides that summary judgment may

be granted only when the evidence shows "that there is no genuine issue as to any material fact

and that the moving party is entitled to judgment as a matter of law."  Serbin v. Bora Corp., 96

F.3d 66, 69, n.2 (3d Cir. 1996).  In determining whether there remain any actual issues of factual

dispute, the court must resolve all reasonable doubts in favor of the nonmoving party.

Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574 (1986); Meyer v. Riegel Prods.

Corp., 720 F.2d 303, 307 n.2 (3d Cir. 1983).  At the summary judgment stage, "the judge's

function is not himself to weigh the evidence and determine the truth of the matter but to

determine whether there is a genuine issue for trial."  Anderson v. Liberty Lobby, Inc., 477 U.S.

242, 249 (1986).

The moving party bears the initial burden of identifying evidence that demonstrates the

absence of a genuine issue of material fact.  Celotex Corp. v. Catrett, 477 U.S. 317 (1986).  Once

that burden has been met, it is incumbent upon the nonmoving party to set forth specific facts

showing that there is a genuine issue for trial.  Anderson, 477 U.S. at 248.  The non-movant must

"do more than simply show that there is some metaphysical doubt as to the material facts."

Matsushita, 475 U.S. at 586.  Thus, if the non-movant's evidence on any essential element of the

claims asserted is merely "colorable" or is "not significantly probative," the court should enter

summary judgment in favor of the moving party.  Anderson, 477 U.S. at 249-250.  In other

words, the non-moving party must "make a showing sufficient to establish the existence of

[every] element essential to that party's case, and on which that party will bear the burden of

proof at trial.  Serbin, 96 F.3d at 69, n.2.  Keeping in mind the fact that this matter must be

examined in this particular procedural posture, the Court will now turn to the issues presented in

this case.

### Legal Discussion

In the Complaint, Plaintiffs claim that AT&T breached its fiduciary duties under ERISA

by failing to disclose that the VRIP changes were under serious consideration at the time

Plaintiffs retired.  Plaintiffs also allege that Defendant violated its fiduciary duties by

misrepresenting the situation to them in three different ways, namely by: 1) falsely representing

that Special Update would provide the greatest benefits to retirees over the next four to seven

years; 2) falsely representing that the Special Update benefits were "frozen"; and 3) falsely

representing that anyone retiring pursuant to Special Update would be given an opportunity to

participate under any enhanced plan.  Each of these allegations will be addressed separately

pursuant to the relevant legal framework established by this Circuit.  As the Court's resolution of

the summary judgment motion ultimately disposes of the class certification issue, summary

judgment will be addressed first.

## I.  Legal Background

Under ERISA, an employer that also serves as a plan administrator, like Defendant in this case, is a fiduciary that is required to "discharge its duties solely in the interests of the participants and beneficiaries." 29 U.S.C. § 1104(a)(1); <u>Fischer v. Phila. Elec. Co.</u>, 994 F.2d 130, 133 (3d Cir. 1993) ("Fischer I").  Therefore, when a plan administrator explains plan benefits to its employees, it acts in this fiduciary capacity.  <u>Int'l Union, United Auto.. Aerospace & Agr. Implement Workers</u>, 188 F.3d 130, 148 (3d Cir. 1999).  Section 404(a) of ERISA, 29 U.S.C. § 1104, is the touchstone for understanding the scope and object of an ERISA fiduciary's duties.  <u>Bixler v. Central Pennsylvania Teamsters Health & Welfare Fund</u>, 12 F.3d 1292, 1299 (3d Cir. 1993).  The section establishes that a fiduciary shall act exclusively for the benefit of participants and "with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims." 29 U.S.C. § 1104(a)(1)(B).

The Third Circuit has repeatedly held that a fiduciary in this context may not materially mislead those to whom these statutory duties of loyalty and prudence are owed. <u>In re Unisys Sav. Plan Litig.</u>, 74 F.3d 420 (3d Cir. 1996); <u>Curcio v. John Hancock Mut. Life Ins. Co.</u>, 33 F.3d 226, 238 (3d Cir. 1994); <u>Bixler v. Central Pennsylvania Teamsters Health and Welfare Plan</u>, 12 F.3d 1292, 1300 (3d Cir. 1994); <u>Fischer I</u>, 994 F.2d at 135.  Thus, a plan administrator breaches its fiduciary duty under ERISA if it makes material misrepresentations to plan participants concerning employee benefits.  "Put simply, when a plan administrator speaks, it must speak

truthfully." <u>Fischer I</u>, 994 F.2d at 135.  The breadth of the fiduciary duty is not limited to a

prohibition of affirmative misrepresentations, as the duty "entails not only a negative duty not to

misinform, but also an affirmative duty to inform when the trustee knows that silence might be

harmful." <u>Bixler</u>, 12 F.3d at 1300.  Therefore, the failure to give certain relevant information

regarding benefits to beneficiaries might lead to liability if the administrator fails to communicate

"those material facts, known to the fiduciary but unknown to the beneficiary, which the

beneficiary must know for its own protection." <u>Glaziers & Glassworkers Union Local No. 252</u>

<u>Annuity Fund v. Newbridge Sec., Inc.</u>, 93 F.3d 1171, 1182 (3d Cir.1996).  The knowledge of the

fiduciary may give rise to such a duty to disclose even in the absence of a specific request by the

beneficiary because "absent such information, the beneficiary may have no reason to suspect that

it should make inquiry into what may appear to be a routine matter." <u>Glaziers & Glassworkers</u>

<u>Union Local No. 252</u>, 93 F.3d at 1181.

   Overall, a successful claim for breach of fiduciary duty under ERISA for a

misrepresentation requires that plaintiff demonstrate that: (1) defendant company was acting as a

fiduciary; (2) defendant made affirmative misrepresentations or failed to adequately inform plan

participants and beneficiaries; (3) the information misrepresented or not disclosed was material;

and (4) plaintiffs relied on the misrepresentation to their detriment.  <u>See</u> <u>Horvath v. Keystone</u>

<u>Health Plan East, Inc.</u>, 333 F.3d 450, 459 (3d Cir. 2003); <u>Daniels v. Thomas & Betts Corp.</u>, 263

F.3d 66, 73 (3d Cir. 2001); <u>International Union, United Auto., Aerospace & Agr. Implement</u>

<u>Workers</u>, 188 F.3d at 148; <u>In re Unisys Corp. Retiree Med. Benefits "ERISA" Litig.</u>, 57 F.3d

1255, 1264-1265 (3d Cir.1995) ("Unisys I").  A misleading statement or omission is material if

there is a "substantial likelihood" that the misrepresentation would "mislead a reasonable

employee in making an adequately informed decision about if and when to retire." <u>Unisys I.</u>, 57
F.3d at 1264.

One commonly-litigated dispute over ERISA fiduciary responsibilities arises when a plan
administrator tells employees that no pension plan improvements are being considered, thereby
inducing the employees to retire, when in fact, the company is seriously considering such a
change, and implements that change subsequent to the employees' retirement. <u>See e.g.</u>, <u>Fischer
v. Phila. Elec. Co.</u>, 96 F.3d 1533, 1538 (3d Cir. 1996) ("Fischer II"). In determining the scope
and degree of disclosure required under ERISA in this context, the Third Circuit has recognized
that equally important considerations are at cross-purposes. On one hand:

> ERISA does not impose a duty of clairvoyance on fiduciaries. An
> ERISA fiduciary is under no obligation to offer precise predictions
> about future changes to its plan. Rather, its obligation is to answer
> participants' questions forthrightly, a duty that does not require the
> fiduciary to disclose its internal deliberations.

<u>Fischer II</u>, 96 F.3d at 1539 (citations and quotations omitted in original). <u>See also</u> <u>Mushalla v.
Teamsters Local No. 863</u>, 300 F.3d 391, 398 (3d Cir. 2002) ("Every business must develop
strategies, gather information, evaluate options, and make decisions. Full disclosure of each step
in this process is a practical impossibility.") (internal citation omitted). Similarly, imposing
liability too quickly for failing to disclose a potential early retirement plan could actually harm
employees by deterring employers from ever offering improved benefits. <u>Fischer II</u>, 96 F.3d at
1541. At the same time, however, ERISA was enacted in large part to "ensure that employees
receive sufficient information about their rights under employee benefit plans to make well-
informed employment and retirement decisions." <u>Harte v. Bethlehem Steel Corp.</u>, 214 F.3d 446,
451 (3d Cir. 2000). Indeed, the very goals of the "fiduciary duty jurisprudence" arising out of

ERISA stem from the need "to protect and strengthen the rights of employees" and "to enforce

fiduciary standards." Jordan v. Federal Express Corp., 116 F.3d 1005, 1014 (3d Cir.1997).

In attempting to balance the different considerations under these circumstances, this

Circuit has determined that an ERISA fiduciary must disclose information about changes to a

pension plan only when those changes are under "serious consideration."  According to the three-

prong test first set forth in Fischer II, "serious consideration" exists when: 1) a specific proposal;

2) is being discussed for purposes of implementation; 3) by senior management with the

authority to implement the change.  Id. at 1539.  This formulation does not turn on any single

factor but is inherently fact-specific.  Id.

A specific proposal emerges subsequent to the preliminary steps of "gathering

information, developing strategies, and analyzing options.  Fischer II, 96 F.3d at 1539-1540.  To

be deemed "specific," it must be "sufficiently concrete" to support the consideration by senior

management for implementation.  Id. at 1540.  However, a "specific proposal" can "contain

several alternatives, and the plan as finally implemented may differ somewhat from the

proposal."  Id.  The "discussion for implementation" element "distinguishes serious

consideration from the preliminary steps of gathering data and formulating strategy.  It also

protects the ability of senior management to take a role in the early phases of the process without

automatically triggering a duty of disclosure."  Id.  This factor "recognizes that a corporate

executive can order an analysis of benefits alternatives or commission a comparative study

without seriously considering implementing a change in benefits. Preliminary stages may also

require interaction among upper level management, company personnel, and outside

consultants."  Id.

Finally, to constitute serious consideration for purposes of liability under ERISA, the proposal must be discussed by those members of "senior management" who have the authority to implement the change. This <u>Fischer II</u> prong "ensures that the analysis of serious consideration focuses on the proper actors within the corporate hierarchy." <u>Id.</u> at 1540. As the <u>Fischer II</u> court noted:

> This focus on authority can be used to identify the proper cadre of senior management, but it should not limit serious consideration to deliberations by a quorum of the Board of Directors, typically the only corporate body that in a literal sense has the power to implement changes in benefits packages. It is sufficient for this factor that the plan be considered by those members of senior management with responsibility for the benefits area of the business, and who ultimately will make recommendations to the Board regarding benefits operations.

<u>Id.</u> at 1540.

Because the <u>Fischer II</u> "serious consideration" jurisprudence has tended to develop separately from the general breach of fiduciary duty cases under ERISA (denominated the <u>Bixler</u> line after the seminal Third Circuit case so regarding), the Third Circuit has recently attempted to delineate the boundaries of the different analyses. In <u>Mushalla v. Teamsters Local No. 863</u>, 300 F.3d 391 (3d Cir. 2002), the court explained that:

> Cases in the <u>Bixler</u> line place an affirmative duty on fund administrators to provide fund participants with relevant information regarding existing benefits. The <u>Fischer II</u> line, by contrast, places a duty on fund administrators to respond truthfully to the inquiries of fund participants regarding potential changes to their benefits which are under 'serious consideration.' While the two lines of cases are consistent, they do not overlap.

<u>Mushalla</u>, 300 F.3d at 398.

To put it simply, "<u>Bixler</u> applies to *existing* benefits, <u>Fischer II</u> applies to *possible*

benefits." Id. (emphasis added). As such, this Court's inquiry will be guided by a determination

of whether the alleged misrepresentations are best characterized as "existing" or "possible"

benefits. Only in the latter of these two situations does the Fischer II serious consideration test

apply. Otherwise, the more general discussion of misrepresentation discussed in Bixler and its

progeny is more appropriate.

## II. Legal Analysis

As previously mentioned, Plaintiffs claim that AT&T breached its fiduciary duties by

1) failing to disclose that there was another plan under serious consideration at the time Plaintiffs

retired; 2) falsely representing that the 1997 Special Update pension plan would provide the

greatest benefits to retirees over the next four to seven years; 3) falsely representing that benefits

under the Special Update were "frozen" and would not grow any larger; and 4) falsely

representing that anyone retiring pursuant to Special Update would be given an opportunity to

participate under any enhanced plan. The totality of these misrepresentations allegedly induced

Plaintiffs to retire under the provisions of Special Update and prior to the enactment of the

Voluntary Retirement Incentive Program in 1998. For purposes of analytical clarity, each of

these alleged misrepresentations will be examined separately.

### A. Failing to Disclose the Consideration of VRIP before Plaintiffs Retired

Plaintiffs allege that Defendant did not disclose its consideration of the Voluntary

Retirement Incentive Plan in a timely manner and thereby breached its fiduciary duties. This

claim fits squarely within the confines of the Fischer II "serious consideration" test as it concerns

the proper disclosure of potential changes to pension benefits. An examination of the facts set

forth in the record, even when viewed in a light most favorable to Plaintiffs, makes clear to this

Court that as a matter of law, Defendant did not seriously consider the VRIP until after Plaintiffs

had retired, and Defendant was therefore under no duty to disclose information about the VRIP

any earlier.

Prior to January 1998, AT&T's employees were merely involved "in gathering

information, developing strategies, and analyzing options" concerning changes to its Plan.

Fischer II, 96 F.3d at 1539-1540.  Only by January 7, 1998 had a "specific proposal" for VRIP

been formulated.  Before that, in November 1997, staff members were told only to "think

conceptually" about various options that could be used to reduce AT&T's costs.  In late

December 1997, representatives had a "brain storming" session to explore various downsizing

options, including what eventually became VRIP.  On January 7, 1998, however, Vice President

Burlingame first suggested to the Operations Group that voluntary downsizing measures should

be considered in addition to involuntary ones.  The idea appears to have become "sufficiently

concrete" by this time, as the fundamental design elements of the Plan amendment that would

become VRIP were in place, complete with cost analyses and actuarial evaluations.  This specific

proposal was not "discussed for purposes of implementation," however, until January 10th and

11th, 1998, when members of AT&T's Human Resources, Benefits and Legal Organizations

departments met with representatives of ASA to discuss design options and to "brain storm" so

as to evaluate the feasibility of several force reduction alternatives.  At this point, a team had

therefore gathered to analyze the implications of enacting a program like VRIP.  Fischer II does

not require disclosure, however, until "senior management with the authority to implement the

change" have discussed the specific proposal.  At AT&T, the Operations Group is plainly the

relevant senior management, as the OG comprises "those members of senior management with responsibility for the benefits area of the business, and who ultimately will make recommendations to the Board regarding benefits operations." Fischer II, 96 F.3d at 1540. The Operations Group did not consider the VRIP changes for purposes of implementation until January 14, 1998, when a formal presentation was made to the CEO, CFO and other senior management officials regarding the various design options.

Overall, then, the earliest possible date on which it can fairly be said all three elements of the Fischer II test "coalesce[d] to form a composite picture of serious consideration" was January 14, 1998. Fischer II., 96 F.3d at 1539. In all likelihood, the "serious consideration" date actually arose at some point thereafter when the contours of the plan as it would finally be approved were detailed. Plaintiffs have not provided sufficient evidence to counter Defendant's undisputed evidence so as to create genuine issues of material fact and thereby survive a summary judgment motion on this issue of serious consideration.[4] The available evidence cannot support a determination that AT&T senior management had discussed a specific proposal about VRIP with a view toward implementation prior to Plaintiffs' retirement. Because Defendant did not "seriously consider" the VRIP amendments until after Plaintiffs had retired, the Court finds that as a matter of law, Defendant was under no duty to disclose details of the VRIP any earlier, and accordingly, did not violate its fiduciary duties pursuant to ERISA on these grounds. Summary judgment is thereby granted to Defendant on this claim.

---

[4]Plaintiffs' argument that the VRIP was under "serious consideration" as early as 1996 because a prior CEO had expressed the desire to downsize at that time is unpersuasive. One cannot equate "serious consideration" of a specific proposal with such general proclamations.

**B.  Special Update Would Provide a Greater Benefit over Next Four to Seven Years**

Plaintiffs claim that AT&T falsely stated to them in 1997 that Special Update rather than

Cash Balance would provide a greater benefit to retirees over the course of the subsequent four to

seven years.  Some Plaintiffs allege that such a misrepresentation was made at the pre-retirement

seminars that they attended.  Others point to similar comments made in AT&T's April 28, 1997

Fact Sheet, which states:

> In general, if you are within 7 years of retirement eligibility under the
> current plan, your special update will most likely provide a greater
> benefit than the cash balance feature.  If you're more than 7 years from
> retirement eligibility under the current plan though, the cash balance
> feature will most likely produce a better benefit than the special
> update.

Pls. Ex. 23.

Unlike the previous allegation, it is not entirely clear whether this claim should be

reviewed under the <u>Fischer II</u> "serious consideration" analysis or under the <u>Bixler</u> line concerning

misrepresentations generally.  The analytical difficulty stems in part from the fact that a

prediction concerning the level of future benefits under different pension programs encompasses

both future and present dimensions.  Defendant's alleged statements concerning the prospects of

employee pensions over time under Cash Balance and Special Update are certainly future-

oriented so as to lend credence to the notion that "serious consideration" analysis is most

appropriate.  At the same time, the statements do not relate to proposed benefits, but about actual

existing benefits, and how those benefits would fare over time, making <u>Bixler</u> seem more

appropriate.  Choosing the proper analysis is also made difficult because it hinges in part on

exactly *why* Plaintiffs believe these assertions by Defendant should be considered false.  If these

assertions are considered false because of AT&T's failure to disclose the VRIP discussions

earlier, Plaintiffs' claim probably fits within the confines of <u>Fischer II</u>.  However, if the

statements are considered false for any act of deception that existed concurrently with the

statement, for instance, because Defendant knew that Special Update would not be the best

option for those nearing retirement, but told employees otherwise, the claim requires review

under <u>Bixler</u>.

      There is reason to believe that this claim stems from Defendant's failure to disclose VRIP

and is therefore really just a derivative of the prior claim that VRIP should have been announced

earlier.[5]  If so, Plaintiffs' claim must fail for the reasons already discussed.  Even if the Court

were to give Plaintiffs every benefit of the doubt and construe their claim to allege that

Defendant acted deceptively about existing benefits unrelated to the timing of VRIP's disclosure,

the Court rejects Plaintiff's claim as a matter of law.  This conclusion necessarily follows from

the fact that Defendant's statements concerning its beliefs about the future of Special Update and

Cash Balance do not constitute an actionable misrepresentation.  The Court is guided in its

conclusion that Defendant made no misrepresentation by the similar situation that arose in <u>Taylor</u>

<u>v. Peoples Natural Gas Co.</u>, 49 F.3d 982 (3d Cir. 1995), when a retiree brought suit against his

employer and plan administrator for breach of fiduciary duty under ERISA.  In <u>Taylor</u>, a

supervisor at defendant company told plaintiff that he believed that if an early retirement

_____

[5]For example, certain Plaintiffs stated at deposition that the statements were false because
of the VRIP changes and not because of any event prior to that.  <u>See, e.g.</u>, Dep. of Michael
Mascola, 55: ("Q. Anything other than VRIP led you to conclude that the statement about the
five to seven years was inaccurate? A. Nothing other than the VRIP, that's correct."); Dep. of
David Portzer, 50 ("Q. So is VRIP what made the statement [in the Burlingame April 28 letter],
in your mind, inaccurate? A. Yes.").

program was offered in the future, it might be offered retroactively. Id. at 989.  After plaintiff

retired, an early retirement program was offered but, contrary to the supervisor's statements, it

was not made retroactive.  The Taylor court declared that an "honest statement of belief

reasonably grounded in fact does not constitute a misrepresentation." Id. at 990.  Because the

supervisor expressed an honest, reasonable opinion as to the future scope of the possible

amendment, the court found that as a matter of law, no reasonable fact-finder could conclude that

this statement constituted a misrepresentation and granted summary judgment to defendant. Id.

     In the same fashion, Defendant's statements concerning the Special Update and Cash

Balance were not misrepresentations, but constitute honest statements of belief reasonably

grounded in fact.  AT&T was "operating under the premise that this was the plan that would be

in effect for as long as we could see into the future." (Dep. Harold Burlingame, 183).  The

significant boost in benefits offered by Special Update were fixed and would not accumulate any

further.  In contrast, the Cash Balance option would accrue over time, and would inevitably

"catch up" over time to the Special Update levels.  Based on their economic analysis, AT&T

employees reasonably believed that this "catch up" period would take 4-7 years, and fully

disclosed this information to Plaintiffs, replete with the appropriate qualifiers that suggested the

company could make no guarantees as to individual cases.  Plaintiffs have provided no reason to

counter Defendant's solid evidence that these statements were offered honestly and reasonably.

     As in the Taylor decision, courts have routinely held that a plan administrator cannot be

held liable for comments honestly and reasonably made, but are only later proved incorrect.  See

McCall v. Burlington N. Sante Fe Co., 237 F.3d 506 (5th Cir. 2000) (employer's statements that

any future retirement packages would not be as good as those contained in the current offering

were not actionable although better benefits were subsequently offered, because the statements

were a truthful reflection of management's intentions at the time); Swinney v. General Motors

Corp., 46 F.3d 512 (6th Cir. 1995) (employer's statement that those who postponed retirement

would not be eligible for special retirement package was not an actionable misrepresentation,

even though employer later changed its mind and allowed eligibility, because statement was true

at the time); Barnes v. Lacy, 927 F.2d 539 (11th Cir. 1991) (employer's original statement that

retirement package was "one-time offer" was not actionable misrepresentation even though more

lucrative package was later offered, because the statements were made in good faith and

indicated the employer's actual intent at the time); Radley v. Eastman Kodak Co., 19 F. Supp. 2d

89, 99 (W.D.N.Y. 1998) (benefits counselor's statements that there would not be additional

retirement incentives offered in the foreseeable future, although eventually proven false, were not

misrepresentations because they were reasonable statements at the time and accurate of then-

existing facts and personal predictions).  Defendant in the present case had every reason to

believe that its predictions were correct and should not be held liable because unexpected future

actors and future decisions proved those predictions inaccurate.  See Swinney, 46 F.3d at 520

("Changing circumstances . . . might require an employer to sweeten its severance package, and

an employer should not be forever deterred from giving its employees a better deal merely

because it did not clearly indicate to a previous employee that a better deal might one day be

proposed.")

     The court in In re Unisys Corp. Retiree Medical Benefit "ERISA" Litigation, 57 F.3d

1255 (3d Cir. 1995) ("Unisys I") did find that a misrepresentation could arise even if the

defendant company did not anticipate the changes that were eventually made.  Id. at 1265, n.15.

However, the present case materially differs from the circumstances in Unisys I.  In Unisys I,

defendant affirmatively represented that retiree benefits were vested and could never be modified

or terminated, when defendant knew that, in fact, they were terminable at will.  Although the

company had no reason to expect it would change the plan in the future, it was aware that it

retained the right to modify it and knowingly failed to clarify material information about the

retention of that power when responding to employee inquiries.  Id.  The court found a breach of

fiduciary duty because defendant "actively misinformed its employees by affirmatively

representing to them that their medical benefits were guaranteed once they retired, when in fact

the company knew this was not true and that employees were making important retirement

decisions relying upon this information."  Id. at 1266-1267.  In contrast, Defendant AT&T made

no such guarantees, but stated only that "in general" if an employee is within seven years of

retirement eligibility under the current plan, Special Update would "most likely" be the best

option. See, e.g., Ballone v. Eastman Kodak Co., 109 F.3d 117, 125 (2d Cir. 1997) ("Whereas

mere mispredictions are not actionable, false statements about future benefits may be material if

couched as a guarantee, especially where, as alleged here, the guarantee is supported by specific

statements of fact.")  Moreover, unlike the company in Unisys I, Defendant here never made any

representations knowing they were not true.  See, e.g., Int'l Union, United Auto.. Aerospace &

Agr. Implement Workers, 188 F.3d 130, 148 (3d Cir. 1999) (distinguishing Unisys I

misrepresentation analysis because no competent evidence was presented to suggest that the

company made any affirmative misrepresentations or stood silent when asked about the duration

of retiree benefits).

        ERISA "does not impose a duty of clairvoyance on fiduciaries."  Fischer I, 994 F.2d at

135.  Nor does it require an employer to "inform its employees that retiree benefits may at some

point in the future be modified or changed."  Int'l Union, United Auto., Aerospace & Agr.

Implement Workers, 188 F.3d at 151.  Defendant acted consistently with its fiduciary duties

under ERISA.  Because no genuine issues of material fact prevent a ruling as a matter of law, this

Court grants summary judgment to Defendant on this claim.

### C.  Accrued Benefits Under Special Update Were "Frozen"

Plaintiffs also claim that AT&T falsely told them in both written communications and

pre-retirement seminars that the accrued benefit under Special Update was "frozen" and would

not grow any larger.  They claim that Defendant violated its fiduciary duties in making this

statement, because after they had retired, Defendant subsequently added to the benefits of those

who opted for Special Update by way of the VRIP changes.  Once again, the Court will construe

the claim in a light most favorable for Plaintiffs, so that the claim does not relate to the non-

disclosure of VRIP, which would fail under Fischer II, but is directed at a deception concurrent

with the statement regarding the existing benefits of Special Update.

It is important to note that Defendant's statements regarding the "frozen" nature of

benefits under Special Update are not now nor ever were false.  Special Update has always been

based on a pay-base averaging window of 1994-1996, the length of a participant's service as of

December 31, 1996, and a 1.6% multiplier. (Def. Statement of Material Facts, ¶ 28-29).  Because

all pension accruals under that formula have ceased, any additional accruals derived from a

participant's continuing service after December 31, 1996 were not considered, and no accruals

were made beyond the one-time increase to participants' pensions, the Special Update benefit has

remained a "frozen" benefit.  The VRIP amendment in 1998 did not change the static nature of

Special Update but served as a supplementary package to it. Defendant's statements so regarding

were and continue to be the actual truth. However, the Court realizes that such a literal

interpretation of Defendant's words may run counter to the underlying purpose of ERISA to

protect beneficiaries and participants. Certain statements, although factually true, may at the

time made, have imparted a different meaning on employees, and consequently may have

unfairly induced them to retire prematurely.

   Disregarding the literal truthfulness of these statements, the claim should nevertheless be

dismissed as a matter of law. For the reasons heretofore discussed, the assertions allegedly made

by Defendant simply do not constitute an actionable misrepresentation. Any statements that the

level of benefits under Special Update were fixed were "honest statement[s] of belief reasonably

grounded in fact" and therefore, not a misrepresentation. Taylor, 49 F.3d at 990. As adopted by

the Board on April 16, 1997, the Special Update was designed as a frozen benefit and

Defendant's employees properly conveyed that information. Defendant fully complied with its

duties of loyalty to the plan beneficiaries by "speaking truthfully" regarding the Special Update

benefits. Fischer I, 994 F.2d at 135. Plaintiffs have not suggested any different or additional

information that Defendant should have stated or omitted so as to better comply with ERISA in

this regards. In fact, if Defendant had *not* disclosed to Plaintiffs the fixed nature of benefits

under Special Update, Defendant could very well have been held liable for failing in its

"affirmative duty to inform when the trustee knows that silence might be harmful." Bixler, 12

F.3d at 1300. Holding Defendant liable for not disclosing the fact that in the future, the

Voluntary Retirement Incentive Program would increase benefits beyond Special Update would

effectively "impose a duty of clairvoyance on fiduciaries," an imposition that has been

categorically rejected by the Third Circuit.  As no material disputes prevent a ruling as a matter

of law, summary judgment is granted to Defendant on this claim.


**D. 1997 Special Update Retirees Would be Eligible to Participate in Future Changes to
Plan**

Plaintiffs also allege that Defendant falsely stated that if AT&T's pension plan were ever

improved, those retiring in 1997 would be eligible for those improvements.  On a class-wide

basis, there is some doubt as to the validity of this allegation.  Only two of the thirty-six named

Plaintiffs claimed to have been present when a statement was made to that effect.  The remaining

plaintiffs who were deposed either denied or could not recall ever hearing AT&T make such a

representation. (Dep. of David Portzer, 225-226; Ronald Sears 188-189; Ronald Mascola, 153;

Frank Mangone, 214-215; Anthony Schiano, 192; Robert LaFlamme, 136-137; Eugene

Rappoport, 151-152; Gerald Peterson, 222).  One of the two individuals who did testify hearing

the alleged misrepresentation, Plaintiff Lando, stated that he recalls these statements but could

not remember who said the statement nor that person's department or level of management.

(Dep. of Salvatore Lando, 48, 50, 99, 120).  The other individual asserting this claim, Plaintiff

George Wuzniak, testified that he recalls these statements being made at a seminar given by

Defendant's agent Michael Fazio.  He testified that the statements were something to the effect

of "Well, if there was [a future improvement in benefits], you certainly would be made eligible

for it."  He couldn't remember specific words but instead a general "message" that participants in

the plan would be offered an opportunity to partake in a new offering if that came up.  (Dep. of

George Wuzniak, 59-60, 67).  Fazio adamantly denies ever having made such a statement and

adds that "[i]t would have been a stupid thing to say.  If you retired under a benefit you retired as those benefits worked at that time.  You certainly wouldn't be eligible for benefits that were in place after you retired."   (Dep. of Michael Fazio, 43-44).   Moreover, neither Fazio nor any other seminar presenter was authorized to make such a statement.  (Dep. of Michael Fazio, 43; Kenneth Willets, 181).  See also Dep. of Willets, 182. ("Our seminar speakers were very well-trained in knowing that generally when one leaves a company they leave under the rules of a pension plan at the time that exists at that time and, therefore, could not be guaranteed, and generally would not receive any enhancements or changes that would incur to the pension plan after the time that they left.")

        However, to raise a genuine issue of material fact, the opponent need not match, item for item, each piece of evidence proffered by the movant.  In re Unisys Sav. Plan Litig., 74 F.3d at 433, n. 10 (citing Big Apple, BMW, Inc. v. BMW of N. Am. Inc., 974 F.2d 1358, 1362-63 (3d Cir. 1992)).  If the opponent has exceeded the "mere scintilla" threshold, and has offered a genuine issue of material fact, the court cannot credit the movant's version of events against the opponent, even if the quantity of the movant's evidence far outweighs that of its opponent.  Id.  It remains the duty of the fact finder to ascertain the credibility and weight of the evidence.

        Unlike the other alleged misrepresentations in this case that could be dismissed as honest statements reasonably grounded in fact, this one, if proven at trial, would constitute an active misrepresentation in violation of Defendant's fiduciary duties under ERISA.  Viewing the facts in a light most favorable to the non-movants, the Court denies summary judgment to Defendants on this claim with respect to Plaintiffs Lando and Wuzniak.  Issues of fact remain regarding exactly what was said by Defendant and whether Plaintiffs relied on those statements, therefore

the claim for those two Plaintiffs must be assessed by the trier of fact. However, because the other deposed Plaintiffs specifically denied or do not remember hearing such a comment, the Court will grant summary judgment to Defendants as to them. As for the other named Plaintiffs who were not deposed, the Court has been presented with no evidence that any of them heard the alleged misrepresentations about eligibility. The Court assumes that had such evidence or testimony existed, it would have been included or referred to in Plaintiffs' papers since it is so important to Plaintiffs' claim. Consequently, as it pertains to those Plaintiffs, the Court will grant summary judgment to Defendants. However, since there appears to have been no discovery as to said Plaintiffs, the Court grants summary judgment without prejudice to those Plaintiffs to reopen their claims and join in this action with Plaintiffs Lando and Wuzniak if they can demonstrate that the alleged misrepresentations were also made to them and relied upon.

**E. Class Certification Issue**

Inasmuch as the Court has granted summary judgment on almost all the claims, with the exception of the alleged misrepresentation that the retirees would be eligible to participate in future changes to the Plan, Plaintiffs' attempts to certify a class of those persons who retired pursuant to Special Update from April 27, 1997 through December 31, 1997 is not appropriate. Only two of the ten representative Plaintiffs have made any allegation as to this claim, thus, the attempt to certify the class certainly fails under the requirements of Federal Rule of Civil Procedure 23. The putative class as it relates to the alleged misrepresentations does not meet the "typicality" requirements of 23(a) since the claim of eligibility is not typical among the putative

class members.[6]  In addition, because only two Plaintiffs appear to be eligible for the remaining

issues, the group is not so "numerous" so to make joinder impracticable.  The class in its present

form cannot meet the requirements of Rule 23(b)(2) in that Defendant has not acted or refused to

act on grounds generally applicable to the class with regards to this misrepresentation.  Neither

can the putative class any longer meet the 23(b)(3) requirements that common questions of law

and fact "predominate" and that the class action is a superior method of adjudicating the

controversy.  This is clearly highlighted by the differing forms of the alleged misrepresentation

and the highly-individualized issues of reliance.  Therefore, the Court denies the motion for class

certification, and the two Plaintiffs can proceed to trial on this issue in their individual capacity.

**Conclusion**

Plaintiff includes a laundry list of alleged "genuine issues of material fact" so as to try to

prevent a finding of summary judgment.  However, these issues are either mere allegations

unsupported by evidence (ex. that VRIP was part of a long-term plan, that AT&T intended to

lower expenses by moving long-term management employees off the payroll; that AT&T's

---

[6]Rule 23(a) of the Federal Rules of Civil Procedure sets forth several prerequisites to the maintenance of a class action:

> One or more members of a class may sue or be sued as representative parties on behalf of all only if (1) the class is so numerous that joinder of all members is impracticable, (2) there are questions of law or fact common to the class, (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class, and (4) the representative parties will fairly and adequately protect the interests of the class.

Fed.R.Civ.P. 23(a).  Moreover, the putative class must meet the requirements of either Rule 23(b)(1), 23(b)(2), or 23(b)(3).

statements were designed to assure them that retirement under Special Update was the best option for them), or are supported by evidence, but are simply immaterial to the case (ex. that AT&T tracked workforce by age and service).  Because these statements are not "sufficient evidence for a jury to return a verdict in favor of the non-moving party," summary judgment is appropriate.  Boyle v. County of Allegheny Pennsylvania, 139 F.3d 386, 393 (3d Cir.1998) (quoting Armbruster v. Unisys Corp., 32 F.3d 768, 777 (3d Cir.1994)).

The Court recognizes the disappointment and frustration of Plaintiffs to have learned only months after they retired that their pensions might have been larger had they delayed their retirement for a short period. However, in light of the absence of a specific proposal discussed by senior management for purposes of implementation, Defendant was under no duty to disclose the VRIP amendments by the time of Plaintiffs' retirement.  Moreover, the statements made by Defendant concerning the projected future of the Special Update and the "frozen" benefits do not constitute an actionable misrepresentation.  Except as to the one outstanding claim, Plaintiffs' claims under ERISA therefore fail as a matter of law and certification of the class must be denied accordingly.

For the reasons set forth above, IT IS on this 9th day of January 2004, hereby,

ORDERED that Defendant's motion for summary judgment is GRANTED on Plaintiffs' claims relating to "serious consideration" and timely disclosure and on Plaintiffs' claims relating to Defendant's statements that the Special Update benefits were "frozen" and would provide the greatest benefits to retirees over the next four to seven years; and it is

FURTHER ORDERED that with respect to Defendant's statements that anyone retiring pursuant to Special Update would be given an opportunity to participate in future enhancements

to the Plan, Defendant's motion for summary judgment is DENIED as to Plaintiffs Lando and

Wuzniak, and GRANTED as to all other named Plaintiffs; and it is

     FURTHER ORDERED that Plaintiff's motion for class certification is DENIED.


It is so ordered.

DATED: January 9th, 2004

                   _s/ Jose L. Linares, U.S.D.J._____
                   JOSE L. LINARES
                   UNITED STATES DISTRICT JUDGE