# Exhibit K

1  Michael D. Braun (167416)
2  BRAUN LAW GROUP, P.C.
   12400 Wilshire Blvd., Suite 920
3  Los Angeles, CA 90025
4  Telephone: (310) 442-7755
   Facsimile: (310) 442-7756
5  E-mail: service@braunlawgroup.com

6
   Counsel for Plaintiff
7  *Additional Counsel on Signature Page*

8              UNITED STATES DISTRICT COURT
9         FOR THE CENTRAL DISTRICT OF CALIFORNIA

10  STEVEN PRO, Individually and on        CASE NO.
11  Behalf of All Others Similarly Situated,    CV07-06252
                              Plaintiff,
12                                          CLASS ACTION
13      v.
                                            COMPLAINT FOR BREACHES
14  COUNTRYWIDE FINANCIAL                   OF FIDUCIARY DUTY UNDER
    CORPORATION, ANGELO R.                  THE EMPLOYEE RETIREMENT
15  MOZILO, KATHLEEN BROWN,                 INCOME SECURITY ACT
16  HENRY G. CISNEROS, JEFFREY M.
17  CUNNINGHAM, ROBERT J.
    DONATO, MICHAEL E.
18  DOUGHERTY, BEN M. ENIS,
19  EDWIN HELLER, STANFORD L.
    KURLAND, MARTIN R. MELONE,
20  ROBERT T. PARRY, OSCAR P.
21  ROBERTSON, KEITH P. RUSSELL,
    HARLEY W. SNYDER, MARSHALL
22  M. GATES, and JOHN AND JANE
23  DOES 1-20.

24                              Defendants.

25
                    I.    INTRODUCTION
26
27      1.    Plaintiff Steven Pro alleges the following based upon the investigation of

28  Plaintiff's counsel, which included a review of U.S. Securities and Exchange

1  Commission ("SEC") filings by Countrywide Financial Corporation ("Countrywide" or
2  the "Company"), including the Company's proxy statements (Form 14A), annual reports
3  (Form 10-K), quarterly reports (Form 10-Q), current periodic reports (Form 8-K),
4  registration statements (Forms S-8), and the annual reports (Form 11-K) filed on behalf
5  of the Countrywide Financial Corporation 401(k) Savings and Investment Plan, as
6  amended and restated effective January 1, 1997, and subsequent amendments one
7  through twelve (attached hereto as Exhibit A) (hereinafter the "Plan"), a review of the
8  Forms 5500 filed by the Plan with the Department of Labor, interviews with participants
9  of the Plan, and a review of available documents governing the operations of the Plan.
10 Plaintiff believes that substantial additional evidentiary support will exist for the
11 allegations set forth herein after a reasonable opportunity for discovery.

## II. NATURE OF THE ACTION

12
13     2.     This is a class action brought on behalf of the Plan pursuant to §§ 502(a)(2)
14 and (a)(3) of the Employee Retirement Income Security Act ("ERISA"), 29 U.S.C.
15 §§1132(a)(2) and (a)(3), against the fiduciaries of the Plan for violations of ERISA.
16     3.     The Plan is a retirement plan sponsored by Countrywide.
17     4.     Plaintiff's claim arises from the failure of Defendants, who are fiduciaries of
18 the Plan, to act solely in the interest of the participants and beneficiaries of the Plan, and
19 to exercise the required skill, care, prudence, and diligence in administering the Plan and
20 the Plan's assets during the period January 31, 2006 through the present (the "Class
21 Period").
22     5.     Plaintiff alleges that Defendants allowed the imprudent investment of the
23 Plan's assets in Countrywide equity throughout the Class Period despite the fact that they
24 clearly knew or should have known that such investment was unduly risky and imprudent
25 due to the Company's serious mismanagement and improper business practices,
26 including, among other practices: (a) marketing and extending subprime mortgage loans,
27 made on a "low documentation" basis, without adequate consideration of the borrower's
28 ability to repay and with unreasonably high risk of borrower default; (b) intentionally

1  marketing subprime loans with high risk of default to borrowers who qualified for prime-
2  rate loans in order to increase Company profits; (c) encouraging brokers to market
3  excessively high-cost loans with greater risk of default to borrowers by offering incentive
4  commissions; (d) representing that Countrywide had strict and selective underwriting and
5  loan origination practices; (e) representing that Countrywide had sufficient reserves set
6  aside to cover the high-risk loans it was selling; (f) operating with inadequate liquidity in
7  relation to the volatility of Countrywide's business lines and assets; and (g) operating
8  without the requisite internal controls to determine appropriate loan loss provisions; all of
9  which caused Countrywide's financial statements to be misleading and which artificially
10 inflated the value of shares of Countrywide stock and the Countrywide Stock Fund in the
11 Plan ("Fund"), and which have called into serious question Countrywide's continued
12 viability. In short, during the Class Period, the Company was seriously mismanaged and
13 faced dire financial circumstances.

14      6.      In addition, Plaintiff alleges that the Insider Selling Defendants suffered
15 from serious conflicts of interest when they chose their own interests over those of the
16 Plan's participants and beneficiaries. These Defendants, although they were aware that
17 the Company stock price was over-inflated due to ongoing serious mismanagement and
18 inappropriate lending practices at the Company, failed to discontinue the Plan's
19 investment in Company stock or to inform the Plan participants of the Company's
20 problems. Instead, they benefited from their inside knowledge by selling their personal
21 holdings of Countrywide stock for over $400 million in proceeds during the Class Period
22 and prior to the stock's precipitous decline.

23      7.      Plaintiff alleges in Count I that the Defendants who were responsible for the
24 investment of the Plan's assets breached their fiduciary duties to the Plan's participants in
25 violation of ERISA by failing to prudently and loyally manage the Plan's investment in
26 Countrywide stock. In Count II, Plaintiff alleges that the Defendants, who were
27 responsible for the selection, monitoring and removal of the Plan's other fiduciaries,
28 failed to properly monitor the performance of their fiduciary appointees and remove and

1   replace those whose performance was inadequate.  In Count III, Plaintiff alleges that
2   Defendants breached their fiduciary duty to inform the Plan's participants by failing to
3   provide complete and accurate information regarding the soundness of Countrywide
4   stock and the prudence of investing and holding retirement contributions in Countrywide
5   equity.    In Count IV, Plaintiff alleges that Defendants breached their duties and
6   responsibilities as co-fiduciaries by failing to prevent breaches by other fiduciaries of
7   their duties of prudent and loyal management, complete and accurate communications,
8   and adequate monitoring.    Finally, in Count V, Plaintiff states a claim against
9   Countrywide for knowing participation in the fiduciary breaches alleged herein.

10      8.    As more fully explained below, during the Class Period, Defendants
11  imprudently permitted the Plan to hold and acquire millions of dollars in Countrywide
12  stock. Based on publicly available Plan information, it appears that Defendants' breaches
13  have caused the Plan to lose well over *one hundred million dollars* of retirement savings
14  during the Class Period.

15      9.    This action is brought on behalf of the Plan and seeks to recover losses to the
16  Plan for which Defendants are personally liable pursuant to ERISA §§ 409 and 502(a)(2),
17  29 U.S.C. §§ 1109 & 1132(a)(2).  In addition, under § 502(a)(3) of ERISA, 29 U.S.C. §
18  1132(a)(3), Plaintiff seeks other equitable relief from Defendants, including, without
19  limitation, injunctive relief and, as available under applicable law, constructive trust,
20  restitution, equitable tracing, and other monetary relief.

21      10.    ERISA §§ 409(a) and 502(a)(2) authorize participants such as Plaintiff to
22  sue in a representative capacity for losses suffered by the Plan as a result of breaches of
23  fiduciary duty.  Pursuant to that authority, Plaintiff brings this action as a class action
24  under Fed. R. Civ. P. 23 on behalf of all participants and beneficiaries of the Plan whose
25  Plan accounts were invested in Countrywide stock during the Class Period.

26      11.    In addition, because the information and documents on which Plaintiff's
27  claims are based are, for the most part, solely in Defendants' possession, certain of
28  Plaintiff's allegations are by necessity upon information and belief.  At such time as

1   Plaintiff has had the opportunity to conduct discovery, Plaintiff will, to the extent
2   necessary and appropriate, amend this Complaint, or, if required, seek leave to amend, to
3   add such other additional facts as are discovered that further support Plaintiff's claims.

### III. JURISDICTION AND VENUE

5       12.     **Subject Matter Jurisdiction.**  This Court has subject matter jurisdiction
6   over this action pursuant to 28 U.S.C. § 1331 and ERISA § 502(e)(1), 29 U.S.C.
7   § 1132(e)(1).

8       13.     **Personal Jurisdiction.**  ERISA provides for nationwide service of process.
9   ERISA § 502(e)(2), 29 U.S.C. § 1132(e)(2).  All of the Defendants are either residents of
10  the United States or subject to service in the United States and this Court therefore has
11  personal jurisdiction over them.  This Court also has personal jurisdiction over them
12  pursuant to Fed. R. Civ. P. 4(k)(1)(A) because they would all be subject to the
13  jurisdiction of a court of general jurisdiction in the State of California.

14      14.     **Venue.**  Venue is proper in this district pursuant to ERISA § 502(e)(2), 29
15  U.S.C. § 1132(e)(2), because the Plan is administered in this district, some or all of the
16  fiduciary breaches for which relief is sought occurred in this district, and/or some
17  Defendants reside and/or transact business in this district.

### IV. PARTIES

19  **A.    Plaintiff.**

20      15.     Plaintiff Steven Pro is a resident of Sun Valley, California.  Plaintiff Pro is a
21  participant in the Plan within the meaning of ERISA § 3(7), 29 U.S.C. § 1102(7), and
22  was a participant in the Plan throughout the Class Period.  He continues to hold shares of
23  Company stock in his retirement account in the Plan and did so throughout the Class
24  Period.

25  **B.    Defendants.**

26      16.     The Defendants are identified below.  All of the Defendants are fiduciaries
27  of the Plan within the meaning of ERISA, as is explained below in Section VI.
28  ("Defendants' Fiduciary Status"), and all of them breached their fiduciary duties in

1   various ways as is explained in Section XI. ("Causes of Action").

2       17.   **Countrywide Financial Corporation.**    Countrywide is a Delaware

3   corporation, with its principal executive offices located at 4500 Park Granada, Calabasas,

4   California.   According to its website, www.my.countrywide.com, the Company is a

5   diversified financial services company focused primarily on real estate finance and

6   related activities.   Countrywide manages its business through five business segments:

7   Mortgage Banking; Banking; Capital Markets; Insurance; and Global Operations.   The

8   mortgage banking business segment is Countrywide's core business and generated 48

9   percent of the Company's pre-tax earnings in 2006.   Countrywide's common stock is

10  listed on the New York Stock Exchange and trades under the ticker symbol "CFC."   As

11  described more fully below, the Company was a fiduciary for the Plan.

12      18.   **Director Defendants.** The Countrywide Board of Directors (hereinafter the

13  "Board") is the governing body of Countrywide under its charter, its bylaws, and

14  applicable Delaware law, and, unless otherwise noted, comprises the persons who carried

15  out the Company's responsibilities with respect to the Plan.   The members of the Board

16  during the Class Period included:

17          (a).   **Defendant Angelo R. Mozilo** has served as Chairman of the Board

18              since March 1999 and as the Chief Executive Officer of Countrywide since

19              February 1998.   Prior to his current position, Defendant Mozilo served as

20              President of the Company from March 2000 through December 2003.   He

21              has served in other executive capacities since the Company's formation in

22              March 1969. During the Class Period, Defendant Mozilo sold over 6 million

23              shares of Company stock for proceeds of approximately $242 million.   In

24              fact, in the last year alone, Defendant Mozilo made a profit of $129 million

25              from the sale of Company stock, approximately one-third of the amount he

26              has reaped over the past 23 years.   Since Countrywide began trading on the

27              NYSE, Defendant Mozilo has sold $406 million worth of Countrywide

28              stock, but, upon information and belief, has never purchased a share.

According to the Form 4 filed with the SEC on August 13, 2007, Defendant Mozilo continues to hold approximately 500,000 shares in Countrywide stock. Between 2002 and 2006, Defendant Mozilo received about $387 million from pay and stock option gains according to the Company's filings with the SEC. *See* Definitive Proxy Statement, Form 14A, Apr. 27, 2007 at 35; Definitive Proxy Statement, Form 14A, Apr. 28, 2006; Definitive Proxy Statement, Form 14A, Apr. 29, 2005; Definitive Proxy Statement, Form 14A, Apr. 29, 2004; Definitive Proxy Statement, Form 14A, Apr. 25, 2003.

(b).   **Defendant Kathleen Brown** served as a Director of Countrywide from 2005 until her resignation from the Board effective March 29, 2007.

(c).   **Defendant Henry G. Cisneros** has served as a Director of Countrywide since 2001. During the Class Period, Defendant Cisneros sold over 79,000 shares of Company stock for proceeds of approximately $3 million.

(d).   **Defendant Jeffrey M. Cunningham** has served as a Director of Countrywide since 1998. During the Class Period, Defendant Cunningham sold approximately 75,000 shares of Company stock for proceeds of approximately $3 million.

(e).   **Defendant Robert J. Donato** has served as a Director of Countrywide since 1993. During the Class Period, Defendant Donato sold approximately 54,000 shares of Company stock for proceeds of approximately $2.1 million.

(f).   **Defendant Michael E. Dougherty** served as a Director of Countrywide from 1998 until June 2007. During the Class Period, Defendant Dougherty sold approximately 227,905 shares of Company stock for proceeds of approximately $9.2 million.

(g).   **Defendant Ben M. Enis** served as a Director of Countrywide from 1984 until his resignation from the Board effective June 2006.

(h).    **Defendant Edwin Heller** served as a Director of Countrywide from 1993 until his resignation from the Board effective June 2006.  During the Class Period, Defendant Heller sold approximately 106,500 shares of Company stock for proceeds of approximately $4 million.

(i).    **Defendant Stanford L. Kurland** served as a Director of Countrywide from 1999 until his resignation from the Company effective September 7, 2006.  Defendant Kurland also served as the President of the Company from 2004 until his resignation and as the Chief Operating Officer of the Company from 1988 until his resignation.  Defendant Kurland served in a number of other executive positions during his tenure at the Company, including Executive Managing Director from 2000 to 2003 and Senior Managing Director from 1989 to 2000.  In addition, Defendant Kurland served as the Chairman and Chief Executive Officer of the Company's principal operating subsidiary, Countrywide Home Loans, Inc.  During the Class Period, Defendant Kurland sold over 400,000 shares of Company stock for proceeds of approximately $15 million.

(j).    **Defendant Martin R. Melone** has served as a Director of Countrywide since 2003.

(k).    **Defendant Robert T. Parry** has served as a Director of Countrywide since 2004.

(l).    **Defendant Oscar P. Robertson** has served as a Director of Countrywide since 2000.  During the Class Period, Defendant Robertson sold approximately 152,000 shares of Company stock for proceeds of approximately $6 million.

(m).    **Defendant Keith P. Russell** has served as a Director of Countrywide since 2003.

(n).    **Defendant Harley W. Snyder** has been a member of Countrywide's Board of Directors since 1991.  During the Class Period, Defendant Snyder

1      sold approximately 170,000 shares of Company stock for proceeds of
2      approximately $6.5 million.

3      19.    During the Class Period, Defendants Mozilo, Cisneros, Cunningham,
4   Donato, Dougherty, Gates, Heller, Kurland, Robertson, and Snyder, (hereinafter, the
5   "Insider Selling Defendants"), sold approximately 7,804,506 shares of Countrywide stock
6   for proceeds of over $294 million.

7      20.    As is explained in more detail below, the Board had certain appointment and
8   oversight responsibilities with respect to the Plan.  The Board and it members listed
9   above are referred to as the "Director Defendants."

10     21.    **Compensation Committee Defendants.**  As explained more fully below,
11  the Plan assigns certain fiduciary responsibilities and duties to Countrywide's Board of
12  Directors (the "Board"), certain of which, as discussed below, were discharged by the
13  Compensation Committee of the Board of Directors.  The Defendants identified in this
14  paragraph are referred to as the "Compensation Committee Defendants."  On information
15  and belief, the Compensation Committee Defendants are as follows:

16          (a).   **Defendant Henry G. Cisneros** has served as a member of the
17      Compensation Committee.

18          (b).   **Defendant Jeffrey M. Cunningham** has served as a member of the
19      Compensation Committee.

20          (c).   **Defendant Robert J. Donato** has served as a member of the
21      Compensation Committee.

22          (d).   **Defendant Michael E. Dougherty** has served as a member of the
23      Compensation Committee.

24          (g).   **Defendant Edwin Heller** has served as a member of the
25      Compensation Committee.

26          (h).   **Defendant Oscar P. Robertson** has served as a member of the
27      Compensation Committee.

28

1           (i).   **Defendant Harley W. Snyder** has served as a member of the

2           Compensation Committee.

3      22.   **Administrative Committee and its members.**  As explained more fully

4   below, the Plan assigns certain fiduciary responsibilities and duties to the Countrywide

5   Financial Corporation Administrative Committee of Employee Benefit Plans

6   ("Administrative Committee").  Administrative Committee members have full authority

7   and power to administer and construe the Plan. On information and belief, the individual

8   Administrative Committee Defendants are as follows:

9           (a).   **Defendant Marshall M. Gates** has served as a member of the

10          Administrative Committee.  Upon information and belief Defendant Gates is

11          a Senior Managing Director and Chief Administrative Officer at

12          Countrywide. During the Class Period, Defendant Gates sold approximately

13          75,000 shares of Company stock for proceeds of approximately $3 million.

14      23.   The identities of the remaining members of the Administrative Committee

15   are currently unknown to Plaintiff and are therefore named fictitiously as John and Jane

16   Does 1-10.  Once the identities of additional Administrative Committee members are

17   ascertained, Plaintiff will seek leave to join them under their true names.  The

18   Administrative Committee and its members (Defendant Gates and John and Jane Does 1-

19   10) are referred to as the "Administrative Committee Defendants."

20      24.   **Investment Committee and its members.**  As explained more fully below,

21   the Plan assigns certain fiduciary responsibilities and duties to the Investment Committee

22   of Employee Benefit Plans ("Investment Committee").  Specifically, the Investment

23   Committee has the delegated responsibility for selecting the investment funds in the Plan

24   and for monitoring the performance of those funds.  The identities of the Investment

25   Committee members are currently unknown to Plaintiff and are therefore named

26   fictitiously as John and Jane Does 11 – 20.  Once the identities of these fiduciaries are

27   ascertained, Plaintiff will seek leave to join them under their true names. The Investment

28   Committee and its members (John and Jane Does 11 – 20) are referred to as the

1  "Investment Committee Defendants."

2      25.    As illustrated below in Section VII. E ("Defendants Suffered From Conflicts

3  of Interest"), the individual Defendants' sales of Company stock increased during the

4  Class Period as the financial condition of the Company deteriorated.

## V.  THE PLAN

**A.    Background.**

7      26.    The Plan, sponsored by Countrywide, is an "employee pension benefit plan,"

8  as defined by § 3(2)(A) of ERISA, 29 U.S.C. § 1002(2)(A).  The Plan is a legal entity

9  that can sue and be sued.  ERISA § 502(d)(1), 29 U.S.C. § 1132(d)(1).  However, in a

10  breach of fiduciary duty action such as this, the Plan is neither a defendant nor a plaintiff.

11  Rather, pursuant to ERISA § 409, 29 U.S.C. § 1109, and the law interpreting it, the relief

12  requested in this action is for the benefit of the Plan and its participants/beneficiaries.

13      27.    The assets of an employee benefit plan, such as the Plan here, must be "held

14  in trust by one or more trustees."  ERISA § 403(a), 29 U.S.C. § 1103(a).  During the

15  Class Period, the assets of the Plan were held in a trust fund administered by Fidelity

16  Investments ("Fidelity"), the Plan's trustee.  *See* Countrywide Financial Corporation

17  401(k) Savings and Investment Plan, Annual Report (Form 11-K) at 10 (Dec. 31, 2006)

18  (hereinafter the "2006 Form 11-K").

19      28.    The Plan provides benefits, except in limited circumstances, for all

20  employees.  Effective January 1, 2004, "An employee becomes eligible to participate in

21  the Plan as soon as administratively possible following the date he or she meets the

22  following requirements: (A) Attainment of age 21; and (B) Completion of the Eligibility

23  Computation Period, if he or she is then an Eligible Employee."  Amendment Number

24  Three to the Countrywide Financial Corporation 401(k) Savings and Investment Plan §

25  5.04(a) (Dec. 3, 2003) (hereinafter "Plan Amendment Three").

26      29.    Under the Plan, an account is established and maintained for each

27  participant, reflecting the manner in which each account is invested and the value of the

28  investments including withdrawals, distributions, and any charges or credits made to the

1  account. *See* Countrywide Credit Industries, Inc. 401(k) Savings and Investment Plan, as

2  amended and restated effective January 1, 1997 (hereinafter "Plan Document") § 7.01.

3       30.    The Countrywide Stock Fund holds the Plan's shares of Countrywide stock.

4  **B.    Employee and Employer Contributions.**

5       31.    At all relevant times, the Plan had two separate components: (1) employee

6  contributions, and (2) employer contributions.

7       32.    Plan participants could elect, via Salary Deferral Contributions, to contribute

8  to the Plan up to 40 percent of their eligible compensation per year subject to IRS Code

9  limitations. *See* Plan Amendment Three § 4.01(a); Plan Document § 6.02(a).

10       33.    One of the investment options made available to participants by the Plan

11  fiduciaries is the Countrywide Stock Fund. The Plan is not designed to require the

12  Company Stock Fund. Rather, as discussed in more detail below, the Company Stock

13  Fund is an optional feature of the Plan that the Plan Administrator "may select" as it

14  determines appropriate for the investment of participants' accounts. Plan Document §

15  8.02(a).

16       34.    Plan participants could invest up to 50 percent of their Salary Deferral

17  Contributions in Company Stock. *Id.* § 8.04(c).

18       35.    Despite making its contributions in Company Stock throughout the Class

19  Period, the Company had the discretion to make Employer Matching Contributions and

20  Employer Discretionary Contributions **"in cash or in Company Stock"** pursuant to the

21  Plan document. *Id.* § 5.04.[1]

22       36.    Additionally, the Company had discretionary authority for determining the

23  amount, if any, of Employer Matching Contributions and Employer Discretionary

24

25  [1] The Plan was amended in November 2006 so that Employer Matching Contributions

26  were to be made in Company Stock; however, the Company still had the discretion to

27  make Employer Discretionary Contributions in either cash or Company Stock. *See*
Eleventh Amendment to the Countrywide Financial Corporation 401(k) Savings and

28  Investment Plan (hereinafter "Plan Amendment Eleven") § 5.04(a) (Nov. 2, 2006).

1    Contributions for each eligible Plan participant. *See* Plan Document §§ 5.01, 5.02.

2        37.    Participants were not fully vested in their Employer Contributions Accounts

3    until five years of service. *See* Plan Document § 9.02; Ninth Amendment to the

4    Countrywide Financial Corporation 401(k) Savings and Investment Plan (hereinafter

5    "Plan Amendment Nine") § 9.02(b) (Jan. 1, 2006).

6    **C.    Company Stock in the Plan.**

7        38.    As stated in the Plan: "The Administrator may select such additional

8    investment vehicles as it determines appropriate for the investment of Participants'

9    Accounts, including, but not limited to, Company Stock." Plan Document § 8.02(a).

10   Hence, whether to offer Company stock as an investment option is a discretionary feature

11   of the Plan over which Plan fiduciaries exercised control.

12       39.    For most Plan participants, "the portions of a participant's account which in

13   [sic] invested in Company Stock shall not be eligible for investment in any other

14   Investment Fund." Plan Document § 8.04(a).

15       40.    The Plan Administrator had the discretion to "adopt rules permitting

16   Participants to elect to invest all or a portion of the Company Stock held in their

17   Accounts in another Investment Fund." *Id.* at § 8.04(b).

18       41.    During the Class Period, Countrywide Company Stock represented more

19   than 30 percent of the Plan's net assets. *See* 2006 Form 11-K.

20       42.    The Plan has incurred substantial losses as a result of the Plan's investment

21   in Countrywide stock. As of December 31, 2006, the Plan held approximately 9 million

22   shares of Countrywide stock, then having a market value of approximately $350 million.

23   *Id.* at 12. Following revelations that Countrywide engaged in predatory subprime lending

24   practices, among other improper practices, Countrywide stock trades at approximately

25   $20 per share as of the date of this Complaint, representing a decline of approximately 40

26   percent since the beginning of the Class Period. Upon information and belief, the value

27   of Countrywide stock in the Plan is now approximately $ 178 million.

28

43.    in the plan, ERISA § 404(a)(2), 29 U.S.C. § 1104(a)(2), the fiduciaries remain bound by the other core ERISA fiduciary duties, including the duties to act loyally, prudently, and for the exclusive purpose of providing benefits to plan participants.

44.    Hence, if plan fiduciaries know or if an adequate investigation would have revealed that company stock no longer was a prudent investment, the fiduciaries are required to discontinue offering the stock as a plan investment option, provide complete and accurate information to plan participants of the risk of continuing to make and maintain investment in the stock, and, to the extent appropriate under the circumstances, sell the plan's holding of company stock, and invest the plan assets in other suitable investments. Defendants took none of these actions.[2]

**D.    Purported ESOP Component.**

45.    In October, 1991, the "Countrywide Credit Industries, Inc. Profit Sharing Stock Ownership Plan ("ESOP") was merged into the Plan and the ESOP accounts were transferred to the Plan." Plan Document at "Purpose." After the merger, the "Plan consisted of a profit-sharing plan with 401(k) and employee stock ownership plan features...." *Id.*

46.    An employee stock ownership plan is an ERISA plan that is designed to

---

[2] In November, 2006, around the time the Pension Protection Act of 2006 went into effect, the Plan was amended so that a Participant could direct investments in Company Stock out of the Employer Contribution Account, whether or not such contributions had vested. *See* Plan Amendment Eleven § 8.03(e); Pension Protection Act of 2006 § 901(a)(1), I.R.C. § 401(a)(35) (allowing a plan participant with at least three years of service to divest the portion of the account invested in employer securities that is attributable to employer contributions in other investment options). Additionally at this time, the Plan was amended so that a participant could change his or her "investment election with respect to existing investments in Company stock in his or her Account, provided that at the time of such change, including exchanges from other available investment options, the value of the Participants' investment in Company Stock shall not exceed fifty percent (50%) of the total value of the Account." Plan Amendment Eleven § 8.04(c).

1    invest primarily in "qualifying employer securities." 29 U.S.C. § 1107(d)(6)(A). As with
2    a 401(k) plan without an ESOP component, fiduciaries of an ESOP remain bound by core
3    ERISA fiduciaries duties, including the duties to act loyally, prudently, and for the
4    exclusive purpose of providing benefits to plan participants.

5        47.    On information and belief, the Plan did not satisfy all of the statutory and
6    regulatory mandates with respect to ESOP design and/or operation. For example, the
7    ESOP component is not designed to invest primarily in qualifying employer securities in
8    violation of 29 C.F.R. § 2550.4073-6(b).

9        48.    Yet, even if the Plan is found to have an ESOP component, if the fiduciaries
10   know or if an adequate investigation would reveal that company stock no longer is a
11   prudent investment, the fiduciaries must disregard plan direction to maintain investments
12   in such stock and protect the plan by investing the plan assets in other suitable
13   investments. Here, this course of action was all the more appropriate because Company
14   stock was not a required feature of the Plan, but, to the contrary, was a discretionary
15   feature made available at the direction of the Plan Administrator.

16                   **VI. DEFENDANTS' FIDUCIARY STATUS**
17   **A.    The Nature of Fiduciary Status.**

18       49.    **Named Fiduciaries.** Every ERISA plan must have one or more "named
19   fiduciaries." ERISA § 402(a)(1), 29 U.S.C. § 1102(a)(1). The person named as the
20   "administrator" in the plan instrument is automatically a named fiduciary, and in the
21   absence of such a designation, the sponsor is the administrator. ERISA § 3(16)(A), 29
22   U.S.C. § 1002(16)(A).

23       50.    **De Facto Fiduciaries.** ERISA treats as fiduciaries not only persons
24   explicitly named as fiduciaries under § 402(a)(1), 29 U.S.C. § 1102(a)(1), but also any
25   other persons who in fact perform fiduciary functions. Thus, a person is a fiduciary to the
26   extent "(i) he exercises any discretionary authority or discretionary control respecting
27   management of such plan or exercises any authority or control respecting management or
28   disposition of its assets, (ii) he renders investment advice for a fee or other compensation,

1   direct or indirect, with respect to any moneys or other property of such plan, or has any

2   authority or responsibility to do so, or (iii) he has any discretionary authority or

3   discretionary responsibility in the administration of such plan." ERISA § 3(21)(A)(i), 29

4   U.S.C. § 1002(21)(A)(i).

5       51.    Each of the Defendants was a fiduciary with respect to the Plan and owed

6   fiduciary duties to the Plan and the participants under ERISA in the manner and to the

7   extent set forth in the Plan's documents, through their conduct, and under ERISA.

8       52.    As fiduciaries, Defendants were required by ERISA § 404(a)(1), 29 U.S.C.

9   § 1104(a)(1), to manage and administer the Plan, and the Plan's investments solely in the

10   interest of the Plan's participants and beneficiaries and with the care, skill, prudence, and

11   diligence under the circumstances then prevailing that a prudent man acting in a like

12   capacity and familiar with such matters would use in the conduct of an enterprise of a like

13   character and with like aims.

14       53.    Plaintiff does not allege that each Defendant was a fiduciary with respect to

15   all aspects of the Plan's management and administration. Rather, as set forth below,

16   Defendants were fiduciaries to the extent of the specific fiduciary discretion and authority

17   assigned to or exercised by each of them, and, as further set forth below, the claims

18   against each Defendant are based on such specific discretion and authority.

19       54.    Instead of delegating all fiduciary responsibility for the Plan to external

20   service providers, Countrywide chose to assign the appointment and removal of

21   fiduciaries to the monitoring Defendants named herein. These persons and entities in

22   turn selected Countrywide employees, officers and agents to perform most relevant

23   fiduciary functions.

24       55.    ERISA permits fiduciary functions to be delegated to insiders without an

25   automatic violation of the rules against prohibited transactions, ERISA § 408(c)(3), 29

26   U.S.C. § 1108(c)(3), but insider fiduciaries, like external fiduciaries, must act solely in

27   the interest of participants and beneficiaries, not in the interest of the Plan sponsor.

28

**B.    The Company's Fiduciary Status.**

56.    Pursuant to the Plan document, up until the Plan was amended in November, 2006, the Company was the "Administrator" of the Plan, as that term is defined under ERISA, and a "Named Fiduciary" for purposes of Section 402(a)(2) of ERISA.  Plan Document §§ 14.01, 14.04; Amendment Number Five to the Countrywide Financial Corporation 401(k) Savings and Investment Plan (hereinafter "Plan Amendment Five") § 14.01 (June 15, 2004).

57.    The Company's authority and powers included the following:

(a) to administer and construe the Plan, subject to applicable requirements of law.

***

(ii) To make and enforce such rules and regulations, which shall be uniform and nondiscriminatory, and to prescribe such forms, as it deems necessary or proper for the efficient administration of the Plan;

(iii) To construe and interpret the Plan, to resolve ambiguities, and inconsistencies and to supply omissions with respect to the Plan provisions, which determinations shall be final and conclusive on all persons claiming benefits under the Plan;

(iv) To decide all questions concerning the Plan. . . .

***

(v) To determine the amount of benefits which shall be payable to any person in accordance with the provisions of the Plan;

(vi) To retain such consultants, accountants and attorneys as may be deemed necessary or desirable to render statements, reports, and advice with respect to the Plan and to assist the Administrator in complying with all applicable rules and regulations affecting the Plan; any consultants, accountants and attorneys may be the same as those retained by the Plan; and

(vii) To exercise all other powers specified in the Plan.

(b) The Administrator may adopt such rules for the conduct of its affairs as it deems appropriate.

1
2
3

    (c) Any decisions and determinations made by the Administrator pursuant to its duties and powers described in the Plan shall be conclusive and binding upon all parties. The Administrator shall have sole discretion in carrying out its responsibilities.

4 Plan Document § 14.02.

5
6
7

    58.    Such duties were to be performed on behalf of the Company by such "persons or committee as may be appointed by the Board of Directors" of Countrywide. *Id.* at § 14.01.

8
9
10
11

    59.    The Company could delegate its duties and could appoint "accountants, actuaries, legal counsel, investment advisors, investment managers, claims administrators, specialists and other persons as the Administrator deems appropriate in connection with administering the Plan." *Id.* at § 14.03.

12
13
14
15
16
17
18
19

    60.    Moreover, upon information and belief, in order to comply with ERISA, during at least part of the Class Period the Company exercised responsibility for communicating with participants regarding the Plan in a plan-wide, uniform, mandatory manner, by means of the Plan's Summary Plan Description ("SPD"). *See* ERISA § 101(a)(1) (requiring the plan administrator to furnish to each participant covered under the plan and to each beneficiary who is receiving benefits under the plan a summary plan description). These SPDs incorporated by reference Countrywide's SEC filings, thus converting such materials into fiduciary communications.

20
21
22
23
24
25
26

    61.    The Company, as Plan Administrator, was responsible for determining whether to offer Company stock as a Plan investment option. Plan Document § 8.02(a). Furthermore, the Company was responsible for determining the amount, if any, of Employer Matching and Employer Discretionary Contributions, as well as the discretion of allocating the Employer Matching Contributions and/or Employer Discretionary Contributions "in cash or in Company Stock." *Id.* at § 5.04; *see supra* text accompanying note 1.

27
28

    62.    Additionally, while the Plan provided that "the portion of a Participant's Account which in [sic] invested in Company Stock shall not be eligible for investment in

1  any other Investment Fund," the Company had the discretion to "adopt rules permitting
2  Participants to elect to invest all or a portion of the Company Stock held in their
3  Accounts in another Investment Fund." *Id.* at § 8.04(b)-(c).

4      63.   Moreover, Countrywide, at all applicable times, has exercised control over
5  the activities of its employees that performed fiduciary functions with respect to the Plan,
6  including the Administrative Committee Defendants and the Investment Committee
7  Defendants, and, on information and belief, can hire or appoint, terminate, and replace
8  such employees at will.  Countrywide is, thus, responsible for the activities of its
9  employees through traditional principles of agency and *respondeat superior* liability.

10     64.   Finally, under basic tenants of corporate law, Countrywide is imputed with
11  the knowledge that the Defendants had knowledge of the misconduct alleged herein, even
12  if not communicated to Countrywide.

13     65.   Consequently, in light of the foregoing duties, responsibilities, and actions,
14  the Company was both a named fiduciary of the Plan pursuant to ERISA § 402(a)(1), 29
15  U.S.C. § 1102(a)(1), and *de facto* fiduciary within the meaning of ERISA § 3(21), 29
16  U.S.C. § 1002(21), in that it exercised discretionary authority or discretionary control
17  respecting management of the Plan, exercised authority or control respecting
18  management or disposition of the Plan's assets, and/or had discretionary authority or
19  discretionary responsibility in the administration of the Plan.

20  **C.   The Director Defendants' Fiduciary Status Under the Plan.**

21     66.   Countrywide, as a corporate entity, cannot act on its own without any human
22  counterpart. In this regard, during the Class Period, upon information and belief,
23  Countrywide relied and continues to rely directly on the members of the Board to carry
24  out certain of its fiduciaries responsibilities with respect to the Plan. As a result, the
25  Director Defendants are functional fiduciaries under ERISA.

26     67.   Moreover, upon information and belief, the Director Defendants established
27  the Compensation Committee, Investment Committee and Administrative Committee to
28  carry out fiduciary duties with respect to the Plan. *Id.* § 14.01; Compensation Committee

1   Charter at 1 (attached hereto as Exhibit B); Plan Amendment Five § 14.01.

2       68.    Pursuant to the Compensation Committee Charter, the Director Defendants

3   delegated to the Compensation Committee the duty to appoint and monitor the

4   Investment and Administrative Committees. Compensation Committee Charter at 3. As

5   the Compensation Committee was to report regularly to the Director

6   Defendants according to the Compensation Committee Charter, the Director Defendants

7   retained fiduciary responsibility in this respect. *Id.* at 1.

8       69.    As a result of this appointment authority, the Director Defendants were

9   required to monitor, provide critical information to their appointees regarding the

10  Company and the Plan, and if prudence so dictated, remove the members of the

11  Compensation Committee, Investment Committee and Administrative Committee who

12  failed to faithfully discharge their responsibilities under ERISA. Plan Document § 14.01;

13  Compensation Committee Charter at 3; Plan Amendment Five § 14.01.

14      70.    Thus, according to Department of Labor regulations, the Director

15  Defendants exercised a fiduciary function under ERISA. 29 C.F.R. § 2509.75-8 (D-4).

16      71.    Consequently, in light of the foregoing duties, responsibilities, and actions,

17  the Director Defendants were both named fiduciaries of the Plan pursuant to ERISA

18  § 402(a)(1), 29 U.S.C. § 1102(a)(1), and *de facto* fiduciaries of the Plan within the

19  meaning of ERISA § 3(21), 29 U.S.C. § 1002(21), during the Class Period in that they

20  exercised discretionary authority or discretionary control respecting management of the

21  Plan, exercised authority or control respecting management or disposition of the Plan's

22  assets, and/or had discretionary authority or discretionary responsibility in the

23  administration of the Plan.

24  **D.    The Compensation Committee Defendants' Fiduciary Status.**

25      72.    During at least part of the proposed Class Period, the Board of Directors was

26  to appoint persons or committees to perform Plan duties on behalf of the Company. Plan

27  Document § 14.01; Plan Amendment Five § 14.01.

28

73.    Pursuant to the Compensation Committee Charter (attached hereto as Exhibit B), the Compensation Committee has the duty "to discharge the responsibilities of the Board of Directors [of Countrywide] relating to the compensation of the Company's Directors, executives, and employees." Compensation Committee Charter at 1.

74.    In regards to the Plan, the Compensation Committee has the authority and duty to "appoint or remove individuals authorized to make administrative and investment decisions on behalf of the Company with respect to employee benefit plans, including but not limited to, the Company's 401(k) and pension plans and monitor their performance." *Id.* at 3.

75.    Upon information and belief, the Compensation Committee appointed and had a duty to monitor members of the Investment Committee and members of the Administrative Committee. Thus, according to Department of Labor regulations, the Compensation Committee exercised a fiduciary function under ERISA. 29 C.F.R. § 2509.75-8 (D-4).

76.    Additionally upon information and belief, the Compensation Committee made regular reports to the Board regarding its duties under the Compensation Committee Charter, including its appointment and monitoring duties of the Investment and Administrative Committees. *See* Compensation Committee Charter at 1 ("The Committee shall make regular reports to the Board.").

77.    Consequently, in light of the foregoing duties, responsibilities, and actions, the Compensation Committee Defendants were fiduciaries of the Plan within the meaning of ERISA § 3(21), 29 U.S.C. § 1002(21), during the Class Period in that they exercised discretionary authority or discretionary control respecting management of the Plan, exercised authority or control respecting management or disposition of the Plan's assets, and/or had discretionary authority or discretionary responsibility in the administration of the Plan.

-21-

78.    The Compensation Committee also had a duty to report to the Board pursuant to the Compensation Committee Charter at 1.

**E.    The Administrative Committee Defendants' Fiduciary Status.**

79.    The Plan provides that as of November 2006, the Administrative Committee is the "Plan Administrator," and as the Administrator it shall have the following powers and duties:

(i).    To require any person to furnish such information as it may request for the purpose of the proper administration of the Plan as a condition to receiving benefits under the Plan;

(ii).    To make and enforce such rules and regulations, which shall be uniform and nondiscriminatory, and to prescribe such forms, as it deems necessary or proper for the efficient administration of the Plan;

(iii).    To construe and interpret the Plan, to resolve ambiguities, and inconsistencies and to supply omissions with respect to the Plan provisions, which determinations shall be final and conclusive on all persons claiming benefits under the Plan;

(iv).    To decide all questions concerning the Plan, including the eligibility of any person to participate in the Plan and the status and rights of any Participant or Beneficiary under the Plan;

(v).    To determine the amount of benefits which shall be payable to any person in accordance with the provisions of the Plan;

(vi).    To retain such consultants, accountants and attorneys as may be deemed necessary or desirable to render statements, reports, and advice with respect to the Plan and to assist the Administrator in complying with all applicable rules and regulations affecting the Plan; any consultants, accountants and attorneys may be the same as those retained by the Plan; and

(vii).    To exercise all other powers specified in the Plan.

Plan Amendment Eleven § 14.01; Plan Document § 14.02(a)(i) – (vii).

80.    Moreover, upon information and belief, in order to comply with ERISA, during at least part of the Class Period the Administrative Committee exercised responsibility for communicating with participants regarding the Plan in a plan-wide, uniform, mandatory manner, by means of the Plan's SPDs.  *See* ERISA § 101(a)(1)

1    (requiring the plan administrator to furnish to each participant covered under the plan and

2    to each beneficiary who is receiving benefits under the plan a summary plan description).

3    These SPDs incorporated by reference Countrywide's SEC filings, thus converting such

4    materials into fiduciary communications.

5        81.    Consequently, in light of the foregoing duties, responsibilities, and actions,

6    the Administrative Committee Defendants were both named fiduciaries of the Plan

7    pursuant to ERISA § 402(a)(1), 29 U.S.C. § 1102(a)(1), and *de facto* fiduciaries within

8    the meaning of ERISA § 3(21), 29 U.S.C. § 1002(21), in that they exercised discretionary

9    authority or discretionary control respecting management of the Plan, exercised authority

10   or control respecting management or disposition of the Plan's assets, and/or had

11   discretionary authority or discretionary responsibility in the administration of the Plan.

12   **F.    The Investment Committee Defendants' Fiduciary Status.**

13       82.    The Plan provides that the Investment Committee is a "Named Fiduciary"

14   for purposes of § 402(a) of ERISA. It has been delegated the responsibility of selecting

15   the investments in the Plan and monitoring the performance of the investment funds. *See*

16   Plan Document § 14.01; Plan Amendment Five § 14.01; Plan Amendment Eleven §

17   14.01.    Upon information and belief, the Investment Committee discharged this

18   responsibility together with the Plan Administrator pursuant to § 8.02(a) of the Plan.

19       83.    Consequently, in light of the foregoing duties, responsibilities, and actions,

20   the Investment Committee Defendants were both named fiduciaries of the Plan pursuant

21   to ERISA § 402(a)(1), 29 U.S.C. § 1102(a)(1), and *de facto* fiduciaries within the

22   meaning of ERISA § 3(21), 29 U.S.C. § 1002(21), in that they exercised discretionary

23   authority or discretionary control respecting management of the Plan, exercised authority

24   or control respecting management or disposition of the Plan's assets, and/or had

25   discretionary authority or discretionary responsibility in the administration of the Plan.

26

27

28

# VII.  FACTS BEARING ON FIDUCIARY BREACH

A.  **Countrywide Was an Imprudent Investment for the Plan during the Class Period Because of its Serious Mismanagement, Precipitous Decline in the Price of its Stock and Dire Financial Condition.**

1.  **Summary.**

84.    During the Class Period, Countrywide stock became an imprudent investment for participants' retirement savings because of, *inter alia*, the Company's highly risky and inappropriate origination practices and serious financial mismanagement which caused the value of Countrywide stock to be artificially inflated and exposed the Plan to huge losses as a result of such circumstances.

85.    Countrywide's  inappropriate  origination  practices  and  serious mismanagement pertains to, among other problems, Countrywide's (1) predatory and highly risky lending practices; (2) lack of adequate internal controls over its improper lending practices contributing to high delinquency and foreclosure rates among borrowers; and (3) misleading statements and misrepresentations regarding the Company's financial condition which caused the price of Countrywide stock to be artificially inflated during the Class Period.  In short, during the Class Period, the Company was seriously mismanaged and faced dire financial circumstances as a result of the aforementioned circumstances.  Accordingly, investment in Countrywide stock under these circumstances was imprudent and caused the Plan to suffer enormous losses.

2.  **The Rise of the Subprime Lending Industry.**

86.    Countrywide, like the mortgage industry as a whole, saw rapid growth in its origination of subprime loans in recent years.  Between 2003 and 2005, Countrywide's production of subprime loans doubled, from $19.8 billion to $44.6 billion.  Annual Report (Form 10-K) (Dec. 31, 2006) (hereinafter the "2006 Form 10-K") at 3.

87.    The proliferation of subprime loans has been attributed by many industry experts to a confluence of factors that occurred in 2004 and 2005, including rising home prices, declining affordability, historically low interest rates, intense lender competition, innovations in the structure and marketing of mortgages, and an abundance of capital

from lenders and mortgage securities investors.  *See* Sandra L. Thompson, Dir., Div. of Supervision and Consumer Prot., *Testimony Before the Committee on Banking, Housing and Urban Affairs, U.S. Senate: Federal Deposit Insurance Corporation on Mortgage Market Turmoil: Causes and Consequences*, Mar. 22, 2007, *available at* http://www.fdic.gov/news/news/speeches/chairman/ spmar22071.html.

88.    Upon information and belief, in 2004, as interest rates began to climb, the pool of potential prime borrowers looking to refinance began to dry up and lenders began extending loans to subprime borrowers with troubled credit histories in an effort to maintain or grow market share in a declining origination environment.

89.    In order to take advantage of this new market, lenders began weakening their underwriting standards, including:

> (a).    reducing the minimum credit score borrowers need to qualify for certain loans;

> (b).    allowing borrowers to finance a greater percentage of a home's value or to carry a higher debt load;

> (c).    introducing new products designed to lower borrowers' monthly payments for an initial period; and

> (d).    allowing borrowers to take out loans with little, if any, documentation of income and assets.

*See* Ruth Simon, *Mortgage Lenders Loosen Standards — Despite Growing Concerns, Banks Keep Relaxing Credit-Score, Income and Debt-Load Rules*, Wall St. J., July 26, 2005, at D1.

90.    In addition to lowering underwriting standards, lenders began offering novel loan products to entice borrowers which put them at greater risk of defaulting:

> (a).    **No-documentation and low-documentation loans:** Known in the industry as "liar loans," the practice of requiring little or no documentation from borrowers constituted as much as 40 percent of subprime mortgages issued in 2006, up from 25 percent in 2001.  *See* Gretchen Morgenson,

1    *Crisis Looms In Mortgages*, N.Y. Times, Mar. 11, 2007.

2    (b).    **Piggy-back loans:** These combine a mortgage with a home-equity

3    loan or line of credit, allowing borrowers to finance more than 80 percent of

4    the home's value without paying for private mortgage insurance.    As of

5    2006, about half of all subprime loans included "piggyback" loans, and on

6    average all borrowers financed 82 percent of the underlying value of their

7    property, markedly up from 48 percent in 2000. *See Id.*; James R. Hagerty

8    & Ruth Simon, *Home Lenders Pare Risky Loans – More Defaults Prompt*

9    *Cut in 'Piggyback' Mortgages; Housing Market May Suffer*, Wall St. J.,

10    Feb. 14, 2007, at A3.

11    (c).    **Interest-only mortgages:** These allow borrowers to pay interest and

12    no principal in the loan's early years, which keep payments low for a time,

13    but require that the deferred payment of principal be made in the future

14    through increased monthly or balloon payments.

15    (d).    **Option adjustable-mortgages:** The most prevalent of which are

16    hybrid adjustable rate mortgages ("ARMs"), the loans are marketed with

17    promotional or "teaser" rates during the loan's introductory period that later

18    balloon to much higher rates once the introductory period has ended.    ARMs

19    currently account for between one-half and one-third of subprime

20    mortgages. *See* Testimony of Roger T. Cole, Director, Division of Banking

21    Supervision and Regulation, The Federal Reserve Board, *Mortgage Markets*,

22    Before the Committee on Banking, Housing and Urban Affairs, U.S. Senate,

23    Mar. 22, 2007, *available at* http://www.federalreserve.gov/boarddocs/

24    testimony/2007/20070322/default.htm.

25    **3.    The Fall of the Subprime Lending Industry.**

26    91.    As early as 2004, industry watchdogs began expressing growing fears that

27    relaxed lending practices were increasing risks for borrowers and lenders in overheated

28    housing markets. *See* Simon, *Mortgage Lenders, supra.* As lenders were making it

-26-

1   easier for borrowers to qualify for a loan by such practices as described above, they were
2   also greatly increasing the likelihood that borrowers would be unable to make payments,
3   and that defaults would rise. Of particular concern was the prevalence of adjustable-rate
4   loans, which in combination with the lowered lending standards, were more likely to
5   result in borrowers' early payment defaults.

6       92.    In May 2005, bank regulators issued their first-ever guideline for credit-risk
7   management for home-equity lending and, in December 2005, new guidelines for
8   mortgage lenders were issued as well. *Id.*; Testimony of Sandra L. Thompson, *supra*.
9   The proposed "Interagency Guidance on Nontraditional Mortgage Product Risks" sent a
10  clear message to the marketplace that bank regulators were concerned about the lessened
11  underwriting standards and general lax risk management practices of subprime lenders.

12      93.    As of mid-2005, delinquency rates for subprime loans (60-days or more past
13  due) rose for the first time since 2002. By the fourth quarter of 2005, delinquencies and
14  foreclosures began to rise even more severely -- as of October 2005 the delinquency rate
15  was twice that recorded on new subprime loans a year earlier. *See* Simon & Hagerty,
16  *More Borrowers*, *supra*.

17      94.    According to the FDIC, total subprime delinquencies rose from 10.33
18  percent in the fourth quarter of 2004 to 13.33 percent in the fourth quarter of 2006 and
19  foreclosures rose from 1.47 percent to 2.0 percent over the same period. Testimony of
20  Sandra L. Thompson, *supra*.

21      95.    Subprime loans with ARMs accounted for the largest rise in delinquency
22  rates, an increase from 9.83 percent to 14.44 percent between the fourth quarter of 2004
23  and the fourth quarter of 2006; whereas foreclosures rose from 1.5 percent to 2.7 percent
24  during the same period. *Id.*

25      96.    In 2006 alone, roughly 80,000 subprime borrowers fell into delinquency,
26  many shortly after origination. *See* Simon & Hagerty, *More Borrowers*, *supra*.

27

28

97.     In short, the rate of delinquency and foreclosure suggests that lenders underestimated the risk involved and borrowers did not fully understand the full costs of these loans.

**B.      Countrywide Engaged in Risky and Inappropriate Subprime Lending Practices and Serious Mismanagement.**

98.     Despite the many warnings issued by industry analysts and government regulators, as well as other negative indicators, such as rising interest rates and a cooling housing market, for much of the Class Period, Countrywide continued to engage in risky and inappropriate lending practices and to make inaccurate prognostications about its financial future.

**1.      Countrywide's Aggressive Lending Practices.**

99.     In August 2007, *The New York Times* revealed that Countrywide had engaged in predatory lending practices by steering borrowers to risky subprime loans with unfavorable terms in order to generate greater profits for the Company:

> On its way to becoming the nation's largest mortgage lender, the Countrywide Financial Corporation encouraged its sales force to court customers over the telephone with a seductive pitch that seldom varied. 'I want to be sure you are getting the best loan possible,' the sales representatives would say.
>
> But providing 'the best loan possible' to customers wasn't always the bank's main goal, say some former employees. Instead, potential borrowers were often led to high-cost and sometimes unfavorable loans that resulted in richer commissions for Countrywide's smooth-talking sales force, outsize fees to company affiliates providing services on the loans, and a roaring stock price that made Countrywide executives among the highest paid in America.
> Countrywide's entire operation, from its computer system to its incentive pay structure and financing arrangements, is intended to wring maximum profits out of the mortgage lending boom no matter what it costs borrowers, according to interviews with former employees and brokers who worked in different units of the company and internal documents they provided. One document, for instance, shows that until last September the computer system in the company's subprime unit excluded borrowers' cash reserves, which had the effect of steering them away from lower-cost loans to those that were more expensive to homeowners and more profitable to Countrywide.

1  Gretchen Morgenson, *Inside the Countrywide Lending Spree*, N.Y. Times, Aug. 26,
2  2007.

3      100.  Many of the loans Countrywide forced on uninformed borrowers contained
4  unfavorable terms such as teaser interest rates which were reset to double digits after the
5  teaser period expired, while others carried prohibitive prepayment penalties that made
6  refinancing impossibly expensive. *Id.*

7      101.  Upon information and belief, Countrywide incentivized its brokers to market
8  these unfavorable terms by offering them extra commissions if they did so. *Id.*  For
9  example, upon information and belief, brokers could earn equal to 1 percent of the loan's
10  value if they added a three-year prepayment penalty to the loan. *Id.*  In addition, upon
11  information and belief, brokers could earn higher commissions for building higher reset
12  rates into the adjustable rate loans after the teaser period expired. *Id.*

13      102.  Upon information and belief, Countrywide made such loans because the
14  Company's profit margin from the securitization and sale of these loans in the secondary
15  market was greater and thus the company's commission structure rewarded sales
16  representatives for making risky, high-cost loans.

17      103.  However, Countrywide's business model, which prioritizes fees and
18  commissions over financial viability of loans, has resulted in massive delinquencies in its
19  subprime loans and has compromised the financial circumstances of the Company. 20.15
20  percent of subprime loans made by Countrywide were delinquent as of June 30, 2007, up
21  from 14.41 percent in the same period the preceding year. *Id.*; Countrywide Financial
22  Corp. Quarterly Report (Form 10-Q) (June 30, 2007) at 92. Moreover, almost 10 percent
23  of subprime mortgages were delinquent by 90 days or more compared with the previous
24  year's rate of 5.35 percent. Morgenson, *Inside the Countrywide Lending Spree, supra.*
25  At the end of 2006, delinquencies for Countrywide's subprime loans had increased to
26  19.03 percent, up 25 percent from the previous year's rate (15.20 percent) and up more
27  than 68 percent from the delinquency rate in 2004 (11.29 percent). 2006 Form 10-K at 9.
28

104.   Countrywide's unscrupulous lending practices are currently the subject of a U.S. Senate panel investigating the current housing and mortgage crisis.  In a recent press conference the panel's chair, Senator Charles Schumer, noted in amazement that 40 percent of subprime loans facing foreclosure could have qualified as prime-rate loans. John Godfrey, *Schumer Tells Countrywide to End Lending Practices*, Wall St. J., Aug. 29, 2007.  Senator Schumer called on Countrywide to end "its bad business practices and reverse some the damage it has already inflicted on our housing market." *Press Conference with Senator Charles Schumer (D-NY): Countrywide and Subprime Loans*, Fed. News Service, Aug. 29, 2007, *available at* http://text.fednews.com/ transcript.htm?id=20070829t0480&query=schumer&SLID=83ea7d275d2a0272eec4f753 84376875.

### 2.    Countrywide Continued to Offer Subprime Loans Despite the High Risk of Default or Foreclosure.

105.   For much of the Class Period, Countrywide continued to extend subprime loans to borrowers which contained many of the weakened lending terms discussed in Section VII. A.2, *supra*.  Countrywide's aggressive marketing of these loans resulted in massive increases in loan delinquencies and foreclosures and put the financial health of the Company in jeopardy.

106.   As of 2006, Countrywide ranked as one of the largest subprime lender in the country by originating $40.5 billion in subprime mortgage loans.  2006 Form 10-K at 3; *See* Nat'l Mortgage News Online, available at http://data.nationalmortgagenews.com. And again, for the first quarter of 2007, the Company ranked as both the number one subprime originator *and* the number one subprime servicer.  *See* Nat'l Mortgage News Online, *supra*.

107.   In early 2007, the result of Countrywide's aggressive and risky origination practices were revealed when, as discussed at ¶ 103 *supra*, the Company issued its Annual Report, detailing the marked increase in delinquencies and loan foreclosures for the subprime loans the Company was servicing.

108.   Countrywide also reported that foreclosures for subprime loans increased to 3.53 percent, more than doubling the rate of 1.74 percent in 2004.  2006 Form 10-K at 9. Countrywide's loans pending in foreclosure comprised 0.65 percent of its total loans in 2006, up from 0.44 percent in 2005 and 0.42 percent in 2004.  *Id.*

109.   However, it was not until late February 2007 that Countrywide began to tighten up its origination terms.  For instance, the Company continued to originate loans comprising more than 95 percent of a home's appraised value and required no documentation of a borrower's income until February 23, 2007.   *See* Gretchen Morgenson, *Inside the Countrywide Lending Spree*, N.Y. Times, Aug. 26, 2007.

110.   And it was not until March 2007, that Countrywide instructed its brokers to stop offering borrowers the option of no-money-down home loans, or "piggyback" loans, which were responsible for a steep rise in delinquencies.   In a Company email Countrywide told its loan originators:  "Please get in any deals over 95 LTV (loan-to-value) today!... Countrywide BC will no longer be offering any 100 LTV products as of Monday, March 12."  *Countrywide Ends No Down-Payment Lending*, Reuters, Mar. 9, 2007.

111.   Moreover, as recently as July 27, 2007, Countrywide's product list showed that it would lend $500,000 to a borrower rated C-, the second riskiest grade.  As long as the loan represented no more than 70 percent of the property's underlying value, the Company would lend to a borrower with a credit score as low as 500.  Morgenson, *Inside the Countrywide Lending Spree, supra.*  In fact, the Company would lend even if the borrower had been 90 days late on a current mortgage payment twice in the last 12 months, if the borrower had filed for personal bankruptcy protection, or if the borrower had faced foreclosure or default notices on his or her property. *Id.*

112.  Finally, in mid-August 2007, after Countrywide's stock had lost approximately 40 percent of its value since the beginning of the Class Period, the Company announced that it would make significant changes to its operations by limiting itself to mortgages which can be bought by government-backed agencies, Freddie Mac

1  and Fannie Mae.  Vikas Bajaj, *Big Changes and Big Loan for Lender*, N.Y. Times, Aug.
2  17, 2007.  The effort to clean up its act, however, came too late to prevent massive losses
3  to the Plan caused by the investment in Countrywide stock.

**3.    Countrywide Failed to Sufficiently Reserve for Various Liabilities and Obligations Related to Mortgages that it Securitized or Sold.**

6  113.    Countrywide retains subordinated interests in mortgages that it securitizes
7  and makes representations to buyers about performance and other characteristics of
8  mortgages that it sells.    The Company's Annual Report for 2006 reveals that
9  Countrywide underreserved for credit risk arising from its retained subordinated interests
10  and understated liabilities arising from representations it made regarding sold mortgages.

11  114.    For instance, from 2005 to 2006 the Company increased its recorded
12  reserves and liabilities at a rate much faster than the rate of increase of the related assets
13  or revenue.    And from December 31, 2005 to December 31, 2006, the value of
14  Countrywide's subordinated interests increased 16 percent, to $2.0 billion; during the
15  same period, its allowance for credit losses increased more than twice as much, by 36
16  percent to $269.2 million.  2006 Form 10-K at 46.

17  115.    Also during the same period, Countrywide's loan sales *decreased* two
18  percent to $403 billion, while its liability for related representations and warranties
19  *increased* by 108 percent to $390.2 million.  2006 Form 10-K at 45, 46.

20  116.    Similarly, while Countrywide's revenue from gain on sale of loans increased
21  approximately 17 percent during the period to $4.7 billion, its reserves for losses arising
22  from gains on sale increased more than 300 percent, to $290.4 million from $66.5
23  million.  2006 Form 10-K at F-20-F-21.  This increase in 2006 of the accumulation of
24  liabilities or reserves for activities that occurred in past periods caused Countrywide's
25  stock price to be artificially inflated during the Class Period.

**4.    Countrywide Failed to Provide Complete and Accurate Information to Participants Regarding the Excessive Risks of the Investment.**

117.    During much of the Class Period, Countrywide, and in particular Defendant Mozilo, provided incomplete and inaccurate information regarding the financial circumstances of the Company to Plan participants and the market as a whole.

118.    On January 31, 2006, Countrywide announced results for the quarter and year ended December 31, 2005, touting its impressive growth including quarterly and 2005 net earnings of $639 million and $2.5 billion, respectively, compared to $370 million and $2.2 billion for the comparable periods in 2004.  Defendant Mozilo boasted that:

> Importantly, we achieved these results despite an environment that included volatile interest rates; declining production profit margins throughout the industry; and the adverse effects of 2005's hurricanes, primarily Hurricane Katrina. If not for the hurricane charges, the Company would have surpassed its record of $4.18 per diluted share, achieved in the peak refinance boom year of 2003. Countrywide's exceptional performance in the 2005 environment is a reflection of the Company's ability to generate organic market share growth in its Mortgage Banking segment, and of the effective implementation of its strategy to expand its other business segments.'

> ***

> As we look ahead to 2006 and beyond, we expect to see the market transition continue, which should lead to substantial industry consolidation. In the past, Countrywide has benefited from consolidating environments by recruiting talented personnel and fortifying our infrastructure. Just as we have done for nearly four decades, we expect to emerge from challenging times as a stronger Company that is better positioned for the future. We continue to believe the long-term fundamentals of the housing and mortgage finance markets are strong as homeownership remains the foundation of the American dream. Shareholders should take comfort in knowing that Countrywide's workforce of more than 50,000 will continue to work toward making this dream available to all Americans.'

Countrywide Financial Corp., Current Report (Form 8-K) (Jan. 31, 2006).

1       119.  On February 9, 2006, Countrywide issued a press release touting its

2 continued growth, including operational results for January 2006 which announced that

3 Countrywide had been named the number one mortgage originator and servicer for 2005

4 by an industry group and had increased its origination share by more than 3 percentage

5 points from 2004 to reach 15.7 percent and widened its lead as the number one originator.

6 Countrywide Financial Corp., Current Report (Form 8-K) (Feb. 9, 2006).

7       120.  On March 9, 2006, Countrywide issued a press release touting its positive

8 operational results for February 2006 which reflected "across-the-board growth compared

9 to February 2005."  Countrywide Financial Corp., Current Report (Form 8-K) (Mar. 9,

10 2006).

11       121.  On April 11, 2006, Countrywide issued a press release touting its positive

12 operational results for March 2006, including a growth in mortgage loan fundings of $40

13 billion, up 10 percent year-over-year and 29 percent over the prior month.  Moreover, the

14 Company reported that for the first quarter of 2006, mortgage loan fundings were up 13

15 percent over the first quarter of 2005 and refinance volume remained high, accounting for

16 55 percent of the first quarter's production.  Countrywide Financial Corp., Current Report

17 (Form 8-K) (Apr. 11, 2006).

18       122.  On April 27, 2006 Countrywide a issued a press release touting its positive

19 earnings for the first quarter, including net quarterly earnings of $684 million and diluted

20 earnings per share were $1.10, as compared to $689 million in net earnings and $1.13 in

21 diluted earnings per share for the first quarter of 2005, and $639 million in net earnings

22 and $1.03 in diluted earnings per share for the fourth quarter of 2005.  Defendant Mozilo

23 explained that these results were achieved "[d]espite the challenges created by this

24 environment" and demonstrated the "effectiveness of [Countrywide's] time-tested

25 business model, our focus on mortgage lending and the continued diversification of our

26 earnings base." Countrywide Financial Corp., Current Report (Form 8-K) (Apr. 27,

27 2006).  He remarked further that "we remain confident in Countrywide's position within

28 the industry.  We will continue to capitalize upon consolidation and other industry

1  dynamics to grow market share, enhance our infrastructure and create greater shareholder

2  value." *Id.*

3     123.  On July 13, 2006, Countrywide issued a press release announcing slowing in

4  the mortgage loan production market as compared to the prior year, but touted its

5  operational results as compared to the industry-wide rate of origination:

> 'Countrywide's mortgage loan production results for the month of
> June and the second quarter of 2006 reflected the year-over-year
> slowdown in activity across the industry,' said Stanford L. Kurland,
> President and Chief Operating Officer. 'While the Company's total
> mortgage loan fundings for the second quarter of 2006 declined by 3
> percent year-over-year, they were up 13 percent from the first quarter
> of 2006, reflecting seasonal improvement. This compared positively
> to the industry, where industry origination volume for the second
> quarter of 2006 was estimated by various industry sources to decline,
> on average, by approximately 13 percent year-over-year. In addition,
> compared to last month, mortgage loan fundings and average daily
> applications increased. The mortgage pipeline also remains strong at
> $65 billion, matching last month and indicative of near-term strength
> in funding volume for Countrywide.'

16  Countrywide Financial Corp., Current Report (Form 8-K) (July 13, 2006).

17     124.  On July 24, 2006, Countrywide issued a press release touting its positive

18  results for the second quarter, including "a 25 percent year-over-year growth in diluted

19  earnings per share for the second quarter despite a 121 basis point rise in the 10-Year

20  U.S. Treasury yield and a 3 percent decline in our total loan funding volume."

21  Countrywide Financial Corp., Current Report (Form 8-K) (July 24, 2006). Defendant

22  Mozilo, explained:

> This demonstrated the power of our business model, as the strategic
> counterbalancing of our Production and Servicing sectors fueled
> positive results in our Mortgage Banking segment.  The ongoing
> growth initiatives in our other businesses are providing significant
> value to the consolidated franchise. Together, these activities help
> position the Company as a strong performer over the long term in a
> wide range of interest rate environments.

28  *Id.*

125.  On August 9, 2006, Countrywide issued a press release announcing a decline in its operational results for July 2006, which stated in part:

- Mortgage loan fundings for the month of July were $36 billion, a decrease of 19 percent from July 2005.  Year-to-date fundings of $256 billion were essentially flat as compared to last year.

- Monthly purchase volume in July was $17 billion as compared to $21 billion for July 2005.  Year-to-date purchase activity of $119 billion was down 3 percent from last year.

- Adjustable-rate loan fundings for the month of July were $17 billion, a decline of 27 percent from July 2005.  Year-to-date adjustable-rate volume was $125 billion, down 10 percent from last year.

- Average daily mortgage loan application activity in July was $2.5 billion, a decrease of 15 percent from last year.  The mortgage loan pipeline was $62 billion at July 31, 2006 as compared to $77 billion at July 31, 2005.

Defendant Kurland, attributed the results in residential mortgage loan production to current market conditions, including the slowed pace of home sales.  Countrywide Financial Corp., Current Report (Form 8-K) (Aug. 9, 2006).

126.  On September 14, 2006, Countrywide again issued a press release announcing a decline in its operational results for the previous month, August 2006, as compared to the prior year.  Defendant Mozilo attributed these results to the "expected industry slowdown."  Countrywide Financial Corp., Current Report (Form 8-K) (Sept. 14, 2006).

127.  On October 24, 2006, Countrywide announced, "In response to changing market conditions, management has initiated an expense and headcount reduction program. By year end, we expect that this program will generate an annualized cost savings run rate of over $500 million." The Company also announced:

We anticipate the fourth quarter of 2006 will be characterized by a continued slowdown in purchase volume beyond typical seasonality. However, should interest rates remain at their current levels or move

lower, we expect that increased refinance activity will mitigate this decline. We also continue to expect that margins will remain under pressure and that pricing will remain competitive as the mortgage market consolidates. In addition, pay-option loans - which have historically provided higher margins - are declining as a percentage of total production and have experienced margin erosion, and this trend may continue.

Countrywide Financial Corp., Current Report (Form 8-K) (Oct. 24, 2006).

128.    On March 12, 2007, Countrywide issued a press release announcing a further decline in its operational results for February 2007 which stated in part:

The nonprime lending industry is currently experiencing significant volatility and instability. . . . As a result, many nonprime competitors have recently exited the market and other lenders have suggested their continued viability is in question. Aggressive industry underwriting guidelines and lower home price appreciation have resulted in increasing delinquencies and defaults. Furthermore, as a result of investor concerns about nonprime loan performance, yield requirements have increased and secondary market liquidity has been reduced. These factors will adversely impact residual valuations and gains on sale of nonprime loans until market conditions improve.'

'In response to market factors, management has implemented changes to our origination policies to mitigate future exposure including further tightening of underwriting guidelines. Nonprime fundings were only 7 percent of total mortgage loan fundings in February and recent nonprime application volumes have declined as a result of our recent policy changes. At December 31, 2006, our nonprime residuals amounted to $402 million, which represents 0.2 percent of the Company's assets.

Management views that the long term impact of the current nonprime market dynamics is positive for both the industry and Countrywide. . . . The industry should benefit from more rational underwriting and pricing as excess lending capacity is eliminated. Countrywide is well positioned to take advantage of this market disruption due to its experience, operating controls, strong liquidity profile and relatively low exposure to nonprime. Nonetheless, the Company may experience short term earnings volatility during this transition period.

-37-

1  Countrywide Financial Corp., Current Report (Form 8-K) (Mar 12, 2007).

2      129.  On April 26, 2007, Countrywide announced the Company's earnings results

3  for the first quarter.  Defendant Mozilo explained that "[w]hile the Company's core

4  operations delivered what was otherwise a strong quarter, earnings were impacted by

5  charges relating to our subprime activities as well as increases to our loss reserves and

6  related asset valuation adjustments stemming from higher delinquencies and softer

7  housing markets."  Countrywide Financial Corp., Current Report (Form 8-K) (Apr. 26,

8  2007).  In addition, the announcement provided the following outlook for 2007:

> Management believes that considerable risks remain in the mortgage
> marketplace, including but not limited to potential further
> deterioration in the housing market that could impact origination
> volume and future credit costs; potential pending regulatory or
> legislative actions that could impose constraints on our operations;
> and other business risks as outlined in the disclaimer at the end of this
> press release. While the balance of 2007 is expected to be challenging,
> management continues to believe that current market conditions will
> result in opportunities in the form of further industry consolidation.
> Management also believes that the Company is well-positioned to
> capitalize upon these opportunities, which should strengthen
> Countrywide's franchise and result in accelerated future market share
> and earnings growth.

*Id.*

19      130.  On June 12, 2007, Countrywide issued a press release touting its positive

20  operational results for May 2007, including "a 17 percent increase in home purchase

21  activity from the prior month."  Countrywide Financial Corp., Current Report (Form 8-K)

22  (June 12, 2007).  President and Chief Operating Officer David Sambol attributed the

23  results to "[Countrywide's] focus on integrating the activities of our Bank and mortgage

24  company, Countrywide Bank funded $19 billion, or 44 percent, of total residential

25  mortgage production during the month of May 2007, its highest monthly amount to date."

26  *Id.*  Moreover, the Company announced that according to *Inside Mortgage Finance*, it

27  had retained its position as the number one mortgage originator in all channels for the

28  first quarter of 2007.  *Id.*

131. On July 16, 2007, Countrywide issued a press release announcing operational results for June 2007 which stated in part:

> 'Market conditions became increasingly challenging throughout the second quarter of 2007,' said David Sambol, President and Chief Operating Officer. 'The housing market continues to soften, and delinquencies and defaults continue to rise. Additionally, interest rates, price competition in the residential lending markets and secondary market volatility have all increased. However, Countrywide's residential funding volume in June was strong, driven primarily by seasonal purchase activity and higher application volumes in preceding months.'

Countrywide Financial Corp., Current Report (Form 8-K) (July 16, 2007).

132. Countrywide's announcements were attempts by the Company to hide the truth regarding upcoming impairment charges and drastic need for an infusion of cash. Rather than disclose that Company stock had become an imprudent investment for the Plan, Defendants continued to make optimistic statements about the Company's future and, in particular, continued to make Employer Matching Contributions in Company stock and allow Company stock to remain an investment option in the Plan.

**5.    Countrywide's Financial Problems Come to Light.**

133. In July 2007, it became abundantly clear that Countrywide had ignored warnings regarding the risks of the subprime lending industry and that this failure was leading to the Company's financial demise.

134. On July 24, 2007, Countrywide announced that it had taken impairment charges of $417 million during the second quarter on the Company's investments in credit-sensitive retained interests. The impairment included:

> $388 million, or approximately $0.40 in earnings per diluted share based on a normalized tax rate, of impairment on residual securities collateralized by prime home equity loans. The impairment charges on these residuals were attributable to accelerated increases in delinquency levels and increases in the estimates of future defaults and loss severities on the underlying loans.

Countrywide Financial Corp., Current Report (Form 8-K) (July 24, 2007).

135.   As a result of these developments, the Company updated its 2007 earnings estimate.  The update cut the earnings estimate to $2.70 a share from $3.30, which was already down from its previous guidance of $3.50 to $4.30 a share.  *Id.*  Upon this news Countrywide's stock price fell $3.56 or 10.4 percent, closing at $30.50 per share, on unprecedented volume of 51.2 million shares, a loss of over $1.87 billion in total market capitalization.

136.   On August 2, 2007, Countrywide issued a press release entitled: "Countrywide Comments on Its Strong Funding Liquidity and Financial Condition."  The press release stated in part:

> 'Our mortgage company has significant short-term funding liquidity cushions and is supplemented by the ample liquidity sources of our bank. . . . In fact, we have almost $50 billion of highly-reliable short-term funding liquidity available as a cushion today. It is important to note that the Company has experienced no disruption in financing its ongoing daily operations, including placement of commercial paper.'

> 'Countrywide's financial condition remains strong, as evidenced by over $14 billion of net worth, significant excess capital and our strong investment grade credit ratings. . . . Two independent credit rating agencies, Moody's Investors Service and Standard & Poor's Rating Service, this week re-affirmed their ratings and stable outlook for Countrywide, its bank and its mortgage company.'

*Countrywide Comments on Its Strong Funding Liquidity and Financial Condition,* PR Newswire (Aug. 2, 2007).

137.   On August 6, 2007, Countrywide detailed the Company's liquidity sources in an unprecedented disclosure.   Upon release of these disclosures, the price of Countrywide rose 7.0 percent or $1.75, closing at $26.75, on volume of 50.5 million shares. Countrywide Financial Corp., Current Report (Form 8-K) (Aug. 6, 2007).

138.   On August 9, 2007, after the close of the markets, Countrywide issued its second quarter results and disclosed the Company's significant financing needs which contradicted its statement one week earlier that the Company's financial situation remained strong and raised questions about the short-term sufficiency and reliability of