1    the reserves presented in its August 6, 2007 Form 8-K. The Form 10-Q filed August 9,
2    2007 stated in part:

3        Item 1A.     Risk Factors

4        Item 1A of our 2006 Annual Report presents risk factors that may
5        impact the Company's future results. In light of recent developments
         in the mortgage; housing and secondary markets, those risk factors are
6        supplemented by the following risk factor:

7        **_Debt and secondary mortgage market conditions could have a_**
8        **_material adverse impact on our earnings and financial condition_**

9        We have significant financing needs that we meet through the capital
10       markets, including the debt and secondary mortgage markets. These
         markets are currently experiencing unprecedented disruptions, which
11       could have an adverse impact on the Company's earnings and
12       financial condition, particularly in the short term.

13       Current conditions in the debt markets include reduced liquidity and
14       increased credit risk premiums for certain market participants. These
         conditions, which increase the cost and reduce the availability of debt,
15       may continue or worsen in the future. The Company attempts to
16       mitigate the impact of debt market disruptions by obtaining adequate
         committed and uncommitted facilities from a variety of reliable
17       sources. There can be no assurance however, that the Company will
18       be successful in these efforts, that such facilities will be adequate or
         that the cost of debt will allow us to operate at profitable levels. The
19       Company's cost of debt is also dependent on its maintaining
20       investment-grade credit ratings. Since the Company is highly
         dependent on the availability of credit to finance its operations,
21       disruptions in the debt markets or a reduction in our credit ratings,
22       could have an adverse impact on our earnings and financial condition,
23       particularly in the short term.

24       The secondary mortgage markets are also currently experiencing
         unprecedented disruptions resulting from reduced investor demand for
25       mortgage loans and mortgage-backed securities and increased investor
26       yield-requirements for those loans and securities. These conditions
         may continue or worsen in the future. In light of current conditions,
27       we expect to retain a larger portion of mortgage loans and mortgage-
28       backed securities than we would in other environments. While our
         capital and liquidity positions are currently strong and we believe we

-41-

1

2    have sufficient capacity to hold additional mortgage loans and
     mortgage backed securities until investor demand improves and yield

3    requirements moderate, our capacity to retain mortgage loans and
     mortgage backed securities is not unlimited. As a result, a prolonged

4    period of secondary market illiquidity may reduce our loan production
     volumes and could have an adverse impact on our future earnings and

5    financial condition.

6    Countrywide Financial Corp. Quarterly Report (Form 10-Q) (Aug. 9, 2007)

7    (emphasis added).

8         139.   On August 15, 2007, Countrywide shares sank 13 percent, their biggest one-

9    day decline since the 1987 stock market crash, on fears that the largest U.S. mortgage

10   lender could face bankruptcy, spurred by a downgrade of Countrywide stock from a

11   "Buy" recommendation to "Sell" by Merrill Lynch analyst Kenneth Bruce. Bruce stated

12   that "[i]f enough financial pressure is placed on Countrywide or if the market loses

13   confidence in its ability to function properly, then the model can break, leading to an

14   effective insolvency. . . . If liquidations occur in a weak market, then it is possible for

15   Countrywide to go bankrupt.'" Jonathan Stempel, *Countrywide Plunges on Bankruptcy*

16   *Fear*, Reuters, Aug. 15, 2007.

17        140.   The following day, August 16, 2007, Countrywide announced that it had

18   drawn down its $11.5 billion credit facility to supplement its funding liquidity position.

19   According to David Sambol, President and Chief Operating Officer:   "Along with

20   reduced liquidity in the secondary market, funding liquidity for the mortgage industry has

21   also become constrained." Countrywide Financial Corp. Current Report (Form 8-K)

22   (Aug. 16, 2007).

23        141.   Analysts characterized Countrywide's chosen course as a move made in

24   desperation: "Countrywide said it would tap its $11.5 billion bank line of credit to

25   provide liquidity. And tap is the right word, because usually a bank line like this is your

26   liquidity source of last resort, which you use only when you're tapped out." Randall W.

27   Forsyth, *On Borrowed Time*, Barron's Online, Aug. 20, 2007.

28

1    142.   Upon news of the downgrade and the announcement that the Company had
2  drawn down its *entire* credit facility, Countrywide shares tumbled and closed at $18.95
3  per share, a decline of 42 percent from the start of the Class Period.

4    143.   As of August 17, 2007, Countrywide began laying off employees involved
5  in loan origination – only two weeks after it reported hiring loan officers from rivals
6  forced to close shop.  James R. Hagerty, *Countrywide Begins Staff Layoffs*, Wall St. J.,
7  Aug. 20, 2007, at A6.

8    144.   On August 22, 2007, Countrywide issued a press release in which the
9  Company announced that it had received a much needed infusion of cash in the form of a
10  $2 billion equity investment from Bank of America.  The investment is in the form of a
11  non-voting convertible preferred security yielding 7.25 percent annually.  Under the
12  terms of the agreement, the security can be converted into common stock at $18 per
13  share, with resulting shares subject to restrictions on trading for 18 months after
14  conversion.  Defendant Mozilo, in the Company's press release, stated in part:

15
16
17
18
> Bank of America's investment in Countrywide represents a vote of
> confidence and strengthens our balance sheet, enabling us to position
> Countrywide for future growth and success. This transaction benefits
> all of Countrywide's constituents, including investors, shareholders,
> mortgage customers, deposit holders, business partners and
> employees.

19
20  Countrywide Financial Corp. Press Release, *Countrywide Receives $2 Billion Strategic*
21  *Equity Investment From Bank of America*, attached as Exhibit 99.1 to Countrywide
22  Financial Corp, Current Report (Form 8-K) (Aug. 23, 2007).   However, analysts
23  characterized the agreement as highly *unfavorable* to Countrywide:

24
25
26
27
> As it turned out, Bank of America's generous gesture was not entirely
> altruistic.  In return for the $2 billion, it got a preferred that paid
> 7.25%, a much heftier yield than the 2.5% to 3.5% converts issued by
> Countrywide a scant three months earlier.  Moreover, the preferred
> sold to Bank of America is convertible at a surprisingly 205 below
> then market price of Countrywide common.

28  Alan Abelson, *Up and Down Wall Street*, Barron's Online, Aug. 27, 2007.

1      145.  The investment by Bank of America was supposed to strengthen
2    Countrywide's financials, but was met with skepticism in the market.  "Two billion
3    dollars from Bank of America is not a lot compared to what they may need," said Stuart
4    Plesser, an equity analyst at Standard & Poor's in New York. James R. Hagerty and
5    Karen Richardson, *Why is Countrywide Sliding?  It's Unclear, That's the Issue,* Wall St.
6    J., Aug. 29, 2007.

7      146.  On September 7, 2007, Countrywide announced that it would cut up to
8    12,000 additional jobs, amounting to as much as 20 percent of the Company's workforce.
9    *Countrywide Announces Plan to Address Changing Market Conditions Including*
10   *Workforce Reductions,* attached as Exhibit 99.1 to Countrywide Financial Corp, Current
11   Report (Form 8-K) (Sept. 7, 2007).  Countrywide also announced plans to revise its
12   product offerings to include only high quality prime loans or loans that can be sold in the
13   secondary market. *Id.*

14     147.  On September 11, 2007, it was announced that Countrywide had hired
15   Goldman Sachs Group, Inc. to help it find additional financing for the second time in less
16   than a month.  Steve Dickson, *Countrywide Shares Fall on Report Lender Needs Cash,*
17   Bloomberg News, Sept. 11, 2007.  As a result of this news, Company stock fell 5 percent
18   to $16.18, its lowest closing price in four years.

19     148.  On September 13, 2007, the Company announced that it had secured an
20   additional $12 billion in secured borrowing through new or existing credit lines.  Lingling
21   Wei, *Countrywide Loan Fundings Fall; Lender Lines Up $12 Billion Credit,* Wall St. J.,
22   Sept. 13, 2007.

23   **C.**   **Defendants Knew or Should Have Known That Countrywide Stock Was an**
24         **Imprudent Investment.**

25     149.  During the Class Period, as described herein, Defendants knew or, had they
26   properly discharged their fiduciary obligations, would have known that Countrywide stock
27   was imprudent investment alternatives for the Plan due to Countrywide's serious
28   mismanagement and improper business practices, including, among other practices:  (a)

-44-

1  marketing and extending subprime mortgage loans, made on a "low documentation"
2  basis, without adequate consideration of the borrower's ability to repay and with
3  unreasonably high risk of borrower default; (b) intentionally marketing subprime loans
4  with high risk of default to borrowers who qualified for prime-rate loans in order to
5  increase Company profits; (c) encouraging brokers to market excessively high-cost loans
6  with greater risk of default to borrowers by offering incentive commissions; (d)
7  representing that Countrywide had strict and selective underwriting and loan origination
8  practices; (e) representing that Countrywide had sufficient reserves set aside to cover the
9  high-risk loans it was selling; (f) operating with inadequate liquidity in relation to the
10  volatility of Countrywide's business lines and assets; and (g) operating without the
11  requisite internal controls to determine appropriate loan loss provisions.

12      150.  As a result, Countrywide's stock price and the price of the Fund were
13  artificially inflated making them an imprudent investment for the Plan.

14      151.  As a result of Defendants' knowledge of the public misconceptions concerning
15  the true financial health of the Company, any generalized warnings of market and
16  diversification risks that Defendants made to the Plan's participants regarding the Plan's
17  investment in Countrywide stock did not effectively inform the Plan's participants of the past,
18  immediate, and future dangers of investing in Company stock.

19      152.  Defendants also failed to take into account the changing risk profile of the
20  Countrywide stock investment as a result of the above circumstances and the Company's
21  deteriorating financial circumstances as demonstrated by objective indicators for
22  evaluating a company's ongoing viability.

23      153.  The Defendants failed to conduct an appropriate investigation into whether
24  Countrywide stock was a prudent investment for the Plan and, in connection therewith, failed
25  to provide the Plan's participants with information regarding Countrywide's tremendous
26  problems so that participants could make informed decisions regarding their investments in
27  Countrywide stock in the Plan.

28

154.  An adequate or even cursory investigation by Defendants would have revealed to a reasonable fiduciary that, under these circumstances, investment by the Plan in Countrywide stock was excessively and unduly risky, and, thus, imprudent.  A prudent fiduciary acting under similar circumstances would have acted to protect participants against unnecessary losses and would have made different investment decisions.

155.  Because Defendants knew or should have known that Countrywide was not a prudent investment option for the Plan, they had a fiduciary duty to protect the Plan and its participants from unreasonable and entirely predictable losses incurred as a result of the Plan's investment in Countrywide stock.

156.  Defendants had available to them several different options for satisfying this duty, including: making appropriate public disclosures, as necessary; divesting the Plan of Countrywide stock; discontinuing further contributions to and/or investment in Countrywide stock under the Plan; consulting independent fiduciaries regarding appropriate measures to take in order to prudently and loyally serve the participants of the Plan; and/or resigning as fiduciaries of the Plan to the extent that as a result of their employment by Countrywide they could not loyally serve the Plan and its participants in connection with the Plan's acquisition and holding of Countrywide stock.

157.  Despite the availability of these and other options, Defendants failed to take any action to protect participants from losses resulting from the Plan's investment in Countrywide stock.  In fact, Defendants continued to invest and to allow investment of the Plan's assets in Company stock even as Countrywide's problems came to light.

158.  In addition, the Defendants failed to adequately review the performance of the other fiduciaries of the Plan to ensure that they were fulfilling their fiduciary duties under the Plan and ERISA.

159.  When it came to their own personal holdings of Countrywide stock, however, the Insider Selling Defendants sold millions of dollars of the stock, effectively cashing in while hanging Plan participants out to dry.  Such conduct violated the duties of prudence and loyalty under ERISA.

**D.    Defendants Failed to Provide Plan Participants with Complete and Accurate Information about the True Risks of Investment in Countrywide Stock in the Plan.**

160.    ERISA mandates that plan fiduciaries have a duty of loyalty to the plan and its participants which includes the duty to speak truthfully to the plan and its participants when communicating with them. A fiduciary's duty of loyalty to plan participants under ERISA includes an obligation not to materially mislead, or knowingly allow others to materially mislead, plan participants and beneficiaries.

161.    During the Class Period, upon information and belief, Defendants made direct and indirect communications with participants in the Plan which included statements regarding investments in Company stock. These communications included, but were not limited to, SEC filings, annual reports, press releases, and Plan documents, in which Defendants failed to disclose that Company stock was not a prudent retirement investment, and which were incorporated by reference in Plan documents. The Company regularly communicated with employees, including participants in the Plan, about the performance, future financial and business prospects of the Company's common stock, which was, far and away, the single largest asset of the Plan. 2006 Form 11-K at 10.

162.    Defendants, as the Plan's fiduciaries, knew or should have known certain basic facts about the characteristics and behavior of the Plan's participants, well-recognized in the 401(k) literature and the trade press, concerning investment in company stock, including that:

> (a).    Employees tend to interpret a match in company stock as an endorsement of the company and its stock;
>
> (b).    Out of loyalty, employees tend to invest in company stock;
>
> (c).    Employees tend to over-extrapolate from recent returns, expecting high returns to continue or increase going forward;
>
> (d).    Employees tend not to change their investment option allocations in the plan once made;
>
> (e).    No qualified retirement professional would advise rank and file

-47-

employees to invest more than a modest amount of retirement savings in company stock, and many retirement professionals would advise employees to avoid investment in company stock entirely;

(f).    Lower income employees tend to invest more heavily in company stock than more affluent workers, though they are at greater risk; and

(g).    Even for risk-tolerant investors, the risks inherent to company stock are not commensurate with it rewards.

163.    Even though Defendants knew or should have known these facts, and even though Defendants knew of the high concentration of the Plan's funds in Company stock during the Class Period, Defendants failed to take any meaningful ameliorative action to protect the Plan and its participants from their heavy investment in an imprudent retirement vehicle, Countrywide stock.

164.    In addition, Defendants failed to provide participants, and the market as a whole, with complete and accurate information regarding the true financial condition of the Company.   As such, participants in the Plan could not appreciate the true risks presented by investments in Company stock and therefore could not make informed decisions regarding their investments in Company stock in the Plan.

165.    Specifically, Defendants failed to provide the Plan's participants with complete and accurate information regarding Countrywide's serious mismanagement and improper business practices, including, among other practices:    (a) marketing and extending subprime mortgage loans, made on a "low documentation" basis, without adequate consideration of the borrower's ability to repay and with unreasonably high risk of borrower default; (b) intentionally marketing subprime loans with high risk of default to borrowers who qualified for prime-rate loans in order to increase Company profits; (c) encouraging brokers to market excessively high-cost loans with greater risk of default to borrowers by offering incentive commissions; (d) representing that Countrywide had strict and selective underwriting and loan origination practices; (e) representing that Countrywide had sufficient reserves set aside to cover the high-risk loans it was selling;

1    (f) operating with inadequate liquidity in relation to the volatility of Countrywide's
2    business lines and assets; and (g) operating without the requisite internal controls to
3    determine appropriate loan loss provisions.

4        166.  As such, the participants were not informed of the true risks of investing
5    their retirement assets in the Plan in Countrywide stock.

6    **E.    Defendants Suffered From Conflicts of Interest.**

7        167.  As ERISA fiduciaries, Defendants are required to manage the Plan's
8    investments, including the investment in Countrywide stock, solely in the interest of the
9    participants and beneficiaries, and for the exclusive purpose of providing benefits to
10   participants and their beneficiaries.  This duty of loyalty requires fiduciaries to avoid
11   conflicts of interest and to resolve them promptly when they occur.

12       168.  Conflicts of interest abound when a company that invests plan assets in
13   company stock founders.  This is because as the situation deteriorates, plan fiduciaries are
14   torn between their duties as officers and directors for the company on the one hand, and
15   to the plan and plan participants on the other.  As courts have made clear "'[w]hen a
16   fiduciary has dual loyalties, the prudent person standard requires that he make a careful
17   and impartial investigation of all investment decisions.'"  *Martin v. Feilen,* 965 F.2d 660,
18   670 (8th Cir.1992) (citation omitted).  Here, Defendants breached this fundamental
19   fiduciary duty.

20       169.  First, Defendants failed to investigate whether to take appropriate and
21   necessary action to protect the Plan, and instead, chose the interests of the Company over
22   the Plan by continuing to offer Countrywide stock as a Plan investment option, and
23   maintain investment in Countrywide stock in the Plan.

24       170.  Second, certain of the Defendants who knew or should have known of
25   Countrywide's inflated stock price during much of the Class Period, benefited directly
26   from this knowledge or neglect by selling their personal holdings of Countrywide stock
27   for significant gain.  During the Class Period, the Insider Selling Defendants sold
28   approximately 7,804,506 shares of Countrywide stock for proceeds of over $294 million.

-49-

The following is a summary of the insider sales by these Plan fiduciaries since January 2006:

| Name | Sales | Shares Sold | Proceeds of Sales |
|------|-------|-------------|-------------------|
| Mozilo | 116 | 6,451,463 | $242,912,933 |
| Cisneros | 3 | 79,407 | $3,052,506 |
| Cunningham | 12 | 75,000 | $3,004,450 |
| Donato | 2 | 54,142 | $2,142,052 |
| Dougherty | 12 | 227,905 | $9,182,698 |
| Gates | 4 | 75,000 | $2,978,475 |
| Heller | 3 | 106,540 | $4,014,688 |
| Kurland | 34 | 413,049 | $15,211,426 |
| Robertson | 3 | 152,000 | $5,966,400 |
| Snyder | 6 | 170,000 | $6,462,738 |
| **TOTALS:** | **196** | **7,804,506** | **$294,928,366** |

171. In particular, Defendant Mozilo engaged in significant selling during the Class Period. Upon review of the Form 4s filed in the last year alone, Defendant Mozilo made a profit of $129 million from the sale of Company stock, approximately one-third of the amount he has reaped over the past 23 years. Defendant Mozilo continues to hold approximately 500,000 shares in Countrywide stock. Form 4 (Aug. 13, 2007).

172. The Insider Selling Defendants breached their fiduciary duties to the Plan and its participants, as, rather than ensure that the Plan discontinued investment in Company stock or informing Plan participants regarding the material negative information concerning the Company's above-outlined problems, they chose to remain quiet and reap the benefit of their insider knowledge by selling their personal holdings of Countrywide for enormous gain.

173. While the above Defendants protected and enriched themselves, they stood idly by as the Plan lost well over one hundred million dollars because of its investment in Countrywide stock. This is precisely the type of conflicted and disloyal action that ERISA was intended to prevent.

# VIII. THE RELEVANT LAW

1

2    174.    ERISA § 502(a)(2), 29 U.S.C. § 1132(a)(2), provides, in pertinent part, that

3    a civil action may be brought by a participant for relief under ERISA § 409, 29 U.S.C. §

4    1109.

5    175.    ERISA § 409(a), 29 U.S.C. § 1109(a), "Liability for Breach of Fiduciary

6    Duty," provides, in pertinent part, that:

7
            any person who is a fiduciary with respect to a plan who breaches any
8           of the responsibilities, obligations, or duties imposed upon fiduciaries
            by this subchapter shall be personally liable to make good to such plan
9           any losses to the plan resulting from each such breach, and to restore
            to such plan any profits of such fiduciary which have been made
10          through use of assets of the plan by the fiduciary, and shall be subject
11          to such other equitable or remedial relief as the court may deem
            appropriate, including removal of such fiduciary.
12

13   176.    ERISA § 502(a)(3), 29 U.S.C. § 1132(a)(3), authorizes individual

14   participants to seek equitable relief from defendants, including, without limitation,

15   injunctive relief and, as available under applicable law, constructive trust, restitution, and

16   other monetary relief.

17   177.    ERISA §§ 404(a)(1)(A) and (B), 29 U.S.C. §§ 1104(a)(1)(A) and (B),

18   provides, in pertinent part, that a fiduciary shall discharge his duties with respect to a plan

19   solely in the interest of the participants and beneficiaries, for the exclusive purpose of

20   providing benefits to participants and their beneficiaries, and with the care, skill,

21   prudence, and diligence under the circumstances then prevailing that a prudent man

22   acting in a like capacity and familiar with such matters would use in the conduct of an

23   enterprise of a like character and with like aims.

24   178.    These fiduciary duties under ERISA §§ 404(a)(1)(A) and (B) are referred to

25   as the duties of loyalty, exclusive purpose and prudence and are the "highest known to

26   the law." *Howard v. Shay*, 100 F.3d 1484, 1489 (9th Cir. 1996).  They entail, among

27   other things:

28

and to continually monitor, the merits of all the investment alternatives of a plan, including in this instance Countrywide stock, to ensure that each investment is a suitable option for the plan;

(b).    The duty to avoid conflicts of interest and to resolve them promptly when they occur. A fiduciary must always administer a plan with an "eye single" to the interests of the participants and beneficiaries, regardless of the interests of the fiduciaries themselves or the plan sponsor;

(c).    The duty to follow the terms of the plan document only "insofar as such documents and instruments are consistent with the provisions of [title I] and title IV" of ERISA. 29 U.S.C. § 1104(a)(1)(D). Therefore, if a plan's terms are inconsistent with ERISA, a prudent fiduciary acting in the best interests of the plan's participants must effectively override the plan's terms. The Department of Labor's regulations interpreting ERISA also demonstrate that the fiduciary's duty of prudence trumps even his obligations to comply with plan terms, including statements of investment policy or plan design; and

(d).    The duty to disclose and inform, which encompasses: (1) a negative duty not to misinform; (2) an affirmative duty to inform when the fiduciary knows or should know that silence might be harmful; and (3) a duty to convey complete and accurate information material to the circumstances of participants and beneficiaries.

179.    ERISA § 405(a), 29 U.S.C. § 1105(a), "Liability for Breach by Co-Fiduciary," provides, in pertinent part, that:

In addition to any liability which he may have under any other provision of this part, a fiduciary with respect to a plan shall be liable for a breach of fiduciary responsibility of another fiduciary with respect to the same plan in the following circumstances:

(1) if he participates knowingly in, or knowingly undertakes to conceal, an act or omission of such other fiduciary, knowing such act or omission is a breach;

(2) if, by his failure to comply with section 404(a)(1), 29 U.S.C. § 1104(a)(1), in the administration of his specific responsibilities which give rise to his status as a fiduciary, he has enabled such other fiduciary to commit a breach; or

-52-

1
2

(3) if he has knowledge of a breach by such other fiduciary, unless he makes reasonable efforts under the circumstances to remedy the breach.

3
4

180.   Co-fiduciary liability is an important part of ERISA's regulation of fiduciary

5

responsibility.   Because ERISA permits the fractionalization of the fiduciary duty, there

6

may be, as in this case, several ERISA fiduciaries involved in a given issue, such as the

7

role of company stock in a plan.   In the absence of co-fiduciary liability, fiduciaries

8

would be incentivized to limit their responsibilities as much as possible and to ignore the

9

conduct of other fiduciaries.   The result would be a setting in which a major fiduciary

10

breach could occur, but the responsible party could not easily be identified.   Co-fiduciary

11

liability obviates this.   Even if a fiduciary merely knows of a breach, a breach he had no

12

connection with, he must take steps to remedy it:

13
14
15
16
17
18
19

[I]f a fiduciary knows that another fiduciary of the plan has committed a breach, and the first fiduciary knows that this is a breach, the first fiduciary must take reasonable steps under the circumstances to remedy the breach.   .  .  .   [T]he most appropriate steps in the circumstances may be to notify the plan sponsor of the breach, or to proceed to an appropriate Federal court for instructions, or bring the matter to the attention of the Secretary of Labor.   The proper remedy is to be determined by the facts and circumstances of the particular case, and it may be affected by the relationship of the fiduciary to the plan and to the co- fiduciary, the duties and responsibilities of the fiduciary in question, and the nature of the breach.

20
21

1974 U.S.C.C.A.N. 5038, 1974 WL 11542, at 5080.

22

181.   Plaintiff therefore brings this action under the authority of ERISA

23

§ 502(a)(2) for relief under ERISA § 409(a) to recover losses sustained by the Plan

24

arising out of the breaches of fiduciary duties by the Defendants for violations under

25

ERISA § 404(a)(1) and ERISA § 405(a).

26

### IX.   ERISA § 404(c) DEFENSE INAPPLICABLE

27

182.   ERISA § 404(c) is an affirmative defense that provides a limited exception

28

to fiduciary liability for losses that result from participants' exercise of control over

-53-

1   investment decisions. In order for § 404(c) to apply, participants must in fact exercise
2   "independent control" over investment decisions, and the fiduciaries must otherwise
3   satisfy the numerous procedural and substantive requirements of ERISA § 404(c), 29
4   U.S.C. § 1104(c), and the regulations promulgated under it.

5       183.  ERISA § 404(c) does not apply here for, among others, the following three
6   reasons.

7       184.  First, ERISA § 404(c) does not and cannot provide any defense to the
8   fiduciaries' imprudent decision to select and continue offering Countrywide stock as an
9   investment option in the Plan, or to continue matching in Countrywide stock, as these are
10  not decisions that were made or controlled by the participants. *See Final Reg. Regarding*
11  *Participant Directed Individual Account Plans* (ERISA Section 404(c) Plans) ("Final
12  404(c) Reg."), 57 Fed. Reg. 46906-01, 1992 WL 277875, at *46924 n.27 (Oct. 13, 1992)
13  (codified at 29 C.F.R. § 2550) (noting that "the act of limiting or designating investment
14  options which are intended to constitute all or part of the investment universe of an
15  ERISA § 404(c) plan is a fiduciary function which, whether achieved through fiduciary
16  designation or express plan language, is not a direct or necessary result of any participant
17  direction of such plan").

18      185.  Second, as to participant directed investment in Countrywide stock, ERISA
19  § 404(c) does not apply because Defendants failed to ensure effective participant control
20  by providing complete and accurate material information to participants regarding
21  Countrywide stock. *See* 29 C.F.R. § 2550.404c-1(b)(2)(i)(B) (the participant must be
22  provided with "sufficient information to make informed decisions"). As a consequence,
23  participants in the Plan did not have informed control over the portion of the Plan's assets
24  that were invested in Countrywide stock as a result of their investment directions, and the
25  Defendants remain entirely responsible for losses that result from such investment.

26      186.  Third, upon information and belief, the Plan participants were not informed
27  that the Plan intended to comply as a § 404(c) plan in the manner required by ERISA and
28  applicable regulations. Therefore, §404(c) of ERISA does not apply to participants'

-54-

1  "investment decisions" regarding Countrywide stock, and Defendants remain liable for
2  losses suffered by participants during the Class Period as a result of such decisions.

3      187.  Because ERISA § 404(c) does not apply here, the Defendants' liability to the
4  Plan, the Plaintiff and the Class (as defined below) for losses caused by the Plan's
5  investment in Countrywide stock is established upon proof that such investments were or
6  became imprudent and resulted in losses in the value of the assets in the Plan during the
7  Class Period.

8  **X. DEFENDANTS' INVESTMENT IN COUNTRYWIDE STOCK IS NOT**
9  **ENTITLED TO A PRESUMPTION OF PRUDENCE**

10      188.  The presumption of prudence that some courts have held applies to the
11  decision to make and maintain investment in company stock in an ESOP does not apply
12  here because the Plan was not, in fact, designed to require the offering of Company stock
13  as a Plan investment option.  Rather, Company stock is a discretionary feature of the
14  Plan.  Accordingly, the Plan lacks the principle feature on which the presumption of
15  prudence is based – namely a need to balance two competing objectives of typical ESOPs
16  – retirement savings on the one hand, and the goal of long term employee ownership on
17  the other.  Here, the Plan's only long-term purpose is retirement savings.

18      189.  To the extent that a presumption of reasonableness applies to the decision to
19  maintain investments in company stock in the purported ESOP portion of the Plan, such
20  presumption is overcome by the facts alleged here, including, among other averments:

21  • A precipitous stock price decline from over $32.49 to $19.81 during the Class
22      Period;

23  • Serious and gross mismanagement evidenced by, among other things:
24      o marketing and extending subprime mortgage loans, made on a "low
25        documentation" basis, without adequate consideration of the borrower's
26        ability to repay and with unreasonably high risk of borrower default;
27      o intentionally marketing subprime loans with high risk of default to
28        borrowers who qualified for prime-rate loans in order to increase

-55-

Company profits;

- o encouraging brokers to market excessively high-cost loans with greater risk of default to borrowers by offering incentive commissions;

- o representing that Countrywide had strict and selective underwriting and loan origination practices;

- o representing that Countrywide had sufficient reserves set aside to cover the high-risk loans it was selling;

- o operating with inadequate liquidity in relation to the volatility of Countrywide's business lines and assets; and

- o operating without the requisite internal controls to determine appropriate loan loss provisions

- o the artificial inflation of Countrywide stock as a result of the above improper business practices.

- • Countrywide's deteriorating financial condition calling into question the Company's ongoing viability as a result of the Company's inadequate reserves and risky and inappropriate lending practices; and

- • Insider self-dealing by Defendants identified above.

190.    The imprudence of continued investment by Defendants in Countrywide stock during the Class Period runs afoul of Department of Labor regulations:

> [B]ecause every investment necessarily causes a plan to forgo other investment opportunities, an investment will not be prudent if it would be expected to provide a plan with a lower rate of return than available alternative investments with commensurate degrees of risk or is riskier than alternative available investments with commensurate rates of return.

29 C.F.R. § 2509.94-1.  Defendants had available to them investment alternatives to Countrywide stock that had either a higher rate of return with risk commensurate to Countrywide stock or an expected rate of return commensurate to Countrywide stock but with less risk.

-56-

191.   Based on these circumstances, and the others alleged herein, it was imprudent and an abuse of discretion for Defendants to continue to make and maintain investment in Countrywide stock, and, effectively, to do nothing at all to protect the Plan from large losses as a result of such investment during the Class Period.

## XI.  CAUSES OF ACTION

A.    **Count I:  Failure to Prudently and Loyally Manage the Plan and Assets of the Plan.**

192.   Plaintiff incorporates by this reference the paragraphs above.

193.   This Count alleges fiduciary breach against: the Company, the Director Defendants and the Administrative Committee Defendants during such time as each served as the Plan Administrator, respectively, and the Investment Committee Defendants.

194.   The Defendants named in this Count were named fiduciaries pursuant to ERISA § 402(a)(1), 29 U.S.C. § 1102(a)(1), or *de facto* fiduciaries within the meaning of § 3(21)(A), 29 U.S.C. § 1002(21)(A), or both.  Thus, they were bound by the duties of loyalty, exclusive purpose, and prudence.

195.   As alleged above, the scope of the fiduciary duties and responsibilities of the Defendants included managing the assets of the Plan for the sole and exclusive benefit of the Plan's participants and beneficiaries, and with the care, skill, diligence, and prudence required by ERISA.  The Defendants were directly responsible for, among other things, selecting prudent investment options, eliminating imprudent options, determining how to invest employer contributions to the Plan and directing the Trustee regarding the same, evaluating the merits of the Plan's investments on an ongoing basis, and taking all necessary steps to ensure that the Plan's assets were invested prudently.

196.   Yet, contrary to their duties and obligations under the Plan documents and ERISA, the Defendants failed to loyally and prudently manage the assets of the Plan. Specifically, during the Class Period, these Defendants knew or should have known that Countrywide stock no longer was a suitable and appropriate investment for the Plan, but

1    was, instead, a highly speculative and excessively risky investment in light of the
2    Company's fundamental weaknesses, deteriorating financial circumstances, and
3    challenges to its ongoing viability. Nonetheless, during the Class Period, these
4    Defendants continued to offer Countrywide stock as an investment option for participant
5    contributions in the Plan, as well as the sole investment receptacle for Employer
6    Matching Contributions in the Plan during the Class Period, even though the Defendants
7    named in this Count had: (1) the discretion to suspend offering Company stock as a Plan
8    investment option; (2) the discretion to suspend making matching contributions and
9    discretionary contributions in Company stock, and instead, invest such amount in cash,
10   and (3) the discretion to adopt rules permitting participants to elect to invest all or a
11   portion of the Company Stock held in their accounts in another Fund. *See* Section V. ,
12   *supra.*

13       197. Defendants could have and should have taken action to protect Plan
14   participants from unnecessary losses by utilizing their discretion under the Plan
15   Document and ERISA to suspend offering Company stock as a Plan investment option
16   during the Class Period and matching in the stock. Instead, the Defendants continued to
17   offer Countrywide stock in the Plan despite the fact that they clearly knew or should have
18   known that such investment was unduly risky and imprudent due to the Company's
19   serious mismanagement and improper business practices, described herein.

20       198. The Defendants were obliged to prudently and loyally manage all of the
21   Plan's assets. However, their duties of prudence and loyalty were especially significant
22   with respect to Company stock because: (a) company stock is a particularly risky and
23   volatile investment, even in the absence of company misconduct; and (b) participants
24   tend to underestimate the likely risk and overestimate the likely return of investment in
25   company stock. In view of this, the Defendants were obliged to have in place a regular,
26   systematic procedure for evaluating the prudence of investment in Company stock.

27       199. The Defendants had no such procedure. Moreover, they failed to conduct an
28   appropriate investigation of the merits of continued investment in Countrywide stock

even in light of the losses, the Company's highly risky and inappropriate practices, and the particular dangers that these practices posed to the Plan. Such an investigation would have revealed to a reasonably prudent fiduciary the imprudence of continuing to make and maintain investment in Countrywide stock under these circumstances.

200. The Defendants' decisions respecting the Plan's investment in Countrywide stock described above, under the circumstances alleged herein, abused their discretion as ERISA fiduciaries in that a prudent fiduciary acting under similar circumstances would have made different investment decisions. Specifically, based on the above, a prudent fiduciary could not have reasonably believed that further and continued investment of the Plan's contributions and assets in Countrywide stock was in keeping with the Plan's settlor's expectations of how a prudent fiduciary would operate.

201. The Defendants were obligated to discharge their duties with respect to the Plan with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims. ERISA § 404(a)(1)(B), 29 U.S.C. § 1104(a)(1)(B).

202. According to DOL regulations and case law interpreting this statutory provision, a fiduciary's investment or investment course of action is prudent if: (a) he has given appropriate consideration to those facts and circumstances that, given the scope of such fiduciary's investment duties, the fiduciary knows or should know are relevant to the particular investment or investment course of action involved, including the role the investment or investment course of action plays in that portion of the plan's investment portfolio with respect to which the fiduciary has investment duties; and (b) he has acted accordingly.

203. Again, according to DOL regulations, "appropriate consideration" in this context includes, but is not necessarily limited to:

- A determination by the fiduciary that the particular investment or investment course of action is reasonably designed, as part of the portfolio (or, where

-59-

applicable, that portion of the plan portfolio with respect to which the fiduciary has investment duties), to further the purposes of the plan, taking into consideration the risk of loss and the opportunity for gain (or other return) associated with the investment or investment course of action; and

- Consideration of the following factors as they relate to such portion of the portfolio:

    o The composition of the portfolio with regard to diversification;

    o The liquidity and current return of the portfolio relative to the anticipated cash flow requirements of the plan; and

    o The projected return of the portfolio relative to the funding objectives of the plan.

204.  Given the conduct of the Company as described above, the Defendants could not possibly have acted prudently when they continued to invest the Plan's assets in Countrywide stock because, among other reasons:

- The Prudence Defendants knew of and/or failed to investigate the failures of the Company, including, but not limited to the following, which made the Company an extremely risky and imprudent investment for the Plan:

    o marketing and extending subprime mortgage loans, made on a "low documentation" basis, without adequate consideration of the borrower's ability to repay and with unreasonably high risk of borrower default;

    o intentionally marketing subprime loans with high risk of default to borrowers who qualified for prime-rate loans in order to increase Company profits;

    o encouraging brokers to market excessively high-cost loans with greater risk of default to borrowers by offering incentive commissions

    o representing that Countrywide had strict and selective underwriting and loan origination practices;

    o representing that Countrywide had sufficient reserves set aside to cover

-60-

the high-risk loans it was selling;

   o operating with inadequate liquidity in relation to the volatility of Countrywide's business lines and assets; and

   o operating without the requisite internal controls to determine appropriate loan loss provisions; and

   o the artificial inflation of Countrywide stock as a result of the above improper business practices.

- The risk associated with the investment in Countrywide stock during the Class Period was far above and beyond the normal, acceptable risk associated with investment in company stock;

- This abnormal investment risk could not have been known by the Plan's participants, and the Prudence Defendants knew that it was unknown to them (as it was to the market generally), because the fiduciaries never disclosed it;

- Knowing of this extraordinary risk, and knowing the Plan's participants did not know it, the Prudence Defendants had a duty to avoid permitting the Plan or any participant from investing the Plan's assets in Countrywide stock; and

- Further, knowing that the Plan was not a diversified portfolio, but was heavily invested in Company stock, the Prudence Defendants had a heightened responsibility to divest the Plan of Company stock if it became or remained imprudent.

205. The fiduciary duty of loyalty entails, among other things, a duty to avoid conflicts of interest and to resolve them promptly when they occur. A fiduciary must always administer a plan with single-minded devotion to the interests of the participants and beneficiaries, regardless of the interests of the fiduciaries themselves or the plan sponsor. On information and belief, the Insider Selling Defendants acted in their own self-interest in benefiting from selling huge amounts of Company stock at fraudulently inflated values. Fiduciaries laboring under such conflicts, must, in order to comply with the duty of loyalty, make special efforts to assure that their decision making process is

1 untainted by the conflict and made in a disinterested fashion, typically by seeking
2 independent financial and legal advice obtained only on behalf of the plan.

3    206.  The Insider Selling Defendants breached their duty to avoid conflicts of
4 interest and to promptly resolve them by, *inter alia*, failing to engage independent
5 advisors who could make independent judgments concerning the Plan's investment in
6 Countrywide; failing to notify appropriate federal agencies, including the DOL, of the
7 facts and circumstances that made Countrywide stock an unsuitable investment for the
8 Plan; failing to take such other steps as were necessary to ensure that participants'
9 interests were loyally and prudently served; with respect to each of these above failures,
10 doing so in order to avoid adversely impacting their own compensation or drawing
11 attention to Countrywide's inappropriate practices; engaging in insider sales of
12 Countrywide stock and yet, taking no action to disclose to the Plan's participants the
13 reason for their sales or to protect the Plan's holdings of Countrywide stock once proper
14 disclosure was made; and by otherwise placing their own and Countrywide's improper
15 interests above the interests of the participants with respect to the Plan's investment in
16 Countrywide stock.

17    207.  As a consequence of the Defendants' breaches of fiduciary duty alleged in
18 this Count, the Plan suffered tremendous losses.  If the Defendants had discharged their
19 fiduciary duties to prudently invest the Plan's assets, the losses suffered by the Plan
20 would have been minimized or avoided.  Therefore, as a direct and proximate result of
21 the breaches of fiduciary duty alleged herein, the Plan, and indirectly Plaintiff and the
22 other Class members, lost well over one hundred million dollars of retirement savings.

23    208.  Pursuant to ERISA §§ 409, 502(a)(2) and (a)(3), 29 U.S.C. §§ 1109(a),
24 1132(a)(2) and (a)(3), the Defendants are liable to restore the losses to the Plan caused by
25 their breaches of fiduciary duties alleged in this Count and to provide other equitable
26 relief as appropriate.

27
28

-62-

**B.    Count II:  Failure to Monitor Fiduciaries.**

209.   Plaintiff incorporates by this reference the allegations above.

210.   This Count alleges fiduciary breaches against the following Defendants:  the Company, Director Defendants and Compensation Committee Defendants, through which the Company and the Board of Directors acted in carrying out their appointment responsibilities (collectively, the "Monitoring Defendants").

211.   As alleged above, during the Class Period the Monitoring Defendants were named fiduciaries pursuant to ERISA § 402(a)(1), 29 U.S.C. § 1102(a)(1), or *de facto* fiduciaries within the meaning of ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A), or both. Thus, they were bound by the duties of loyalty, exclusive purpose, and prudence.

212.   As alleged above, the scope of the fiduciary responsibilities of the Monitoring Defendants included the responsibility to appoint, and remove, and thus, monitor the performance of other fiduciaries as follows:

| Monitoring Fiduciary | Monitored Fiduciary | Reference |
|---|---|---|
| Countrywide | Investment Committee<br>Administrative Committee | ¶ 63 |
| Director Defendants | Compensation Committee<br>Investment Committee<br>Administrative Committee | ¶¶ 67-69 |
| Compensation Committee | Investment Committee<br>Administrative Committee | ¶¶ 74-76 |

213.   Under ERISA, a monitoring fiduciary must ensure that the monitored fiduciaries are performing their fiduciary obligations, including those with respect to the investment and holding of plan assets, and must take prompt and effective action to protect the plan and participants when they are not.

214.   The monitoring duty further requires that appointing fiduciaries have procedures in place so that on an ongoing basis they may review and evaluate whether the "hands-on" fiduciaries are doing an adequate job (for example, by requiring periodic

1    reports on their work and the plan's performance, and by ensuring that they have a

2    prudent process for obtaining the information and resources they need).  In the absence of

3    a sensible process for monitoring their appointees, the appointing fiduciaries would have

4    no basis for prudently concluding that their appointees were faithfully and effectively

5    performing their obligations to plan participants or for deciding whether to retain or

6    remove them.

7        215.    Furthermore, a monitoring fiduciary must provide the monitored fiduciaries

8    with complete and accurate information in their possession that they know or reasonably

9    should know that the monitored fiduciaries must have in order to prudently manage the

10   plan and the plan assets, or that may have an extreme impact on the plan and the

11   fiduciaries' investment decisions regarding the plan.

12       216.    The Monitoring Defendants breached their fiduciary monitoring duties by,

13   among other things: (a) failing, at least with respect to the Plan's investment in Company

14   stock, to monitor their appointees, to evaluate their performance, or to have any system in

15   place for doing so, and standing idly by as the Plan suffered enormous losses as a result

16   of their appointees' imprudent actions and inaction with respect to Company stock; (b)

17   failing to ensure that the monitored fiduciaries appreciated the true extent of

18   Countrywide's highly risky and inappropriate business and accounting practices, and the

19   likely impact of such practices on the value of the Plan's investment in Countrywide

20   stock; (c) to the extent any appointee lacked such information, failing to provide

21   complete and accurate information to all of their appointees such that they could make

22   sufficiently informed fiduciary decisions with respect to the Plan's assets; and (d) failing

23   to remove appointees whose performance was inadequate in that they continued to make

24   and maintain investments in Countrywide stock despite their knowledge of practices that

25   rendered Countrywide stock an imprudent investment during the Class Period for

26   participants' retirement savings in the Plan, and who breached their fiduciary duties

27   under ERISA.

28

217. As a consequence of the Monitoring Defendants' breaches of fiduciary duty, the Plan suffered tremendous losses. If the Monitoring Defendants had discharged their fiduciary monitoring duties as described above, the losses suffered by the Plan would have been minimized or avoided. Therefore, as a direct and proximate result of the breaches of fiduciary duty alleged herein, the Plan, and indirectly Plaintiff and the other Class members, lost well over one hundred million dollars of retirement savings.

218. Pursuant to ERISA §§ 409, 502(a)(2) and (a)(3), 29 U.S.C. §§ 1109(a), 1132(a)(2) and (a)(3), the Monitoring Defendants are liable to restore the losses to the Plan caused by their breaches of fiduciary duties alleged in this Count and to provide other equitable relief as appropriate.

**C.    Count III: Breach of Fiduciary Duty – Failure to Provide Complete and Accurate Information to the Plan's Participants and Beneficiaries.**

219. Plaintiff incorporates by this reference the allegations above.

220. This Count alleges fiduciary breach against: the Company, the Director Defendants and the Administrative Committee Defendants.

221. At all relevant times, as alleged above, Defendants listed in this Count were fiduciaries within the meaning of ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A). Thus, they were bound by the duties of loyalty, exclusive purpose, and prudence.

222. At all relevant times, the scope of the fiduciary responsibility of the Defendants included the communications and material disclosures to the Plan participants and beneficiaries.

223. The duty of loyalty under ERISA requires fiduciaries to speak truthfully to participants, not to mislead them regarding the plan or plan assets, and to disclose information that participants need in order to exercise their rights and interests under the plan. This duty to inform participants includes an obligation to provide participants and beneficiaries of the plan with complete and accurate information, and to refrain from providing false information or concealing material information, regarding plan investment options such that participants can make informed decisions with regard to the

1   prudence of investing in such options made available under the plan. This duty applies to
2   all of the Plan's investment options, including investment in Countrywide stock.

3       224. Because investments in the Plan were not diversified (*i.e.* the Defendants
4   chose to invest the Plan's assets, and/or allow those assets to be invested so heavily in
5   Countrywide stock), such investment carried with it an inherently high degree of risk.
6   This inherent risk made the Defendants' duty to provide complete and accurate
7   information particularly important with respect to Countrywide stock.

8       225. The Defendants breached their duty to inform participants by failing to
9   provide complete and accurate information regarding Countrywide's serious
10  mismanagement and improper business practices, public misrepresentations and material
11  accounting irregularities, and the consequential artificial inflation of the value of
12  Countrywide stock, and, generally, by conveying incomplete information regarding the
13  soundness of Countrywide stock and the prudence of investing and holding retirement
14  contributions in Countrywide equity. These failures were particularly devastating to the
15  Plan and its participants; a heavy percentage of the Plan's assets were invested in
16  Countrywide stock during the Class Period and, thus, losses in this investment had a
17  significant impact on the value of participants' retirement assets.

18      226. Defendants' omissions clearly were material to participants' ability to
19  exercise informed control over their Plan accounts, as in the absence of the information,
20  participants did not know the true risks presented by the Plan's investment in
21  Countrywide stock.

22      227. Defendants' omissions and incomplete statements alleged herein were Plan-
23  wide and uniform in that the Defendants failed to provide complete and accurate
24  information to any of the Plan's participants.

25      228. Defendants in this Count were unjustly enriched by the fiduciary breaches
26  described in this Count.

27      229. As a direct and proximate result of the breaches of fiduciary duties alleged
28  herein, the Plan, and indirectly Plaintiff and the Plan's other participants and

-66-

1   beneficiaries, lost a significant portion of their retirement investment.

2        230.   Pursuant to ERISA § 502(a)(2), 29 U.S.C. § 1132(a)(2) and ERISA § 409(a),

3   29 U.S.C. § 1109(a), Defendants in this Count are liable to restore the losses to the Plan

4   caused by their breaches of fiduciary duties alleged in this Count.

5   **D.**     **Count IV: Co-Fiduciary Liability.**

6        231.   Plaintiff incorporates by this reference the allegations above.

7        232.   This Count alleges co-fiduciary liability against the following Defendants:

8   all Defendants (the "Co-Fiduciary Defendants").

9        233.   As alleged above, during the Class Period the Co-Fiduciary Defendants were

10   named fiduciaries pursuant to ERISA § 402(a)(1), 29 U.S.C. § 1102(a)(1), or *de facto*

11   fiduciaries within the meaning of ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A), or both.

12   Thus, they were bound by the duties of loyalty, exclusive purpose, and prudence.

13        234.   As alleged above, ERISA § 405(a), 29 U.S.C. § 1105, imposes liability on a

14   fiduciary, in addition to any liability which he may have under any other provision, for a

15   breach of fiduciary responsibility of another fiduciary with respect to the same plan if

16   knows of a breach and fails to remedy it, knowingly participates in a breach, or enables a

17   breach. The Co-Fiduciary Defendants breached all three provisions.

18        235.   **Knowledge of a Breach and Failure to Remedy.** ERISA § 405(a)(3), 29

19   U.S.C. § 1105, imposes co-fiduciary liability on a fiduciary for a fiduciary breach by

20   another fiduciary if, he has knowledge of a breach by such other fiduciary, unless he

21   makes reasonable efforts under the circumstances to remedy the breach. Each Defendant

22   knew of the breaches by the other fiduciaries and made no efforts, much less reasonable

23   ones, to remedy those breaches. In particular, they did not communicate their knowledge

24   of the Company's improper activity to the other fiduciaries.

25        236.   Countrywide, through its officers and employees, engaged in highly risky

26   and inappropriate business practices, withheld material information from the market, and

27   profited from such practices, and, thus, knowledge of such practices is imputed to

28   Countrywide as a matter of law.

237. Because Defendants knew of the Company's failures and inappropriate business practices, they also knew that the Defendants were breaching their duties by continuing to invest in Company stock. Yet, they failed to undertake any effort to remedy these breaches. Instead, they compounded them by downplaying the significance of Countrywide's failed and inappropriate business practices, and obfuscating the risk that the practices posed to the Company, and, thus, to the Plan.

238. **Knowing Participation in a Breach.** ERISA § 405(a)(1), 29 U.S.C. § 1105(1), imposes liability on a fiduciary for a breach of fiduciary responsibility of another fiduciary with respect to the same plan if he participates knowingly in, or knowingly undertakes to conceal, an act or omission of such other fiduciary, knowing such act or omission is a breach. Countrywide knowingly participated in the fiduciary breaches of the Defendants in that it benefited from the sale or contribution of its stock at prices that were disproportionate to the risks for the Plan's participants. Likewise, the Monitoring Defendants knowingly participated in the breaches of the Investment and Administrative Committee Defendants because, as alleged above, they had actual knowledge of the facts that rendered Countrywide stock an imprudent retirement investment and yet, ignoring their oversight responsibilities, permitted the Defendants to breach their duties.

239. **Enabling a Breach.** ERISA § 405(a)(2), 29 U.S.C. § 1105(2), imposes liability on a fiduciary if by failing to comply with ERISA § 404(a)(1), 29 U.S.C. §1104(a)(1), in the administration of his specific responsibilities which give rise to his status as a fiduciary, he has enabled another fiduciary to commit a breach.

240. The Monitoring Defendants' failure to monitor the Defendants, particularly the Investment and Administrative Committee Defendants, enabled that committee to breach their duties.

241. As a direct and proximate result of the breaches of fiduciary duties alleged herein, the Plan, and indirectly Plaintiff and the Plan's other participants and beneficiaries, lost well over one hundred million dollars of retirement savings.

242.  Pursuant to ERISA §§ 409, 502(a)(2) and (a)(3), 29 U.S.C. §§ 1109(a), 1132(a)(2) and (a)(3), the Co-Fiduciary Defendants are liable to restore the losses to the Plan caused by their breaches of fiduciary duties alleged in this Count and to provide other equitable relief as appropriate.

**E.    Count V:  Knowing Participation in a Breach of Fiduciary Duty.**

243.  Plaintiff incorporates the allegations contained in the previous paragraphs of this Complaint as if fully set forth herein.

244.  To the extent that Countrywide is found not to have been fiduciary or to have acted in a fiduciary capacity with respect to the conduct alleged to have violated ERISA, Countrywide knowingly participated in the breaches of those Defendants who were fiduciaries and acted in a fiduciary capacity and as such is liable for equitable relief as a result of participating in such breaches.

245.  Countrywide benefited from the breaches by discharging its obligations to make contributions to the Plan in amounts specified by the Plan, contributing Countrywide stock to the Plan while the value of the stock was inflated as the result of Countrywide's highly risky and improper business practices, and providing the market with materially misleading statements and omissions.  Accordingly, Countrywide may be required to disgorge this benefit or a constructive trust should be imposed on treasury shares of Countrywide stock which would have been contributed to the Plan, but for Countrywide's participation in the foregoing breaches of fiduciary duty.

## XII.  CAUSATION

246.  The Plan suffered enormous losses because substantial assets of the Plan were imprudently invested or allowed to be invested by Defendants in Countrywide stock during the Class Period, in breach of Defendants' fiduciary duties.

247.  Defendants are liable for the Plan's losses in this case because: (a) most of the Plan's investment in Countrywide stock was the result of the Defendants' decisions to invest Employer Matching Contributions in the Plan in Countrywide stock and (b) as to the portion of Plan's assets invested in Countrywide stock as a result of participant

1  contributions, the Defendants are liable for these losses because they failed to take the
2  necessary and required steps to ensure effective and informed independent participant
3  control over the investment decision-making process, as required by ERISA § 404(c), 29
4  U.S.C. § 1104(c), and the regulations promulgated thereunder.

5      248.   The Defendants also are liable for losses that resulted from their decision to
6  invest a majority of the assets of the Plan in Countrywide stock rather than cash or other
7  investment options, and clearly prudent under the circumstances presented here.

8      249.   Had the Defendants properly discharged their fiduciary and co-fiduciary
9  duties, including the monitoring and removal of fiduciaries who failed to satisfy their
10  ERISA-mandated duties of prudence and loyalty, eliminating Countrywide stock as an
11  investment alternative when it became imprudent, and divesting the Plan of Countrywide
12  stock when maintaining such an investment became imprudent, the Plan would have
13  avoided some or all of the losses that it, and indirectly, the participants suffered.

14              **XIII.  REMEDY FOR BREACHES OF FIDUCIARY DUTY**

15      250.   The Defendants breached their fiduciary duties in that they knew or should
16  have known the facts as alleged above, and therefore knew or should have known that the
17  Plan's assets should not have been invested in Countrywide stock during the Class
18  Period.

19      251.   As a consequence of the Defendants' breaches, the Plan suffered significant
20  losses.

21      252.   ERISA § 502(a)(2), 29 U.S.C. § 1132(a)(2) authorizes a plan participant to
22  bring a civil action for appropriate relief under ERISA § 409, 29 U.S.C. § 1109. Section
23  409 requires "any person who is a fiduciary. . . who breaches any of the. . . duties
24  imposed upon fiduciaries. . . to make good to such plan any losses to the plan. . . ."
25  Section 409 also authorizes "such other equitable or remedial relief as the court may
26  deem appropriate. . . ."

27      253.   With respect to calculation of the losses to the Plan, breaches of fiduciary
28  duty result in a presumption that, but for the breaches of fiduciary duty, the Plan would

1   not have made or maintained their investments in the challenged investment and, instead,

2   prudent fiduciaries would have invested the Plan's assets in the most profitable

3   alternative investment available to them. Alternatively, losses may be measured not only

4   with reference to the decline in stock price relative to alternative investments, but also by

5   calculating the additional shares of Countrywide stock that the Plan would have acquired

6   had the Plan fiduciaries taken appropriate steps to protect the Plan. The Court should

7   adopt the measure of loss most advantageous to the Plan. In this way, the remedy

8   restores the Plan's lost value and puts the participants in the position they would have

9   been in if the Plan had been properly administered.

10      254. Plaintiff and the Class are therefore entitled to relief from the Defendants in

11  the form of: (a) a monetary payment to the Plan to make good to the Plan the losses to the

12  Plan resulting from the breaches of fiduciary duties alleged above in an amount to be

13  proven at trial based on the principles described above, as provided by ERISA § 409(a),

14  29 U.S.C. § 1109(a); (b) injunctive and other appropriate equitable relief to remedy the

15  breaches alleged above, as provided by ERISA §§ 409(a), 502(a)(2) and (3), 29 U.S.C. §§

16  1109(a), 1132(a)(2) and (3); (c) injunctive and other appropriate equitable relief pursuant

17  to ERISA § 502(a)(3), 29 U.S.C. 1132(a)(3), for knowing participation by a non-

18  fiduciary in a fiduciary breach; (d) reasonable attorney fees and expenses, as provided by

19  ERISA § 502(g), 29 U.S.C. § 1132(g), the common fund doctrine, and other applicable

20  law; (e) taxable costs and interest on these amounts, as provided by law; and (6) such

21  other legal or equitable relief as may be just and proper.

22      255. Under ERISA, each Defendant is jointly and severally liable for the losses

23  suffered by the Plan in this case.

24                        **XIV. CLASS ACTION ALLEGATIONS**

25      256. **Class Definition.** Plaintiff brings this action as a class action pursuant to

26  Rules 23(a), (b)(1), (b)(2) and (b)(3) of the Federal Rules of Civil Procedure on behalf of

27  Plaintiff and the following class of persons similarly situated (the "Class"):

28

-71-

1

2

3

> All persons, other than Defendants, who were participants in or beneficiaries of the Plan at any time between January 31, 2006 and the present, and whose accounts included investments in Countrywide stock.

4

5

6

7

257. **Class Period.** The fiduciaries of the Plan knew or should have known at least by January 31, 2006 that the Company's material weaknesses were so pervasive that Countrywide stock could no longer be offered as a prudent investment for the retirement Plan.

8

9

10

11

12

13

258. **Numerosity.** The members of the Class are so numerous that joinder of all members is impracticable. While the exact number of Class members is unknown to Plaintiff at this time, and can only be ascertained through appropriate discovery, Plaintiff believes there are, based on the Plan's Form 5500 for Plan year 2005, 46,047 active participants in the Plan who participated in, or were beneficiaries of, the Plan during the Class Period.

14

15

16

259. **Commonality.** Common questions of law and fact exist as to all members of the Class and predominate over any questions affecting solely individual members of the Class. Among the questions of law and fact common to the Class are:

17

18

      (a). whether Defendants each owed a fiduciary duty to Plaintiff and members of the Class;

19

20

21

      (b). whether Defendants breached their fiduciary duties to Plaintiff and members of the Class by failing to act prudently and solely in the interests of the Plan's participants and beneficiaries;

22

      (c). whether Defendants violated ERISA; and

23

24

      (d). whether the Plan has suffered losses and, if so, what is the proper measure of damages.

25

26

27

28

260. **Typicality.** Plaintiff's claims are typical of the claims of the members of the Class because: (1) to the extent Plaintiff seeks relief on behalf of the Plan pursuant to ERISA § 502(a)(2), his claim on behalf of the Plan is not only typical to, but identical to a claim under this section brought by any Class member; and (2) to the extent Plaintiff

1    seeks relief under ERISA § 502(a)(3) on behalf of himself for equitable relief, that relief
2    would affect all Class members equally.

3        261. **Adequacy.**  Plaintiff will fairly and adequately protect the interests of the
4    members of the Class and has retained counsel competent and experienced in class
5    action, complex, and ERISA litigation.  Plaintiff has no interests antagonistic to or in
6    conflict with those of the Class.

7        262. **Rule 23(b)(1)(B) Requirements.**  Class action status in this ERISA action is
8    warranted under Rule 23(b)(1)(B) because prosecution of separate actions by the
9    members of the Class would create a risk of adjudications with respect to individual
10   members of the Class which would, as a practical matter, be dispositive of the interests of
11   the other members not parties to the actions, or substantially impair or impede their
12   ability to protect their interests.

13       263. **Other Rule 23(b) Requirements.**  Class action status is also warranted
14   under the other subsections of Rule 23(b) because: (i) prosecution of separate actions by
15   the members of the Class would create a risk of establishing incompatible standards of
16   conduct for Defendants; (ii) Defendants have acted or refused to act on grounds generally
17   applicable to the Class, thereby making appropriate final injunctive, declaratory, or other
18   appropriate equitable relief with respect to the Class as a whole; and (iii) questions of law
19   or fact common to members of the Class predominate over any questions affecting only
20   individual members and a class action is superior to the other available methods for the
21   fair and efficient adjudication of this controversy.

22                          **XV.  PRAYER FOR RELIEF**

23       WHEREFORE, Plaintiff prays for:

24       A.    A Declaration that the Defendants, and each of them, have breached their
25   ERISA fiduciary duties to the participants;

26       B.    A Declaration that the Defendants, and each of them, are not entitled to the
27   protection of ERISA § 404(c)(1)(B), 29 U.S.C. § 1104(c)(1)(B);

28

                                       -73-

C.    An Order compelling the Defendants to make good to the Plan all losses to the Plan resulting from Defendants' breaches of their fiduciary duties, including losses to the Plan resulting from imprudent investment of the Plan's assets, and to restore to the Plan all profits the Defendants made through use of the Plan's assets, and to restore to the Plan all profits which the participants would have made if the Defendants had fulfilled their fiduciary obligations;

D.    Imposition of a Constructive Trust on any amounts by which any Defendant was unjustly enriched at the expense of the Plan as the result of breaches of fiduciary duty;

E.    An Order requiring Defendants to appoint one or more independent fiduciaries to participate in the management of the Plan's investment in Countrywide stock;

F.    Actual damages in the amount of any losses the Plan suffered;

G.    An Order awarding costs pursuant to 29 U.S.C. § 1132(g);

H.    An Order awarding attorneys' fees pursuant to the common fund doctrine, 29 U.S.C. § 1132(g), and other applicable law; and

I.    An Order for equitable restitution and other appropriate equitable and injunctive relief against the Defendants.

DATED this 26th day of September, 2007.

BRAUN LAW GROUP, P.C.

Michael D. Braun (167416)
service@braunlawgroup.com
BRAUN LAW GROUP, P.C.
12400 Wilshire Blvd., Suite 920
Los Angeles, CA 90025
Telephone: (310) 442-7755
Facsimile: (310) 442-7756
Local Counsel for Plaintiff

-74-

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

Lynn Lincoln Sarko
lsarko@kellerrohrback.com
Derek W. Loeser
dloeser@kellerrohrback.com
Erin M. Riley
eriley@kellerrohrback.com
KELLER ROHRBACK L.L.P.
1201 Third Avenue, Suite 3200
Seattle, WA  98101-3052
Telephone:  (206) 623-1900
Facsimile:  (206) 623-3384
Counsel for Plaintiff