UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

----------------------------------------------------------------x
                                  :

IN RE CITIGROUP ERISA LITIGATION       :

                                  :

----------------------------------------------------------------x

07 Civ. 9790

OPINION & ORDER

## CONTENTS

I.  BACKGROUND ...................................................................... 4

    A.  The Parties .............................................................. 5

    B.  The Plans................................................................ 6

    C.  This Action.............................................................. 9

II.  DISCUSSION ...................................................................... 10

    A.  Count I: Defendants Allegedly Offered Citigroup Stock as an Investment Option Even Though Defendants Knew that Citigroup Stock Was an Imprudent Investment.................................................................... 11

        1.  Defendants Had No Discretion to Eliminate Citigroup Stock as an Investment Option........................................................ 13

        2.  The Investment Committee Had No Discretion to Liquidate the Citigroup Common Stock Fund for the Purpose of Limiting Financial Losses.............. 14

        3.  The Investment and Administration Committees Had No Discretion to Use "Timing and Frequency" Limitations to Discourage Investment in Citigroup Stock .......................................................... 17

        4.  Defendants Had No Duty to Override the Plans' Terms ................................ 18

        5.  Citibank, as Trustee of the Citigroup Plan, Had No Discretion Regarding the Plan's Investment in Citigroup Stock ........................................ 26

        6.  Plaintiffs Have Failed to Plead a Plausible Claim that Citibank and Citigroup, the Sponsor of the Citibuilder and Citigroup Plans, Respectively, Functioned as De Facto Fiduciaries.............................................. 27

        7.  Offering Citigroup Stock as an Investment Option Was Presumptively Prudent .................................................................. 28

8.  The Allegations in the Complaint Do Not Establish a Plausible Claim to
    Overcome the Presumption of Prudence.......................................................... 31

9.  Because Citigroup Stock Was a Prudent Investment, Plaintiffs Fail to
    Allege that Defendants Breached a Duty to Investigate ................................. 36

B.  Count II: Defendants Allegedly Failed to Provide Plan Participants with
    "Complete and Accurate" Information About Citigroup's Financial Condition .. 37

1.  Defendants Had No Affirmative Duty to Disclose Information About
    Citigroup's Financial Condition .................................................................... 37

2.  Neither Citigroup nor Prince Was "Acting as a Fiduciary" When Making
    Statements About Citigroup's Financial Condition........................................ 42

3.  Plaintiffs Have Failed to Plead a Plausible Claim that the Administration
    Committee Knew of Citigroup's Alleged Financial Problems ....................... 46

C.  Count III: Defendants Allegedly Failed to Monitor Plan Fiduciaries.................. 48

D.  Count IV: Defendants Allegedly Failed to Disclose Information to
    Co-Fiduciaries...................................................................................................... 49

E.  Count V: Defendants Allegedly Performed Their Duties with Conflicts
    of Interest ............................................................................................................. 50

F.  Count VI: Defendants Allegedly Face Co-Fiduciary Liability............................ 50

III. CONCLUSION...................................................................................................... 51

\*      \*      \*

SIDNEY H. STEIN, U.S. District Judge.

This is a putative class action brought pursuant to the Employment Retirement

Income Security Act ("ERISA"), 29 U.S.C. § 1132(a)(2)-(3).  Plaintiffs are participants

in two Plans covered by ERISA: the Citigroup 401(k) Plan and the Citibuilder 401(k)

Plan for Puerto Rico.  Plaintiffs allege that defendants were fiduciaries of the Plans and

that defendants breached their fiduciary duties in several ways.  Principally, plaintiffs

claim that defendants breached their fiduciary duties by offering Citigroup stock as an

investment option to Plan participants even though defendants knew, or should have

known, that Citigroup stock was an imprudent investment (Count I).  Plaintiffs also claim

that defendants breached their fiduciary duties by failing to provide complete and accurate information about Citigroup's financial condition to Plan participants (Count II). Finally, plaintiffs claim that certain defendants breached their fiduciary duties by neglecting to monitor appointed fiduciaries (Count III), by failing to disclose necessary information to their co-fiduciaries (Count IV), by performing their duties while they had conflicts of interest (Count V), and by participating in the fiduciary breaches of others (Count VI).

Defendants have moved to dismiss each of plaintiffs' claims pursuant to Federal Rule of Civil Procedure 12(b)(6). That motion is granted for the following reasons:

First, plaintiffs have failed to state a claim that defendants breached their fiduciary duties by offering Citigroup stock as an investment option. The Plans unequivocally required that Citigroup stock be offered as an investment option, and thus defendants had no discretion—and could not have been "acting as fiduciaries"—with respect to the Plans' investment in Citigroup stock. Even if defendants did have discretion to eliminate Citigroup stock as an investment option, investment in Citigroup stock was presumptively prudent, and plaintiffs have failed to allege facts in support of a plausible claim to overcome that presumption.

Second, plaintiffs have failed to state a claim that defendants breached their fiduciary duties by failing to provide "complete and accurate" information to Plan participants. Defendants did not have an affirmative duty to disclose financial information about Citigroup because ERISA fiduciaries are not required to provide investment advice. To the extent that some defendants made statements to Plan participants regarding Citigroup's financial situation, those defendants were not acting as

3

fiduciaries when making those statements or, alternatively, plaintiffs have failed to allege facts showing that defendants knew the statements were misleading.

Third, plaintiffs have failed to state a claim that Citigroup and its directors breached their fiduciary duties by failing to monitor Plan fiduciaries. Because plaintiffs' allegations against the appointed fiduciaries fail, plaintiffs cannot identify an instance of misconduct that Citigroup and its directors failed to detect.

Fourth, plaintiffs have failed to state a claim that Citigroup and its directors breached any duty to disclose information to Plan fiduciaries. The limited fiduciary responsibilities of Citigroup and its directors did not include a duty to disclose material, non-public information about Citigroup's financial situation to Plan fiduciaries.

Fifth, plaintiffs have failed to state a claim that defendants breached their fiduciary duties by performing their Plan duties while they had conflicts of interest. Plaintiffs allege only that defendants' compensation was tied to the performance of Citigroup stock and that certain defendants sold Citigroup stock during the class period. Those allegations are insufficient to set forth an actionable conflict of interest on defendants' part.

Sixth, and finally, plaintiffs have failed to state a claim based on the theory of co-fiduciary liability. All of plaintiffs' other allegations fail, and thus plaintiffs have not identified a fiduciary breach on which to base a claim of co-fiduciary liability.

## I.    BACKGROUND

The following facts are taken from the complaint[1] or from documents attached to the complaint and referred to repeatedly in the complaint. *See, e.g.*, *ATSI Commc'ns, Inc.*

---

[1] All references to the "complaint" in this Opinion are references to the "Consolidated Class Action Complaint for Violations of the Employee Retirement Income Security Act" dated September 15, 2008.

*v. Shaar Fund, Ltd.*, 493 F.3d 87, 98 (2d Cir. 2007) (a court "may consider any written instrument attached to the complaint," as well as "statements or documents incorporated into the complaint by reference," in deciding a motion to dismiss).

### A.    The Parties

Plaintiffs are "current or former employees of Citigroup" and participants in the Citigroup 401(k) Plan and Citibuilder 401(k) Plan for Puerto Rico.  (Compl. ¶¶ 2, 16-21.) Plaintiffs purport to represent all "persons who were participants in or beneficiaries of the Plans at any time between January 1, 2007 and January 15, 2008 . . . and whose Plan accounts included investments in Citigroup."  (*Id.* ¶ 289.)  At the end of 2006, the Citigroup Plan had 151,201 participants and the Citibuilder Plan had 2,225 participants. (*Id.* ¶ 290.)

Defendants are various individuals and entities associated with the Plans.  The "Administration Committee" is a group of eight individuals who are charged with administrating the Plans, construing the Plans' terms, deciding participants' eligibility for benefits, and communicating with participants.  (*Id.* ¶¶ 32, 62-68.)  The Administration Committee manages both the Citigroup Plan and the Citibuilder Plan.  (*Id.* ¶ 45.)

The "Investment Committee" is a group of ten individuals who are responsible for selecting the investment options offered to Plan participants.  (*Id.* ¶¶ 33, 69-70.)  Like the Administration Committee, the Investment Committee carries out its duties for both the Citigroup Plan and the Citibuilder Plan.  (*Id.* ¶ 45.)

Citibank, N.A., "a subsidiary of Citigroup," is Citigroup's "consumer and corporate banking arm."  (*Id.* ¶ 25.)  Citibank is the "sponsor"—that is, the creator—of the Citibuilder Plan.  (*Id.* ¶ 26.)  Citibank also serves as the appointed "trustee" of the Citigroup Plan.  (*Id.* ¶ 53.)

Citigroup, Inc., was "the world's largest bank by revenue as of 2008," employing "approximately 358,000 staff around the world" and holding "over 200 million customer accounts in more than 100 countries."  (*Id.* ¶ 23.)  Citigroup is the sponsor of the Citigroup Plan.  (*Id.* ¶ 24.)  It has authority under the Plans to appoint the trustee of the Citigroup Plan, to appoint the members of Administration and Investment Committees, and to "direct the trustee . . . to receive company stock in lieu of cash dividends" in conjunction with a dividend reinvestment plan.  (*Id.* ¶¶ 46-48.)  Plaintiffs also claim that Citigroup has "exercised *de facto* authority" over the members of the Administration and Investment Committees because Citigroup has had "authority and discretion to hire and terminate" the Committees' members.  (*Id.* ¶¶ 49-50.)

Charles O. Prince and Robert E. Rubin were members of Citigroup's board of directors during the class period.  Prince served as Citigroup's chief executive officer from 2003 to 2007 and as chairman of the board from 2006 to 2007.  (*Id.* ¶ 28.)  Rubin served briefly as chairman of the board in 2007.  (*Id.* ¶ 29.)  Plaintiffs allege that the Prince and Rubin were Plan fiduciaries insofar as Prince and Rubin, as members of Citigroup's board, had authority to appoint Plan fiduciaries.  (*Id.* ¶¶ 58-59.)  Plaintiffs also allege that Prince was a fiduciary because he "made numerous statements . . . to . . . Plan participants . . . regarding the Company . . . and the future prospects of the Company."  (*Id.* ¶ 60.)

### B.     The Plans

The Citigroup and Citibuilder Plans each qualified as an "employee pension benefit plan" as defined by 29 U.S.C. § 1002(2)(A).  (*Id.* ¶ 78.)  In addition, each Plan was an "eligible individual account plan" ("EIAP") as defined by 29 U.S.C. § 1107(d)(3), and each Plan qualified for preferential tax treatment pursuant to I.R.C. § 401(k).  (*Id.*)

Plan participants could contribute to the Plans "on a pre-tax basis through payroll deductions," and Citigroup made "matching contributions" in certain circumstances. (*Id.* ¶¶ 81-82.) Participants could invest their contributions in a number of "investment funds." The Citigroup Plan Agreement provided:

> Investment Funds. In order to allow each Participant to determine the manner in which his Accounts will be invested, the Trustee shall maintain, within the Trust, the Citigroup Common Stock Fund and other Investment Funds. Each Participant's Accounts shall be invested in such Investment Funds in the proportions directed by the Participant in accordance with the rules and procedures established by the [Administration] Committee, including but not limited to any timing and frequency limitations approved by the Investment Committee. Pending investment or for other purposes of the Plan, including the payment of benefits hereunder, the Investment Funds may hold cash and short-term investments in accordance with guidelines prescribed by the Investment Committee. Any one or more of such Investment Funds may be eliminated, or new Investment Funds may be made available, at any time by the Investment Committee without consent by any Participant or Employer; provided, the Citigroup Common Stock Fund shall be permanently maintained as an Investment Fund under the Plan. Different Investment Funds may be made available to different groups of Participants, determined on an Employer-by-Employer basis, in the discretion of the Investment Committee.

(Citigroup 401(k) Plan ("Citigroup Plan") § 7.01, Compl. Ex. E)  The Citibuilder Plan Agreement contained similar—though not identical—language. (*See* Citibuilder 401(k) Plan for Puerto Rico ("Citibuilder Plan") § 7.01, Compl. Ex. D)

The Plans contained special provisions for the investment fund called the "Citigroup Common Stock Fund." The Plans defined the Fund as follows:

> "Citigroup Common Stock Fund" means an Investment Fund comprised of shares of Citigroup Common Stock. Solely in order to permit the orderly purchase of Citigroup Common Stock in a volume that does not disrupt the stock market and in order to pay benefits hereunder, the Citigroup Common Stock Fund may hold cash and short-term instruments in addition to shares of Citigroup Common Stock, in accordance with guidelines prescribed by the Investment Committee.

(Citigroup Plan § 2.01; Citibuilder Plan § 2.01.)  Further, in explaining the Investment

Committee's responsibilities, the Plans provided:

> The duties of the Investment Committee shall extend to the promulgation
> of any guidelines with respect to the amount of cash or any short-term
> investments that may be held by the Citigroup Common Stock Fund.  In
> addition, notwithstanding the fact that provisions in the Plan mandate the
> creation and continuation of the Citigroup Common Stock Fund and
> provide that certain contributions to the Citigroup Common Stock Fund
> must remain invested in the Common Stock Fund for certain periods of
> time, if it is determined that there exists a duty on the part of any person
> (appointed under this Plan or otherwise) to determine whether such
> provisions should be modified, such duty shall be that of the Investment
> Committee.

(Citigroup Plan § 7.09(e); Citibuilder Plan § 7.09(e).)  Finally, the Citigroup Plan

designated the Citigroup Common Stock Fund as an "employee stock ownership plan"

("ESOP") under ERISA:

> ESOP Designation.    The Plan shall consist of a component that is
> designated as an ESOP within the meaning of Section 4975(e)(7) of the
> Code, and a component that is not designated as an ESOP.    The
> component designated as an ESOP shall consist of any amount invested in
> the Citigroup Common Stock Fund under the Plan.  The component that is
> not designated as an ESOP shall consist of the remaining portion of the
> Plan.

> Designed to Invest in Employer Securities.  The component designated as
> an ESOP under the Plan is designed to invest primarily in Citigroup
> Common Stock, a qualifying employer security within the meaning of
> Section 409(l) of the Code.

(Citigroup Plan §§ 15.01-.02.)  While the Citibuilder Plan was an EIAP, the Citibuilder

Plan did not designate the Citigroup Common Stock Fund as an ESOP.

C.    **This Action**

According to plaintiffs, Citigroup investing extensively in subprime mortgages and securities related to subprime mortgages in the mid-2000s.  (Compl. ¶ 7.)[2]  Plaintiffs claim that, following the collapse of the subprime mortgage market (*id.* ¶¶ 114-129), Citigroup lost tens of billions of dollars in its subprime-mortgage-related investments (*id.* ¶ 134).  As a result, the price of Citigroup stock allegedly fell fifty-two percent during the class period, from a high of $55.70 per share on January 1, 2007 to a low of $26.94 per share on January 15, 2008.  (*Id.* ¶ 172.)

Plaintiffs claim that Citigroup knew of "the heavy losses which the Company would inevitably sustain from subprime loans" (*id.* ¶ 133) and used various methods to mislead investors regarding Citigroup's "subprime loan loss exposure" (*id.* ¶¶ 7, 136-183).  Those methods, plaintiffs claim, included the use of "structured investment vehicles," which were allegedly designed to keep Citigroup's subprime mortgage exposure "off the Company's balance sheet."  (*Id.* ¶¶ 176-182.)

In 2007, the Citigroup Plan held approximately $2.14 billion worth of Citigroup stock—one fifth of the Plan's total investments.  (Compl. ¶ 88.)  During the same period, the Citibuilder Plan held approximately $4.3 million of Citigroup stock—about one third of the Plan's total investments.  (*Id.* ¶ 103.)  Plaintiffs claim that, as a result of the Plans' investment in Citigroup stock, the Plans suffered substantial losses when the price of Citigroup stock fell during the class period.  (*Id.* ¶ 281.)

---

[2] The complaint describes "subprime" mortgages as home loans given to borrowers who do not qualify for prime interest rates because they have "'weakened credit histories typically characterized by payment delinquencies, previous charge-offs, judgments, or bankruptcies; low credit scores; high debt-burden ratios; or high loan-to-value ratios.'"  (Compl. ¶ 111 (quoting the congressional testimony of Sandra F. Braunstein, Director of the Division of Consumer and Community Affairs of the Federal Reserve Board).)

Plaintiffs bring this action against defendants on the ground that defendants knew, or should have known, that Citigroup stock was an imprudent investment during the class period. Plaintiffs claim that ERISA required defendants to take steps to eliminate Citigroup stock as an investment option for Plan participants. Plaintiffs also claim that defendants should have informed Plan participants of Citigroup's financial condition and that defendants should have taken other steps—including monitoring Plan fiduciaries and disclosing necessary information to Plan fiduciaries—in an effort to limit the Plans' financial losses. The failure to take each of those actions, plaintiffs claim, was a breach of defendants' fiduciary duties pursuant to ERISA. (*See id.* ¶ 4.)

After thirteen ERISA actions were filed by Plan participants in this district, the thirteen actions were consolidated and interim lead plaintiffs and interim lead counsel were appointed. (Order, Jan. 22, 2008.) Plaintiffs filed a Consolidated Class Action Complaint on September 15, 2008, and as noted above, defendants have now moved to dismiss the complaint pursuant to Federal Rule of Civil Procedure 12(b)(6).

## II.    DISCUSSION

In evaluating a motion to dismiss the complaint under Federal Rule of Civil Procedure 12(b)(6), a court accepts the truth of the facts alleged in the complaint and draws all reasonable inferences in the plaintiff's favor. *Ashcroft v. Iqbal*, 129 S. Ct. 1937, 1949 (2009); *Global Network Commc'ns, Inc. v. City of New York*, 458 F.3d 150, 154 (2d Cir. 2006). Nonetheless, "the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions." *Iqbal*, 129 S. Ct. at 1949. Thus, a complaint that "offers 'labels and conclusions' or 'a formulaic recitation of the elements of a cause of action will not do.'" *Id.* (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007)).

A complaint should be dismissed if it fails to set forth "enough facts to state a claim for relief that is plausible on its face." *Twombly*, 550 U.S. at 570. "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged. The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Iqbal*, 129 S. Ct. at 1949 (quoting *Twombly*, 550 U.S. at 556).

A.    **Count I: Defendants Allegedly Offered Citigroup Stock as an Investment Option Even Though Defendants Knew that Citigroup Stock Was an Imprudent Investment**

Count I alleges that defendants breached their ERISA fiduciary duties by offering Citigroup stock as an investment option to Plan participants during the class period even though defendants knew that Citigroup stock was an imprudent investment. (Compl. ¶¶ 219, 227.) Analyzing that claim requires a brief overview of the scope of the duties ERISA imposes on fiduciaries.

An employer creates an ERISA plan with a written instrument called a "plan agreement." The plan agreement describes the plan and nominates fiduciaries to make discretionary decisions on behalf of the plan. *See* 29 U.S.C. § 1102. When employers "'adopt, modify, or terminate'" ERISA plans, "'they do not act as fiduciaries, but are analogous to the settlors of a trust.'" *Hughes Aircraft Co. v. Jacobson*, 525 U.S. 432, 443 (1999) (quoting *Lockheed Corp. v. Spink*, 517 U.S. 882, 890 (1996)). Just as settlors may design trusts as they see fit, employers, acting as plan sponsors, have wide latitude in designing ERISA plans. *Cf. Shaw v. Delta Air Lines, Inc.*, 463 U.S. 85, 91 (1983) ("ERISA does not mandate that employers provide any particular benefits . . . ."). Plan sponsors, therefore, have no fiduciary duties—and thus face no liability for breach of

11

fiduciary duty—when they "adopt, modify, or terminate" ERISA plans.  *Hughes Aircraft*, 525 U.S. at 443.

ERISA does impose fiduciary duties on those who have "discretionary authority" to administer or manage ERISA plans.  29 U.S.C. § 1002(21)(A).  That includes, of course, individuals named as fiduciaries in the plan agreement.  Such "named fiduciaries" are given specific responsibilities and must carry out those responsibilities in accordance with the fiduciary duties that ERISA imposes.  Named fiduciaries are not, however, the only individuals who are considered fiduciaries under ERISA.  Anyone is an ERISA fiduciary "to the extent" that he or she exercises discretion in controlling a plan, even if he or she is not named as a fiduciary in the plan agreement.  Thus, ERISA "defines 'fiduciary' not in terms of formal trusteeship, but in functional terms of control and authority over the plan."  *Mertens v. Hewitt Assocs.*, 508 U.S. 248, 262 (1993).  "Congress intended ERISA's definition of fiduciary to be broadly construed."  *LoPresti v. Terwilliger*, 126 F.3d 34, 40 (2d Cir. 1997) (quotation omitted).

ERISA fiduciaries have a number of fiduciary duties.  An ERISA fiduciary has a duty of loyalty, which means that he must "discharge his duties with respect to a plan solely in the interest of the participants and beneficiaries."  29 U.S.C. § 1104(a)(1).  An ERISA fiduciary has a duty of prudence, which means that he must act "with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims."  *Id.* § 1104(a)(1)(B).  And an ERISA fiduciary must act "in accordance with the documents and instruments governing the plan

12

insofar as such documents and instruments are consistent with" certain ERISA provisions.  *Id.* § 1104(a)(1)(D).

ERISA also requires fiduciaries to manage fund assets "by diversifying the investments of the plan so as to minimize the risk of large losses," *id.* § 1104(a)(1)(C), although the diversification requirement does not apply to a plan that qualifies as an "eligible individual account plan" ("EIAP"), *id.* §§ 1104(a)(2), 1107(d)(3)(A).  For EIAPs—such as the Plans here—"the diversification requirement . . . and the prudence requirement (only to the extent that it requires diversification) . . . is not violated by acquisition or holding of qualifying employer real property or qualifying employer securities."  *Id.* § 1104(a)(2).

Here, Count I alleges that defendants breached their duties of prudence and loyalty by offering Citigroup stock as an investment option to Plan participants during the class period.  (Compl. ¶¶ 219, 227.)  It was disloyal and imprudent, plaintiffs maintain, for defendants to continue to offer Citigroup stock when defendants knew, or should have known, that Citigroup stock was an extremely risky investment.  (*Id.*)  Plaintiffs' allegations in Count I fail to state a claim upon which relief can be granted for several reasons.  Those reasons are as follows:

### 1. Defendants Had No Discretion to Eliminate Citigroup Stock as an Investment Option

The "threshold question" in "every case charging breach of ERISA fiduciary duty" is whether the defendant "was acting as a fiduciary (that is, was performing a fiduciary function) when taking the action subject to complaint."  *Pegram v. Herdrich*, 530 U.S. 211, 226 (2000).  Whether an individual was "acting as a fiduciary" depends on whether the individual had discretion over the plan function in question.  *See* 29 U.S.C.

§ 1002(21)(A); *Pegram*, 530 U.S. at 225-26; *Harris Trust & Sav. Bank v. John Hancock*
*Mut. Life Ins. Co.*, 302 F.3d 18, 28 (2d Cir. 2002).

Here, the plain language of the Plan Agreements establishes that no defendant had
discretion to eliminate Citigroup stock from among the investment options offered to
Plan participants.  The Citigroup Plan unambiguously mandates that "the Citigroup
Common Stock Fund *shall be permanently maintained* as an Investment Fund under the
Plan."  (Citigroup Plan § 7.01 (emphasis added).)  The Citibuilder Plan, similarly,
provides that "the Trustee shall maintain . . . the Citigroup Common Stock Fund."
(Citibuilder Plan § 7.01; *see also id.* § 7.09(e) (observing that the Citibuilder Plan's
provisions "mandate the creation and continuation of the Citigroup Common Stock
Fund").  Each Plan also stipulates that the Citigroup Common Stock Fund must hold
Citigroup stock, as each Plan Agreement defines the "Citigroup Common Stock Fund" as
"an Investment Fund comprised of shares of Citigroup Common Stock."  (Citigroup Plan
§ 2.01; Citibuilder Plan § 2.01.)

Therefore, defendants had no discretion whatsoever to eliminate Citigroup stock
as an investment option, and defendants were not acting as fiduciaries, *Pegram*, 530 U.S.
at 226, to the extent that they maintained Citigroup stock as an investment option.
Plaintiffs' breach of fiduciary duty claims in Count I accordingly fail to state a claim
upon which relief can be granted.

> 2.    **The Investment Committee Had No Discretion to Liquidate the
> Citigroup Common Stock Fund for the Purpose of Limiting
> Financial Losses**

Even in the face of explicit Plan language requiring that Citigroup stock had to be
offered as an investment option, plaintiffs argue that there were steps that the Plans'
Investment Committee could have taken—but did not take—to limit the Plans'

investment in Citigroup stock.  The failure to take those steps, plaintiffs contend, constituted a breach of the Investment Committee's fiduciary duties.

First, plaintiffs claim that the Investment Committee could have converted the assets of the Citigroup Common Stock Fund to cash or short-term instruments.  Plaintiffs note that section 2.01 of the Plans provides that the Citigroup Common Stock Fund "may hold cash and short-term investments in addition to shares of Citigroup Common Stock." Plaintiffs note further that, under section 15.02, the Citigroup Common Stock Fund was designed to invest "*primarily*" in Citigroup stock.  In plaintiffs' view, the word "primarily," as opposed to "exclusively," gave Plan fiduciaries discretion to hold assets other than Citigroup stock in the Citigroup Common Stock Fund.  Read in conjunction with section 2.01, plaintiffs contend that the word "primarily" in section 15.02 gave the Investment Committee discretion to convert a substantial portion of the Citigroup Common Stock Fund to cash or short-term assets.

However, plaintiffs' reading of the Plans is untenable in light of the pellucid language in the Plans requiring that the Citigroup Common Stock Fund be "comprised of shares of Citigroup Common Stock."  (Citigroup Plan § 2.01; Citibuilder Plan § 2.01.) Although section 2.01 permits the Citigroup Common Stock Fund to "hold cash and short-term investments . . . in accordance with guidelines prescribed by the Investment Committee," the section establishes two—and only two—purposes for which the Fund may "hold cash and short-term assets": (1) "to permit the orderly purchase of Citigroup Common Stock in a volume that does not disrupt the stock market" and (2) "to pay benefits hereunder."  (*Id.*)  Neither is implicated here.

Furthermore, the language of section 15.02—explaining that the Citigroup Common Stock Fund was "designed to invest *primarily* in Citigroup Common Stock"— did not provide any discretion to the Investment Committee (or to any other Plan fiduciary) to liquidate the Citigroup Common Stock Fund.  Some courts have found that the phrase "designed to invest *primarily* in [employer stock]" gives an ERISA fiduciary discretion to invest an ESOP in assets other than employer stock.  *See In re Ferro Corp. ERISA Litig.*, 422 F. Supp. 2d 850, 859 (N.D. Ohio 2006); *In re Sprint Corp. ERISA Litig.*, 388 F. Supp. 2d 1207, 1220-21 (D. Kan. 2004); *In re Enron Corp. Sec., Derivative & ERISA Litig.*, 284 F. Supp. 2d 511, 670 (S.D. Tex. 2003).  Plaintiffs have cited no case, however, that has made such a finding in the face of the unambiguous Plan language here.  As noted above, section 2.01 unmistakably mandates that the Citigroup Common Stock Fund be "comprised of shares of Citigroup Common Stock," and section 2.01 permits deviations from that mandate "[s]olely in order" to achieve two limited purposes. Plaintiffs' reading of the word "primarily" in section 15.02 is inconsistent with section 2.01 because plaintiffs' reading would allow divestment of Citigroup stock for a third, unauthorized purpose: an attempt to limit the impact of a declining stock price.

There is, instead, only one reading of the word "primarily" in section 15.02 that can be reconciled with the clear language of section 2.01: the Fund was required to hold Citigroup stock and no other assets but was permitted to hold cash and short-term assets *only* for the purpose of paying Plan benefits or permitting Citigroup stock to be purchased in a volume that did not disrupt the market.  Under that, the only plausible reading of section 15.02, the Investment Committee had no discretion to liquidate the Citigroup Common Stock Fund for the purpose of limiting the Plan's financial losses due to a

potential decline in the price of Citigroup stock. The Investment Committee was not, therefore, acting as a fiduciary when it did not liquidate the Citigroup Common Stock Fund, and plaintiffs' allegations regarding the Investment Committee's failure to liquidate do not state a claim upon which relief can be granted.

### 3. The Investment and Administration Committees Had No Discretion to Use "Timing and Frequency" Limitations to Discourage Investment in Citigroup Stock

Plaintiffs also contend that, even if the Citigroup Common Stock Fund was a required investment option, the Investment Committee "had the power to determine the proportions of each participant's accounts that could be invested in the Citigroup Common Stock Fund, including the timing and frequency of the investments (based on recommendations from the Administration Committee)." (Pls.' Mem. in Opp'n 25.) In support of that argument, plaintiffs cite section 7.01, which provides in part:

> Each Participant's Accounts shall be invested in such Investment Funds in the proportions directed by the Participant in accordance with the rules and procedures established by the [Administration] Committee, including but not limited to any timing or frequency limitations approved by the Investment Committee.

(Citigroup Plan § 7.01; Citibuilder Plan § 7.01.) It appears that plaintiffs believe that the Investment and Administration Committees could have approved "timing or frequency limitations" that discouraged investment in Citigroup stock, thereby limiting the Funds' exposure to the stock's declining price. Failure to approve such "timing and frequency" limitations, plaintiffs argue, was a breach of the Investment Committee's fiduciary duties.

That claim is meritless. Given the Plans' edict requiring Citigroup stock as an investment option (*see* Citigroup Plan §§ 2.01, 7.01; Citibuilder Plan §§ 2.01, 7.01), it is nonsensical to suggest that the Plans also gave the Investment Committee or the Administration Committee discretion to discourage investment in Citigroup stock by

means of "timing or frequency limitations." Those "limitations" were meant to ensure the smooth administration of the Plans; there is no indication that the limitations were intended to be used to discourage investment in Citigroup stock. Thus, the language of the Plans shows that neither Committee was "acting as a fiduciary" when it declined to use timing and frequency limitations to discourage investment in Citigroup Stock. Plaintiffs' allegations regarding such limitations, therefore, fail to state a claim upon which relief can be granted.

### 4.    Defendants Had No Duty to Override the Plans' Terms

In addition, plaintiffs claim that, even if the terms of the Plan Agreements required that Citigroup stock be offered as an investment option, defendants had a fiduciary duty to override those terms in order to protect Plan participants from an impending collapse in the price of Citigroup shares.

The Second Circuit has not determined whether there are circumstances in which ERISA requires a fiduciary to override plan terms, and there is a split of authority on that issue in other courts. Some district courts have written that "ERISA casts upon fiduciaries an affirmative, overriding obligation to reject plan terms where those terms would require . . . imprudent actions in contravention of the fiduciary duties imposed under ERISA." *Agway, Inc. Employees' 401(k) Thrift Inv. Plan v. Magnuson*, 2006 U.S. Dist. LEXIS 74670, at *58 (N.D.N.Y. July 13, 2006); *see also, e.g.*, *In re Polaroid ERISA Litig.*, 362 F. Supp. 2d 461, 473 (S.D.N.Y. 2005). Other district courts, however, have written that "where a plan's settlor mandates investment in employer securities, the plan fiduciaries are 'immune from judicial inquiry' related to such investments, essentially because they are implementing the intent of the settlor." *Urban v. Comcast Corp.*, 2008 WL 4739519, at *12 (E.D. Pa. 2008) (quoting *Moench v. Robertson*, 62 F.3d 553, 571

(3d Cir. 1995)); *see also, e.g.*, *Graden v. Conexant Sys., Inc.*, 574 F. Supp. 2d 456, 462 (D.N.J. 2008)

  Here, this Court holds that neither the Investment Committee nor any other Plan fiduciary had a duty to override the Plans' mandate that Citigroup stock be offered as an investment option.  Not only does that holding accord with traditional principles of trust law, but it is consistent with ERISA's language, structure, and purpose.

Although ERISA is a "comprehensive and reticulated statute" which "should not be supplemented by extratextual remedies" and "common-law doctrines," the common law of trusts "may offer a 'starting point' for analysis" as long as it is not "inconsistent with the language of the statute, its structure, or its purposes."  *Hughes Aircraft*, 525 U.S. at 447 (quotations and citations omitted); *Harris Trust & Sav. Bank v. Salomon Smith Barney Inc.*, 530 U.S. 238, 250 (2000).  Indeed, "rather than explicitly enumerating *all* of the powers and duties of trustees and other fiduciaries, Congress invoked the common law of trusts to define the general scope of their authority and responsibility."  *Cent. States, Se. & Sw. Areas Pension Fund  v. Cent. Transp., Inc.*, 472 U.S. 559, 570 (1985).  Consequently, the Supreme Court has recognized that ERISA's fiduciary duties "draw much of their content from the common law of trusts."  *Varity Corp. v. Howe*, 516 U.S. 489, 496 (1996) (citing *Cent. States*, 472 U.S. at 570).

  As a "starting point," therefore, it is worth noting that common law trustees must follow trust terms that mandate investment in specified assets.  Trustees have "a duty to administer the trust . . . in accordance with the terms of the trust" and, in particular, "a duty to conform to the terms of the trust directing or restricting investments by the trustee."  Restatement (Third) of Trusts §§ 76(1), 91(b) (2007).  "The terms of the trust

may limit the trustee's investment authority in various ways," and unless those

limitations are unlawful, impossible, or abrogated by a court, they are "legally

permissible and are ordinarily binding on the trustee in managing the trust assets, thus

often displacing the normal duty of prudence." *Id.* § 91 cmt. e.

     Those precepts of trust law are relevant here, for at least in the context of EIAPs

and ESOPs, a fiduciary obligation to adhere to a plan's mandates regarding company

stock is not "inconsistent with the language of [ERISA], its structure, or its purposes."

*Hughes Aircraft*, 525 U.S. at 447.[3]  The language of ERISA provides that

> a fiduciary shall discharge his duties with respect to a plan . . . in accordance with the documents and instruments governing the plan insofar as such documents and instruments are consistent with the provisions of [ERISA, 29 U.S.C. §§ 1001-1191c, 1301-1461].

29 U.S.C. § 1104(a)(1), (a)(1)(D).  Accordingly, if an ERISA plan mandates that

employer stock be offered as an investment option, plan fiduciaries are required to follow

that mandate as long as it is consistent with ERISA's other provisions.  At least for

EIAPs and ESOPs, investment in employer stock *is* consistent with ERISA's other

provisions, as ERISA explicitly contemplates that EIAPs and ESOPs will invest in

employer stock, *see* § 1107(d)(3), (5)-(6), and do so without diversifying, *see id.*

§ 1104(a)(2).  Those textual markers strongly suggest that an EIAP or an ESOP may,

consistent with ERISA, *require* that employer stock be offered to participants as an

---

[3] The relevance of trust law is not, however, unlimited.  The Court recognizes, for example, that if an investment limitation would frustrate the purpose of the trust, a trustee may petition a court to modify the trust.  *See* Restatement (Third) of Trusts § 66; *see also id.* § 91 cmt. e.  In some circumstances, "the trustee may have a duty to apply to the court for permission to deviate from the terms of the trust."  *Id.* § 91 cmt. e (citing *id.* § 66(2) & cmt. e).  Those concepts are not present in ERISA.

investment option.  Such a requirement, therefore, is a plan term that fiduciaries should be compelled to follow.[4]

Not only does the language of ERISA support that conclusion, but the structure of ERISA does so as well.  If fiduciaries were to override an EIAP's mandates about employer stock, they would, in effect, be *amending* the plan, as they would be altering the plan design as set forth in the plan agreement.  ERISA requires that every plan "provide a procedure for amending such plan, and for identifying the persons who have authority to amend the plan."  29 U.S.C. § 1102(b)(3).  Thus, ERISA's structure requires that *those* persons—the persons a plan identifies pursuant to subsection 1102(b)(3)—are the ones who may amend a plan if amendment is necessary.  There is no indication that fiduciaries such as the Investment Committee—named pursuant to subsection 1102(a), not subsection 1102(b)(3)—have a separate authority to amend the plan by overriding plan terms, let alone any *duty* to do so.

Moreover, amending an ERISA plan is a settlor function, and ERISA assigns no fiduciary duties to sponsors when they "adopt, modify, or terminate" ERISA plans. *Hughes Aircraft*, 525 U.S. at 443.  Insofar as overriding plan terms is the equivalent of amending a plan, imposing a duty on fiduciaries to override plan terms would be the equivalent of imposing a duty on plan sponsors to amend a plan.  That, of course, is contrary to ERISA's structure, which assigns duties (and thus potential liability) to fiduciaries, but no duties (and thus no potential liability) to sponsors.  *See id.*

---

[4] The complaint alleges, "upon information and belief," that the Plans do "not satisfy all of the statutory and regulatory mandates with respect to the ESOP or EIAP design and/or operation."  (Compl. ¶ 90.) Plaintiffs have not, however, pleaded any facts in support of that conclusory allegation, and thus plaintiffs have failed to state that claim.

Finally, not only do the language of ERISA and the structure of ERISA demonstrate that fiduciaries should be required to adhere to an EIAP's mandate that employer stock be offered as an investment option, but the purpose of ERISA does so as well. One of Congress's goals in passing ERISA was "safeguarding the interests of participants in employee benefit plans." *Moench*, 62 F.3d at 569 (quotation omitted). But Congress has also "repeatedly expressed its intent to encourage the formation of [EIAPs and][5] ESOPs by passing legislation granting such plans favorable treatment," and Congress has "warned against judicial and administrative action that would thwart that goal." *Id.*; *see also Kirschbaum v. Reliant Energy, Inc.*, 526 F.3d 243, 253 (5th Cir. 2008) ("Congress has expressed a strong preference for plan investment in employer's stock, although this preference may be in tension with ERISA's general fiduciary duties.") A provision in an EIAP or an ESOP requiring that employer stock be offered as an investment option is patently in line with Congress's goal of encouraging employee stock ownership. It would "thwart" that goal to hold a fiduciary liable for adhering to such a plan provision.

---

[5] Much of the caselaw in this area addresses ESOPs in particular, not just EIAPs in general. Nevertheless, nearly all of the points made about ESOPs apply equally to EIAPs. The Third Circuit explained:

> Because one of the purposes of EIAPs is to promote investment in employer securities, they are subject to many of the same exceptions that apply to ESOPs. *See Wright v. Oregon Metallurgical Corp.*, 360 F.3d 1090, 1094 (9th Cir. 2004). For example, § 1104(a)(2) provides that all EIAPs, not just ESOPs, are exempt from ERISA's duty to diversify: "In the case of an *eligible individual account plan* . . . the diversification requirement . . . and the prudence requirement (only to the extent that it requires diversification) . . . is not violated by acquisition or holding of . . . qualifying employer securities." 29 U.S.C. § 1104(a)(2) (emphasis added). And § 1108(e)(3)(A) states that ERISA's prohibitions against dealing with a party in interest or self-dealing "shall not apply to the acquisition or sale by a plan of qualifying employer securities . . . if the plan is an *eligible individual account plan*." 29 U.S.C. § 1108(e)(3)(A) (emphasis added). Consequently, EIAPs, like ESOPs, "place employee retirement assets at much greater risk" than traditional ERISA plans. *Wright*, 360 F.3d at 1097 n.2.

*Edgar v. Avaya, Inc.*, 503 F.3d 340, 347 (3d Cir. 2007).

EIAPs and ESOPs are "not intended to guarantee retirement benefits." *Moench*, 62 F.3d at 568. The purpose of EIAPs and ESOPs is to give employees an ownership interest and thus a stake in the financial successes—and failures—of the companies for which they work. *See Steinman v. Hicks*, 352 F.3d 1101, 1103 (7th Cir. 2003) (clarifying that ESOPs were not "intended to replace traditional pension arrangements" but rather were "intended to promote the ownership, partial or complete, of firms by their employees"). The Third Circuit explained:

> Employee stock ownership plans are designed to invest primarily in qualifying employer securities. Thus, unlike the traditional pension plan governed by ERISA, ESOP assets generally are invested in securities issued by the plan's sponsoring company. In keeping with this, ESOPs, unlike pension plans, are not intended to guarantee retirement benefits, and indeed, by its very nature an ESOP places employee retirement assets at much greater risk than does the typical diversified ERISA plan.

*Moench*, 62 F.3d at 568 (quotations, citations, and alterations omitted); *see also Edgar v. Avaya, Inc.*, 503 F.3d 340, 347 (3d Cir. 2007) (noting that EIAPs "'place employee retirement assets at much greater risk' than traditional ERISA plans" (quoting *Wright v. Oregon Metallurgical Corp.*, 360 F.3d 1090, 1094 (9th Cir. 2004)). Thus, if the price of employer stock collapses and the value of an EIAP or an ESOP declines, it is a natural result of the plan's design. No fault would lie with the plan's fiduciaries, who were adhering to the mandatory terms of a plan that was designed not to guarantee income but to encourage employee stock ownership.

Plaintiffs vigorously dispute that reasoning. They argue that the terms of an ERISA plan are void insofar as they eviscerate a fiduciary's duty of prudence. Plaintiffs note that, under ERISA, "any provision in an agreement or instrument which purports to relieve a fiduciary from responsibility or liability for any responsibility, obligation, or duty . . . shall be void as against public policy." 29 U.S.C. § 1110(a). Thus, according to

23

plaintiffs, if an EIAP or an ESOP mandates that employer stock be offered as an investment option, and if employer stock becomes an imprudent investment, then a fiduciary's duty of prudence would trump the plan's mandate, and the fiduciary would be duty-bound to override the plan's terms and divest the plan of its now-imprudent investment in employer stock.

Plaintiffs' analysis, however, is at odds with ERISA's provisions regarding EIAPs and ESOPs. An EIAP or an ESOP that mandates that employer stock be offered as an investment option is hardly an attempt to "relieve a fiduciary from responsibility or liability." Instead, when a plan mandates that employer stock be offered as an investment option, it follows a clear statutory path, laid out by Congress, to encourage employee stock ownership. *See id.* §§ 1104(a)(2), 1107(d)(3), (5)-(6); *cf. Steinman*, 352 F.3d at 1103 ("Since the very purpose of an ESOP is to give employees stock in the employer, it would be anomalous if the ESOP's trustees were required to sell most of the stock donated by the employer in order to create a diversified portfolio of stocks.")

Furthermore, under plaintiffs' interpretation of ERISA, plan fiduciaries could find themselves in a confusing, untenable position, as they would be required to make a perilous choice if the price of employer stock falters. Under plaintiffs' interpretation of ERISA, even if a plan's terms required that employer stock be offered as an investment option, fiduciaries would have a duty to override those terms if the employer stock became an imprudent investment. As the price of employer stock declined, fiduciaries would face two options. On the one hand, the fiduciaries could adhere to the plan's mandate regarding employer stock. In so doing, however, the fiduciaries could face liability for a breach of the duty of prudence for failing to divest. *Id.* § 1104(a)(1)(B).

On the other hand, the fiduciaries could override the plan's terms and divest the plan of employer stock. That course of action, however, could lead to liability for violating the terms of the plan agreement; if the price of the divested stock rebounded, the fiduciary would almost certainly be sued for having overridden the plan terms. *See id.* § 1104(a)(1)(D).

Thus, under plaintiffs' interpretation of ERISA, fiduciaries would risk liability whether or not they decided to override the plans' terms. *Cf. Kirschbaum*, 526 F.3d at 256 ("A fiduciary cannot be placed in the untenable position of having to predict the future of the company stock's performance. In such a case, he could be sued for not selling if he adhered to the plan, but also sued for deviating from the plan if the stock rebounded."); *Moench*, 62 F.3d at 571-72 ("[C]ourts must recognize that if the fiduciary, in what it regards as an exercise of caution, does not maintain the investment in the employer's securities, it may face liability for that caution, particularly if the employer's securities thrive."). In short, plaintiffs' interpretation of ERISA asks too much of fiduciaries. It requires fiduciaries to be "virtual guarantors of the financial success of the . . . plan." *Moench*, 62 F.3d at 570 (quotation omitted).

The correct interpretation of ERISA simply requires fiduciaries to adhere to a plan's terms regarding employer stock, even if the price of employer stock falls. That interpretation eliminates the Catch-22 faced by fiduciaries under plaintiffs' interpretation. It accords with ERISA's text, which exempts EIAPs from the diversification requirement. It accords with ERISA's structure, which treats plan amendment as a settlor function. And it accords with ERISA's purpose, which is, at least for EIAPs and ESOPs, to encourage employee stock ownership, not to guarantee retirement benefits.

Here, therefore, neither the Investment Committee nor any other fiduciary had discretion to override the Plans' requirement that Citigroup stock be offered as an investment option. For that reason, plaintiffs' breach of fiduciary duty claim—insofar as plaintiffs allege a failure to override the Plans' terms—does not state a claim upon which relief can be granted.[6]

### 5.    Citibank, as Trustee of the Citigroup Plan, Had No Discretion Regarding the Plan's Investment in Citigroup Stock

Citibank was appointed to serve as the trustee of the Citigroup Plan pursuant to a trust agreement. (*See* Trust Agreement, Compl. Ex. C.) Citibank was given a number of discretionary responsibilities (*id.* § 2.2), but when it came to decisions about how to invest the Fund, Citibank was required to follow the directions of the Investment Committee or an Investment Manager appointed by Investment Committee (*id.* § 4.2). *See also* 29 U.S.C. § 1103(a)(1). Citibank's powers were further circumscribed with respect to the Fund's investment in Citigroup Stock, for the Citigroup Plan provided that the "the Trustee *shall maintain*, within the Trust, the Citigroup Common Stock Fund." (Citigroup Plan § 7.01 (emphasis added).)

---

[6] Plaintiffs further allege that the Investment Committee had discretion to override Plan terms because the Plans provided that

> notwithstanding the fact that provisions in the Plan mandate the creation and continuation of the Citigroup Common Stock Fund and provide that certain contributions to the Citigroup Common Stock Fund must remain invested in the Common Stock Fund for certain periods of time, if it is determined that there exists a duty on the part of any person (appointed under this Plan or otherwise) to determine whether such provisions should be modified, such duty shall be that of the Investment Committee.

(Citigroup Plan § 7.09(e); Citibuilder Plan § 7.09(e).) The exact meaning of that provision is unclear, but what is clear is that the provision is *conditional*. The provision applies only "*if* it is determined that there exists a duty on the part of any person (appointed under this Plan or otherwise) to determine whether such provisions should be modified." (*Id.* (emphasis added).) Since it has just been determined that no fiduciary had a duty to override Plan terms—or to "determine whether such provisions should be modified"—the provision does not apply here. Plaintiffs have not, in any event, pleaded that any other person "determined that there exists a duty" as described in section 7.09(e).

It is unclear how plaintiffs believe that Citibank breached its fiduciary duties as the Citigroup Fund's trustee, but Citibank had no discretion to remove Citigroup stock from among the investment options offered to Plan participants. Thus, to the extent that plaintiffs allege any breach of fiduciary duties against Citibank in connection with the Plan's investment in Citigroup stock, those allegations fail to state a claim upon which relief can be granted.

### 6. Plaintiffs Have Failed to Plead a Plausible Claim that Citibank and Citigroup, the Sponsor of the Citibuilder and Citigroup Plans, Respectively, Functioned as De Facto Fiduciaries

Citibank was the sponsor of the Citibuilder Plan, and Citigroup was the sponsor of the Citigroup Plan. Citibank and Citigroup were acting as settlors of trusts, not as ERISA fiduciaries, when they created the Plan terms regarding the Citigroup Common Stock Fund. *See Hughes Aircraft Co.*, 525 U.S. at 443. Thus, plaintiffs cannot bring suit against Citibank and Citigroup for designing the Plans in a manner that mandated the existence of the Citigroup Common Stock Fund.

Instead, plaintiffs have alleged that Citibank and Citigroup functioned as de facto fiduciaries by exerting control of the Plans' investments. With respect to Citibank, the complaint alleges, without explanation, that "in light of" Citibank's "duties, responsibilities, and actions," it was "a *de facto* fiduciary of the Plans." (Compl. ¶ 56.) With respect to Citigroup, the complaint alleges that Citigroup was a de facto fiduciary because it controlled the named fiduciaries:

> Upon information and belief, Citigroup exercised *de facto* authority and control with respect to the *de jure* responsibilities of the Board, Citibank, the Administration and Investment Committees, and/or any other employee fiduciaries, making itself fully responsible for the prudent and loyal fulfillment of the *de jure* responsibilities assigned by the governing Plan documents to those Defendants.

27

(*Id.* ¶ 49.)  The complaint also alleges that, because "Citigroup had the authority and discretion to hire and terminate" its "officers and employees," "Citigroup had, at all applicable times, effective control over the activities of its officers and employees, including over their Plan related-activities."  (*Id.* ¶ 50.)

Those allegations are insufficient to state a plausible claim that either Citigroup or Citibank was a de facto fiduciary.  With respect to Citibank, Plaintiffs' allegations are entirely conclusory.  With respect to Citigroup, the only "heft" plaintiffs have added to their claim, *see Twombly*, 550 U.S. at 557, is the allegation that Citigroup had the authority to hire and fire some of the named fiduciaries.  That fact alone is insufficient to show that Citigroup exerted control over its employees' fiduciary responsibilities, and thus plaintiffs "have not nudged their claims" regarding Citigroup's de facto fiduciary status "across the line from conceivable to plausible."  *Id.* at 570; *Iqbal*, 129 S. Ct. at 1950-51.

### 7.    Offering Citigroup Stock as an Investment Option Was Presumptively Prudent

No defendant had discretion to eliminate Citigroup stock from among the investment options offered to Plan participants.  But even if a defendant did have that discretion, plaintiffs' breach of fiduciary duty claims would fail.  Defendants are entitled to a presumption that offering Citigroup stock as an investment option was prudent, and plaintiffs have been unable to plead facts in support of a plausible claim to overcome that presumption.

In *Moench*, 62 F.3d at 571-72, the Third Circuit set forth a presumption of prudence for an ESOP's investment in employer stock, and in *Avaya*, 503 F.3d at 347, the Third Circuit extended the presumption to cover EIAPs that encourage investment in

employer stock. As an initial matter, it is important to note that *Moench* was "not concerned with a situation in which an ESOP plan in absolute unmistakable terms requires that the fiduciary invest the assets in the employer's securities regardless of the surrounding circumstances." 62 F.3d at 567 n.4. Instead, *Moench* addressed a plan in which the fiduciaries were "not absolutely required to invest in employer securities" but were "more than simply permitted to make such investments." *Id.* at 571. Similarly, *Avaya* addressed an EIAP in which the fiduciaries were not required to invest in Avaya stock but had only "limited discretion not to offer Avaya stock as an investment option." 503 F.3d at 347 n.11.

Nevertheless, *Moench* and *Avaya* implied, but did not hold, that if a plan *were* to require a fiduciary to invest in employer stock, the fiduciary would be entitled to more than just a presumption of prudence: the fiduciary would, in such a case, be "immune from judicial inquiry" for investing in employer stock. *See id.* at 346 (explaining that *Moench* looked to trust law and found that "if the trust 'requires' the trustee to invest in a particular stock, then the trustee is 'immune from judicial inquiry'" (quoting *Moench*, 62 F.3d at 571)); *see also Graden*, 574 F. Supp. 2d at 462; *Urban*, 2008 WL 4739519, at *12. Here, the Citigroup Plans used "unmistakable terms" to require that Citigroup stock be offered as an investment option. Therefore, as discussed above, defendants did not have discretion to eliminate Citigroup stock as an investment option, and in the terms of *Moench* and *Avaya*, defendants are now "immune from judicial inquiry" in connection with the Plans' investments in Citigroup stock.

But even if defendants did have discretion to eliminate Citigroup stock as an investment option, the Plans here encouraged investment in employer stock, and thus the

*Moench* presumption would apply. *See Avaya*, 503 F.3d at 347. *Moench* held that,

because of "the purpose behind ERISA and the nature of ESOPs themselves," an ESOP

fiduciary that decided to invest a fund's assets in employer stock was "entitled to a

presumption that it acted consistently with ERISA by virtue of that decision." 62 F.3d at

571. A plaintiff could "overcome that presumption," *Moench* explained, only "by

establishing that the fiduciary abused its discretion by investing in employer securities."

*Id.*

The Second Circuit has not yet determined whether courts in this Circuit should

apply the *Moench* presumption. *Moench*'s reasoning, however, is persuasive, and

numerous courts have followed it. *See, e.g.*, *Pugh v. Tribune Co.*, 521 F.3d 686, 701 (7th

Cir. 2008); *Kirschbaum*, 526 F.3d at 254; *Kuper v. Iovenko*, 66 F.3d 1447, 1459 (6th Cir.

1995). The presumption, therefore, will be applied here: plaintiffs can plead a breach of

fiduciary duty claim only by alleging facts that, if true, would make it plausible that

offering Citigroup stock as an investment option during the class period constituted an

abuse of discretion.

Plaintiffs object that if the *Moench* presumption applies at all, it should apply only

on a motion for summary judgment, not on a motion to dismiss. It is true that *Moench*

first articulated the presumption in the context of a motion for summary judgment, 62

F.3d at 556, and several courts have held that *Moench* does not apply when evaluating a

Rule 12(b)(6) motion, *see, e.g.*, *Enron*, 284 F. Supp. 2d at 533 n.3; *In re Westar Energy,*

*Inc., ERISA Litig.*, No. 03-4032-JAR, 2005 U.S. Dist. LEXIS 28585, at *71 (D. Kan.

Sept. 29, 2005); *see also Polaroid*, 362 F. Supp. 2d at 475.

Nevertheless, following the Supreme Court's ruling in *Twombly*, 550 U.S. 544, courts have regularly applied *Moench* at the motion-to-dismiss stage, *see Avaya*, 503 F.3d at 349; *In re Bausch & Lomb Inc. ERISA Litig.*, No. 06-CV-6297, 2008 WL 5234281, at *4-6 (W.D.N.Y. Dec. 12 2008); *Graden*, 574 F. Supp. 2d at 462-64; *Halaris v. Viacom, Inc.*, No. 3:06-CV-1646-N, 2008 WL 3855044, at *2 (N.D. Tex. Aug. 19, 2008); *In re Dell, Inc. ERISA Litig.*, 563 F. Supp. 2d 681, 692-93 (W.D. Tex. 2008); *In re RadioShack Corp. ERISA Litig.*, 547 F. Supp. 2d 606, 614 (N.D. Tex. 2008). Joining that trend, this Court will apply the *Moench* presumption in conjunction with defendants' motion to dismiss the complaint in this action. As *Avaya* explained, "if a plaintiff does not plead all of the essential elements of his or her legal claim, a district court is required to dismiss the complaint pursuant to Rule 12(b)(6)," and here there is "no reason to allow this case to proceed to discovery when, even if the allegations are proven true," plaintiffs "cannot establish that defendants abused their discretion." 503 F.3d at 349.

### 8. The Allegations in the Complaint Do Not Establish a Plausible Claim to Overcome the Presumption of Prudence

To overcome the *Moench* presumption on a motion to dismiss, a complaint must contain facts that, if true, would make it plausible that a fiduciary "'could not have believed reasonably'" that "'continued adherence'" to the plan's mandates regarding employer stock "'was in keeping with the settlor's expectations of how a prudent trustee would operate.'" *Id.* at 348 (quoting *Moench*, 62 F.3d at 571). To that end, the complaint "may" contain allegations showing that, "'owing to circumstances not known to the settlor and not anticipated by him,' investing in employer securities 'would defeat or substantially impair the accomplishment of the purposes of the trust.'" *Id.* (quoting *Moench*, 62 F.3d at 571).

In *Moench*, the court remanded the action to the district court to determine, in the first instance, whether the plaintiff had overcome the presumption of prudence. 62 F.3d at 572. Nevertheless, the court suggested that the plaintiff would be able to overcome the presumption by proving, as the plaintiff claimed, that the price of employer stock had suffered a "precipitous decline" and that the plan fiduciaries had had "knowledge of its impending collapse." *Id*. In *Moench*, a "precipitous decline" in stock price meant that the stock lost ninety-eight percent of its value over a two-year period, dropping from $18.25 per share to $0.25 per share. *Id*. at 557. An "impending collapse" meant that "federal regulators informed the company's Board of Directors that they had concerns about the company's financial condition and had uncovered various regulatory violations; the Federal Deposit Insurance Corporation eventually took over control of one of the company's subsidiaries; and, ultimately, the company filed for Chapter 11 bankruptcy." *Avaya*, 503 F.3d at 348 (summarizing *Moench*, 62 F.3d at 557).

While the allegations in *Moench* were, if substantiated, enough to overcome the presumption of prudence, other courts have provided examples of allegations that were *not* enough to overcome the presumption. In *Avaya*, the plaintiff alleged that

> defendants abused their discretion by knowingly or recklessly disregarding the fact that: (1) the cost of integrating a recent corporate acquisition was greater than defendants publicly represented; (2) rather than having a positive financial impact, the acquisition reduced Avaya's earnings by at least $0.06 per share during the 2005 fiscal year; (3) changes to Avaya's method of delivering products to market were causing severe disruptions in sales; and (4) the company was experiencing a dramatic reduction in demand for its products.

*Id.* Although those allegations showed that "Avaya was undergoing corporate developments that were likely to have a negative effect . . . on the value of the company's stock," the court concluded that the drop in stock price—from $10.69 to $8.01 per

share—did not create "the type of dire situation which would require defendants to disobey the terms of the Plans by not offering the Avaya Stock Fund as an investment option." *Id.*

In *Kirschbaum*, the Fifth Circuit provided particularly instructive guidance for courts applying the *Moench* presumption.[7]  526 F.3d at 255-57.  "In contrast to the company-wide failure evidenced in *Moench*," *Kirschbaum* addressed a company whose stock had fallen forty percent.  *Id.* at 255.  That was not enough, *Kirschbaum* held, to show that the company's "viability as a going concern was ever threatened" or that the company's "stock was in danger of becoming essentially worthless."  *Id.*  The court did "not hold that the *Moench* presumption applies only in the case of investments in stock of a company that is about to collapse," but the court emphasized that the *Moench* presumption is a "substantial shield."  *Id.* at 256.  The court explained:

> One cannot say that whenever plan fiduciaries are aware of circumstances that may impair the value of company stock, they have a fiduciary duty to depart from ESOP or EIAP plan provisions.  Instead, there ought to be persuasive and analytically rigorous facts demonstrating that reasonable fiduciaries would have considered themselves bound to divest.  Less than rigorous application of the *Moench* presumption threatens its essential purpose.

*Id.*

Here, plaintiffs allege that Citigroup engaged in "a pattern of risky loan practices" by "marketing, purchasing, and originating subprime loans without adequate considerations of the borrower's ability to pay and with unreasonably high risk of borrower default."  (Compl. ¶ 7.)  Also, plaintiffs allege that Citigroup invested in

---

[7] As in *Moench*, *Kirschbaum* declined "to speculate on the scope of a fiduciary duty to override clear and unequivocal plan terms."  526 F.3d at 255.  Instead, *Kirschbaum* held that even if the defendants "had some discretion to override the Plan, Kirschbaum's allegations fail to rebut the *Moench* presumption of prudence."  *Id.*

mortgage-related securities and took on liabilities associated with mortgage-related credit products.  (*Id.* ¶¶ 130-31.)  Many of those liabilities, plaintiffs claim, were not reflected on Citigroup's balance sheet but were, instead, contained in off-balance-sheet entities called "structured investment vehicles."  (*Id.*  ¶¶ 176, 178, 182.)

      As a result, plaintiffs allege that Citigroup suffered losses totaling tens of billions of dollars when the bottom fell out of the subprime mortgage market.  (*Id.* ¶ 134; *see also* ¶¶ 114-129.)  For example, in the fourth quarter of 2007, the last full quarter of the class period, Citigroup reported a loss of $18.1 billion related to subprime mortgages.  (*Id.* ¶ 134.)  The price of Citigroup's stock, moreover, declined during the class period from a high of $55.70 per share on January 1, 2007 to a low of $26.94 per share on January 15, 2008—a fifty-two percent drop.  (*Id.* ¶ 172.)

      If true, those allegations would constitute evidence supporting the position that Citigroup adopted imprudent and risky business strategies that resulted in substantial losses to the company.  But they would not suggest "the type of dire situation" that would have caused defendants to believe that "'continued adherence'" to the Plans' mandate regarding Citigroup stock was no longer "'in keeping with the settlor's expectations of how a prudent trustee would operate.'"  *Avaya*, 503 F.3d at 348 (quoting *Moench*, 62 F.3d at 571).  For one thing, a fifty-two percent decline in stock price is significant, but courts have held that declines of similar or greater magnitude were *not* enough to overcome the *Moench* presumption.  *See Kirschbaum*, 526 F.3d at 256 (forty percent drop in stock price); *Kuper*, 66 F.3d at 1451, 1459 (eighty percent drop); *Wright*, 360 F.3d at 1096, 1098 (seventy-five percent drop); *In re Duke Energy ERISA Litig.*, 281 F. Supp. 2d

786, 795 (W.D.N.C. 2003) (fifty-five percent drop); *Crowley v. Corning, Inc.*, 234 F.
Supp. 2d 222, 227 (W.D.N.Y. 2002) (eighty percent drop).

Furthermore, the allegations in this action provide "no indication" that, during the
class period, Citigroup's "viability as a going concern was ever threatened."
*Kirschbaum*, 526 F.3d at 255.  In absolute terms, Citigroup's losses were substantial—the
company lost tens of billions of dollars during the class period.  (Compl. ¶ 134.)  But for
what plaintiffs acknowledge as the "world's largest bank by revenue" (*id.* ¶ 23), the
losses were not cataclysmic.  Citigroup was a mammoth corporation with hundreds of
billions of dollars of market capitalization.  (*Id.* ¶¶ 134, 173.)  As of the filing of the
complaint, Citigroup employed "approximately 358,000 staff around the world" and held
"over 200 million customer accounts in more than 100 countries."  (*Id.* ¶ 23.)  Thus,
while Citigroup suffered losses during the class period as a result of the collapse of the
subprime mortgage market, the situation was "a far cry from the downward spiral in
*Moench*, and much less grave than facts other courts routinely conclude are insufficient to
rebut the *Moench* presumption."  *Kirschbaum*, 526 F.3d at 255.

Plaintiffs' breach of fiduciary duty allegations are necessarily limited to the class
period, which lasted from January 1, 2007 to January 15, 2008.  Indeed, plaintiffs claim
that defendants breached their fiduciary duties because, "*during the Class Period*, . . .
Defendants continued to offer Citigroup as an investment option for the Plans."  (Compl.
¶ 219 (emphasis added).)  Even assuming that Citigroup deteriorated after the class
period ended (*see* Pls.' Mem. in Opp'n 32), the allegations in the complaint do not
suggest any threat to Citigroup's viability prior to January 15, 2008.  Thus, even if they
are true, the allegations in the complaint do not support a determination that it is plausible

that reasonable fiduciaries would have considered themselves bound to divest the Plans of Citigroup stock during the class period.

For that reason, the allegations in the complaint are insufficient to overcome the presumption that Citigroup stock was a prudent investment. Insofar as plaintiffs allege that defendants breached their fiduciary duties because Citigroup stock was an imprudent investment, plaintiffs fail to state a claim upon which relief can be granted.

### 9. Because Citigroup Stock Was a Prudent Investment, Plaintiffs Fail to Allege that Defendants Breached a Duty to Investigate

The final aspect of Count I is a claim that the Administration and Investment Committees breached their fiduciary duties by failing to investigate whether Citigroup stock was a prudent investment. The complaint alleges numerous "warning flags" that, according to plaintiffs, should have altered the Administration and Investment Committees to the need to investigate whether it was prudent to offer Citigroup stock as an investment option. (Compl. ¶ 189.)

Since the Administration and Investment Committee had no discretion to divest the Plans of Citigroup stock—and since plaintiffs have not, in any event, overcome the presumption that Citigroup stock was a prudent investment—plaintiffs cannot show that a failure to investigate led to any losses to the Plan. *See In re McKesson HBOC, Inc. ERISA Litig.*, 391 F. Supp. 2d 812, 833 (N.D. Cal. 2005) ("[A] plaintiff must show that an investment actually was imprudent before he can state a claim for failing to investigate other investment options."); *see also Wright*, 360 F.3d at 1099. Accordingly, insofar as plaintiffs' breach of fiduciary duty allegations are premised on a failure to investigate, plaintiffs have failed to state a claim upon which relief can be granted.

36

**B.      Count II: Defendants Allegedly Failed to Provide Plan Participants with "Complete and Accurate" Information About Citigroup's Financial Condition**

Count II alleges that the "Communication Defendants"—that is, Citigroup, Prince, and the Administration Committee—breached their ERISA fiduciary duties by "failing to provide complete and accurate information" and by "conveying through statements and omissions inaccurate material information" regarding "the Company and Citigroup stock." (Compl. ¶¶ 231, 237.)  In particular, plaintiffs claim that defendants did not "inform participants of the true magnitude of the Company's involvement in subprime lending" and other investments related to subprime mortgages. (*Id.*) That claim appears to be grounded on two distinct allegations:

First, plaintiffs allege that defendants breached their fiduciary duties through their silence.  That is, plaintiffs maintain that defendants knew of the "true magnitude of the Company's involvement in subprime lending" but failed to disclose what they knew to plan participants. (*See id.* ¶¶ 200, 237.)

Second, plaintiffs allege that, when defendants did communicate to plan participants, they breached their fiduciary duties by providing "materially false and misleading" information. (*Id.* ¶ 197.)

**1.      Defendants Had No Affirmative Duty to Disclose Information About Citigroup's Financial Condition**

Assuming that each of the Communication Defendants had a fiduciary duty to communicate some information to Plan participants, none of the Communication Defendants had a duty to disclose financial information regarding "the Company and Citigroup stock."

The caselaw is clear that *if* an ERISA fiduciary communicates information to plan participants, the fiduciary must be truthful.  *See Varity*, 516 U.S. at 506 ("[L]ying is inconsistent with the duty of loyalty owed by all fiduciaries and codified in . . . 29 U.S.C. 1104(a)(1)." (quotation omitted)); *see also Avaya*, 503 F.3d at 350 ("It is well-established that an ERISA fiduciary may not materially mislead those to whom section 1104(a)'s duties of loyalty and prudence are owed." (quotation omitted)).  But the Second Circuit has not ruled directly on whether an ERISA fiduciary has an affirmative duty to inform plan participants about nonpublic corporate developments that might affect the value of employer stock.

In *Avaya*, the Third Circuit held that the failure of a plan's fiduciaries to "inform Plan participants about several adverse corporate developments" did "not constitute a breach of their disclosure obligations under ERISA."  503 F.3d at 350-51.  Instead, the fiduciaries "fulfilled their duty of disclosure under ERISA by informing Plan participants about the potential risks associated with investment in the Avaya Stock Fund."  *Id.* at 350.  The fiduciaries did not, the court wrote, "have a duty to 'give investment advice' or 'to opine on' the stock's condition."  *Id.* (quoting *Meinhardt v. Unisys Corp.*, 74 F.3d 420, 443 (3d Cir. 1996)).

Furthermore, even though the Second Circuit has not decided the exact issue presented here, the Second Circuit has provided guidance.  In *Board of Trustees of CWA/ITU Negotiated Pension Plan v. Weinstein*, 107 F.3d 139 (2d Cir. 1997), a plan participant claimed that plan administrators had violated ERISA by failing to disclose "actuarial valuation reports" in response to the participant's request.  The Second Circuit observed that section 104(b)(4) of ERISA set forth a precise list of documents that the

administrators were required to provide "'upon written request of any participant or beneficiary.'"  *Id.* at 142 (quoting 29 U.S.C. § 1024(b)(4)).  Examining the definition of the terms on that list, the court concluded that section 104(b)(4) did not require the disclosure of actuarial reports.  *Id.* at 142-46.

The court then addressed the participant's argument that "the Administrators were required to provide him with copies of the actuarial valuation reports pursuant to their general fiduciary duties of loyalty and prudence, set out in ERISA § 404(a)(1)(A)-(D)." *Id.* at 146 (citing 29 U.S.C. § 1104(a)(1)(A)-(D)).  Noting that those "provisions say nothing explicitly about providing documents to participants," the panel found "in the general fiduciary duty provisions of ERISA no basis for requiring disclosure of the actuarial valuation reports."  *Id.* at 146-47 (quotation omitted).  The court reasoned that since it had "concluded that Congress intentionally fashioned § 104(b)(4) to limit the categories of documents that administrators' must disclose on demand of plan participants," it was "inappropriate to infer an unlimited disclosure obligation on the basis of general provisions that say nothing about disclosure."  *Id.* at 147; *see also Weiss v. Cigna Healthcare*, 972 F. Supp. 748, 754 (S.D.N.Y. 1997) (holding that a plan fiduciary was not required to disclose "physician compensation arrangements" because the "general obligations set forth in ERISA § 404 do not refer to the disclosure of information to Plan participants" and had "Congress seen fit to require the affirmative disclosure of physician compensation arrangements, it could certainly have done so in ERISA §§ 101-111").

There are important similarities between the claim rejected by *Weinstein* and the disclosure claim asserted by plaintiffs in this action.  Here, ERISA provided a

"comprehensive set of 'reporting and disclosure' requirements" governing what defendants were required to disclose to Plan participants. *Curtiss-Wright Corp. v. Schoonejongen*, 514 U.S. 73, 83 (1995) (citing 29 U.S.C. §§ 1021-31). Just as the documents sought in *Weinstein* did not fall within the statute's explicit disclosure requirements, plaintiffs can point to no ERISA provision requiring that fiduciaries disclose information bearing on an employer's financial condition.

Rather, like the plan participant in *Weinstein*, 107 F.3d at 146, plaintiffs claim that defendants were required to disclose information about Citigroup's investments "pursuant to their general fiduciary duties of loyalty and prudence." That theory of relief is foreclosed by the reasoning of *Weinstein*, which made clear that it is "inappropriate to infer an unlimited disclosure obligation on the basis of general provisions that say nothing about disclosure." *Id.* at 147. Plaintiffs' failure-to-disclose claim must therefore be dismissed insofar as plaintiffs allege that defendants had an affirmative duty to convey financial information about Citigroup.

That holding is appropriate even though, as *Polaroid*—a district court case— recognized, several courts have determined that an ERISA fiduciary faces "'an affirmative duty to inform when the [fiduciary] knows that silence might be harmful.'" *Polaroid*, 362 F. Supp. 2d at 478 (quoting *Bixler v. Cent. Pa. Teamsters Health & Welfare Fund*, 12 F.3d 1292, 1300 (3d Cir. 1993), and citing *Devlin v. Empire Blue Cross & Blue Shield*, 274 F.3d 76, 87 (2d Cir. 2001); *Krohn v. Huron Mem'l Hosp.*, 173 F.3d 542, 547-48 (6th Cir. 1999); *Eddy v. Colonial Life Ins. Co. of Am.*, 919 F.2d 747, 750-51 (D.C. Cir. 1990)). The distinction centers on the fact that the cases cited in *Polaroid* involved information about plan *benefits*, not information about the financial status of

plan *investments*. When a beneficiary asks a fiduciary whether he or she is eligible for

benefits, "the fiduciary has an obligation to convey complete and accurate information

material to the beneficiary's circumstance . . . even if that information comprises

elements about which the beneficiary has not specifically inquired." *Bixler*, 12 F.3d at

1300 (citing *Eddy*, 919 F.2d at 750); *see also Devlin*, 274 F.3d at 88-89 (addressing a

claim that a fiduciary made "affirmative misrepresentations regarding plan benefits" and

the plan's terms); *Krohn*, 173 F.3d at 548 (addressing a claim that a plan administrator

"breached its fiduciary duty by failing to provide information about [a beneficiary's]

entitlement to long-term disability benefits when her husband requested general

information about the benefits to which she was entitled").

　　　A fiduciary's duty to volunteer information about plan benefits derives

straightforwardly from the fiduciary's obligation to "discharge his duties . . . 'for the

exclusive purpose' of providing *benefits* to them." *Devlin*, 274 F.3d at 88 (quoting 29

U.S.C. § 1104(a)(1)(A)-(B)) (emphasis added). But it is quite another matter to suggest

that a fiduciary must volunteer financial information about companies in which

participants may invest. That would transform fiduciaries into investment advisors, and

as the Third Circuit has written, fiduciaries do "not have a duty to 'give investment

advice' or 'to opine on' the stock's condition." *Avaya*, 503 F.3d at 350 (quoting

*Meinhardt*, 74 F.3d at 443).

　　　Thus, when it comes to information about plan benefits, a fiduciary may have "an

affirmative duty to inform when the [fiduciary] knows that silence might be harmful."

*Polaroid*, 362 F. Supp. 2d at 478 (quotation and citations omitted). After all, ERISA's

fiduciary provisions explicitly require a fiduciary to "discharge his duties . . . for the

exclusive purpose of . . . providing benefits to participants and their beneficiaries."  29

U.S.C. § 1104(a)(1)(A)(i).  But when it comes to financial information about companies

in which participants may invest, it is "inappropriate to infer an unlimited disclosure

obligation on the basis of general provisions that say nothing about disclosure."

*Weinstein*, 107 F.3d at 147.

> ### 2.    Neither Citigroup nor Prince Was "Acting as a Fiduciary" When Making Statements About Citigroup's Financial Condition

Plaintiffs allege that, regardless of whether or not the Communication Defendants

had an affirmative duty to disclose information about Citigroup's financial condition, the

Communication Defendants volunteered misleading information about Citigroup and

thereby violated their fiduciary duty to speak truthfully to Plan participants.

With respect to Citigroup and Prince, plaintiffs allege, upon "information and

belief," that:

- Citigroup and Prince "regularly" provided misleading information about Citigroup's financial condition in "newsletters, memos, letters, the Plans' documents, and/or other Plan related materials."  (*Id.* ¶ 197.)

- "Citigroup representatives from the Company's headquarters" held "mandatory town hall meetings about every three months where they would assemble . . . Plan participants . . . and encourage [them] to invest in Citigroup stock through the Plans."  (*Id.* ¶ 198.)

- Citigroup filed documents with the SEC—"including 8-Ks attaching Citigroup press releases, 10-Qs, and 10-Ks"—that were "materially false and misleading." (*Id.* ¶ 197.)

- Prince signed the misleading SEC filings, and the filings "quoted certain . . . false and misleading statements" that Prince made.  (*Id.*)

- The Plans' Summary Plan Descriptions "directed the Plans' participants to rely on Citigroup's filings with the SEC."  (*Id.*)

All of those communications, plaintiffs claim, were misleading because they "fostered an inaccurately rosy picture of the soundness of Citigroup stock as a Plan investment" and "prevented the Plans' participants from appreciating the true risks presented by investments in Citigroup stock."  (*Id.* ¶ 199.)

If, as plaintiffs claim, a Plan fiduciary volunteered information to participants about Citigroup's financial condition, that fiduciary had a duty to speak truthfully and not to mislead.  *See Varity*, 516 U.S. at 506; *see also In re WorldCom, Inc. ERISA Litigation*, 263 F. Supp. 2d 745, 766 (S.D.N.Y. 2003).  But ERISA's duty to speak truthfully applies only to those who are, in fact, ERISA fiduciaries.  As always, the "threshold question" in "every case charging breach of ERISA fiduciary duty" is whether the defendant "was acting as a fiduciary (that is, was performing a fiduciary function) when taking the action subject to complaint."  *Pegram*, 530 U.S. at 226.  Thus, for plaintiffs to plead breach of fiduciary duty claims based on the allegedly misleading statements of Citigroup or Prince, plaintiffs must first sufficiently allege that each was "acting as a fiduciary (that is, was performing a fiduciary function)" when making the statements at issue.

Citigroup and Prince had only minor responsibilities under the Plans, and none of those responsibilities involved administering the Plans or communicating with Plan participants.  Plaintiffs allege that Citigroup (and Prince, as a Citigroup director) had authority (1) to appoint the members of the Investment and Administration Committees; (2) to appoint the trustee of the Citigroup Plan; and (3) in connection with a dividend reinvestment plan, to direct the trustee to "receive company shares in lieu of cash

dividends." (Compl. ¶¶ 46-48, 57; *see also* Trust Agreement §§ 4.1(n).)[8] Citigroup and

Prince may have had fiduciary duties in connection with those limited responsibilities—

for example, a duty to appoint members of the Investment and Administration

Committees in a prudent and loyal manner. But it is clear from the Plan Agreements that

Citigroup and Prince had no responsibility to communicate with Plan participants. Thus,

even if Citigroup and Prince "regularly" provided Plan participants with misleading

information about Citigroup's financial condition (Compl. ¶ 197), those communications

were not subject to ERISA's duty to speak truthfully. They were, instead, *corporate*

communications from an employer to its employees, not *ERISA* communications from a

fiduciary to participants.

Furthermore, emerging caselaw makes clear that those "who prepare SEC filings

do not become ERISA fiduciaries through those acts" and, "consequently, do not violate

ERISA if the filings contain misrepresentations." *WorldCom*, 263 F. Supp. 2d at 767.

That rule is sensible, as SEC filings are "documents that directors must execute to

comply with a corporation's obligations under federal securities laws." *Id.* at 760. SEC

filings do not, standing alone, have anything to do with ERISA. Thus, if Citigroup filed

"materially false and misleading" 8-Ks, 10-Qs, and 10-Ks (Compl. ¶ 197)—and if Prince

signed those filings knowing them to be false (*id.*)—Citigroup and Prince may have run

afoul of the federal securities laws, but Citigroup and Prince did not violate ERISA.

Plaintiffs contend that this is a case like *Varity*, 516 U.S. 489, where the Supreme

Court held that a corporate officer was "acting as a fiduciary" when the officer spoke to a

---

[8] Plaintiffs also claim that Citigroup exercised "*de facto* authority" over Plan fiduciaries. (Compl. ¶ 49.)
As described above, plaintiffs' allegations in support of that claim are insufficient to meet the pleading
standard set forth in *Twombly*, 550 U.S. at 570, and *Iqbal*, 129 S. Ct. at 1949. *See supra* Subsection II.A.6.

group of employees about how a corporate restructuring would affect the company's ERISA benefit plan.  In *Varity*, the corporation was "both an employer and the benefit plan's administrator," and the corporation had not "authorized only special individuals" to "speak as plan administrators."  *Id.* at 498, 503.  Thus, the Court explained that the corporation could, at various times, wear two "hats," its "'fiduciary,' as well as its 'employer,' hat."  *Id.* at 498.  There were times, the Court wrote, when the corporation communicated with its employees and was "acting only in its capacity as an employer." *Id.*  But when the corporation held a meeting of employees and "*intentionally* connected its statements about [the corporation's] financial health to statements it made about the future of benefits," the corporation was wearing both hats and was thus "acting as a fiduciary."  *Id.* at 503, 505.

Contrary to plaintiffs' contention, this case is not like *Varity*.  Here, unlike in *Varity*, Citigroup was *not* "both an employer and the . . . plan's administrator" and Citigroup *had* "authorized only special individuals" to "speak as plan administrators."  *Id.* at 498, 503.  The Plan Agreements explicitly designated a separate entity—the Administration Committee—to serve as the Plans' administrator:

> The Plan shall be administered by the [Administration] Committee.  The Committee shall be the plan administrator within the meaning of Section 3(16)(A) of ERISA and shall have fiduciary responsibility for the general operation of the Plan.

(Citigroup Plan § 3.01(a); Citibuilder Plan § 3.01(a).)  Thus, this is not a case where the employer wore two hats when speaking to plan participants.  Rather, the unambiguous provisions of the Plan Agreements show that Citigroup had only minor fiduciary responsibilities and no responsibility to administer the Plans or to communicate with Plan participants.  Thus, even if Citigroup held "town hall meetings" and made statements to

Plan participants regarding Citigroup's financial condition (*see* Compl. ¶¶ 197-98),

Citigroup could have been wearing only one hat—its employer hat—when it made those

statements.[9]

As a result, neither Citigroup nor Prince was "acting as a fiduciary" when

communicating with Plan participants regarding Citigroup's financial condition.  Insofar

as plaintiffs' breach of fiduciary duty claims rests on allegations that Citigroup and

Prince violated ERISA's duty to speak truthfully, plaintiffs have failed to state a claim

upon which relief can be granted.

### 3. Plaintiffs Have Failed to Plead a Plausible Claim that the Administration Committee Knew of Citigroup's Alleged Financial Problems

Unlike Citigroup and Prince, there is no doubt that the Administration Committee

was a fiduciary with respect to communications.  As discussed above, the Administration

Committee was the administrator of the Plans, and thus the Administration Committee

was responsible for fulfilling ERISA's numerous disclosure requirements.  *See* 29 U.S.C.

§§ 1021-31.  If the Administration Committee communicated with Plan participants

regarding Citigroup's financial condition, the Committee had a duty to be truthful.

Plaintiffs allege that, like Citigroup and Prince, the Administration Committee

"regularly" provided misleading information about Citigroup's financial condition in

"newsletters, memos, letters, the Plans' documents, and/or other Plan related materials."

(Compl. ¶ 197.)  The complaint, however, provides only one specific example of such

---

[9] Furthermore, plaintiffs fail to allege particularized facts to show that Citigroup and Prince's made any statements that were "*intentionally* connected" to Plan benefits.  *Varity*, 516 U.S. at 504.  For example, plaintiffs contend that when Citigroup and Prince spoke to Plan participants about "Citigroup stock," they were speaking as fiduciaries because Citigroup stock was "the single largest asset of both Plans."  (Compl. ¶ 197; Pls.' Mem. in Opp'n 42.)  That contention is unavailing.  Plaintiffs cannot plead that Citigroup and Prince spoke as fiduciaries without additional factual allegations that Citigroup and Prince "intentionally connected" their statements about "Citigroup stock" to Plan benefits.

communications: plaintiffs claim that the Plans' Summary Plan Descriptions, issued by the Administration Committee, "directed the Plans' participants to rely on Citigroup's filings with the SEC." (*Id.*)

There is caselaw holding that, although those "who prepare and sign SEC filings do not become ERISA fiduciaries through those acts," those "who are ERISA fiduciaries . . . cannot in violation of their fiduciary obligations disseminate false information to plan participants, including false information contained in SEC filings. *WorldCom*, 263 F. Supp. 2d at 766.

Assuming that rule is sound, plaintiffs' claim against the Administration Committee nonetheless fails because the complaint does not contain facts showing that the Administration Committee knew or should have known anything about Citigroup's potential losses related to subprime mortgages. Nor does the complaint contain facts showing that the Administration Committee knew or should have known anything about the allegedly false and misleading information in Citigroup's SEC filings.

The complaint alleges baldly that "the Administration . . . Committee Defendants knew or should have known about Citigroup's massive subprime exposure as a result of their responsibilities as fiduciaries of the Plans." (Compl. ¶ 188; *see also id.* ¶ 185.) The complaint does not, however, provide any facts in support of that allegation. Instead, plaintiffs' allegation that the Administration Committee "knew or should have known" of Citigroup's "massive subprime exposure" is no more than a "'naked assertion[]' devoid of 'further factual enhancement.'" *Iqbal*, 129 S. Ct. at 1949 (quoting *Twombly*, 550 U.S. at 557). Without an allegation that the Administration Committee had any notion that Citigroup's SEC filings were "false and misleading," plaintiffs have failed to state a

claim that the Committee breached its duty to speak truthfully.  *Cf. Crowley*, 234 F. Supp. 2d at 230.

### C.      Count III: Defendants Allegedly Failed to Monitor Plan Fiduciaries

Count III alleges that the so-called "Monitoring Defendants"—Citigroup, Prince, and Rubin—breached their fiduciary duties by failing to monitor the fiduciaries they appointed—the members of the Administration and Investment Committees.  Plaintiffs articulate that claim in different ways, but their allegations boil down to one contention: the Plans "suffered enormous losses as a result of [the Committees'] imprudent actions and inaction with respect to [Citigroup] stock," and thus the Monitoring Defendants must have breached their duty to monitor the Committees by "failing to remove appointees whose performance was inadequate."  (Compl. ¶ 250.)[10]

Several courts have held that the authority to appoint ERISA fiduciaries brings with it a duty to monitor the appointees.  *See Polaroid*, 362 F. Supp. 2d at 477 (collecting cases and noting that an "appointing fiduciary's duty to monitor his appointees is well-established").  But even if the duty to monitor exists, plaintiffs have failed to plead a breach of the duty to monitor here.  Plaintiffs' failure-to-monitor claim rests entirely on plaintiffs' allegation that the Administration and Investment Committees acted imprudently with respect to the Plans' investment in Citigroup stock.  As discussed above, the Committees had no discretion to eliminate Citigroup stock as an investment option and, in any event, investment in Citigroup stock was presumptively prudent.  Thus, plaintiffs have failed to plead a breach of the duty to monitor because plaintiffs

---

[10] Plaintiffs also allege that the Monitoring Defendants breached their duty to monitor by "failing to ensure that the monitored fiduciaries appreciated the true extent of Citigroup's highly risky and inappropriate business practices."  (Comp. ¶ 250.)  That claim will be addressed in connection with Count IV, which makes essentially the same allegations.

have failed to cite any instance of misconduct that the Monitoring Defendants failed to

detect.  *See, e.g.*, *Smith v. Delta Air Lines, Inc.*, 422 F. Supp. 2d 1310, 1333 (N.D. Ga.

2006) ("Plaintiff cannot maintain a claim of failure to monitor when those to be

monitored were acting prudently.").

> **D.**      **Count IV: Defendants Allegedly Failed to Disclose Information to Co-Fiduciaries**

Count IV alleges that the Monitoring Defendants—Citigroup, Prince, and

Rubin—breached their fiduciary duties by failing to provide non-public information

about "the risks posed by investment in [Citigroup] stock" to the Administration and

Investment Committees.  (Compl. ¶¶ 255, 257.)  Plaintiffs claim that the Monitoring

Defendants had a duty to disclose information to the Committees as part of their duty to

monitor appointees and as an independent aspect of their general fiduciary obligations.

(*Id.* ¶¶ 250, 255.)

That claim fails because, as discussed above, the Monitoring Defendants were

fiduciaries only to the extent that they appointed the members of the Administration and

Investment Committees.  Their fiduciary obligations in no way extended to managing the

Plans' investments or to communicating with Plan participants.  To hold that the

Monitoring Defendants had a duty to provide material, non-public information to the

Plans' fiduciaries would extend the Monitoring Defendants' fiduciary responsibilities far

past their limited role as outlined by the Plan Agreement.  Accordingly, plaintiffs'

allegations regarding the Monitoring Defendants' failure to provide information to Plan

fiduciaries do not state a claim upon which relief can be granted.

### E.    Count V: Defendants Allegedly Performed Their Duties with Conflicts of Interest

Count V alleges that all defendants had conflicts of interest—and thus breached their duties of loyalty—because "the compensation and tenure of Defendants were tied to the performance of Citigroup stock and/or the publicly reported financial performance of Citigroup." (Compl. ¶ 264.) A "conflict-of-interest claim" that is "based purely on the fact that Defendants' compensation was stock-based . . . fails to state a claim for breach of fiduciary duty." *Polaroid*, 362 F. Supp. 2d at 479 (citing *WorldCom*, 263 F. Supp. 2d at 768). The allegations here are essentially the same, as plaintiffs claim that defendants' compensation was "tied to the performance of Citigroup stock." That is not enough to plead an actionable conflict of interest.

Count V also alleges that Prince and Rubin breached the ERISA duty of loyalty by selling millions of dollars of Citigroup stock during the class period. (Compl. ¶ 264.) Plaintiffs do not, however, explain how sales of Citigroup stock created any conflict for Prince and Rubin. Accordingly, plaintiffs' conflict-of-interest allegations fail to state a claim upon which relief can be granted.

### F.    Count VI: Defendants Allegedly Face Co-Fiduciary Liability

Count VI brings a claim against all defendants on a theory of "co-fiduciary liability." ERISA provides that

> a fiduciary with respect to a plan shall be liable for a breach of fiduciary responsibility of another fiduciary with respect to the same plan in the following circumstances:
>
> (1) if he participates knowingly in, or knowingly undertakes to conceal, an act or omission of such other fiduciary, knowing such act or omission is a breach;

(2) if, by his failure to comply with section 404(a)(1) in the administration of his specific responsibilities which give rise to his status as a fiduciary, he has enabled such other fiduciary to commit a breach; or

(3) if he has knowledge of a breach by such other fiduciary, unless he makes reasonable efforts under the circumstances to remedy the breach.

29 U.S.C. § 1105(a). Here, plaintiffs have failed to allege a claim of co-fiduciary liability because, as described above, all of plaintiffs' other claims fail. Thus, plaintiffs have not alleged "a breach of fiduciary responsibility of another fiduciary," *id.* § 1105(a), and plaintiff's co-fiduciary claim must be dismissed.

## III.    CONCLUSION

For the reasons set forth above, none of plaintiffs' allegations state a claim upon which relief can be granted. Defendants' motion to dismiss is accordingly granted, and the Clerk of Court is directed to enter judgment for defendants.[11]


Dated: New York, New York
       August 31, 2009


SO ORDERED:

Sidney H. Stein U.S.D.J.

---

[11] The Clerk of Court is directed to enter judgment for defendants in each of the consolidated actions: 07 Civ. 9790, 07 Civ. 10294, 07 Civ. 10341, 07 Civ. 10396, 07 Civ. 10442, 07 Civ. 10458, 07 Civ. 10461, 07 Civ. 10472, 07 Civ. 11156, 07 Civ. 11158, 07 Civ. 11164, 07 Civ. 11207, and 07 Civ. 11369.